**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ x
  UNITED STATES OF AMERICA,             :
                                          :
           Plaintiff,             :       08 Civ. 10223 (NRB) (DFE)
                                            :
      - v -                       :
                                            :
  DANIEL B. KARRON,               :
                                          :
           Defendant.           :
------------------------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2793
Facsimile:  (212) 637-2717
Email:  michael.byars@usdoj.gov

MICHAEL J. BYARS
Assistant United States Attorney
   – Of Counsel –

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND .......................................................................................... 3

    A.  The ATP Cooperative Agreement .................................................. 3

    B.  Karron Obtained ATP Funds for CASI and Then Misapplied Funds
        under CASI's Care, Custody and Control.......................................... 4

    C.  The Criminal Action against Karron................................................ 7

        1.  The Government Charged Karron with Misapplying CASI Funds ........... 7

        2.  At Trial, the Government Presented Ample Evidence That Karron
            Knowingly Misapplied CASI Funds and Fraudulently Concealed that
            Misapplication............................................................................ 7

        3.  The Jury, Charged with Deciding Whether Karron Intentionally
            Misapplied Money under CASI's Care, Custody and Control,
            Convicted Karron of Violating Section 666 ...................................... 8

        4.  The Sentencing Court Found that Karron Had Incurred More than $120,000
            in Inappropriate Expenses............................................................ 9

        5.  Karron's Conviction Has Been Upheld on Appeal and Is Therefore Final ............. 10

    D.  The Civil Action against Karron .................................................... 10

ARGUMENT ............................................................................................. 11

    I.  The Summary Judgment Standard .................................................. 11

    II.  Summary Judgment Is Warranted under the FCA's Statutory Estoppel Provision .......... 12

        A.  The FCA's Statutory Estoppel Provision.......................................... 12

        B.  Elements of Civil Liability under the FCA.......................................... 12

        C.  The FCA's Statutory Estoppel Provision Applies to the FCA Claims
            against Karron in This Action........................................................ 13

    III.  Summary Judgment Is Warranted as to Karron's Liability for Civil Damages under
        Common-Law Collateral Estoppel .................................................. 15

A.    The Principle of Collateral Estoppel........................................................................15

B.    Application of Common Law Collateral Estoppel Is Warranted Based on the Record
      from the Criminal Action ........................................................................................15

IV. Karron Is Liable for Damages Trebling the Amount CASI Received from the ATP and
    For Civil Penalties for Each of Karron's False Reports and Certifications......................17

A.    The Appropriate Calculation of Karron's Civil Damages Is Three Times the Full
      Amount CASI Received from the ATP under the Cooperative Agreement.............18

B.    Karron Also Is Liable for Civil Penalties ................................................................24

CONCLUSION  .....................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE**

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ................................................................................11

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ................................................................................11

*Cook County v. United States ex rel. Chandler*,
 538 U.S. 119 (2003) ...........................................................................17, 25

*Emich Motors Corp. v. Gen. Motors Corp.*,
 340 U.S. 558 (1951) ................................................................................13

*Henke v. U.S. Dep't of Commerce*,
 83 F.3d 1445 (D.C. Cir. 1996) ................................................................2

*Morse Diesel Int'l, Inc. v. United States*,
 79 Fed. Cl. 116 (2007) ............................................................................17

*NLRB v. Thalbo Corp.*,
 171 F.3d 102 (2d Cir. 1999) ...................................................................15

*Rock Island, Ark. & La. R.R. Co. v. United States*,
 254 U.S. 141 (1920) ................................................................................17

*Stichting Ter Behartiging Van de Belangen Van Oudaandeel-houders In Het Kapitaal Van Saybolt International B.V. v. Schreiber*,
 327 F.3d 173 (2d Cir. 2003) ...................................................................15

*United States ex rel. Antidiscrimination Ctr. of Metro New York v. Westchester County*,
 No. 06-CV-2860 (DLC), 2009 WL 1108517 (S.D.N.Y. Apr. 24, 2009) .................... 21, 22

*United States ex rel. Compton v. Midwest Specialties, Inc.*,
 142 F.3d 296 (D.C. Cir. 1998) ................................................................18

*United States ex rel. Feldman v. Van Gorp*,
 No. 03-CV-8135 (WHP), 2010 WL 1948592 (S.D.N.Y. May 3, 2010) ...............20, 21, 22

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
 352 F.3d 908 (4th Cir. 2003) ..................................................................24

*United States ex rel. Kirk v. Schindler Elevator Corp.*,
 601 F.3d 94 (2d Cir. 2010) ......................................................................10

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
 985 F.2d 1148 (2d Cir. 1993) ..................................................................24

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
    575 F.3d 458 (5th Cir. 2009) ................................................................... *passim*

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
    530 F.Supp.2d 888 (S.D. Tex. 2008) ...............................................................24

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) ...............................................................................18

*United States ex rel. Mikes v. Straus*,
    274 F.3d 687 (2d Cir. 2001) ....................................................................12

*United States ex rel. Miller v. Bill Harbert Int'l Constr. Inc.*,
    No. 95-1231 (RCL), 2007 WL 851857 (D.D.C. Mar. 14, 2007) ......................................14

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
    501 F. Supp. 2d 51 (D.D.C. 2007) ..............................................................25

*United States ex rel. Resnick v. Weill Med. Coll. of Cornell Univ.*,
    No. 04-CV-3088 (WHP), 2009 WL 637137 (S.D.N.Y. Mar. 5, 2009) .......................18, 24

*United States v. Bornstein*,
    423 U.S. 303 (1976) ...............................................................................25

*United States v. Convalescent Trans., Inc.*,
    No. 4:03-CV-32-FL, 2007 WL 2090210 (E.D.N.C. July 19, 2007) ................................13

*United States v. Diamond*,
    657 F. Supp. 1204 (S.D.N.Y. 1987) ..............................................................15

*United States v. Grossman*,
    No. 01-CV-603 (NRB), 2002 WL 1349749 (S.D.N.Y. June 20, 2002) ............................17

*United States v. Karron*,
    348 Fed. App'x 632 (2d Cir. 2009) ........................................................2, 10, 13

*United States v. Lamanna*,
    114 F. Supp. 2d 193 (W.D.N.Y. 2000) ...........................................................12

*United States v. Mackby*,
    339 F.3d 1013 (9th Cir. 2003) .................................................................17, 18

*United States v. Peters*,
    927 F. Supp. 363 (D. Neb. 1996) ...............................................................16

*United States v. Pimentel*,
    No. 86 Civ. 2113(WK), 1999 WL 504906 (S.D.N.Y. July 15, 1999) .............................17

*United States v. Rogan*,
    517 F.3d 449 (7th Cir. 2008) ................................................................ *passim*

*United States v. Sci. Applications Int'l Corp.*,
    653 F. Supp. 2d 87 (D.D.C. 2009) ...................................................................24

*United States v. TDC Mgmt.*,
    288 F.3d 421 (D.C. Cir. 2002) ..........................................................19, 22, 23

*United States v. Woodbury*,
    359 F.2d 370 (9th Cir. 1966) ...................................................................18

**Statutes and Rules**

15 U.S.C. § 278n (2007) ........................................................................................3

18 U.S.C. § 666 ............................................................................................ *passim*

18 U.S.C. § 981(a)(1)(C) ......................................................................................2

21 U.S.C. § 853(p) ...............................................................................................2

28 U.S.C. § 2461 ...............................................................................................2

31 U.S.C. § 3729(a)(1) ...............................................................................10, 11, 14

31 U.S.C. § 3729(a)(2) ...................................................................................10, 12

31 U.S.C. § 3729(a)(3) .......................................................................................10

31 U.S.C. § 3729(a)(1)(B) ...........................................................................10, 12, 14

31 U.S.C. § 3729(b)(4) ......................................................................................13

31 U.S.C. § 3731(e) .....................................................................................3, 12, 13

31 U.S.C. § 6303(1) ...........................................................................................1

31 U.S.C. § 6304(2) ...........................................................................................2

31 U.S.C. § 6305(1) ...........................................................................................2

31 U.S.C. § 6305(2) ...........................................................................................2

Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, § 5131 ................................3

America Creating Opportunities to Meaningfully Promote Excellence in Technology,
    Education, and Science Act, Pub. L. 110-69, Title III, § 3012(b) .........................................1

Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, § 4(f) .........................................10

Fed. R. Civ. P. 56(c) ...................................................................................................................1, 11

Fed. R. Civ. P. 56(c)(2) ......................................................................................................................11

Fed. R. Civ. P. 56(e)(2) ......................................................................................................................11

**Regulations and Sentencing Guidelines**

15 C.F.R. § 14.25(c) .............................................................................................................................. 5

15 C.F.R. § 295.1(a) ......................................................................................................................4, 22

15 C.F.R. § 295.1(b) ............................................................................................................................4

15 C.F.R. § 295.8 ..........................................................................................................................4, 22

28 C.F.R. § 85.3(a)(9) .......................................................................................................................25

55 Fed. Reg. 30140 (July 24, 1990) ...........................................................................................3, 4, 22

U.S.S.G. § 2B1.1(b)(1) ........................................................................................................................9

Plaintiff the United States of America (the "Government"), by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure (the "Motion"). The Motion seeks a judgment holding defendant Daniel B. Karron ("Karron") liable under the False Claims Act (the "FCA"), 31 U.S.C. § 3729 *et seq.*, for (i) damages in the amount of three times the total amount of the funds Karron drew down from the Advanced Technology Program ("ATP") of the United States Department of Commerce ("Commerce") and (ii) penalties for twenty false statements made by Karron in obtaining these funds.

## PRELIMINARY STATEMENT

In this action, the Government seeks statutory damages and penalties under the FCA, as well as remedies under common law, for Karron's misconduct in connection with funding that Karron obtained through a cooperative agreement with the ATP (the "Cooperative Agreement").[1] The purpose of the ATP was to encourage high-risk and potentially high-reward projects using cutting-edge technology, such as Karron's proposed application of certain mathematics concepts to medical uses. The ATP's use of a cooperative agreement here is particularly relevant to the issue of the proper amount of damages because, among other things, it reflects that the ATP anticipated that Commerce would want to be substantially involved in Karron's project and that Karron's project would not directly benefit the Government, but rather could result in a public benefit if the project succeeded.[2]

---

[1] The ATP program was replaced by the Technology Innovation Program in 2007. *See* America Creating Opportunities to Meaningfully Promote Excellence in Technology, Education, and Science Act, Pub. L. 110-69, Title III, § 3012(b) (the "America COMPETES Act").

[2] Unlike a procurement contract, where "property or services [are acquired] for the *direct benefit or use* of the United States Government," 31 U.S.C. § 6303(1) (emphasis added), a cooperative agreement contemplates no such "direct benefit or use" by the federal government,

Karron was to administer the research project through Computer Aided Surgery, Inc. ("CASI"), a New York limited liability corporation of which Karron was the President, Chief Technical Officer and 90% shareholder.  Karron, however, spent CASI funds on items that had nothing to do with the Cooperative Agreement and were not authorized thereunder, submitted numerous false reports to the ATP, falsely drew down ATP funds and falsely claimed that CASI had contributed cost-share funds required under the terms of the Cooperative Agreement.  From October 1, 2001 until June 27, 2003, when Commerce officials shut down the project, Karron drew down $1,345,500 in ATP funds.

In a related criminal proceeding, Karron was charged with one count of knowing misapplication of federal funds toward the payment of unauthorized expenses, in violation of 18 U.S.C. § 666, and a forfeiture allegation seeking forfeiture of all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, or under the substitute asset provisions of 21 U.S.C. § 853(p).  *See United States v. Karron*, No. 07-CR-541 (RPP).  Those charges were based on the same conduct at issue in this action – Karron's misapplication of CASI funds in violation of the Cooperative Agreement and Karron's false certifications regarding the true application of CASI funds that Karron made to obtain funds from the ATP.  On June 11, 2008, a jury found Karron guilty of violating Section 666.  *See United States v. Karron*, 348 Fed. App'x 632, 632-33 (2d Cir. 2009) (affirming conviction).  In reaching its verdict, the jury found, beyond a reasonable

---

but instead that the recipient will "carry out *a public purpose of support or stimulation*."  *Id.* § 6305(1) (emphasis added).  Unlike a grant agreement, a cooperative agreement is used where the Government anticipates "substantial involvement" of a federal agency in the project. *Compare id.* § 6304(2) *with id.* § 6305(2).  *See also Henke v. U.S. Dep't of Commerce*, 83 F.3d 1445, 1451 n.7 (D.C. Cir. 1996) ("The choice between a grant and a cooperative agreement . . . turns on the anticipated level of agency involvement with the recipient during the performance period:  if the agency anticipates substantial involvement, the agency is to use a cooperative agreement; if the agency anticipates limited involvement, the agency is to use a grant.").

doubt, that Karron had knowingly misapplied CASI funds in violation of the Cooperative Agreement.

Karron's criminal conviction precludes Karron from contesting civil liability for this fraudulent conduct.  The Government is entitled to judgment on its two FCA claims as a matter of law under the FCA's collateral estoppel provision, 31 U.S.C. § 3731(e), which expressly bars Karron from denying here "the essential elements of the offense" for which he was convicted. The Government also is entitled to summary judgment under the common-law doctrine of collateral estoppel because Karron has been convicted of criminal charges presenting the same factual issues as those in this action following a full and fair trial.

Moreover, the Government is entitled to summary judgment as to the amount of damages.  Karron failed to conduct the promised research according to the terms of the Cooperative Agreement and concealed his non-compliance from the ATP, thereby vitiating the purpose of the Cooperative Agreement.  Karron thus cannot be said to have provided the Government with the benefit it bargained for to offset, even in part, the Government's loss of the funds it disbursed to CASI.  Accordingly, the Government is entitled to a civil judgment for treble the full amount Karron drew down from the ATP – *i.e.*, $4,036,500 in trebled damages – less any restitution paid.  The Government is also entitled to a civil penalty in an amount ranging from $5,500 to $11,000 for each of twenty false statements made by Karron to obtain ATP funds – *i.e.*, a total of from $242,000 to $484,000 in penalties.

## BACKGROUND

### A.  The ATP Cooperative Agreement

NIST's ATP program was authorized by section 5131 of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, and implemented in 1990.  *See* 55 Fed. Reg. 30140 (July 24, 1990).  *See also* 15 U.S.C. § 278n (2007) (statutory authorization for the ATP

program).  ATP regulations explain that "[t]he purpose of the [ATP] is to assist[] United States

businesses to carry out research and development on high risk, high pay-off, emerging and

enabling technologies."  15 C.F.R. § 295.1(a).  More specifically, these technologies are:

> (1)  High risk, because the technical challenges make success
> uncertain;
>
> (2)  High pay-off, because when applied they offer significant
> benefits to the U.S. economy; and
>
> (3)  Emerging and enabling, because they offer wide breadth of
> potential application and form an important technical basis for
> future commercial applications.

*Id.*  Under the ATP, intellectual property rights arising from research generally vest in the

recipient of the funding.  *See* 15 C.F.R. § 295.8; *see also* 55 Fed. Reg. 30140, 30143 ("ATP

funding recipients will normally be granted the right to take ownership to these inventions.").

The ATP regulations also contemplate that the program will "employ[] cooperative

agreements rather than grants because such agreements allow ATP to exercise appropriate

management oversight of projects and also to link ATP-funded projects to ongoing R & D at the

National Institute of Standards and Technology wherever such linkage would increase the

likelihood of success of the project."  15 C.F.R. § 295.1(b).

**B.  Karron Obtained ATP Funds for CASI and Then Misapplied Funds under CASI's
Care, Custody and Control**

On or about July 6, 2001 and August 6, 2001, Karron, the holder of a Ph.D. and an M.S.

from New York University, submitted a two-part ATP proposal to Commerce on behalf of CASI

entitled "Anatomic Computer Modeling for Precise and Accurate Therapies" (together, the

"Proposal").  *See* Rule 56.1 Statement ("R. 56.1") ¶ 5.  Karron signed the Proposal as CASI's

"Authorized Company Representative."  *See id.* ¶ 6.  According to the Proposal, CASI would

> develop a new computer application server that will take
> calibrated, encrypted raw images from a client['s] medical imaging
> instrumentation (MRI, CT, Ultrasound, etc.), over the Internet.

> Our system will rapidly generate encrypted, precise, accurate, and
> variable resolution three dimensional tiled models applicable for
> diverse applications as radiation therapy, surgical planning,
> intraoperative guidance, rapid manufacturing of prosthesis,
> verification of surgical results, robotic surgery trajectory planning,
> patient communication, education and other customer specific
> applications[.]  The novel idea[] that enables this technological
> leap forward is Digital Morse Theory (DMT).

*Id.* ¶ 7.  The Proposal included an estimated three-year budget that, as later revised, projected CASI's costs at $2,110,500, with $2,000,000 of that expected to come from the ATP, specifically $800,000 in year one, and $600,000 in each of years two and three.  *See id.* ¶¶ 8-10.

The Proposal specified that CASI would subcontract with the City University of New York's Institute for Software Design and Development ("CUNY") to draw upon "the expected unique contribution of the faculty, visiting scientists, and PhD graduate students."  *Id.* ¶¶ 11-12. The total amount of the subcontract with CUNY was to be $420,000.  *See id.* ¶ 11.  The Proposal listed fourteen "team members," naming Professors Wolberg and Cox as "Core Members" along with Karron.  *Id.* ¶¶ 13-14.  The Proposal also noted the potential for the project to yield widespread economic and social benefits, including through the creation of new markets, improvement of medical treatments, and reduction of medical costs, employee sick leave, medical malpractice litigation and insurance costs.  *See id.* at ¶ 15.

In October 2001, the ATP notified Karron that his Proposal had been approved.  *See id.* ¶ 16.  Karron then signed the Financial Assistance Award, designated as a "cooperative agreement," indicating he would comply with various regulations, including 15 C.F.R. Part 14 and 48 C.F.R. Part 31,[3] as well as other standard provisions and special conditions.[4]  *See id.* 17.

---

[3] The regulations include a requirement that recipients of awards obtain written authorization for any revisions of the program and budget plans in certain circumstances, including: a "[c]hange in the scope or the objective" of the program; a "[c]hange in a key person specified in the application or award document;" and the "inclusion, unless waived by [Commerce], of costs that require prior approval in accordance with" 48 C.F.R. Part 31.  15 C.F.R. § 14.25(c).

Over the next twenty-one months, Karron submitted at least twenty forms to the ATP so that CASI could obtain the ATP funds, each form certifying CASI's compliance with the terms of the Cooperative Agreement.  *See id.* ¶ 22.  Karron also requested and received authorizations for amendments to the award, but did not seek authorization from the ATP for his unilateral decision not to enter into the specified contract with CUNY.  *See id.* ¶ 31; *see also, e.g.*, Sentencing Tr. 68:5-9 ("He put down for subcontractors, he put down $250,000.  He found that he could get students for free.  Is he entitled to an offset or consideration for that because he didn't spend the government's money on subcontractors and got free employees to do a job?" (Karron's counsel)); *id.*, 68:20-21 ("[H]e saved the government considerable money on subcontractors." (Karron's counsel)).  Karron also made $547,426 in expenditures that would later be challenged by Commerce auditors as "either unallowable, unallocable or [in excess of] budget limitations established in the ATP award."  R. 56.1 ¶ 29.

On June 27, 2003, the ATP suspended the award after a limited scope audit confirmed that Karron had failed to comply with the cost share and had drawn down more than $200,000 above the amount authorized.  *See id.* ¶ 26.  By that date, Karron had drawn down the entire $800,000 available from the ATP during the first year, and $545,000 of the $600,000 available during the second year, making the total disbursed by ATP $1,345,500.  *See id.* ¶ 27.

## C.  The Criminal Action against Karron

### 1.  The Government Charged Karron with Misapplying CASI Funds

In June 2007, Karron was arrested for allegedly violating Title 18 U.S.C. § 666 by knowingly misapplying more than $5,000 of funds under the care, custody and control of CASI,

---

[4] The standard provisions included a requirement that Karron would provide quarterly Financial Status Reports, *see* R. 56.1 ¶ 18, and a provision granting CASI exclusive ownership rights to intellectual property developed under the award, subject to, *inter alia*, the grant of certain licensing rights to the United States, *see id.* ¶ 19.  One of the special conditions required Karron to agree to a cost-share of $30,000 in year one.  *See id.* ¶ 21.

which received more than $10,000 in federal funds during a one-year period from the ATP.  *See United States v. Karron*, 07-CR-541 (RPP) (docket items dated June 20, 2007); *United States v. Karron*, 07-CR-541 (RPP) (docket item no. 1) ¶ 1.  A Second Superseding Indictment restated the Section 666 charge, *see United States v. Karron*, 07-CR-541 (RPP) (docket item no. 44) ¶ 1, and also included a Forfeiture Allegation seeking forfeiture of all real and personal property derived from proceeds traceable to the alleged Section 666 violation, including some $390,000 in cash and Karron's interest in an apartment on East 33rd Street in Manhattan, *see id.* ¶ 2.

### 2.   At Trial, the Government Presented Ample Evidence That Karron Knowingly Misapplied CASI Funds and Fraudulently Concealed that Misapplication

The charge against Karron was tried to a jury over eight days in June 2008.  At trial, the Government established the nature and extent of Karron's misconduct through the testimony of Commerce personnel and former CASI employees, as well as extensive documentary evidence, including the Government Exhibits referenced herein.  In addition to the Government Exhibits, most relevant for purposes of this motion is the testimony of Elisha Gurfein, which included that:

- Gurfein was CASI's Business Manager from October 1, 2001 through September 30, 2002.  *See* R. 56.1 ¶ 4.

- Karron admitted to Gurfein that Karron had diverted $75,000 of the initial $150,000 drawn down from the ATP for payment of personal debts, which was unauthorized. *See id.* ¶ 28.

- One week later, Karron informed NIST that only Karron had authority to sign documents on CASI's behalf.  *See id.* ¶ 23.

- The Cooperative Agreement had specified that CUNY would be involved in the project, but Karron decided instead to set up CASI's business location in his own apartment and direct CASI to pay him rent, a prospect that ATP later advised Gurfein would not be permitted.  *See id.* ¶ 11, 31.

- Karron directed Gurfein to create financial reports that were false because they did not reflect actual expenditures, and Karron signed these reports for submission to the ATP.  *See id.* ¶ 25.

### 3. The Jury, Charged with Deciding Whether Karron Intentionally Misapplied Money under CASI's Care, Custody and Control, Convicted Karron of Violating Section 666

At the conclusion of the trial, the jury was instructed to determine whether the evidence showed, beyond a reasonable doubt, that:

- "First, at the time alleged in the indictment, the defendant was an agent of Computer Aided Surgery, Inc., or CASI";

- "Second, in a one-year period, CASI received a federal grant in excess of $10,000";

- "Third, during that one-year period, the defendant without authority intentionally misapplied the grant money";

- "Fourth, the misapplied grant money was under the care, custody, or control of, CASI"; and

- "Fifth, the value of the money intentionally misapplied by defendant was at least $5,000."

Trial Tr. 1350:5-15 (jury instruction generally on the elements of Section 666 charge).  More specifically, with respect to the third element, the court instructed the jury to decide whether the Government had established, beyond a reasonable doubt, that Karron

> use[d] money under the control of CASI knowing that such use [was] unauthorized or wrongful.  Intentional misapplication includes the wrongful use of the money for a purpose the defendant knew was unauthorized, even if such use benefited CASI in some way.
>
> In this case, to intentionally misapply money means to intentionally apply the grant money received by CASI in a manner which the defendant knew was unauthorized under the terms and conditions of the grant.  Misapplication of money, however, does not apply to bona fide salary, wages, fringe benefits, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

*Id.* at 1351:16-1352:2.  The court also instructed the jury that, since "money is fungible," the Government needed to establish only that CASI had received more than $10,000 in federal aid and misapplied more than $5,000 in funds under its care, custody and control, during the same

8

one-year period; the Government did not need to show that particular ATP funds were misapplied.  *Id.* at 1353:9-22.

On June 11, 2008, the jury returned a guilty verdict against Karron on Count One of the Second Superseding Indictment.  *See* R. 56.1 ¶ 1.

### 4.   The Sentencing Court Found that Karron Had Incurred More than $120,000 in Inappropriate Expenses

Following his conviction, Karron received a 15-month custodial sentence and was ordered to pay $120,000 in restitution.  *See id.* ¶ 2.  At sentencing, the court noted that "*more than $120,000* was lost through inappropriate expenses."  Sentencing Tr. 89:13-14 (emphasis added); *see also id.* 90:24 ("It is true that the loss is *at least $120,000* . . . ." (emphasis added)). The court also expressed concern about whether it should base its determination of the proper offense level under U.S.S.G. § 2B1.1(b)(1) on the loss amount or on the amount gained by the defendant.  *See id.* 44:16-45:8.  The court noted that "[i]n a sense, the whole thing, the whole agreement was a loss to the government."  *Id.* 45:19-20.  The court ultimately arrived at the $120,000 amount by totaling categories of expenditures that did not appear on the approved budget, an alternative calculation proposed by the Government in response to the court's concerns:

> MR. EVERDELL:  . . . .  However, if your Honor is not inclined to accept that, because of concerns you have about the calculations here, at the very least, if you look simply at the nonbudgeted categories, things that were not approved by NIST at all, which are those things that I mentioned before -- rent, utilities, capital improvement, cleaning, meals, and other -- then we have a loss amount that is at a minimum just two levels less than what's in the PSR.

*Id.* 25:16-23; 51:1-8 (same); 57:22-58:2 (THE COURT: "I am going to make the findings on the basis that Mr. Everdell suggested.").  In the first year of the Cooperative Agreement, these non-budgeted categories comprised $60,000 in back rent paid by Karron (to himself), $9,832 in

fringe benefits, $11,248 in capital improvements to Karron's apartment, $5,019 in cleaning

expenses, and $43,592 in other unauthorized categories.  *See* R. 56.1 ¶ 30.

### 5.  Karron's Conviction Has Been Upheld on Appeal and Is Therefore Final

Karron appealed, asserting that (i) the jury had been erroneously instructed to determine

whether the defendant "intentionally misapplied" funds and instead should have been instructed

that an "intent to defraud" is an element of "misapplication" of funds, and (ii) Section 666 is void

for vagueness.  *See Karron*, 348 Fed. App'x 632.  The Second Circuit rejected these arguments

and affirmed Karron's conviction by summary order dated October 7, 2009.  *See id.*

### D.  The Civil Action against Karron

On November 24, 2008, the United States brought this action pursuant to the FCA's

former Sections 3729(a)(1) and (2), the latter provision now codified as Section 3729(a)(1)(B).[5]

Specifically, the Complaint alleges that Karron submitted "false or fraudulent claims for

payment in connection with cooperative agreements" under the ATP to CASI, a limited liability

corporation of which Karron was "the President and Chief Technical Officer, as well as a 90%

shareholder."  Complaint at ¶¶ 1, 4-5.  The Complaint further alleges that, despite being warned

repeatedly, Karron "willfully violated the terms of the Grant, misapplying nearly half a million

dollars towards unauthorized expenses and then lying about it," in violation of 18 U.S.C. § 666.

*Id.* at ¶ 21.  Based on these allegations, the Complaint seeks recovery of treble damages and

statutory penalties under the FCA, as well as remedies at common law.  *See id.* at ¶¶ 40-68.

---

[5] On May 20, 2009, Congress passed the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Public Law No. 111-21.  *See United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010).  While FERA amended 31 U.S.C. § 3729(a)(1), (2) and (3), only the amendment to § 3729(a)(2), re-designated as 31 U.S.C. § 3729(a)(1)(B), applies to this action.  *See* Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625 (FERA's amendments "apply to conduct on or after the date of enactment, except that" the amendments to 31 U.S.C. § 3729(a)(2) and to another section of the FCA not relevant here "take effect as if enacted on June 7, 2008, and apply to all claims under the [FCA] pending on or after [June 7, 2008]")).

By Order dated March 16, 2009, the Court denied Karron's request to stay this action

pending an appeal of the related criminal conviction.  *See United States v. Karron*, No. 08-CV-

10223 (NRB) (S.D.N.Y. March 17, 2009) (dkt. item 6) (the "March 16 Order").  On May 15,

2009, the Court denied Karron's requests to certify the March 16 Order for interlocutory appeal

and to proceed *in forma pauperis*, noting that the Government already had proved Karron's guilt

in the criminal proceeding and thus had exceeded the standard of proof in this case.  *See United

States v. Karron*, No. 08-CV-10223 (NRB) (S.D.N.Y. May 15, 2009) (dkt. item 8).  The Court

also noted it was prepared to adjourn briefing on the Government's proposed summary judgment

motion pending Karron's release from custody.  *See id.*  Karron having been released, the

Government now has brought that motion.

## ARGUMENT

### I.     THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact

and . . . the movant is entitled to judgment as matter of law."  Fed. R. Civ. P. 56(c)(2).  The party

seeking summary judgment has the initial burden of production, which may be satisfied by

affirmative evidence negating the non-movant's case or by demonstrating "an absence of

evidence to support the non-movant's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its initial burden of production, the burden then shifts to

the non-movant to "set forth the specific facts showing that there is a genuine issue for trial."

*See* Fed. R. Civ. P. 56(e)(2).  In that regard, "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).

## II.     SUMMARY JUDGMENT IS WARRANTED UNDER THE FCA'S STATUTORY ESTOPPEL PROVISION

### A.     The FCA's Statutory Estoppel Provision

The FCA bars a defendant from contesting "in a subsequent civil proceeding . . . those matters determined by the judgment in the criminal case."  *United States v. Lamanna*, 114 F. Supp. 2d 193, 195 (W.D.N.Y. 2000) (internal quotation marks omitted).  The FCA specifically provides that:

> [n]otwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730.

31 U.S.C. § 3731(e).

### B.     Elements of Civil Liability under the FCA

Former Section 3729(a)(1) subjects an individual to liability if he or she

> knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval.

31 U.S.C. § 3729(a)(1) (2003).  This provision thus requires the Government to demonstrate that the defendant "(1) made a claim, (2) to the [G]overnment, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury."  *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001).

New Section 3729(a)(1)(B) subjects a person to civil liability if he or she "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  The term "material" is, in turn, defined as

"having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id.* § 3729(b)(4).

### C.   The FCA's Statutory Estoppel Provision Applies to the FCA Claim against Karron in This Action

The undisputed record shows that each requirement for the application of the FCA's statutory estoppel provision has been met here.  *First*, there is no dispute that the FCA claims here meet the threshold requirements of 31 U.S.C. § 3731(e).  Further, Karron's fraud on the ATP here – namely, Karron's practice of obtaining ATP funds based on false financial information and using these funds for unauthorized purposes – concerns the same conduct for which Karron was convicted criminally.  *See supra* at 7-8.

*Second*, Karron's conviction having been affirmed on appeal, its validity and finality are likewise undisputed.  *See Karron*, 348 Fed. App'x 632 (2d Cir. 2009).

*Third*, the essential factual underpinnings of the charge for which Karron was convicted match the core elements of the FCA claims asserted against Karron here.  To determine whether a criminal conviction corresponds to the elements of civil claims, courts look to "the pleadings" in the criminal action, the "evidence submitted" at trial, as well as "the instructions" to the jury. *United States v. Convalescent Trans., Inc.*, No. 4:03-CV-32-FL, 2007 WL 2090210, at *4 (E.D.N.C. July 19, 2007); *see generally Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 569 (1951) (any fact "distinctly put in issue [at a criminal trial] and directly determined" by a jury is entitled to collateral estoppel effect in a subsequent civil action).  The record from Karron's criminal action unambiguously demonstrates the correspondence between the issues presented to the jury in that proceeding and the issues integral to the FCA claim in this action.

At the criminal trial, the jury was presented with abundant evidence that Karron knowingly misapplied CASI funds while submitting false certifications for ATP reimbursements

that did not reflect the actual application of the CASI funds. *See supra* at 7. The jury heard

testimony and saw documentary evidence that Karron had sole signing authority for CASI. *See*

*supra* at 7. The jury also was instructed that, in order to convict Karron, it would have to find

beyond a reasonable doubt that Karron knew that he was misapplying CASI's funds to

unauthorized uses despite his certifications of compliance. *See* Trial Tr. at 1351-52. A

conviction on this charge, thus, would demonstrate that the jury had concluded that Karron had

knowingly submitted false certifications to obtain ATP funds and that the records he created and

submitted to the ATP to obtain these funds were false – the core elements of liability under

former Section 3729(a)(1) and new Section 3729(a)(1)(B). *See Mikes*, 274 F.3d at 695.

Karron's conviction, therefore, "necessarily embraced all the elements essential to FCA

liability." *United States ex rel. Miller v. Bill Harbert Int'l Constr. Inc.*, No. 95-1231 (RCL),

2007 WL 851857, at *3 (D.D.C. Mar. 14, 2007) (applying the FCA's statutory estoppel

provision based on contractor's admission of having submitted "rigged bids" in a guilty plea to

criminal antitrust charge).

      In sum, Karron's criminal conviction for misapplying CASI funds provides ample basis

for application of the FCA's statutory estoppel provision. Section 3731(e) bars Karron from now

contesting his civil liability under the FCA. The Government therefore is entitled to summary

judgment as to Karron's liability for damages and penalties under the FCA.

**III.    SUMMARY JUDGMENT IS WARRANTED AS TO KARRON'S LIABILITY**
**        FOR CIVIL DAMAGES UNDER COMMON-LAW COLLATERAL ESTOPPEL**

      The federal common law principle of collateral estoppel also precludes Karron from re-

litigating whether he had defrauded ATP.

**A.  The Principle of Collateral Estoppel**

A criminal conviction "collaterally estops" the criminal defendant from seeking "to prove a fact [in a civil action] that is contrary to any one of the elements of the crime" for which that defendant was found guilty.  *Stichting Ter Behartiging Van de Belangen Van Oudaandeel-houders In Het Kapitaal Van Saybolt International B.V. v. Schreiber*, 327 F.3d 173, 180 (2d Cir. 2003).  Application of this principle is appropriate where "'(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.'"  *Id*. at 180 n.2 (quoting *NLRB v. Thalbo Corp*., 171 F.3d 102, 109 (2d Cir. 1999)).

As with Section 3731(e), courts have regularly applied the principle of collateral estoppel to grant summary relief to the Government on FCA claims based on criminal convictions arising from the same sets of facts.  *See*, *e.g.*, *United States v. Diamond*, 657 F. Supp. 1204, 1205 (S.D.N.Y. 1987) (criminal conviction based on submission of false Medicare claims "forecloses all questions relevant to civil liability under the FCA" under common law) (internal quotation marks omitted) (Walker, J).

**B.  Application of Collateral Estoppel Is Warranted Based on the Record from the Criminal Action**

Each requirement for the application of collateral estoppel is met here.  *First*, as described more fully above, the allegations central to the FCA claims against Karron in this action are the same as the factual allegations essential to the charges in Karron's criminal action.  *Compare supra* at 6-7 (charges in the Second Superseding Indictment) *with supra* at 10 (allegations in this action).  Specifically, the facts dispositive of Karron's civil liability – whether he made and submitted false ATP reimbursement certifications and whether he knew the falsity

15

of such claims, whether he intended to obtain federal ATP funds – are identical to the factual issues central at the criminal trial to his criminal conviction.  *See United States v. Peters*, 927 F. Supp. 363, 366-67 (D. Neb. 1996) (issues are identical when the "same allegations . . . serve[] as the basis" of both civil complaint and criminal indictment), *aff'd*, 110 F.3d 616 (8th Cir. 1997).

*Second*, the facts that establish Karron's civil liability under the FCA were fully litigated before the jury and were actually decided in the criminal action.  As set forth above, the Government presented an array of testimony and documentary evidence at the criminal trial to demonstrate the operation and the scope of Karron's fraud on the ATP.  *See supra* at 7.  Based on that evidence, the jury decided that Karron had knowingly misapplied ATP funds.

*Third*, Karron had a full and fair opportunity to litigate these facts at his criminal trial. For example, the trial transcript makes clear that defense counsel strenuously cross-examined the Government's witnesses.  *See, e.g.*, Trial Tr. at 824:13 (Judge Patterson noting counsel's "lengthy lengthy cross-examination").

*Fourth*, in light of the jury instructions given in the criminal action, it is plain that the jury actually had to decide the issues essential to Karron's civil liability in order to convict him, as it did, on the Section 666 charge.  *See supra* at 8-9; *see also Diamond*, 657 F. Supp. at 1205 (applying common law collateral estoppel based on "a review of Judge Sand's charge to the jury that convicted defendant").

Because there is no genuine dispute that each factor favoring the application of collateral estoppel to Karron's criminal conviction is present, the Government is entitled to summary judgment establishing Karron's liability for civil damages under the FCA.

IV.   **KARRON IS LIABLE FOR DAMAGES TREBLING THE AMOUNT CASI RECEIVED FROM THE ATP AND FOR CIVIL PENALTIES FOR EACH OF KARRON'S FALSE REPORTS AND CERTIFICATIONS**

The FCA requires those who obtain government funds to "turn square corners when they deal with the Government." *Rock Island, Ark. & La. R.R. Co. v. United States*, 254 U.S. 141, 143 (1920) (Holmes, J.). The FCA accordingly provides for treble damages plus a per-claim penalty. *See* 31 U.S.C. § 3729(a); *see also United States v. Grossman*, 01-CV-603 (NRB), 2002 WL 1349749, at *1 (S.D.N.Y. June 20, 2002). Courts have "considerable discretion" to determine the appropriate measure of damages subject to trebling. *Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116, 124-25 (2007); *United States v. Pimentel*, No. 86 Civ. 2113(WK), 1999 WL 504906, at *2 (S.D.N.Y. July 15, 1999) (noting that "the legislative history of the False Claims Act suggests that we have considerable discretion in fashioning a mechanism for determining actual damages").

The purpose of the FCA's damages and penalties provisions is to make the Government whole, not just with respect to the loss of the amount of money fraudulently obtained, but also for consequential damages such as the costs of detecting and investigating the fraud. *See Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 130-32 & n.9 (2003). *See also United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 473 (5th Cir. 2009) (noting that the Department of Defense "generally does not verify all of the information submitted in a proposal [for a grant from its Small Business Innovation Research ("SBIR") program], and it depends heavily on the integrity of SBIR applicants"), *cert. denied* 130 S. Ct. 2092 (2010); *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003) (noting that the harm to the Government in an FCA case includes "harm to the administration and integrity" of the governmental program from which the funds were fraudulently obtained). Thus, damages in an FCA case "typically are liberally calculated to ensure that they 'afford the government complete

17

indemnity for the injuries done it.'"  *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (D.C. Cir. 1998) (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 549 (1943)).

### A.  The Appropriate Calculation of Karron's Civil Damages Is Three Times the Full Amount CASI Received from the ATP under the Cooperative Agreement

The starting point for the calculation of the initial damages amount (*i.e.*, prior to trebling) is the total amount fraudulently obtained.  *See Longhi*, 575 F.3d at 473 ("[D]amages are limited to the amount that was paid out by reason of the false claim.").  In certain cases, typically where the fraud occurs in connection with a procurement contract, the court may reduce the amount fraudulently obtained by the value the court deems to have been received by the Government, reflecting the Government's receipt of the "benefit of its bargain" notwithstanding the fraud:

> Ordinarily the measure of the government's damages would be the amount that it paid out by reason of the false statements over and above what it would have paid out if the claims had been truthful. Such a rule is readily applied, for example, where a false claim, showing unreal costs, is made in connection with a cost-plus type of contract.

*United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966).  *See also Mackby*, 339 F.3d at 1018 (same).  In the context of government funding for research, this is not necessarily the case. *See United States ex rel. Resnick v. Weill Med. Coll. of Cornell Univ.*, No. 04-CV-3088 (WHP), 2009 WL 637137, at *3 (S.D.N.Y. Mar. 5, 2009) ("Depending on the specific terms of the grants, the proper measure of damages may be the whole value of the grant, or the difference between what was paid and what would have been paid in the absence of a false statement." (internal citations omitted)).

Although the Second Circuit apparently has not yet directly considered the issue, other federal courts of appeals have rejected the application of the "benefit of the bargain" theory in cases where the defendant's acts had not resulted in a "tangible benefit to the government and the

intangible benefit is impossible to calculate." *Longhi*, 575 F.3d at 473. In *Longhi*, the defendants had made false statements to the United States Department of Defense in applications for research grants for the development of very thin rechargeable batteries. *Id.* at 462-64. There, the Fifth Circuit affirmed the district court's grant of summary judgment that the proper measure of damages was the entire amount of government research funding received by the defendants. *Id.* at 473 & n.9. The Fifth Circuit explicitly rejected the defendants' argument that the Government had suffered no injury. *Id.* at 472. The court explained that the full amount of the funding constituted a proper measure of damages to be trebled because, in part, the case did not involve "standard procurement contracts where the government ordered a specific product or good," nor would "the end product . . . belong to the [government.]" *Id.* at 473. Moreover, the court reasoned that the defendants' fraud had vitiated the Government's purpose of enabling "eligible deserving" small businesses to develop products that they could commercially market. *Id.*

Similarly, in *United States v. TDC Management*, the D.C. Circuit affirmed the district court's award of damages based on the total amount of the payments fraudulently obtained by the defendant. 288 F.3d 421, 428 (D.C. Cir. 2002) (affirming district court's calculation of damages "based on what the government would have paid out had it known of the information that [the defendant] omitted from its monthly progress reports," *i.e.*, nothing). There, the defendant served as an ombudsman for a program under which government funds were distributed to assist minority-owned enterprises in securing bonding necessary to bid on large construction projects; however, defendant concealed that it was engaged in certain self-interested actions that violated the terms of its participation in this program, resulting in the compromise of its objectivity. *See id.* at 422-24. The court explicitly rejected the defendant's argument that "the government's net damages were zero because it 'got what it had paid for' under the 'best

efforts' agreement." *Id.* at 428.  Noting that the defendant had not contracted to "produce a tangible structure or asset of ascertainable value," the court held that the defendant's fraud had vitiated the value of its "best efforts." *Id.*  The court concluded that the defendant's "deviat[ion] from its contracted role" properly supported the district court's finding that the defendant's services had provided no offsetting value to the Government.  *Id.*

The Seventh Circuit employed similar reasoning to uphold a damages award trebling the total amount of fraudulently obtained Medicare and Medicaid reimbursements, even though "most of the patients for which claims were submitted received some medical care – perhaps all the care reflected in the claim forms."  *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008).  In *Rogan*, reimbursement was improper because the invoices included unnecessary or unperformed services and illegal kickbacks were paid for the referral of patients.  *See id.* at 451-52.  In denying any reduction of damages based on the value of medical care actually received, the court reasoned that the United States itself had not received any medical services from the defendant, but rather had provided "a subsidy . . . with conditions."  *Id.* at 453.  "When the conditions are not satisfied, nothing is due.  Thus the entire amount that [the defendant's company] received . . . must be paid back."  *Id.*

Courts in this district have looked to the above case law to reject the application of the benefit of the bargain theory in cases presenting circumstances similar to Karron's fraudulent misapplication of the Cooperative Agreement funds.  For example, *United States ex rel. Feldman v. Van Gorp* concerned false claims made to obtain a federal research grant.  *See* No. 03-CV-8135 (WHP), 2010 WL 1948592, at *1 (S.D.N.Y. May 3, 2010).  There, Judge Pauley concluded that a reduction of the damages amount under the benefit of the bargain theory was inappropriate because the "training grant is not a standard procurement contract for specific goods or services.  Moreover, its end product did not become the property of the government."  *Id.*, at *2.  Judge

Pauley further reasoned that the Government had bargained for the provision of funds to "recipients who best fit its specified criteria," and so the defendants' false claims had deprived the Government of any such benefit.  *Id.*

In *United States ex rel. Antidiscrimination Center of Metro New York v. Westchester County*, the defendant had obtained over $52 million in federal funds for housing and community development, receipt of which had been expressly conditioned on its certifications that it was affirmatively furthering fair housing.  *See id.*, No. 06-CV-2860 (DLC), 2009 WL 1108517, at *1 (S.D.N.Y. Apr. 24, 2009).  These certifications, however, were found to be fraudulent because the defendant had excluded race in analyzing impediments to housing choices.  *See id.*  Although the defendant's certifications were based on an actual analysis of other impediments, such as a relatively low income, Judge Cote concluded that the defendant's exclusion of race from its analysis had entirely deprived the Government of the benefit of its bargain in awarding housing funds to the defendant.  *See id.*, at *3.  Judge Cote thus barred the defendant from arguing to the jury that its damages should be reduced under the benefit of the bargain theory.  *See id.*  In reaching that conclusion, Judge Cote noted that the defendant "had identified no tangible asset or structure it provided to the United States such that this theory would be applicable; it did not have a contract with the government to build any sort of facility for the government's use or to provide it with goods."  *Id.*  Judge Cote also noted that the defendant, like the defendants in *Rogan* and *Mackby*, had "made false claims in order to receive what was essentially a 'subsidy' from the federal government."  *Id.*

The "benefit of the bargain" theory is similarly inapposite in cases involving cooperative agreements in support of research, such as the ATP Cooperative Agreement at issue here.  As a preliminary matter, a cooperative agreement is not a "standard procurement contract."  *Longhi*, 575 F.3d at 473; *Feldman*, 2010 WL 1948592, at *2.  Thus, the Government did not contract to

receive (nor did it actually receive) a tangible structure or other asset of ascertainable value from CASI.  *See Longhi*, 575 F.3d at 473; *Rogan*, 517 F.3d at 453; *TDC Mgmt.*, 288 F.3d at 428; *Feldman*, 2010 WL 1948592, at *2; *Antidiscrimination Ctr.*, 2009 WL 1108517, at *3.  Rather, the benefit sought by the Government in entering into the Cooperative Agreement was the *possibility* of a benefit to society.  *See* Sentencing Tr. 52:4-8 (Karron's counsel noting that the "government gets their money's worth" here because "[s]ociety would benefit").

In addition, by regulation, ATP's cooperative agreements normally grant the funding recipient the right to take ownership of the intellectual property generated with ATP's financial support.  *See* 15 C.F.R. § 295.8; *see also* 55 Fed. Reg. at 30143.  The Cooperative Agreement here is no exception – CASI (and thus Karron) stood to gain exclusive rights to any intellectual property developed by the project.  *See* R. 56.1 ¶¶ 19, 20.  Thus, the Cooperative Agreement expressly contemplated that the "end product" would not belong to the Government.  *See Longhi*, 575 F.3d at 473; *Feldman*, 2010 WL 1948592, at *2.

Nor did Karron provide the Government with the benefit it bargained for.  As noted, the ATP's use of a cooperative agreement here reflects the ATP's assessment that the project was high-risk and potentially high-reward, and that the ATP accordingly wanted to preserve its ability "to exercise appropriate management oversight" and to draw upon ongoing research and development at NIST to "increase the likelihood of success of the project."  15 C.F.R. § 295.1(a), (b).  Karron's surreptitious misapplication of funds outside the authorized budget, *see* R. 56.1 ¶¶ 25, 26, 28, 29, 30, 31, deprived the ATP of its ability to provide oversight and guidance to the project.  The ATP did not condition its funding on the *results* of Karron's proposed research, but instead on Karron's *compliance* with procedures designed to increase the probability that the proposed high-risk research would succeed.  Karron's strict adherence to the promised and approved budget and to the procedures for amendments thereto was an essential part of the

22

Government's "bargain," and the ATP's purpose for entering into the Cooperative Agreement was not achieved by partial compliance.

In particular, Karron's unilateral and unauthorized decision not to spend $420,000 to obtain the promised "expected unique contribution of the [CUNY Institute for Software Design and Development] faculty, visiting scientists, and PhD graduate students," GX 10 at 4, and instead to use "free" graduate students, *see* Sentencing Tr. 68:5-9, rendered the research that actually was done significantly different from what the ATP had decided was worthy of its funding when it made its award.  When it issued the award to CASI, the possibility that the project would benefit society may have been a speculative, "intangible" benefit, yet ATP effectively put a "price" of $2,000,000 on that possibility.  But included in that price was ATP's assumption that the high-risk nature of the project could and would be mitigated by Karron's compliance.  Absent such compliance, the true value of the "intangible benefit" from the research CASI actually performed is "impossible to calculate." *Longhi*, 575 F.3d at 473.

Finally, the conclusion that Karron must be held liable for the full amount of the funds received by CASI remains appropriate notwithstanding that some research may have been done. As in *Rogan*, Karron received a "subsidy" – here, of research, rather than of the costs of providing medical care – "with conditions." *See Rogan*, 517 F.3d at 453.  And where the conditions of that subsidy are not satisfied, "nothing is due" and "the entire amount . . . received . . . must be paid back." *Id.  See also TDC Mgmt.*, 288 F.3d at 428 (district court could properly find that Government received no offsetting value where defendant deviated from contract). This would be true even if the research CASI actually had performed entirely succeeded.  *See Longhi*, 575 F.3d at 472 (remarking on the "irony" that, despite their violation of the FCA, defendants had developed lithium batteries that were found satisfactory by the Government, and

explaining that "deliver[y of] the hoped for 'ends,' however, does not justify the means . . . employed to receive the . . . grants").

As Judge Pauley illustrated through his case citations in *Resnick*, courts take different approaches to the FCA damages calculation depending on whether, notwithstanding the fraud, the Government can be said to have received the benefit of its bargain.  2009 WL 637137, at *3 (citing *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 530 F.Supp.2d 888 (S.D. Tex. 2008), *aff'd*, 575 F.3d 478, and *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003)).  In cases like *Longhi*, which is on point here for the reasons stated, damages in the full amount drawn down are appropriate.  By contrast, in cases like *Harrison*, where the work required to be performed had, in fact, been fully performed and the defendant's design for a fully operational training program was transferred to the Government, *see* 352 F.3d at 923 n.16, a reduction under the "benefit of the bargain" theory was appropriate.

Accordingly, there is no genuine dispute about the amount of damages owed by Karron.  Karron is liable for a civil judgment in the amount of $4,036,500 – *i.e.*, three times the $1,345,500 that CASI received from ATP, *see* R. 56.1 ¶ 27) – less any amount that Karron has paid or will pay the Government in restitution.

**B.  Karron Also Is Liable for Civil Penalties**

As noted, Karron's submission of false reports and certifications to obtain ATP funds also triggers civil penalties for each such false report or certification.  *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) ("[T]he number of assertable FCA claims is not measured by the number of contracts, but rather by the number of fraudulent acts committed by the defendant."); *see also United States v. Sci. Applications Int'l Corp.*, 653 F. Supp. 2d 87, 94 (D.D.C. 2009) (defendant was liable for false records and statements that were made, used, or caused to be made "to get a false or fraudulent

claim paid or approved" by the government).  In determining the number and amount of civil penalties, courts must focus on the "specific conduct" of the defendant.  *United States v. Bornstein*, 423 U.S. 303, 313 (1976).

The Court has discretion to determine the amount of the civil penalty within the statutory range of at least $5,500 and at most $11,000 for each false certification and report.  *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).  *See also Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003); *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007).  In exercising this discretion, district courts have considered, *inter alia*, the "seriousness of the misconduct, the scienter of the defendants, and the amount of damages." *Miller*, 501 F. Supp. 2d at 56 & n.5.  Courts have often imposed the maximum statutory civil penalty where, as here, the defendant's fraudulent acts were intentional, occurred on more than one occasion, and resulted in significant damages to the Government.  *See, e.g.*, *Longhi*, 530 F. Supp. 2d at 901 (imposing maximum penalties where defendants' fraud was "systematic and knowing"); *Miller*, 501 F. Supp. 2d at 56 (imposing maximum penalties where defendant's fraud was "intricate, far-reaching, and . . . deliberate").

Here, Karron submitted at least twenty false certifications to the ATP, including nine Requests for Advance or Reimbursement, seven Federal Cash Transactions Reports and four false Financial Status Reports.  *See* R. 56.1 ¶ 24.  Karron is therefore liable for civil penalties in the total amount no less than $110,000.

## CONCLUSION

For the reasons set forth above, the Government's motion for summary judgment should be granted as to Karron's liability for treble damages of $4,036,500 and a total civil penalty of no less than $110,000, subject to a reduction in the amount of restitution paid.

Dated: New York, New York
       June 18, 2010

                                        Respectfully submitted,


                                        PREET BHARARA
                                        United States Attorney

                                  By:   s/ *Michael J. Byars*
                                        MICHAEL J. BYARS
                                        Assistant United States Attorney
                                        Telephone:  (212) 637-2793
                                        Facsimile:  (212) 637-2717
                                        Email:  michael.byars@usdoj.gov