

**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of Inspector General**
**Office of Audits**
ATLANTA REGIONAL OFFICE
401 W. Peachtree St., N.W., Suite 2742
Atlanta, Georgia 30328
(404) 730-2788 FAX
(404) 730-2780

**AUG 2 5 2004**

MEMORANDUM FOR:    Angela McNerney, Chief
Grants and Agreements Management Division
National Institute of Standards and Technology

*Kathleen M. McKevitt*

FROM:    William F. Bedwell, Jr.
Regional Inspector General
  for Audits

SUBJECT:    Final Audit Report No. ATL-16095-4-0002
Auditee:  Computer Aided Surgery, Inc., NY
NIST Award No. 70NANB1H3050

We are attaching a copy of the subject audit report for your action in accordance with DAO 213-5, "Audit Resolution and Follow-up." The original report has been sent to the auditee/recipient, who has thirty (30) days from the date of the transmittal to submit comments and supporting documentation to you. We have also attached a copy of our transmittal letter.

Under DAO 213-5, you have sixty (60) calendar days from the date of this memorandum to reach a decision on the actions you propose to take on each audit finding and recommendation and to submit an Audit Resolution Proposal to this office. The format for the proposal is Exhibit 8 of the DAO. As applicable, your written proposal must include the rationale and/or legal basis for reinstating any questioned cost in the report and should reference any supporting documentation relied on. Under the DAO, the Office of the Inspector General must concur with your proposal before it may be issued as a final determination and implemented. The DAO prescribes procedures for handling any disagreements this office may have with the Audit Resolution Proposal. Also, please copy us when the audit determination letter is sent to the auditee.

To preclude disclosure of proprietary information protected by the Omnibus Trade and Competitiveness Act of 1988, we have limited distribution of this final report to NIST and Computer Aided Surgery officials.

**GOVERNMENT EXHIBIT**
62
07 Cr. 541 (RPP) **(ID)**

Any inquiry regarding this report should be directed to me at (404) 730-2780.  All correspondence should refer to the audit report number given above.

Attachments

cc:      Sharon Bisco, Audit Liaison, NIST
         Marilyn Goldstein, Grants Officer, NIST
         Barbara Lambis, Policy and Operations Advisor, ATP
         Hope Snowden, Grants Management Specialist, NIST-ATP



**UNITED STATES DEPARTMENT OF COMMERCE**
Office of Inspector General
**Office of Audits**
ATLANTA REGIONAL OFFICE
401 W. Peachtree St., N.W., Suite 2742
Atlanta, Georgia 30328
(404) 730-2788 FAX
(404) 730-2780

AUG 2 5 2004

```
THE ATTACHED AUDIT REPORT MAY
CONTAIN PROPRIETARY INFORMATION
```

Dr. D. B. Karron
Chief Technical Officer
Computer Aided Surgery, Inc.
300 East 33ʳᵈ Street, Suite 4N
New York, New York 10016

Dear Dr. Karron:

Enclosed is the Final Audit Report No. ATL-16095-4-0002 concerning the following
Department of Commerce financial assistance award:

>       Recipient:      Computer Aided Surgery, Inc.
>
>       Award No.:      70NANB1H3050
>
>       DOC Agency:     National Institute of Standards and Technology

The final report was prepared by the Atlanta Regional Office of Audits, Office of Inspector
General.

This letter is notice of your opportunity and responsibility to review the report and to develop
a complete response that addresses each audit finding and recommendation. If you believe
that the report is in error in any respect, or if you disagree with any of the findings and
recommendations, it is important that you explain the error or your reasons for disagreement
and either submit to the Department evidence which supports your contentions or reference any
such evidence previously submitted to this office. You also must explain how each documentary
submission supports the position you are taking; otherwise, we may be unable to analyze the
information.

Your complete response will be considered by the Department in arriving at a decision on what
action to take with respect to the findings and recommendations in the audit report. Enclosure 1
is an explanation of applicable administrative dispute procedures.

Your response to this report must be postmarked no later than thirty (30) days from the date of
this letter. There will be no extensions to this deadline. If you do not submit a response within
the required time frame, you will have no other opportunity to submit comments, arguments or
documentation before the Department makes a decision on the audit report.

Please send your response (including documentary evidence) to the following audit action official:

> Angela McNerney, Chief,
> NIST Grants and Agreements Management Division
> U.S. Department of Commerce
> 100 Bureau Drive, Stop 3580
> Building 411, Room A-143
> Gaithersburg, MD 20899-3580

Please send a copy of the response letter only to:

> William F. Bedwell, Jr.
> Regional Inspector General for Audits
> Office of Inspector General
> U.S. Department of Commerce
> 401 West Peachtree St., N.W. - Suite 2742
> Atlanta, GA 30308

After evaluating your response, the audit action official may provide you with further guidance or request clarification of your response. As you prepare your response, if you have any questions about this report or the process by which the Department reaches a final decision, please call me at (404) 730-2780, referring to the audit report number given above.

Sincerely,

*Kathleen M. McKevitt*

*for*

William F. Bedwell, Jr.
Regional Inspector General
  for Audits

Enclosures

cc:    Sharon Bisco, Audit Liaison, NIST
       Marilyn Goldstein, Grants Officer, NIST
       Barbara Lambis, Policy and Operations Advisor, ATP
       Hope Snowden, Grants Management Specialist, NIST-ATP
       Angela McNerney, Chief, Grants and Agreements Management Division, NIST

Enclosure 1

## NOTICE TO AUDITEE
### Financial Assistance Audits

1. Audit requirements applicable to a particular financial assistance award may be established by law, regulation, policy or the terms of the recipient's financial assistance agreement with the Department of Commerce.

2. The results of any audit will be reported to the bureau or office administering the financial assistance award and to the recipient/auditee, unless the Inspector General of the Department determines that it is in the Government's interest to withhold release of the audit report.

3. The results of an audit may lead to adverse consequences for the auditee, including, but not limited to the following actions (which are subject to applicable laws and regulations):

   o   suspension and/or termination of current awards;

   o   referral of identified problems to other federal funding agencies and entities as deemed necessary for remedial action;

   o   denial of eligibility for future awards;

   o   canceling the authorization for advance payment and substituting reimbursement by check;

   o   establishment of special conditions in current or future awards; and,

   o   disallowance of costs, which could result in a reduction in the amount of federal payments, the withholding of payments, the offsetting of amounts due the Government against amounts due the auditee, or the establishment of a debt and appropriate debt collection follow-up (including referrals to collection agencies).

Because of these and other possible consequences, an auditee should take seriously its responsibility to respond to audit findings and recommendations with explanations and evidence whenever audit results are disputed and the auditee has the opportunity to comment.

4. To ensure that audit reports are accurate and reliable, an auditee may have the following opportunities to point out errors (of fact or law) that the auditee believes were made in the audit, to explain other disagreements with audit findings and recommendations, to present evidence that supports the auditee's positions, and to dispute final determinations:

o   During the audit, the auditee may bring to the attention of the auditors at any time evidence which the auditee believes affects the auditors' work.

o   At the completion of the audit on-site, as a matter of courtesy, the auditee usually is given the opportunity to have an exit conference to discuss the preliminary audit findings and to present a clear statement of the auditee's position on the significant preliminary findings, including possible cost disallowances.

o   Upon issuance of the draft audit report, the auditee may be given the opportunity to comment and submit evidence during the 30-day period after the transmittal of the report. (There are no extensions to this deadline.)

o   Upon issuance of the final audit report, the auditee is given the opportunity to comment and to present evidence during the 30-day period after the transmittal of the report. (There are no extensions to this deadline.)

o   Upon issuance of the Department's decision (the "Audit Resolution Determination"), on the audit report's findings and recommendations, the auditee has the right to appeal for reconsideration within 30 calendar days after receipt of the Determination letter if monies are due the government. (There are no extensions to this deadline.)  The Determination letter will explain the specific appeal procedures to be followed.

o   After an appeal is filed, or after the opportunity for an appeal has expired, the Department will not accept any further submissions of evidence concerning an auditee's dispute of the Department's decisions on the resolution of the financial assistance audit. If it is determined that the auditee owes money or property to the Department, the Department will take appropriate collection action but will not thereafter reconsider the merits of the debt.

o   There are no other administrative appeals available in the Department.

bcc:    Lisa Barlow, Counsel to the Inspector General
        Bill Bedwell, Deputy Assistant Inspector General for Regional Audits
        Tom McCaughey, Director, Financial Statements & Accountability Division
        Ron Lieberman, Director, Business & Science Division
        John Bunting, Denver Regional Inspector General for Audits
        David Sheppard, Seattle Regional Inspector General for Audits
        Editor
        Annie Holmes, Management Assistant
        Jackie Day, Auditor
        IG's Office
        Follow-up File
        Master File
        Katie McKevitt
        Belinda Riley
        Keith Teamer



# U.S. DEPARTMENT OF COMMERCE
## Office of Inspector General



# NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY

## Computer Aided Surgery, Inc.
## New York, New York
## NIST Cooperative Agreement
## Number 70NANB1H3050

*Final Audit Report No. ATL-16095-4-0002 / August 2004*

THIS AUDIT REPORT MAY CONTAIN PROPRIETARY DATA
EXEMPTED FROM DISCLOSURE UNDER THE FREEDOM OF
INFORMATION ACT (5 U.S.C. 552) BY THE OMNIBUS TRADE
AND COMPETITIVENESS ACT OF 1988 (15 U.S.C. 278N)

*Office of Audits, Atlanta Regional Office*

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

## TABLE OF CONTENTS

Page

EXECUTIVE SUMMARY ............................................................. i

INTRODUCTION ................................................................... 1

OBJECTIVE, SCOPE AND METHODOLOGY ............................................. 2

FINDINGS AND RECOMMENDATIONS                                                  4

   AWARDEE'S INADEQUATE FINANCIAL MANAGEMENT SYSTEM
   CONTRIBUTED TO $547,426 IN QUESTIONED COSTS ............................. 4

   AWARD ACTIVITY SINCE LIMITED
   SCOPE AUDIT WAS ISSUED JULY 2003 ...................................... 6

      NIST Not Reimbursed for Excess Drawdowns ........................... 6

      Financial Status Reports Remain Inaccurate ......................... 6

   RESULTS OF COMPLIANCE AUDIT:
   $582,222 DUE TO FEDERAL GOVERNMENT ................................... 7

AWARDEE'S RESPONSE ........................................................ 7

OIG COMMENTS ............................................................. 8

Recommendation ........................................................... 9

OTHER MATTERS ........................................................... 10

APPENDIXES

   I.   SUMMARY OF FINANCIAL/COMPLIANCE AUDIT

   II.   JULY 2003 OIG AUDIT REPORT

   III.  AWARDEE'S RESPONSE TO DRAFT REPORT

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

### EXECUTIVE SUMMARY

In September 2001, NIST awarded a $2,110,500 Advanced Technology Program (ATP) cooperative agreement to Computer Aided Surgery, Inc., a for-profit company researching Computer and engineering technology. Under the ATP program a single company can receive up to $2 million in ATP funds for the direct costs of Research and Development activities for up to three years. Single company recipients are responsible for funding all of their own overhead and indirect costs. Computer Aided Surgery, Inc included in the award agreement its commitment to provide $110,500 of direct project costs in addition to its' agreement to pay all of the indirect costs.

The agreement with Computer Aided Surgery was for a 3-year period with ATP committing $2 million in federal funds; $800,000 in the first year, $600,000 in the second year, and $600,000 in the third year. Computer Aided Surgery committed in the award agreement to provide a 4.57 percent matching share of the direct costs as follows: $36,500 for the first year, $30,500 for the second year, and $43,500 for the third year. The total direct costs of the project were estimated to be $2,110,500. The purpose of the project was to develop and demonstrate novel computer and engineering technology based on Digital Morse Theory to enhance the quality and usability of computerized anatomic models for precise and accurate cancer treatment therapies.

In the first year of the award, the company withdrew the entire $800,000 in federal funding. The second year of the award began October 1, 2002, and by June 2003, the company withdrew $545,000 of the $600,000 available in federal funds. NIST Grant Officials asked our office to perform an audit to determine whether the company had actual expenditures for the federal funds that had been drawn down since the grants officials were having difficulty getting accurate and complete budget data from Computer Aided Surgery.

In July 2003, our office issued a very limited scope audit report (ATL-16095-3-0001) informing NIST that the company had not contributed any of its required $54,084 cost-share and had drawn down $205,125 in excess of the federal share of ATP project costs based on the information in its own accounting records. In addition, the financial status reports submitted to NIST were inaccurate. We recommended that NIST suspend the award payments until Computer Aided Surgery reimburse NIST the $205,125 for funds drawn down in excess of federal share of ATP project expenses and file corrected Financial Status reports for the period of the award. As of March 31, 2004, Computer Aided Surgery has not reimbursed NIST for the funds drawn down in excess of the federal share of ATP project costs and the award remains suspended.

In this second report we are questioning a total of $547,426 in costs that were either unallowable, unallocable or exceeded the budget limitations established in the ATP award. Our audit also found that while the company has submitted revised financial status reports as required, the reports remain inaccurate. The reports show the amount drawn down by electronic transfer for each quarter rather than the actual costs incurred on the ATP project. We also reported under Other Matters, the primary shareholder's inappropriate use of federal funds as a personal loan account.

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

The officials at Computer Aided Surgery do not agree that any additional matching funds are due NIST nor do they believe that there are any significant questioned costs. The awardee submitted a general explanation of the financial difficulties that Computer Aided Surgery encountered since receiving this award, their overall reasons for disagreeing with our draft report, and a point by point rebuttal of each item of questioned costs. While additional explanations were provided for our consideration, the awardee did not submit any additional documentation to support the costs we questioned in our draft report. We continue to recommend that the NIST ATP disallow $547,426 in questioned costs and recover $582,222 in excess federal funds disbursed.

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL–16095–4–0002.*
*August 2004*

### INTRODUCTION

In September 2001, NIST awarded a $2,110,500 Advanced Technology Program (ATP) cooperative agreement to Computer Aided Surgery, Inc., a for-profit company researching innovative composite design and engineering technology. Under the ATP program a single company can receive up to $2 million for the direct costs of Research and Development activities for up to three years. Single company recipients are responsible for funding all of their own overhead and indirect costs. Small companies like Computer Aided Surgery, Inc., are not required to provide cost-sharing of direct costs; however, they may pay a portion of the direct costs if they wish in addition to all the indirect costs.

The agreement with Computer Aided Surgery was for a 3-year period with ATP committing $2 million in federal funds; $800,000 in the first year, $600,000 in the second year, and $600,000 in the third year. Computer Aided Surgery committed in the award agreement to provide a 4.57 percent matching share of the direct costs as follows; $36,500 for the first year, $30,500 for the second year, and $43,500 for the third year. The total direct costs of the project were estimated to be $2,110,500. The purpose of the project was to develop and demonstrate novel computer and engineering technology based on Digital Morse Theory to enhance the quality and usability of computerized anatomic models for precise and accurate cancer treatment therapies.

In the first year of the award, the company withdrew the entire $800,000 in federal funding. The second year of the award began October 1, 2002, and by June 2003, the company withdrew $545,000 of the $600,000 available in federal funds. NIST Grant Officials asked our office to perform an audit to determine whether the company had actual expenditures for the federal funds that had been drawn down since the grants officials were having difficulty getting accurate and complete budget data from Computer Aided Surgery.

In July 2003, our office issued a very limited scope audit report (ATL–16095–3–0001) informing NIST that the company had not contributed any of its required $54,084 cost-share and had drawn down $205,126 in excess of the federal share of ATP project costs based on the information in its own accounting records. In addition, the financial status reports submitted to NIST were inaccurate. We recommended that NIST suspend the award payments until Computer Aided Surgery reimburse NIST the $205,126 for funds drawn down in excess of federal share of ATP project expenses and file corrected Financial Status reports for the period of the award.

Computer Aided Surgery revised its Financial Status Reports as requested. However, the company also hired another accounting firm after we completed our field work in June 2003 to assist in the company's record keeping and to work with our office while we concluded the audit. The primary owner of Computer Aided Surgery did not believe that it received proper credit for all the project costs it incurred and the accounting firm made adjusting entries to the books and records to identify NIST-related expenses versus corporate costs. As a result, we performed additional fieldwork in December 2003 to review the revised records and additional documentation that Computer Aided Surgery was providing to support its costs.

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

## OBJECTIVES, SCOPE, AND METHODOLOGY

We performed our audit of the NIST award in New York City at the company's office during June 2003 and the accountant's office in December 2003. NIST requested that our office conduct the audit because the grants and program officials were concerned about Computer Aided Surgery's ability to account for federal funds being spent. The purpose of the audit was to determine the financial status of the award, the reasonableness, and allowability of expenses charged against the award and review compliance with applicable laws and regulations. The audit covered the period from October 1, 2001, through June 27, 2003. As a result of our initial fieldwork the award was suspended on June 27, 2003.

After our initial fieldwork, Computer Aided Surgery hired a new accounting firm to adjust its books and records to more accurately reflect government requirements. In addition, Computer Aided Surgery submitted additional documentation to NIST to support its matching share contribution to the project. We performed additional field audit work in December 2003 to review the revised accounting records, examine pertinent company documentation, and interviewed agency and company officials as deemed necessary

We examined a copy of the company's most recent annual audit report for the year ending September 30, 2002. That audit was conducted by an independent certified public accountant in accordance with criteria contained in the *NIST Program Specific Audit Guidelines for advanced Technology Program (ATP) Cooperative Agreements with Single Companies* dated May 1999. The report disclosed internal control weaknesses and questioned costs. We obtained our own understanding of internal controls through inquiries with appropriate personnel, inspection of relevant documentation and observation of Computer Aided Surgery's operation to fairly evaluate the assertions included in the audit report. Our testing related to internal controls was focused only on the controls related to our audit objectives of reviewing the reported costs and administrative practices and was not intended to form an opinion of the adequacy of managements controls. Weaknesses noted in our testing are discussed in the Findings and Recommendations of this report.

We relied on computer-processed data supplied by the company as the basis for our audit findings and recommendations. Consequently, we tested the accuracy by tracing and comparing the data to original source documents and other supporting documents. Based on our tests, we concluded that the computerized data was sufficiently reliable for use in meeting our objectives.

We evaluated the corporation's compliance with federal laws and regulations applicable to the NIST cooperative agreement. We identified NIST's *General Terms and Conditions Advanced Technology Program and DOC Financial Assistance Standard Terms and Conditions* and Special Award Conditions as the applicable federal requirements. Since this is a for-profit company, we also identified 48 CFR Part 31, *Contract Cost Principles and Procedures and 15 CFR Part 14, Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, Other Non-Profit and Commercial Organizations.*

2

We found that the company was not in compliance with certain cooperative agreement requirements. The noncompliance issues are deemed material and are detailed in the "Findings and Recommendations" section of this report. With regard to items not tested, nothing came to our attention that caused us to believe that the company had not complied in all material respects.

We conducted the audit in accordance with Government Auditing Standards issued by the Comptroller General of the United States and included tests of the accounting records and other auditing procedures that we considered necessary to fully address the audit objectives. The audit was performed under the authority of the Inspector General Act of 1978, as amended, and Department Organization Order 10-13, dated May 22, 1980, as amended.

This final audit report supersedes our July 2003 audit report, and resolution of this report should be deemed to constitute final action with respect to the prior report.

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

## FINDINGS AND RECOMMENDATIONS

### AWARDEE'S INADEQUATE FINANCIAL
### MANAGEMENT SYSTEM CONTRIBUTED TO
### $547,426 IN QUESTIONED COSTS

Computer Aided Surgery improperly claimed $547,426 in award costs during the 21-month
project period ending June 27, 2003. The $547,426 in questioned costs represents about
41 percent of the $1,345,500 drawn down prior to the award's suspension. Included in the
questioned costs were costs that should have been considered indirect costs but were claimed as
direct project costs, costs that were specifically not allowable per the budget and costs that
exceeded the budgeted amount. Computer Aided Surgery's financial management system failed
to provide effective controls over the accountability for all funds, including written procedures
for determining the reasonableness, allocability and allowability of costs and comparison of costs
to budget amounts. These inadequacies in the financial management system contributed to the
improper claims by Computer Aided Surgery and will result in a refund due NIST of $582,222.
The questioned costs are detailed in Appendix I.

Under the ATP program a single company can receive up to $2 million for the direct costs of
Research and Development activities. Included in the $547,426 of questioned costs were costs
that should have been accounted for as indirect costs and absorbed by the company rather than
claimed as direct ATP award costs.

According to the ATP Proposal Preparation Kit,

> "ATP projects are industry/government, cost shared projects. A company proposing
> to recover 100 percent of the project costs (*because all project costs are charged as
> direct costs*) from ATP is not complying with the spirit of the ATP statute because
> the company has no funds of its own at risk."

During the audited period, Computer Aided Surgery's only source of external funding was the
NIST ATP award. The primary owner of the company paid for some of the corporate expenses
out of his personal funds. However, the fact that there is only a single federal funding source
does not imply that all costs incurred by the corporation should be claimed against the ATP
award. While the main activity of Computer Aided Surgery was the Research and Development
Award, there were management and general activities including oversight, business
management, general record keeping, future fund-raising and related administrative activities
that comprise the overall administration of the business.

Recipients of ATP awards are required to have a financial management system that meets the
standards found in 15 CFR Part 14, *Uniform Administrative Requirement for Grants and
Agreements with Institution of Higher Education, Hospitals, Non-Profit and Commercial
Organizations*. Standards for financial management systems are found in Subpart C, Section 21
and require recipient's financial management system to include the following:

4

- "effective control over and accountability for all funds...",

- "written procedures for determining the reasonableness, allocability and allowability of costs in accordance with the provision of the applicable federal cost principles and the terms and conditions of the award," and

- "Comparison of outlays with budget amounts for each award."

Since the ATP budget included only direct project costs, the financial management system needs to be able to properly classify costs as either direct or indirect.

Computer Aided Surgery does not have a financial management system that allows it to determine readily which of its costs are direct and which are indirect. The general ledger does not separate direct from indirect costs, and Computer Aided Surgery never prepared an indirect cost proposal that identified each item of cost to be included in the indirect cost pools.

The cost principles identified in 48 CFR Part 31, *Contract Cost Principles and Procedures*, do not provide any specific guidance on what would be typical indirect costs. However, ATP's Proposal Preparation Kit states that typical examples of indirect costs include general administration, maintenance, library expenses, and accounting. The kit also states that if the recipient has an adequate accounting system consistent with generally accepted accounting principles, then certain expense items should fall into indirect cost categories, even for a new start up company with only one project.

The Computer Aided Surgery financial management system did not identify the costs that were direct costs and those that were indirect costs. As a result, Computer Aided Surgery has inappropriately charged the following indirect costs to the ATP award: rent, utilities, salary costs and related fringe benefits for company employees that should have had their salaries allocated between the ATP project and other corporate duties, and legal and accounting costs.

Also, Computer Aided Surgery's financial management system did not identify the costs that were specifically unallowable per the award budget. As a result, Computer Aided Surgery inappropriately charged the ATP project for costs that were specifically unallowable per the budget and budget negotiation documents. These unallowable costs include: salary costs and related fringe benefits of employees not approved to work on the project, specific travel and transportation expenses, material and supply costs, and subcontractor expenses.

Finally, the financial management system did not compare the outlays with the budget amounts for specific items in the budget. This resulted in Computer Aided Surgery exceeding the budgeted amount for equipment, supplies and other direct costs.

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

## AWARD ACTIVITY SINCE LIMITED
## SCOPE AUDIT ISSUED JULY 2003

In July 2003, our office issued a very limited scope audit report (ATL 16095-3-0001) informing NIST that the company had not contributed any of its required $54,068 cost-share and had drawn down $205,126 in excess of the federal share of ATP project costs based on the information in its own accounting records.  In addition, the financial status reports submitted to NIST were inaccurate and the reports for the second year of the award had not yet been submitted.  We recommended that NIST suspend the award payments until Computer Aided Surgery reimburses NIST for the excess drawdowns including the cost-share not yet provided and file corrected Financial Status reports for the period of the award.

### NIST Not Reimbursed for Excess Drawdowns

Computer Aided Surgery didn't reimburse NIST for the $205,126 in excess drawdowns identified in our July 2003 report.  While the primary shareholder of Computer Aided Surgery has said that he intends to contribute his own funds to the ATP project, the excess drawdowns identified in our previous report are still classified as a loan Computer Aided Surgery owes NIST.  As shown in their combined balance sheet for June 30, 2003, Computer Aided Surgery owes the ATP program $249,375 (See Other Matters, page 8).

### Financial Status Reports Remain Inaccurate

Over the course of the award, Computer Aided Surgery has had three separate accounting groups managing the books and records of the corporation including the documentation and financial reports required for the NIST ATP project.  The financial reports present the company's cumulative financial operations through each quarterly period.  NIST uses the quarterly reports to monitor the awards and to ensure that recipients are managing funds in accordance with the cooperative agreement and the agency's administrative requirements.  Therefore, it is essential that the reports are submitted timely and are accurate.

Our original review disclosed that Computer Aided Surgery filed inaccurate Financial Status Reports (SF-269's) for each of the four quarters during the period October 1, 2001, through September 30, 2002.  The inaccurate reports show the amount of federal funds drawn down rather than actual federal expenditures in the box designated "federal outlays for the quarter," thereby, overstating expenditures.  Additionally, Computer Aided Surgery claimed that it had contributed the required cost-share funds, when in fact; no matching funds have been contributed.  The Financial Status Reports had not been completed for any of the quarters in year two of the award.

Computer Aided Surgery has since filed "revised " Financial Status Reports for each of the four quarters ending with September 30, 2002, and submitted Financial Status reports for the three quarters during the period October 1, 2002, through June 27, 2003.  However, all of these reports remain inaccurate.  The reports continue to show the amount of federal funds drawn down rather than actual federal expenditures.  These claims also show that total outlays were from federal funds and Computer Aided Surgery did not contribute any of its own funds.

NIST General Terms and Conditions, Advance Technology Program, Section 7.c. (3)(a) states:

> "The Recipient shall submit a "Financial Status Report" (SF-269) on a calendar quarter basis for the periods ending March 31, June 30, September 30, and December 31, or any portion thereof, unless otherwise specified in a special award condition. Reports are due no later than 30 days following the end of each reporting period."

Since NIST suspended the award on June 27, 2003, and this audit covers the entire period of the award, we are not making any recommendations on revising the Financial Status Reports.

## RESULTS OF COMPLIANCE AUDIT:
## $582,222 DUE TO FEDERAL GOVERNMENT

The compliance audit of the three-year cooperative agreement covered the period October 1, 2001, through June 27, 2003. During this period, the company claimed $1,345,500 in project costs. We are questioning $547,426 of this amount and, as a result, our audit shows that the company is entitled to only $763,278 in federal funds. Since $1,345,500 in federal funds were disbursed, we are recommending that $582,222 in excess funds be recovered, which includes $205,126 from our July 2003 audit report. The audit results are summarized below and detailed in Appendix I.

| | | |
|---|---:|---:|
| Federal Funds Disbursed | | $1,345,500 |
| | | |
| Costs Claimed | $1,345,500 | |
| Less: Costs Questioned | 547,426 | |
| Costs Accepted | $ 798,074 | |
| Federal Cost Sharing Ratio | x   .9564 | |
| | | |
| Less: Federal Funds Earned | | 763,278 |
| | | |
| Refund Due Federal Government | | $   582,222 (1) |

(1) Includes refund due from our July 2003 Audit Report (See Appendix II)

**Awardee Response**

Computer Aided Surgery does not agree with the findings and recommendations in our draft report. Specifically, officials at Computer Aided Surgery stated that no additional matching funds are due NIST nor are there any significant questioned costs. The financial problems the company has experienced can be attributed to 1) the company's inexperience with cooperative agreements, and 2) bad advice from its accountant/auditor that ultimately misled Computer Aided Surgery, OIG and NIST ATP officials.

According to its response, Computer Aided Surgery's main issue with the draft report is the OIG's refusal to accept the word of its principal investigator that he had verbal approval from NIST officials for the costs questioned in the report. He asserts that because of the small size

and unusual nature of Computer Aided Surgery, the company cannot be expected to adhere to the same governmental cost guidelines that are used by larger companies. Finally, the OIG is reminded that it is more important to comply with the spirit of the law than the letter of the law.

Officials of Computer Aided Surgery stated that the OIG auditor has not considered the revised financial statements submitted in December 2003. Furthermore, the company was not given credit for its significantly improved business practices and fiscal control in the second year of the award. Finally, Computer Aided Surgery officials stated that its scientific output outweighs any accounting problems. Milestones are being met and basic science is being done.

The response included a point by point rebuttal attached as Exhibit I. The rebuttal explains why the company believes the questioned costs should be allowed.

**OIG Comments**

We do not agree with the recipient's response. While our flash report issued in July 2003 was based on Computer Aided Surgery's earlier accounting records, our Draft Audit Report ATL-16095-4-0001 relied on the revised books and records provided our office in December 2003. We also accepted additional corrections forwarded to our office in February 2004.

We performed our audit in accordance with Government Auditing Standards which require that we obtain evidence to support our audit work. In this audit, we examined the costs claimed by Computer Aided Surgery against its own books and records and written correspondence with ATP grant officers concerning budget negotiations. We evaluated the corporations compliance with the Award's terms and conditions including the required cost principles (15 CFR Part 31) and the program information found in the ATP Proposal Preparation Kit which is provided to potential ATP recipients.

During year one budget negotiations, ATP grant officials did not approve many of the budget revisions requested by Computer Aided Surgery. In addition, ATP officials continually reminded Computer Aided Surgery that expenses' routinely considered to be indirect costs must be absorbed by the company. This rationale is consistent with information provided to NIST recipients in the ATP proposal preparation kit.

We disagree with the recipients' observation that significant management improvements were made during the second year of the award. During year two, of the award, the principal investigator paid himself salary checks in excess of twice his normal rate, thereby advancing himself salary payments. In addition, during the eight days the auditor was on-site (June 2003), the principal investigator consistently violated financial controls put in place by his business manager. For example, the business manager attempted to establish a policy where a check would not be written until he approved the invoice payment. The principal investigator hand wrote checks while we were on-site for invoices not submitted or approved by the business manager.

*U.S. Department of Commerce*
*Office of Inspector General*                                                                              *Report ATL-16095-4-0002*
                                                                                                                          *August 2004*

We find no merit to the argument that it is more important to adhere to the spirit of the law rather than to the terms and conditions of the Award Agreement signed by both ATP officials and Computer Aided Surgery.

Finally, we reviewed the point by point rebuttal of questioned costs attached as Exhibit I of the response. The rebuttal did not provide any new documentation not already considered by the auditor, and did not result in the OIG changing our position on the costs questioned.

### Recommendation

We recommend that the NIST ATP Director disallow $547,426 in questioned costs and recover $582,222 in excess federal funds disbursed.

*U.S. Department of Commerce*                                   *Report ATL-16095-4-0002*
*Office of Inspector General*                                          *August 2004*

## OTHER MATTERS

Computer Aided Surgery's combined balance sheet for June 30, 2003, shows that the corporation owes NIST $249,375 of federal funds that were drawn down over the 21-month period in excess of the project related costs identified in the accounting records. These excess drawdowns are currently accounted for as loans owed by Computer Aided Surgery to the ATP program.

We reviewed the transactions related to the loan account. Some of the transactions in the loan account are due to the most recent accounting firms recording of known unallowable costs as loans due NIST. However, other transactions in the loan account are due to the inappropriate use of federal funds as a personal loan account by Computer Aided Surgery's primary owner who is also the Chief Technical Officer on the ATP Project.

As an example, on October 26, 2001, Computer Aided Surgery received its initial electronic transfer of $150,000 of federal funds. This money was put into an existing checking account with a balance of less than $5,000. On the same day the Chief Technical Officer wrote himself a check for $75,000 that was recorded initially as an advance on salary and later as part of the loan account. In addition, the Chief Technical Officer wrote himself nine checks, $2,000 each, for rent of office space covering the period January 2000 through September 2000, a period of time a full year before the start of the ATP award. This is a total of $93,000 that went directly to the Chief Technical Officer of the initial $150,000 electronic transfer. The use of federal funds as a personal loan account is completely inappropriate.

In addition to the general requirement found in the financial management standards that a recipient should minimize the time elapsing between the transfer of funds from the U.S. Treasury, the *Advanced Technology Program Special Award Conditions* Section 9.c. states:

> "Advances ... shall be limited to the minimum amounts necessary to meet immediate disbursement needs. Advanced funds not disbursed in a timely manner must be promptly returned ... Advances shall be for periods not to exceed 30 days."

We cannot say for certain how much of the $249,375 is due to personal use of federal funds because the account balances have been transferred between the personal loan account and the corporate loan account and the resulting co-mingled loan account balances have been offset with legitimate loan reducing payments such as the salary not paid to the Chief Technical Officer and retained by Computer Aided Surgery to reduce the amount owed to NIST.

*for* *Kathleen M. McKevitt*        8/25/04
William F. Bedwell, Jr.                        Date
Regional Inspector General
   for Audits

10

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

**APPENDIX I**
**Page 1 of 8**

**COMPUTER AIDED SURGERY, INC**
**NIST AWARD NO. 70NANB1H3050**
**SUMMARY OF FINANCIAL/COMPLIANCE AUDIT**
**OCTOBER 1, 2001 THROUGH JUNE 27, 2003**

| Cost Category | Award Budget | Cost Claimed | Costs Questioned | Costs Unsupported | Costs Accepted | Ref Notes |
|---|---|---|---|---|---|---|
| Personnel | 700,000 | 569,911 | 104,683 | | 465,228 | 1 |
| | | | | | | |
| Fringe Benefits | 238,000 | 158,576 | 68,884 | | 89,692 | 2 |
| | | | | | | |
| Travel | 29,000 | 36,538 | 23,998 | | 12,540 | 3 |
| | | | | | | |
| Equipment | 119,000 | 311,923 | | | | |
| Reclassified Costs | | 8,520 | | | | |
| Adj. Equipment | | 320,443 | 201,443 | | 119,000 | 4 |
| | | | | | | |
| Supplies | 11,000 | 47,864 | | | | |
| Reclassified Costs | | (8,520) | | | | |
| Adjusted Supplies | | 39,344 | 24,011 | | 15,333 | 5 |
| | | | | | | |
| Subcontracts | 360,000 | 163,653 | | | | |
| Reclassified Costs | | (16,500) | | | | |
| Adj. Subcontracts | | 147,153 | 67,372 | | 79,781 | 6 |
| | | | | | | |
| Other | 10,000 | 57,035 | | | | |
| Reclassified Costs | | 16,500 | | | | |
| Adjusted Other | | 73,535 | 57,035 | | 16,500 | 7 |
| | | | | | | |
| Total | 1,467,000 | 1,345,500 | 547,426 | | 798,074 | |

Reclassified Costs

   a. $16,500 of costs claimed as "Subcontracts" was reclassified to "Other." This was done because the "Other" category included the amount budgeted for the audit.

   b. $8,520 of costs claimed as "Supplies" was reclassified to "Equipment." The cost was for the purchase of a scanner.

Computation of funds due government:

   Federal Funds Disbursed                             $1,345,500

   Costs Claimed          $1,345,500
   Less: Costs Questioned     547,426

   Costs Accepted         $ 798,074
   Federal Cost Sharing Ratio    x  .9564

   Less: Federal Funds Earned                  763,278

   Refund Due Federal Government          $ 582,222 (1)

   (1) Includes refund due from our July 2003 Audit Report (See Appendix II)

**DRAFT**

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

**APPENDIX I**
**Page 2 of 8**

**REFERENCE NOTES**

1. Personnel Costs

   $104,683 in personnel costs are questioned because these costs are not allocable or allowable to the ATP project.

   - $71,550 is not allocable to the ATP project. 48 CFR Part 31.201-4 states "A cost is allocable if it is assignable or changeable to one or more cost objectives on the basis of relative benefits received." While Computer Aided Surgery has only one federally funded project, the Chief Operating Officer and the Chief Technical Officer spend time on organizational tasks for the business in addition to the work performed on the NIST project. Based on interviews concerning their responsibilities, we allocated a percentage of time for the non-NIST activities and questioned that same percentage of salary cost.

     o $25,000 of the $71,550 is questioned for the Chief Operating Officer due to 25 percent of his time and salary being allocated to non-NIST activities.

     o $46,550 of the $71,550 is questioned for the Chief Technical Officer due to 15 percent of his time and salary being allocated to non-NIST activities.

   - $33,133 is not allowable because NIST grants officials did not approve the salary cost for two employees of Computer Aided Surgery. For a cost to be considered allowable, it must be reasonable and allocable and not prohibited by the provisions of the cost principles or contractual terms and conditions. Computer Aided Surgery's Chief Technical Officer requested approval for the salary cost of the following employees as part of its budget approval but did not receive NIST approval.

     o $15,222 of the $33,133 is questioned for the Fiscal Control employee as the position was never approved by NIST.

     o $17,911 of the $33,133 is questioned for the year two Business Manager as the position was never approved by NIST.

**DRAFT**

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

**APPENDIX I**
**Page 3 of 8**

2. Fringe Benefits

$68,884 in fringe benefit costs are questioned because these costs are not allowable according to the cost principles or are not allocable to the ATP project.

- $52,227 is not allowable because Computer Aided Surgery did not have a plan for the various costs charged as fringe benefits. Fringe Benefits are considered as part of an employee's compensation. 48CFR Part 31- 205-6 (a)(3) states, "The compensation must be based upon and conform to the terms and conditions of the contractor's established compensation or practice followed so consistently as to imply, in effect, an agreement to make the payment.

    o $48,989 of the $52,227 is questioned for the medical expenses paid in excess of employee's insurance reimbursements. These medical expenses were primarily paid for one employee who is the Chief Technical Officer on the project and the primary shareholder of the corporation. In addition, to not having an established plan, 48 CFR part 31 205 (b)(2) provides that under certain conditions the allowability of compensation requires closer scrutiny such as in the case of compensation to owners of a closely held corporation or where the business is such that its compensation levels are not subject to the restraint that normally occur in the conduct of competitive business.

    o $3,238 of the $52,227 is questioned for education cost paid for an employee of the corporation. Payment for education expenses is not part of a stated fringe benefit plan and is not an ordinary expense of the corporation.

- $14,196 of the $68,884 is questioned because it is a cost directly associated with another questioned costs. 48 CFR 31-201 – 6 (a) defines a directly associated costs as any cost which is generated solely as a result of incurring another cost and which would not have been incurred had the other cost not been incurred. When an unallowable cost is incurred, its directly associated costs are also unallowable.

    o $3,130 of the $14,196 is questioned for health insurance cost directly associated with the re-allocation of a percentage of the Chief Operating Officer and Chief Technical Officer's salary to non-NIST activities.

    o $2,600 of the $14,196 is questioned for childcare cost paid for the child of the fiscal control staff. Since the salary of the fiscal control staff person was not approved then the associated cost of childcare is questioned.

**DRAFT**

   o $8,466 of the $14,196 is questioned for payroll tax expense directly associated with the re-allocation of a percentage of the Chief Operating Officer and Chief Technical Officer's salary to non-NIST activities. Additionally, it includes the payroll tax expense directly associated with the business manager's and the fiscal control employee's salary that were never approved by NIST.

  • $355 of the $68,884 is questioned for miscellaneous fitness costs in excess of gym membership paid.

  • $2,106 of the $68,884 is parking related costs for employees while they are at work and for medical visits. NIST grants officials did not approve these costs as part of the budget.

3. Travel

$23,998 in travel costs are questioned. The travel expenses questioned included costs for gas, local parking, taxis, tolls, meals and miscellaneous other items. We allowed the travel costs for conferences attended by the Chief Technical Officer.

4. Equipment

$201,443 in equipment cost is questioned because these costs were not allowable according to the cost principles, are not allocable to the ATP project, or costs exceeded the amount included in the budget for equipment. We reclassified $8,520 to the equipment cost category from the supply cost category so the Adjusted Equipment Costs claimed is $320,443.

  • $18,424 of the $201,443 is questioned because the costs were for capital improvements on the apartment owned by the primary shareholder of Computer Aided Surgery and used by the company as its place of business. NIST Grants Officials did not approve any apartment related expenses as part of the ATP project.

   o $3,500 of the $18,424 is questioned because even though Mistretta Electric was correctly identified in Computer Aided Surgery's accounting records as capital improvement expenses these costs were incorrectly charged to NIST as equipment expenses.

# DRAFT

*U.S. Department of Commerce*
*Office of Inspector General*

Report ATL-16095-4-0002
*August 2004*

**APPENDIX I**
**Page 5 of 8**

- o  $14,924 of the $18,424 is questioned because these are costs for capital improvement that were incorrectly identified in Computer Aided Surgery's accounting records as equipment costs. The costs include: Metro Solar $1,000; Jensen Tools $351; Figlia & Sons $1,995; Abe Karron $14; Homefront Hardware $6,313; Homefront True Value $3,349; Kips Bay Hardware $80; 3DFX Cool $86; Micromark $986; Bator Bintor $700; Home Depot $31; and Render $19.

- • $2,533 of the $201,443 is questioned because the costs were booked twice. These costs include: Office Depot $690; Jensen Tools $3; Homefront Hardware $229; Cables America $717; Datavision Computer $98; Kips Bay Hardware $35; Radio Shack $100; Microsoft Technical $245; Real Audio Video $30; Techalchemy Software $36; Ellerate $20; Apple Computers $32; RegSoft $40; and Software for Science $258.

- • $703 of the $201,443 is questioned because the costs were not allocable to the ATP award. These costs Intuit QB Payroll $129; Sid's Bike Shop $17; Regsoft.com $118; and PayPal $439.

- • $265 of the $201,443 is questioned because NIST grants officials did not approve the costs of dues & subscription in the budget.

- • $179,518 of the $201,443 is questioned as the cost exceeded the amount included in the budget for equipment. Since the cumulative amount of the transfer exceeded 10 percent of the total award, NIST must approve the transfer of funds between line items.

5.  Supplies

$24,011 in supply costs are questioned because these costs are not allowable according to the cost principles or are not allocable to the ATP project. We reclassified $8,520 from the supply cost category to the equipment cost category so the Adjusted Supplies Cost Claimed is $39,344.

- • $21,506 of the $24,011is questioned because NIST grants officials did not approve these costs in the budget.

  - o  $378 for Chase monthly bank analysis includes $30 in NSF charges.

  - o  $2,952 for dues and subscriptions for American Express $623, Real.com $129; ACM $198; IEEE $1,344; Qiosk $12; American Association $186 and Sigma Xi $460.

**DRAFT**

**APPENDIX I**
**Page 6 of 8**

o  $599 for miscellaneous costs to Borders Books $49; Barnes & Nobel $18; PayPal $473; and Niestre $59.

o  $285 for Internet costs paid to Thorn Communication that was incurred prior to the award period.

o  $15,809 for cable hook-up of the Internet and monthly charges based on internet usage. The proposal listed the cost of the internet as an indirect cost and therefore not an allowable direct project cost. These costs include: Thorn Communication $4.903; Webworqs $6,300; Janet Laylor $161; Time Warner Cable $2,038; RCN $1,539; Verizon ISDN $238; Verizon Wireless $82; T-Mobile $237; Unknown purchase $25; Sprint $250; and IDT America $36.

o  $1,014 was reclassified from the miscellaneous category to the Internet category in the supply expense. This costs was to Black Box.

• $2,323 of the $24,011 is questioned because the cost was booked twice. These costs included:  Q-Pass $50; PayPal $62; Jensen tools ($72); Office Depot $1,637; Sigma Xi $460; and American Association $186.

• $651 of the $24,011 is questioned because these costs are for capital improvements paid to various vendors that were incorrectly identified in Computer Aided Surgery's accounting records as supply costs. The costs include: Denver Air Support $295, and Homefront Hardware $356.

The supplies budget was for $11,000. However, we did not question the costs that exceeded the budgeted amount because NIST allows the recipient to re-allocate up to 10 percent of the total budget between direct cost categories without prior approval.

6.  Subcontract

$67,372 in subcontract costs are questioned because these costs are not allowable according to the cost principles or are not allocable to the ATP project. We reclassified $16,500 from the subcontract cost category to the other cost category so the Adjusted Subcontract Cost Claimed is $147, 153.

• $37,146 of the $67,372 is questioned because these costs should have been considered indirect costs and are not allowable ATP direct project costs

o  $2,465 is questioned for tax work done by the auditor and a training course taken by the auditor that is not allocable to the ATP award.

**DRAFT**

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

**APPENDIX I**
**Page 7 of 8**

- o $7,455 is questioned for legal costs, NIST grants officials did not approve as part of the budget.

- o $25,317 is questioned for bookkeeping service, NIST grants officials did not approve this cost as part of the budget.

- o $909 is questioned for clerical costs that are indirect costs and not allowable direct ATP costs.

- o $1,000 is questioned for work performed by Valley of the Mage Consultants. NIST grants officials did not approve this cost as part of the budget.

- $1,000 of the $67,372 is questioned for payments to the Chief Technical Officer's Brother for the setting up a projector purchased with ATP funds. The purchase of a projector was not in the budget or approved by NIST grants officials, and the associated installation is not allowable.

- $12,000 of the $67,372 is questioned for a subcontract with ATG consultants. These are the consultants that assisted Computer Aided Surgery in preparing the proposal for the ATP award. NIST grants officials did not approve this subcontract as part of the budget. It is also unallowable as a cost incurred prior to the award.

- $400 of the $67,372 is questioned because these costs are to Axiom, Inc., a consulting firm hired to assist in the budget negotiations with NIST. NIST grants official did not approve this subcontract as part of the budget.

- $170 of the $67,372 is questioned because these costs were for a consultant for PayPal that NIST grants officials did not approve as part of the budget.

- $16,656 of the $67,372 is questioned for the cost of equipment installation that is a capital improvement to the apartment and is unallowable to this award. These costs include: Mistretta Electric $1,900; Metro Solar $1,040; Bator Bintor $12,059; and Columbia Interiors $1,657.

**DRAFT**

*U.S. Department of Commerce*
*Office of Inspector General*

*Report ATL-16095-4-0002*
*August 2004*

**APPENDIX I**
**Page 8 of 8**

7.  Other

$57,035 in other costs are questioned because these are costs booked to the non-NIST
costs on the Computer Aided Surgery, Inc., books. The costs cannot be specifically
identified to a category, as the amount is the difference between the NIST costs booked
and the cost claimed on the SF-269 (see page 6 of this report). The non-NIST cost
categories include: electricity, legal, rent, cleaning, telephone, and other costs of
operating Computer Aided Surgery, Inc. that should have been considered indirect costs
and not allowable as ATP direct project costs. We reclassified $16,500 to the other cost
category from the subcontract cost category so the Adjusted Other Cost Claimed is
$73,535.

The "Other" budget category only had $10,000 in the budget. However, we did not
question the costs that exceeded budget in this category because NIST allows up to 10
percent of the total budget to be re-allocated to direct cost categories without NIST
approval.

**DRAFT**

APPENDIX II
Page 1 of 6

### U.S. DEPARTMENT OF COMMERCE
*Office of Inspector General*



# NATIONAL INSTITUTE OF STANDARDS & TECHNOLOGY

*Computer Aided Surgery Inc.*
*New York, New York*

*ATP Award No. 70NANB1H3050*

*Audit Report No. ATL-16095-3-0001 /July 2003*

THIS AUDIT REPORT MAY CONTAIN PROPRIETARY DATA
EXEMPTED FROM DISCLOSURE UNDER THE FREEDOM OF
INFORMATION ACT (5 U.S.C. 552) BY THE OMNIBUS TRADE
AND COMPETITIVENESS ACT OF 1988 (15 U.S.C. 278N)

*Office of Audits, Atlanta Regional Office*

*U.S. Department of Commerce*
*Office of Inspector General*

JUL 2 5 2003

MEMORANDUM FOR:      Shamim Shaikh, Acting Chief
                              Grants and Agreements Management Division
                              National Institute of Standards and Technology

*Kathleen M. McKevitt*

FROM:              *for*      William F. Bedwell, Jr.
                                Regional Inspector General
                                for Audits

SUBJECT:           NIST Cooperative Agreement Number 70NANB1H3050
                                Computer Aided Surgery, Inc., NY
                                  Final Report No. ATL-16095-3-0001

This report on our audit of the subject NIST Advanced Technology Program cooperative agreement with Computer Aided Surgery, Inc. is to inform NIST officials of significant findings that require their immediate attention. Based on Computer Aided Surgery's own accounting records, the company should reimburse NIST $205,126. The corporation has not contributed any of its required cost-share, which currently totals $54,068, and has drawn down $205,126 in excess of the federal share of ATP project costs identified in its accounting records. The Financial Status Reports filed with NIST are inaccurate because they show that the company contributed the required matching funds and the reports overstate ATP project expenses. We will issue a separate comprehensive audit report including questioned costs and other non-compliance issues covering the period October 1, 2001, through June 27, 2003.

We are providing a copy of this report to Computer Aided Surgery. However, we have not requested the company prepare a written response to NIST addressing the report findings or recommendations. We will include these findings in the subsequent comprehensive audit report to allow for due process. Requests from the public for copies of this report must be referred to the Office of Inspector General, Office of Compliance and Administration Publication Unit, Room 7009C, Herbert C. Hoover Building, for response under the Freedom of Information Act.

Any information or inquiry regarding this final report should be directed to me at (404) 730-2780, or Kathleen McKevitt of this office at the same number. We appreciate the cooperation and courtesies extended by NIST officials during our audit.

*U.S. Department of Commerce*
*Office of Inspector General*

### Introduction

In September 2001, NIST awarded a $2,110,500 Advanced Technology Program cooperative agreement to Computer Aided Surgery, Inc., a for-profit company involved in innovative composite design and engineering. The agreement was for a 3-year period with $800,000 in federal funds for the first year, $600,000 for the second year, and $600,000 in the third year. The agreement required the company provide a matching share of $36,500 for the first year, $30,500 for the second year, and $43,500 for the third year.

The purpose of the agreement was to develop and demonstrate novel computer and engineering technology based on Digital Morse Theory to enhance the quality and usability of computerized anatomic models for precise and accurate cancer treatment therapies.

### Purpose and Scope of Audit

We performed the audit of the NIST award at the company's office in New York City during June 2003. NIST requested that our office conduct the audit because the grants and program officials were concerned about Computer Aided Surgery's ability to account for federal funds being spent. The purpose of the audit was to determine the financial status of the award, the reasonableness and allowability of expenses charged against the award and review compliance with applicable laws and regulations. The audit covered the period from October 1, 2001, through June 27, 2003. We examined pertinent NIST and company records, and interviewed agency and company officials as deemed necessary.

We relied on computer-processed data supplied by the company as the basis for our audit findings and recommendations. Consequently, we tested the accuracy by tracing and comparing the data to original source documents and other supporting documents. Based on our tests, we concluded that the computerized data was sufficiently reliable for use in meeting our objectives.

We conducted the audit in accordance with generally accepted government auditing standards, and performed it under the authority of the Inspector General Act of 1978, as amended, and Department Organization Order 10-13, dated May 22, 1980, as amended.

### Results of the Audit

During our audit, we found significant problems that we brought to the grants officers attention with a conference call on June 24, 2003 and are documenting with this report. Computer Aided Surgery has not contributed any of its required matching funds, which currently totals $54,068. In addition, the company drew down $205,126 in excess of the federal share of ATP project costs recorded in its accounting records. Finally, the Financial Status reports filed with NIST are inaccurate because they overstate expenses to justify the excess draw-downs and include a cost-share amount that was never contributed. NIST informed us that they suspended further award payments to Computer Aided Surgery as of June 27, 2003. We are working with the company to obtain additional documentation so that we can provide a comprehensive audit of the allowability and reasonableness of ATP project expenses for the period October 1, 2001 through June 27, 2003.

*U.S. Department of Commerce*
*Office of Inspector General*

$54,068 of Required
Matching Funds Not Contributed

Computer Aided Surgery has not contributed any matching funds to the project even though the
NIST award agreement requires a cost share of 4.57 percent.  The Chief Technical Officer of
Computer Aided Surgery identified the State of New York as the source of the matching funds,
but the funding was not received due to the state's budget problems after September 11, 2001.
While the primary owner and Chief Technical Officer of Computer Aided Surgery intends to
contribute his own funds to the ATP project, none of these required funds have been contributed
to date.

The matching funds required for the project based on the ATP identified expenses in the
company's accounting records are shown below:

| Award Amendment | Period | Required Cost-Share | ATP Project Costs Per Books | Required Cost-Share |
|---|---|---|---|---|
| # 2 | 10/01/2001 - 09/30/2002 | 4.36% | $  779,905 | $    34,004 |
| #3 | 10/01/2002 - 06/27/2003 | 4.84% | 414,537 | 20,064 |
| **Total** | | | $1,194,442 | $   54,068 |

$205,126 in Excess Drawdowns

Our audit revealed that Computer Aided Surgery drew down $205,126 of federal funds over the
21-month period in excess of the federal share of ATP expenses identified in its own accounting
records.  A review of the company's financial records revealed that these excess draw-downs
were not spent on ATP project expenses.  The amount of drawdowns in excess of the federal
share of ATP project expenses for the period October 1, 2002 through June 27, 2003 is shown
below:

| | 10/01/01 – 09/30/02 | 10/01/02 – 06/27/03 | Cumulative |
|---|---|---|---|
| **ATP Project Expenses Per Books** | $ 779,905 | $ 414,537 | 1,194,442 |
| **Federal Share of Project** | 95.64% | 95.16% | |
| **Federal Share of ATP Expenses** | $745,901 | $394,473 | 1,140,374 |
| **Federal Funds Drawn-down** | 800,000 | 545,500 | 1,345,500 |
| **Excess Draw-downs of Federal Funds** | $    54,099 | $ 151,027 | $   205,126 |

As shown above, the company drew down $1,345,500 in federal funds between October 1, 2001
and June 27, 2003.  However, a review of the company's general ledger revealed only

*U.S. Department of Commerce*
*Office of Inspector General*

$1,194,442 in ATP project costs during this same 21-month period and based on the project's federal cost-share, Computer Aided Surgery was only entitled to $1,140,374. The $205,126 excess funds went to pay expenses not related to the ATP project. It appears that Computer Aided Surgery's only source of revenue during the period of the award has been the NIST funds.

The *Advanced Technology Program Special Award Conditions* Section 9. c. states:

> "Advances ... shall be limited to the minimum amounts necessary to meet immediate disbursement needs. Advanced funds not disbursed in a timely manner must be promptly returned .... Advances shall be for periods not to exceed 30 days."

Inaccurate Financial Status Reports

Computer Aided Surgery filed inaccurate Financial Status Reports (SF-269's) for each of the four quarters during the period October 1, 2001 through September 30, 2002. The erroneous reports show the amount of federal funds drawn down rather than actual federal expenditures in the box designated "federal outlays for the quarter," thereby, overstating expenditures. Additionally, Computer Aided Surgery claimed that it had contributed the required cost-share funds, when in fact; no matching funds have been contributed. The Financial Status Reports have not been completed for the periods ending December 31, 2002 or March 31, 2003.

The *Advanced Technology Program General Terms and Conditions* Section 7.c. (1) states:

> "By signing this award the Recipient agrees to ensure that only actual costs incurred will be charged to the award and that all costs will be reasonable, allocable, and allowable in accordance with the applicable Federal Cost Principles."

Additionally section 7.c. (3)(a) states:

> "The Recipient shall submit a "Financial Status Report" (SF-269) on a calendar quarter basis for the periods ending March 31, June 30, September 30, and December 31, or any portion thereof, unless otherwise specified in a special award condition. Reports are due no later than 30 days following the end of each reporting period."

4

**Recommendations**

We are recommending that NIST:

1.  Continue to suspend award payments to Computer Aided Surgery, Inc., until it
    meets with the following requirements:

    *   Reimburse NIST $205,126 for funds drawn down in excess of the federal
        share of ATP project expenses.

    *   File the Financial Status Reports (SF-269) for the quarters ending
        December 31, 2002, and March 31, 2003.

2.  Designate the company as a "high risk" organization and, at a minimum place it
    on a reimbursement basis for future drawdowns, if the suspension of award
    payments is removed.

**Funds to Be Put to Better Use**

By implementing this recommendation, $205,126 in federal funds will be put to better
use by returning the funds to NIST and ensuring that the funds are used only for the NIST
project.

cc:     Sharon Bisco, Audit Liaison, NIST
        Marilyn Goldstein, NIST Grants Officer
        Barbara Lambis, Policy and Operations Advisor, ATP
        Hope Snowden, Grants Management Specialist, NIST-ATP
        Bettijoyce B. Lide, Program Manager, NIST-ATP
        Dan Karron, Chief Executive Officer,
            Computer Aided Surgery, Inc.



## Computer Aided Surgery Informatics

Formerly known as Computer Aided Surgery, Inc

Inventors of Digital Morse Theory (DMT) for
Innovative Medical Anatomic Modeling and Advanced Surgical Super-specialty Research
D. B. Karron, Ph.D., President and Chief Technical Officer
300 East 33rd Street, Suite 4N, New York, New York, 10016
Telephone and Voice Mail: +1 (212)  586  8748 Fax:  +1 (212)  448  0261.
Electronic Mail: karron@casi.net  Internet/World Wide Web: http://www.casi.net
Monday, May 10, 2004 at 018:11:21 Hours

# Response to Draft Audit Report on
# Computer Aided Surgery, Inc.
# In the matter of NIST Cooperative Agreement Number
# 70NANB1H3050
# Response Material for Inclusion into
# Draft Audit Report No. ATL-16095-4-0002 / March 2004

Prepared by
Dr D B Karron, with assistance from
Mr. Melvin Spitz,
Mr. M Rothman,
Mr. J Cornwall, CPA,
Professor J Schwartz, CPA, ESQ,
Mr. L Goldberg

This file is "OIG Response CASI DBK New Letterhead 23.doc" created with template: "CASI LLC DBK New Letterhead v01.dot", created at
Monday, May 10, 2004 18:11:00 H,
Saved at Monday, May 10, 2004 18:11:00 H and printed at Monday, May 10, 2004 18:11:00 H
of size 43,634 bytes of 8436 words keyed in by  d b karron          Pages  38 of 38 Pages.

RECEIVED
MAY 1 1 2004
BY

C. A. S. I.
Computer Aided Surgery, Inc.

## Table of Contents

1. Response to Draft Audit Report on  Computer Aided Surgery, Inc.  In the matter of NIST Cooperative
   Agreement Number 70NANB1H3050  Response Material for Inclusion into  Draft Audit Report No. ATL-
   16095-4-0002 / March 2004 ................................................................................................................1
2. Table of Contents ...............................................................................................................................2
3. Background ..........................................................................................................................................3
4. Introduction .........................................................................................................................................3
5. The Problem ........................................................................................................................................4
   Comments on OBJECTIVES, SCOPE, AND METHODOLOGY of OIG report.....................................7
   Comments on FINDINGS AND RECOMMENDATIONS in the OIG report.............................................7
   NO Complaints on CASI Research ......................................................................................................10
   CASI misplaced its faith in Hayes.......................................................................................................10
6. Conclusions ......................................................................................................................................10
   CASI Saved the Government Money. ..................................................................................................11
     NIST ATP misplaced its trust in Hayes.............................................................................................11
     OIG misplaced its trust in Hayes. ....................................................................................................12
   Important observations .......................................................................................................................12
     Overall Conclusions .......................................................................................................................13
7. Exhibits.............................................................................................................................................13
8. Exhibit 1 Summary of Project Costs and Point by Point Rebuttal of Questioned Costs .......................14
   Project summary costs ........................................................................................................................14
   Exhibit 1b Point by Point rebuttals .....................................................................................................15
9. Exhibit II Payroll Reconciliation .........................................................................................................24
10. Exhibit III Consolidated Project Expenditures (Profit and Loss) and related 'Balance Sheet-(9/30/02 6/30/03).26
11. Exhibit IV NIST ATP Project Timeline ...............................................................................................37
    2001 Pre Project .............................................................................................................................37
    2001 Project Launch.......................................................................................................................37
    2002 ..............................................................................................................................................37
    2003 ..............................................................................................................................................37
    2004 ..............................................................................................................................................38

C. A. S. I.
Computer Aided Surgery, Inc.                               :

# Background

In September 2001, NIST awarded a $2,000,000 Advanced Technology Program (ATP) cooperative agreement to Computer Aided Surgery, Inc., a small for profit research firm. CASI is a tiny entrepreneurial startup firm employing at most 3 PhDs and one MD to do advanced applied math and computer research on image and modeling for surgery. CASI was a firm recruited to apply for this ATP grant by the NIST ATP program director. The PI applied after extensive consultation and support from current and former ATP program management and leadership. CASI has been in business since 1995 principally doing DARPA SBIR contracts and has yet to become profitable. The PI, a former professor of Surgery at New York University Medical Center as well as a former Professor of Computer Science at City University of New York, gave up an academic teaching job to focus exclusively on this project. The other scientists, physicians, and students on this project are all CUNY and or NYU faculty working part time with the company, some uncompensated, many under compensated with respect to their regular jobs. In addition, there are many experts who gave generously of their time and energy without compensation, strictly because of their belief in the merits of the research.

# Introduction

Prior to the inception of the NIST ATP project, and repeatedly in the first year, CASI was emphatically, personally, and corporately promised New York State co-funding. The funded portion of this project was jumpstarted retroactive from October 1, 2001, in the middle of the extremely hectic days following the 9/11 attacks in New York City. Given the abruptness of the retroactive funding start, and its inexperience in this type of program, CASI made initial spending errors. These errors were incorrectly and marginally addressed by its accountant and so-called auditor, Ms Joan Hayes, CPA. Hayes had taken over responsibility for CASI accounts on 11 February 2002 after purchasing the CPA practice of the previous CASI accountant, Jill C Feldman, CPA.

Because of the gross inaccuracy of the first year program bookkeeping adjustments, the lateness of these corrections, and the inept consolidation of the first year books and the hostile, non independent first year audit; Hayes is the main reason for NIST ATP suspension of its funding of this project. While the PI admits responsibility for some staff errors in the program filings mostly in the first year, these are not the principal cause of management shortcomings. The principal cause for these shortcomings was advice followed in good faith from Hayes, much of which was to be subsequently proved incorrect, contradictory, coercive, self serving, or extremely destructive.

We will present a timeline (Exhibit IV) for the main program events in support of this contention. CASI was and is on a track toward stability because it learned its lessons from its initial mistakes. The PI has corrected the 'technical' problems and has followed the 'spirit' of the grant in every way. It is excessive and draconian to destroy CASI and it is vital because of problems jumpstarting its first government grant.

CASI's research program has emphasized science over marketing, and self-promotion. CASI research has advanced the state of the art by presentations at medical and computer science/imaging/applied math conferences. NIST ATP and the nation is benefiting from the tireless work of Dr. Karron, his students, and colleagues. Many of these people continued to work on the research no pay, continuing to publish, and advance the state of the art ,despite the technical reporting problems that have interrupted its funding. At no point can CASI be cited for not putting its full effort into its research, which is the main function for NIST ATP funding. This research had became very technology based and the emphasis had to CHANGE, from subcontracting (turnkey) to an 'equipment' oriented program staffed by students and committed professional faculty, as volunteers. Repeated attempts at revising the budget were completely ignored, as were certain requests for staffing changes.

C. A. S. I.
Computer Aided Surgery, Inc.

## The Problem

As a small single company recipient, CASI minimized costs and maximized productivity with its NIST ATP grant. The PI zealously adhered to the spirit of the NIST ATP guidelines. The grant research has never been questioned. Because of errors made in the first month of the grant by the PI based, on inexperience, and on the bad advice of its hostile and self serving accountant Joan Hayes, CPA, technical financial errors were made, then repeatedly made worse and worse and worse by Hayes's abuse of position. Hayes simultaneously served as trusted advisor to the PI, Corporate Tax Accountant, Personal Tax Accountant,, *de facto* management consultant, jury, judge, confessor, master, whistleblower, and auditor for the government.

CASI included in the award agreement a commitment to provide $110,500 of direct project costs, and in fact provided 67,334.19 of this co funding through a payroll holdback by September 2002 (The first year of the project!). See appendix 3, the payroll reconciliation. The NIST ATP program considers awardees' cost sharing sufficiently vital to its program that it will halt projects for lack of co-funding. Yet, there are basic direct and vital costs, such as rent and utilities, which are not really counted in this instance, but belong in the 'other' costs section. These MUST be considered as part and parcel of what was previously requested budget revisions. See Exhibit I.

CASI engaged its long term accounting firm, Jill C. Feldman CPA, to manage CASI's books. CASI had a functioning accounting system at the time. Feldman became pregnant and sought to retire after the hectic days of 9/11/2001. Feldman started the process of selling her firm to Ms. Joan Hayes, CPA in December 2001. Joan Hayes started work on the CASI account at that time, and effectively took over CASI's research, books and papers in February 2002. Hayes was charged with repairing problems caused by the PI's management of the grant at that time and bringing CASI's books and records into order for taxes, management oversight, and for NIST ATP fiscal reporting.

The PI, NIST ATP, and the Department of Commerce Office of the Inspector General OIG were unable to obtain reconciled and stable data as to vendor expenditures, payables, payroll, payroll overhead, and other project cost information from its accountant, Hayes. Hayes waited until just prior to becoming auditor to make important end of first year adjustments (9/30/2002). Hayes bungled and duplicated the calculations for these adjustments, and then assumed the role of an auditor, relinquishing her responsibilities as CPA, and started manipulating her client in earnest.

As project auditor, Hayes was reviewing her own work as project accountant, which destroyed her independence as an auditor. Hayes proceeded to manipulate both CASI and NIST/ATP with threats of wistleblowing CASI to uncover fraud and major career-making revelations to NIST ATP, by reporting the bungles and errors she herself caused in the previous year. She further manipulated the situation and the PI by 'churning' the necessary bookkeeping and accounting work without any useable results. She hid her own double billing invoices in the regenerated two sets of so-called 'new books'. In fact, the 'new books' as opposed to the old books, were incomplete and inaccurate because they lacked consolidation all transactions and reconciliation of all related 'balance sheet' accounts, such as interaccount transfers (contra-accounts) and formal bank reconciliations. How can someone who may have had a hand in preparing so called 'books' independently review them? Furthermore, she kept making unfulfilled promises to NIST and the PI as to when the audit would be completed. She further soured the PI's relationship with NIST ATP by falsely accusing the PI of withholding information and resisting the audit process. In fact, because of her ineptness in preparing and presenting the information to the OIG auditor, in an organized fashion, the finger of accusation points squarely at Joan Hayes, CPA.

If the PI was guilty of anything it was an overwhelming amount of backup to all transactions which made it harder to see the big picture because of all of the detail information kept. Hayes alleged that she was unable to get information from CASI, and the PI was resisting the audit process. She spent so much time collecting and collating data from CASI that she occupied the PI much more than required and hindered the research. Then she threatened to report to NIST ATP that the PI was not spending sufficient time on the project ! With all of this investigating and collecting data, at the time of the 2003 audit, she still fed unreliable and incorrect information to the OIG auditor, and blocked the OIG auditors' access to a valid, reconciled, and auditable set of project books.

C. A. S. I.
Computer Aided Surgery, Inc.

The PI wanted to fire Hayes. In retrospect not terminating Hayes and allowing her to issue a grossly unacceptable audit report was the biggest mistake made by the PI during the entire project. However, the NIST ATP Grant Specialist kept insisting that they get the audit (that they had paid for) finished, despite the fact that Hayes as auditor was abusing her position both as accountant and as auditor to attempt to extort more money from CASI. In fact, during this entire process, she never properly reconciled, and more importantly, consolidated the new sets of books she had generated.  She never actually supplied the PI or the OIG with oft-promised 'new books'.

Hayes kept changing figures during the budget negotiations. Hayes could not supply stable numbers for the (SF-269) and she omitted expenditures summaries and just showed grants received. Because of this, NIST ATP was forced to request an OIG audit, scheduled for June 2003. In July 2003, the OIG issued a 'limited scope' audit report alleging that CASI had not paid any of the adjusted and reduced $54,084 cost-share  (totally untrue, see Exhibit II) and had drawn $205,126 in excess of the federal share of the ATP project costs (based on preliminary audit figures). This was based on the information in the unreconciled and incomplete books kept by its accountant and so-called auditor, Hayes.  Furthermore, Hayes had repeatedly promised she would have books ready for NIST review virtually every day of the extended visit by the OIG field agent. The PI was not aware of critical lacking information that the PI could have provided at that time, prior to the field visit. The auditor was inappropriately given information that was not reconciled, not up to date, or was otherwise incorrect.  The PI was not aware at the time, of the horridly negative and false information Hayes was giving the OIG until the last day of the OIG fieldwork. Instead of remaining independent and neutral, and providing information as requested by the OIG auditor, Hayes, by her own malfeasance, fed the auditor misinformation of the worst kind.  The award was very abruptly suspended and yet the PI continued to pay project costs as they came in, including audit costs, payroll and accounts payable, directly related to the project, and funded by the PI's personal funds. The CASI project staff agreed to continue the project without pay, or at vastly reduced pay.

Because of the incomplete data presented to the OIG in June 2003, in November 2003, the PI visited NIST ATP and requested a re-audit (not a continuation of the previous failed audit based on faulty data from Hayes). This was based on the OIG's admission of the incomplete nature of its first audit.  A new accounting team headed by Mr. Melvin Spitz, CPA, reconciled, consolidated, and corrected the books for the full 12 and 9-month periods, without changing the original transactions posted in the Hayes generated books.  These two sets of 'new books' had been nothing more than summaries of two bank accounts. One called CASI, and the other called NIST. In fact, both accounts were used for project expenditures, but the CASI account has some company wide expenditures, which are not necessarily allocated to NIST.  With the proper support and approach, Mr. Spitz was able to reconcile and consolidate the books in a matter of four weeks, while Hayes's stalling did not achieve this over an 18-month period.

This stonewalling and abuse of position by Hayes is evidenced by the following facts:
1.  Joan Hayes refused to submit her audit report to CASI at any promised time through October, even after giving the OIG a copy of the essentially audit report in June.
2.  NIST ATP demanded its audit report. There was a very real potential that Hayes would never submit her audit report without paying exorbitant fees for unnecessary 'work'. The PI was under intense pressure to supply the Hayes audit report by NIST ATP.
3.  Repeated requests from the Grant Specialist of NIST ATP for the Hayes audit report which NIST ATP had paid for, and they felt was due NIST.
4.  Complaints from the OIG auditor, to the  PI that the OIG was unable to verify the records presented by Hayes even after being on site with CASI and with Hayes for 10 days ! The OIG field auditor said 'her negative results were taken from the CASI Books, and could not be verified'.  She pretty much said she could not do an audit.
5.  Moreover, the OIG  was repeatedly and explicitly promised a reconciled set of CASI books
    a)  prior to the OIG first field visit,
    b)  multiple times during the OIG first field visit, and
    c)  Multiple times after the OIG first field visit.
Mr. Melvin Spitz confirmed with the OIG auditor that they never received a reconciled set of new books from Hayes during the OIG's subsequent field visit with Spitz in December.

C. A. S. I.
Computer Aided Surgery, Inc.

The OIG auditor based its first flash audit on the misdirected and poisoned presentation by Hayes during the its first field visit culminating with the July 2003 flash audit report. At the December OIG field visit, Spitz submitted to the OIG the following:

a) New payroll and loan reconciliations.
b) Detailed reports and logs of reimbursable spending on project costs by the PI.
c) A complete sub ledger on credit cards (AMEX) charges (shortly after the field audit)
d) CASI's newly consolidated books and records, including transfers, from the personal account, and previously ignored activity in the new CASI LLC account, which had been missed in the first audit.
e) All personal contributions, repayments of loans, and reimbursable spending out of the PI's personal checking account, which the OIG auditor together with Mr. Spitz confirmed as to being part of the consolidation.
f) Full explanations of all of the adjustments made to Hayes books by Spitz.

The OIG auditor now had many opportunities for revision of the July 2003 report, which had been based on incomplete records. This was much additional information that had to be considered for the OIG final draft report. This final OIG report should not have been an extension and major expansion of the OIG's previous reported questioned costs. In reality, all the new information should have enabled the OIG to substantially reduce the questioned costs. The new information justified most of the questioned costs..

Mr. Spitz at this point asked if, based on this new complete information, weather Spitz should issue new corrected SF269 quarterly and annual comparison to budget filings to replace the incomplete and erroneously filed reports previously submitted based on Hayes data. The OIG auditor said this was not necessary since her audit would accomplish this. Mr. Spitz also went over Hayes's audit report point by point and without consultation with the PI to present an adequate and unbiased refutation of Hayes audit conclusions. This Hayes report formed the foundation for the July OIG flash audit report. Spitz was given the impression, after his conference with the OIG auditor, who took copious notes, that full weight would be given to all of this 'new information'. This has obviously not been the case.

The PI discussed with the OIG auditor actions needed to assist the OIG's audit, given the previous unsatisfactory performance by Hayes during the first field visit. Mr. Melvin Spitz was tasked solely to work with the OIG to conclude this unending audit. Spitz made adjusting entries to the books and records that clearly identified not only identify NIST-related expenses in very detailed form but a section for allocated corporate expenses. Spitz noted numerous deficiencies and duplications in the Hayes prepared books, especially improper recording of undercount transfers and non-recognition of monies advanced by the PI through CASI; to both fully fund co-payments and repay erroneous salary advances taken at the beginning of the project. The OIG visited in December 2003 to review the reconciled and much improved books and records, was also provided with hard, and disk copies of the Spitz consolidation.

It came as a complete surprise on the issuance of the draft audit report in May that the OIG had not considered the clarifying additional information presented in the December visit. The OIG had instead chosen to re-affirm and expand the faulty Hayes conclusions and did not reduce any of the July flash audit findings. In fact, Spitz had presented as a complement to the income and expenditure consolidation figures a so-called consolidated balance sheet showing fully reconciled items such as cash in bank, intercompany transfers (See Exhibit III). Also included in this balance sheet were the co-payments and repayments of erroneous PI salary advances. The draft report of the OIG totally misinterprets the intercompany transfers once of which is called 'due from CASI', and the other one was called 'due to NIST' which are in fact counterbalancing amounts as being proof that CASI admits to owing money to the project. This is absolutely *prima face* incorrect.

Given the gross malfeasance, lack of independence, hostility, and clear errors in the information presented by Hayes to the OIG, and the intransigence of the OIG in the face of the Hayes errors, the PI is compelled to request a face-to-face negotiation to defend its rights, reputation, and research.

C. A. S. I.
Computer Aided Surgery, Inc.

## Comments on OBJECTIVES, SCOPE, AND METHODOLOGY of OIG report

The scope of the OIG audit was extended to include payments made on costs incurred prior to the June 27 suspension, and to certify payables still on the books. The Hayes report scope only for the first year. As such significant improvements made in CASI fiscal and business processes were overlooked in the Hayes report, and the OIG draft report, which was almost exclusively based on Hayes faulty reporting.

OIG examined a copy of the company's most recent annual audit report for the year ending September 30, 2002. That audit was conducted by Hayes, who as we will demonstrate was NOT an independent certified public accountant. Her audit was not in the spirit and rule of the *NIST Program Specific Audit Guidelines for advanced Technology Program (ATP) Cooperative Agreements with Single Companies* dated May 1999. The Hayes report disclosed internal control weaknesses and questioned costs. The OIG obtained their own understanding of CASI internal controls through inquiries with appropriate personnel, inspection of relevant documentation and observation of CASI's operation to evaluate the assertions included in the audit report. The weaknesses noted in OIG testing did not observe the significant improvements in internal controls and reduction in disallowed costs made in the first year to the second year. None of the improvements are discussed in the findings and recommendations of the OIG draft report.

The OIG relied on computer-processed data supplied by the company as the basis for their audit findings and recommendations. Consequently, the OIG tested the accuracy of this information by tracing and comparing the data to original source documents and other supporting documents stored as scanned images. Based on their tests, the OIG concluded that the computerized data was sufficiently reliable for use in meeting our objectives. Based on this statement costs for scanning equipment used to store, and the costs of clerks and bookkeepers to file and input this data should be allowed, as it was the basis of the OIG's acceptance of this information.

The draft audit report states that it supersedes the OIG July 2003-audit report, and resolution of this report should be deemed to constitute final action with respect to the prior report. CASI disagrees and notes that this report is mealy an extension and elaboration of the July 2003 report, not a correction or a revision of the previous report. The purpose of the CASI request for re-audit fieldwork was to correct erroneous findings in the July 2003 report, not <u>rubberstamp</u> the July findings, based on new accurate and revised books.

## Comments on FINDINGS AND RECOMMENDATIONS in the OIG report

The OIG blames the CASI inadequate financial management system as the main cause of $547,426 questioned costs. CASI had an adequate financial system until Hayes, as our auditor (in the second year), demanded that CASI completely redo its fiscal system to her specifications, in order to pass her standards for the audit. She had the CASI outside bookkeepers; engage in a complete <u>rewrite</u> of CASI's books, which Hayes closely and zealously supervised. Hayes ordered the splitting of CASI's books into two sets of books. These caused unending problems and errors, including vendors never being paid, vendors being overpaid, vendors being paid late, accounts running out of control, and checks bouncing. The PI was constantly running to the bank to beg the bank to refund these fees, which the bank did in all cases. These books were never reconciled and consolidated despite repeated promises to both the PI and the OIG.

According to the ATP Proposal Preparation Kit:

"ATP projects are industry/government, cost shared projects. A company proposing to recover 100 percent of the project costs (*because all project costs are charged as direct costs*) from ATP is not complying with the spirit of the ATP statute because the company has no funds of its own at risk."

The company NEVER promised to recover 100% of the project costs. The approved budget and all of the subsequent proposed budget amendments shows the company co-paying over 4% of the direct project costs.

C. A. S. I.
Computer Aided Surgery, Inc.

The main CASI issue with the OIG draft findings is that the Federal Cost principals have many special exceptions for small entities working 100% on a single federal project. CASI expected and needed ATP to follow its previous practice guidelines of giving special consideration to small firms such as CASI. This expectation was based on its consultants and business manager's many years previous experience managing ATP programs in very large firm. CASI's failing was that it did not get each and every eligible cost being questioned specifically allowed in signed memos. Many of these costs were explicitly allowed in verbal understandings. When the PI was advised to get these understanding documented in memos, the NIST ATP never acknowledged ANY these memos in any documentary fashion, by e-mail, fax, and paper memo. At one point, the PI made a special trip to NIST to discuss these matters and the PI was not allowed to visit in the cafeteria with any of the NIST personnel. During the written budget negotiations, the costs for that specific trip were specifically disallowed for $10.00.

CASI maintains that precisely because it decided to focus exclusively on the NIST ATP project, partly due to the collapse of the investment market and its original, pre 9/11 offers of New York State co funding, many of the questioned costs called overhead are in fact direct costs under the spirit and letter of the Cost Principles 15 CFD Part 14.

The OIG report goes on further to state:
"Recipients of ATP awards are required to have a financial management system that meets the standards found in 15 CFR Part 14, Uniform Administrative Requirement for Grants and Agreements with Institution of Higher Education, Hospitals, Non-Profit and Commercial Organizations. Standards for financial management systems are found in Subpart C, Section 21 and require recipient's financial management system to include the following:
"effective control over and accountability for all funds..."

All CASI and NIST funds were fully accounted for in the CASI books and records. Abundant records were made of all transactions as they flowed through the CASI business process. Backup documentation was made and kept. CASI expended extensive resource to establish and maintain compliance with GAAP accounting, as well as CASI business procedures, under the dictatorial direction of Hayes. She would later refute the CASI recordkeeping procedures because it kept 'all details' and because these details would later work to document various Hayes mistakes. Later, we found she kept vital records (such as payroll reconciliations) from CASI in an attempt to maintain sole control over the account.

Subpart C continues:
"Written procedures for determining the reasonableness, allocability and allow ability of costs in accordance with the provision of the applicable federal cost principles and the terms and conditions of the award ..."

CASI adopted forms and procedures to identify allowable and eligible costs by the following means:

The original CASI books tagged a 'CLASS" of NIST costs in the CASI electronic books and records. Further, all costs that could be charged to NIST were identified with NIST ATP as the customer for chargeback billing of these costs. Finally, under Hayes direction, an entirely separate set of books of ONLY NIST Costs was prepared out of the CASI books. These books were never reconciled or consolidated, yet served as the exclusive basis of the OIG reports. There are significant differences of opinion as to what are NIST ATP costs over the life of the grant. Cost segregation and funds segregation (by a separate NIST checking account with chargeback class tagging) has been incorporated into the business process by CASI.

The OIG further notes this citation from 15 CFR 14:
"Comparison of outlays with budget amounts for each award."

CASI, in good faith, continued its research project in July 2002 after it started budget revision negotiations. In retrospect, the project should have been halted by the PI as CASI spending diverged beyond 10% from its budgeted costs. However, there exists no mechanism for the grantee to stop the project clock on a project. NIST ATP can stop a project as abruptly as it pleases, as illustrated in CASI's case. Therefore the grantee is forced into the situation CASI finds itself in, whereby it cannot make midcourse budget corrections, and it has no recourse but to continue to use up its precious project time. It became clear that its December 2001 budget was woefully

C. A. S. I.
Computer Aided Surgery, Inc.

inadequate. How could CASI recognize that it needed a new budget if it could not track its actual spending relative to its budgeted spending? Clearly, CASI was aware of the discrepancy in its actual spending given the energy and effort expended in attempting to obtain a revised budget. Therefore, CASI was in compliance with the above CFR citation. Had CASI not attempted to negotiate a budget revision, then the above allegation would be clearly true; as it would be evidence that CASI was unaware of the deviations of its spending from its budget.

The OIG report continues on to state:
"Since the ATP budget included only direct project costs, the financial management system needs to be able to properly classify costs as either direct or indirect. "

Companies as small as CASI do not generally seek, or are awarded grants of this size, with such strictures. After repeated discussion with NIST officials, with Axiom consultants and with ATG consultants, specific instructions were given on how to do manage the finances of this grant so that minimal overhead would be incurred.. Further, the PI unfortunately agreed to a complete overhaul of the CASI books under Hayes direction. Furthermore, Hayes refused to consider or account for the original plan for how the grant and the PI would manage and account for overhead and indirect costs.

The OIG report states:
"Computer Aided Surgery does not have a financial management system that allows it to determine readily which of its costs are direct and which are indirect. The general ledger does not separate direct from indirect costs, and Computer Aided Surgery never prepared an indirect cost proposal that identified each item of cost to be included in the indirect cost pools."

Hayes undertook this responsibility and completely failed; The PI had originally tagged costs by using the Quick Books 'CLASS' facility, and customer cost chargeback facility; Hayes refused to consider this and insisted that a completely separate, stand-alone set of books. She insisted this was required for CASI and NIST ATP because of the disparity of the Federal reporting period and the CASI LLC and INC reporting periods. This created the extremely convoluted and unnecessary requirement that almost all entries be posted twice, into each set of books. This caused duplications and transfer accounts that were not subject to the proper consolidation adjustments as done by Spitz.

The OIG admits:
"The cost principles identified in 48 CFR Part 31, *Contract Cost Principles and Procedures*, do not provide any specific guidance on what would be typical indirect costs. However, ATP's Proposal Preparation Kit states that typical examples of indirect costs include general administration, maintenance, library expenses, and accounting. The kit also states that if the recipient has an adequate accounting system consistent with generally accepted accounting principles, then certain expense items should fall into indirect cost categories, even for a new start up company with only one project. "

Because of the small size and unusual nature of CASI, there was no clear guidance for a tiny company such as CASI to establish these costs in the tradition of much larger companies. CASI contends that it is impossible to adhere fully to the guidelines for large companies. This problem was acknowledged in early discussions between CASI and NIST ATP. This problem has been acknowledged throughout the federal government and is part of various legislative reform packages. Every company and project is unique and must comply with the spirit of the law. CASI unquestionably did.

The PI, the IRS, NYS, and the NIST ATP and OIG were never able to obtain from Hayes stable figures for any purpose whatsoever. More importantly, NIST ATP never responded to numerous attempts to revise the budget to confirm to the emerging new realities of the project. The PI surmises that because of the bad relationship nurtured by Hayes with the NIST ATP Grant Specialist and CASI, and given the changing actual figures Hayes supplied during the budget revision negotiations, NIST ATP lost all confidence in the PI and misplaced all of its confidence in Hayes. Hayes, abusing the NIST ATP confidence in her as the auditor, proceeded to torpedo CASI with bad reports to NIST, bad and late reports to the IRS, and fighting with the CASI board and legal team. The PI can only surmise why Hayes has so energetically and viciously undermined her client.

C. A. S. I.
Computer Aided Surgery, Inc.

The PI was never able to rely on Hayes for stable accounting figures during her entire tenure with CASI. Hayes, except for occasional payroll filings (that were also in error) missed every deadline she was ever responsible for. We can see no other basis for such a large amount of uncompensated work as other than to bankrupt CASI so it could not attack Hayes. CASI has reported such grossly unethical behavior to the New York State Department of Education, office of Professional Discipline and they have opened a pending case for investigation.

## NO Complaints on CASI Research

It is clear from the scientific output and professional kudos garnered that CASI is doing world-class significant research, and providing significant value to the NIST ATP program as well as the nation, which despite this accountancy nightmare, is the real purpose of the program. Milestones are being met and important basic science is being done.

## CASI misplaced its faith in Hayes.

CASI trusted Hayes to put its books in order, keep CASI out of trouble, and to make its NIST audit report; what in fact happened Hayes torpedoed everything she was entrusted to protect as accountant, report as auditor, and advise as a government grants management authority and advisor.

# Conclusions

The accompanying OIG draft audit report is ignoring additional information on balance sheet type accounts such as inter-company transfers and PI repayment of faulty advances and co-payments separately attached to the consolidated statement of fund receipts and expenditures (See Exhibit III).

The PI requires without question a face to face meeting, where if both sides are flexible on settling this matter on an amicable basis acceptable to all. Above all, the research was the main purpose of the project, and should remain so. Unfortunately, ignorance of and inexperience with government grant technical guidelines led to some mistakes at the very beginning of the project. These mistakes as to the literal interpretation of program guidelines should not have been allowed to wreck the aim of the project through its suspension.

People worked very hard, for nothing, and the government saved a lot of money. If this work were to be done in a government research laboratory, the cost of the project would have been multiple millions of dollars. Many attempts at revising the budget were met with no response from the NIST ATP sponsor. Our timeline (Exhibit IV) shows that we began this attempt at revision fairly early in the process and our financial appendix (Exhibit I) shows that had the budget been properly adjusted the research results would have come in at an acceptable cost.

Why did the project nature change? Because as the PI was writing the proposal, it seemed at the time that using the NIST ATP funding to hireling the biggest and presumably best computer graphics expert obtainable, namely his CUNY colleague Professor George Wolberg, would help insure the projects success. This was not the case; in fact, some of the most vital contributions to this project were made by people who were never on the NIST ATP or any CASI payroll. As the project commenced, it became clear that Prof. Wolberg had multiple faculty commitments and was also in the process of starting his own business. The PI felt that Prof. Wolberg could not give this project the attention it required. Further, Prof. Wolberg insisted on using his own software libraries, which he owned, and would not give CASI source code to. This created a problem of excessive dependency on Wolberg and his code, something that NIST ATP was concerned about in their first site visit. The PI was spending too much time managing Wolberg and specifying detailed contract modifications for Wolberg and arguing over invoices and not getting what the project needed. However, Professor Cox, along with the CASI intern/student Mr. DaSalla were becoming more and more adept at basic 3D computer graphics, and a PhD student from the U of Delaware, Mr. Thiarajian joined our effort and was able to do more computer graphics than Prof Wolberg was able to do. Mr. Thiarajian never appeared on the CASI payroll, being funded entirely by the Delaware Biotechnology Institute of U Delaware. When the PI started throttling back on Prof. Wolberg hours and funding, the PI started complaining to NIST ATP.

C. A. S. I.
Computer Aided Surgery, Inc.

NIST ATP told the PI that they would back the PI's decisions, and that it was the PI's decision to do what was best for the project. It was this vote of confidence, and the lack of responses from the grant specialist, that gave the PI the very clear and distinct impression that NIST ATP trusted the PI and were willing to go with the PI's project decisions. These messages giving the PI autonomy were repeated in a number of instances. The business manager, Gurfein, kept asking the NIST ATP Grant Specialist many questions and permission for all sorts of CASI business decisions. Repeatedly, the Grant Specialist told Gurfein "you run your business how you see fit: we won't tell you what to do". All this trust and confidence seems to have been poisoned by Hayes.

Because of the NIST ATP resistance to documenting any verbal understandings, amendments, and changes in key people who proved vital to the project, their costs were questioned although they were a key part of the project. Not withstanding this, even if they had been accepted, this subcontractor portion and payroll portion over the three year period should have been substantially changed and transferred to the computer technology. Outsourcing key research roles by contractors caused the PI to loose control over the technical direction of the project. . Because we had to do much more of the project on site, and given the efforts of Dr. Karron's PhD and Masters students, as well as the seats they required, CASI needed a place for the small staff, and the sophisticated equipment. This equipment is being used almost around the clock to this day by students, volunteers, and uncompensated faculty who continue to work on the project. As has been erroneously identified in the draft report of the auditor, the costs of the CASI office as opposed to outside contractors doing the work in their inferior facilities, was substantially more efficient and cheaper with quicker and more advanced results. We should not be punished for trying to save the government money without sacrificing, but rather enhancing the research. The PI stands by the decisions made as to what was best for the project.

## CASI Saved the Government Money.

CASI provided significant research value for the government's dollar. The PI, out of necessity, did operate with MINIMAL OVERHEAD. To penalize the PI by reducing his salary and asking him to repay the salary of the business manager, when the salaries were already budgeted and spent in good faith, along with necessary equipment and a place to house the research, two years later, will only serve to bankrupt CASI.

The research spending was always frugally managed by the PI. CASI built it its computers from components to get research grade systems that are unavailable commercially. The PI stayed with colleagues and friends when traveling on grant business. The PI drove and did not fly whenever possible. The PI's travel was not questioned (except for $10 for a trip to NIST)

Spitz made the books WHOLE by reconciliation and consolidating all pertinent transactions. Mr. Spitz's motto was 'let chips fall where they may'. Considering that during the past year, the PI has made up costs out of pocket and has mortgaged his residence to make transfers of personal funds totaling in excess of $106,000, in addition to co-pays. The PI beseeches NIST to consider that the period of suspension is punishment enough for technical errors. Finally, the quality and value of the research does not warrant suspension.

Terminating this research by bankrupting CASI is a disservice to its sponsor and the nation. The PI firmly believes that this is not what NIST ATP wants or is designed to do. NIST ATP practices and guidelines rules are designed for large corporations with lots of government experience and deep pockets to co-fund these high-risk projects. CASI has neither of these resources.

The PI has demonstrated its persistence in the face of incredible resistance by continuing to push for this grant and by continuing its research.

## NIST ATP misplaced its trust in Hayes

Hayes was in continuous communication with NIST ATP for audit guidance, to protect herself from any suspicion of error or wrongdoing by NIST ATP, and was continuously getting permission for her activities with the NIST ATP Grant specialist, developing a relationship as the CASI 'tattler', and poisoning the relationship between CASI and its sponsor. Hayes was telling the PI that she was going to save CASI from its initial errors, and Hayes was telling

C. A. S. I.
Computer Aided Surgery, Inc.

NIST ATP that Hayes would uncover a major scandal and earn a whistleblower reward for doing so. She would then overcharge for excessive bookkeeping and accounting work from CASI in the process. Hayes demanded slavish obedience from the PI in the minutest detail, which the PI initially thought was appropriate if Hayes was going to 'repair' errors caused early in the grant. Instead, Hayes pillared and exacerbated all of the errors to her own empowerment with the government and to further manipulate and control the PI and CASI. She seemed to take undue thrill and excitement to have so much control over so much funding. All of this was part of her desire to control and manipulate the situation, to play both sides against the middle, destroy CASI to protect her CPA license.

## OIG misplaced its trust in Hayes.

Based on the above problems with Hayes, CASI contends that the OIG should have thrown out the misleading Hayes audit. In the interests of objectivity and fairness, OIG should have, and CASI expected OIG to have started their audit a fresh with the Spitz reconciled and consolidated information, which did not touch the basic transactions, but which clarified them, and made them usable, and auditable. The OIG field representative seemed convinced by the Spitz audit data and its presentation. It appeared at the time that CASI was out from under its dark cloud and there was a distinct possibility that the grant would be resumed. CASI is disappointed that OIG has not changed any of its opinions based on the faulty Hayes audit and the fresh information presented at the December 2003 field visit.

Hayes should have been fired and not permitted to submit the audit report. The PI did not fire Hayes because the PI believed the OIG would give an unbiased report not based on the Hayes audit report. CASI regrets not firing Hayes but CASI had no choice at the time.

### Important observations

The Dec 2001 Budget was and is unviable: It was thrown together just before submitting the grant and CASI did not have any historical basis to estimate costs. It was based on conjectures. CASI required at least a year of operation to get an accurate sample of real costs for budget purposes. First year experience was needed to establish baseline costs. CASI did not have access to stable first year actual figures for the purpose of budget revisions due to Hayes's malfeasance. CASI had expected a substantial reduction and elimination of the OIG questioned costs per the July 2003 report for $205,125.00. CASI clarifications and rebuttals (Exhibit I) show that many disallowances should not stand because the project followed the spirit of the grant, based on a revised viable budget. CASI also expected previously requested budget revisions and some flexibility as to so-called overhead (other costs section).

CASI is committed 100 % to this project. PI is 100% committed to this project and has worked on no others.

Significant management improvements have been made subsequent to the first year. The OIG and Hayes audits do not differentiate in the comparison between the first year to the second year.

The PI made a significant effort to improve compliance with the spirit and even the letter from the first year to the second year.

Personnel very much stabilized in second year. Personnel staying with project through the funding suspension make their commitment clear: Cox, Rothman, Thiarajian, Benedict

As a small business, CASI cannot be asked to afford some of the more inflexible compliance policies, such as disallowed alternative fringes, not normally associated with big corporate structures, rent, electric, telephone, and necessary project alterations.

At no point was the value of the research questions or the value the government has received questioned.

C. A. S. I.
Computer Aided Surgery, Inc.

## Overall Conclusions

In conclusion, CASI does not owe NIST ATP for co-pays.  Program contributions are already fully paid; CASI does not owe a significant amount for ineligible costs (these were already reimbursed by 2003).  CASI does not owe for unbudgeted costs because NIST ATP was poisoned by the Hayes figures used during budget negotiations and the inaccurate audit report, into not negotiating with CASI on necessary budget revisions.

CASI believes that NIST ATP should permit CASI to finish its budget revisions (See Exhibit I) to eliminate problems caused by the December 2001 unviable budget.  CASI has demonstrated significantly improved business practices and fiscal control in the second year and the PI has steadfastly demonstrated his commitment to this project during the year following in suspension.  CASI and the scientific community believe that NIST ATP should resume the grant to permit the project to come to a successful scientific conclusion.

## Exhibits

The following sections are the technical financial exhibits to offered as substantiation evidence in the this CASI NIST ATP Audit rebuttal

C. A. S. I.
Computer Aided Surgery, Inc.

# Exhibit 1 Summary of Project Costs and Point by Point Rebuttal of Questioned Costs

**Project summary costs**

Computer Aided Surgery Inc.
NIST Award No. 70NANB1H3050
Summary of Project Costs
10/1/01-6/27/03

| | Award Budget Per Draft Report Appendix I | Proposed Revised Budget Per CASI | Costs Claimed per Draft Report | Costs Questioned Per Draft Report | Costs Claimed Per CASI | Change in claimed costs - Per CASI | |
|---|---|---|---|---|---|---|---|
| Personnel | 700,000 | 635,000 | 569,911 | 104,683 | 569,911 | None | |
| Fringe Benefits | 238,000 | 175,000 | 158,576 | 68,884 | 161,758 | 3,182 | Error in classification |
| Travel | 29,000 | 35,000 | 36,538 | 23,998 | 36,538 | None | |
| Equipment | 119,000 | 250,000 | 320,443 | 201,443 | 238,677 | (81,766) | non-equipment see our response #7. |
| Supplies | 11,000 | 35,000 | 39,344 | 24,011 | 22,872 | (16,472) | Mostly Internet |
| Subcontracts | 360,000 | 150,000 | 147,153 | 67,372 | 144,688 | (2,465) | Conceded costs |
| Other | 10,000 | 187,000 | 73,535 | 57,035 | 169,676 | 96,141 | See our response #7. |
| Total | 1,467,000 (A) | 1,467,000 (B) | 1,345,500 | 547,426 (C) | 1,344,120 (D) | (1,380) | Net Change |

(A)  Please note the budget is for a 24-month period.

(B)  In general, reductions in the subcontractors' budget of $210,000 and personnel and fringe benefits of $125,000 would fund increases to equipment and "other" categories, so that $335,000 of disallowed expenditures would be reinstated, because of the proper revisions alone.

(C)  Explanations for all questioned items and reclassifications appear in the pages following this summary.

(D)  These amounts are based on a revised budget as per above, and reclassifications as per our explanation to questioned costs. Conceded items have been subtracted from the total.

## Point by Point Rebuttals

## Disallowances:

Please refer to Audit report for references and full explanations.

I. Personnel Costs: $104,683 is questioned.

    A.  $ 71,550 is not allocable to the ATP project.

        a.  $ 25,000 of the Chief Operating Officer's time was allocated to non-NIST activities.

        b.  $ 46,550 of the Chief Technical Officer's time was allocated to non-NIST activities.

    B.  $ 33,133 of employees' salary was not approved by NIST officials.

        a.  $ 15,222 in salary to the Fiscal Control employee was not approved.

        b.  $17,911 in salary to the Business Manager was not approved.

## Answer:

    A.  100% is chargeable and allocable to project.

        a.  Gurfein didn't devote 25% to other activities. He worked exclusively on this project.

        b.  Dr. Karron didn't devote 15% to "organizational" activities. He "lived" exhausting 16 - 18 hour days solely devoted to the project.

    B.  None should be disallowed.

        a.  Although, not approved in writing, the grant specialist verbally approved this position. Clearly, it is reasonable and necessary to the project.

        b.  This was the assumption of Gurfein's slot at a substantially less cost and much more productive person. Benedict was more than a "business manager". He was indispensable to all concerned including any contact with the government, because of his experience with the NIST ATP programs. The government ignored attempts to approve Benedict, which was

detrimental to his being "in the loop". They ignored him in their communications with CASI. Meanwhile the program control improved dramatically under his watch.

2. Fringe Benefits: $ 68,884 are questioned.

2. CASI did have a "cafeteria" type plan, which was in the process of being formalized. There is no formal 'approval' process. It was written policy, and it was in practice since CASI's formation in 1995 without question or problem.

A. $ 52,227 is disallowed because CASI had no plan for the charges.

A. Total fringe benefits were dramatically lower than the 30% - 34% normally allowed by government programs without question. No plans were made to formalize the benefits plan based on this assumption for this program.

a. $48,989 is disallowed because expenses were paid in excess of employee's insurance reimbursements.

a. "Big" company fringe benefits such as a pension plan were not practical for this small company. Therefore, we have a medical reimbursement plan.

b. $ 3,238 of education is disallowed because it is not an ordinary expense of a corporation.

b. The educational training was a direct expense of the project, related to the research.

B. $ 14,196 is disallowed because it is a cost directly associated with another questioned cost.

B. See answers to 1A and 1B above.

a. $ 3,130 is for health insurance directly associated with a percentage of the reallocated salaries of the Chief Operating Officer & Chief Technical Officer's non-NIST activities.

a. Since they should have a zero disallowance on Salaries, health insurance is 100% allocable.

b. $2,600 of childcare cost paid for the child of a fiscal control employee whose salary was not approved.

c. $ 8,466 of payroll taxes directly associated with a percentage of the reallocated salaries of the Chief Operating Officer & Chief Technical Officer's non-NIST activities.

C. $355 for miscellaneous fitness costs in excess of gym membership paid.

D. $ 2,106 of parking related costs for employees while they are at work and medical visits.

3. Travel: $ 23,998 of gas, local gas, parking, taxis, tolls, meals and miscellaneous other items are questioned.

b. Childcare should be 100% allowed just as the related "base" salary has no basis for disallowance.

c. The COO and CTO salary should not be allocated. Similarly their fringes should not be allocated.

C. CASI's Oxford Health Plan does reimburse Gym Visits. CASI was simply supplementing the Oxford benefit, which was allowed by the OIG. The amount is very small and fitness expense is becoming a commonplace fringe benefit. Further, because of the sedentary nature of computer work, this benefit is particularly important for computer software companies and their employee health.

D. This benefit was modeled after the IRS benefit, which allows ancillary costs to medical visits (taxi, transportation, meals). These are alternative fringe benefits necessary for employees to minimize time on medical visits and to support employee productivity.

3. CASI Employees can not always spend a regular 9 am to 5 pm day at CASI; Frequently employees would have to run out mid day to teach a class at Brooklyn College or City College. Alternatively, take classes at school. In order to minimize the time spent by employees searching for parking, this benefit was implemented. Commutation to and from CASI was similarly supported to encourage the travel to CASI.

4. Equipment: $ 201,443 is questioned.

A. $ 18,424 for capital improvement to the apartment owned by the primary shareholder of CASI, and used by the company as its place of business.

    ʙ. $3,500 of Mistretta Electronic was correctly posted to CASI books as capital improvements but was incorrectly charged to NIST as equipment expenses.

    b. $ 14,924 of capital costs was identified as equipment costs.

B. $ 2,533 of costs is booked twice.

C. $ 703 of costs was not allocable to the ATP award.

D. $ 265 of dues & subscriptions was not approved in the budget.

4. Only $260,339 in equipment costs are claimed not $311,923. The balance is computer software and other computer costs, a separate category.

A. Since the apartment was <u>not a residence (the PI paid rent for a share in a home in Connecticut)</u>, but an office, these alterations which <u>detract</u> from the market value of selling the apartment, should be approved as necessary for <u>running</u> the equipment. The auditor admits that it was used by the company as "its place of business". By looking at the vendors, it is obvious that these expenditures are related to wiring and peripherals that buttress the computer technology.

    a. This cost was an electrical upgrade, absolutely required, to run the computer systems for the project. Frequently circuit breaker overloads and losses of data, and insufficient current for air conditioning made this an emergency expense.

    b. They are moved to an "other" category, see #7 below.

B. Insufficient supporting detail is given to confirm or refute this questioned cost item.

C. No sufficient detail is given to verify or deny this questioned cost.

D. De Minimus and Immaterial.

This reveals the petty and hostile orientation of Ms. Hayes. As was explained to the auditor face to face, the way that CASI kept track of the vital professional literature in the field was through IEEE, ACM, AAAS, MEDLARS, SPIE, and Sigma Psi Professional literature online indices and databases. There is no way to subscribe to these databases without membership.

E. $179,518 exceeded the amount in the budget for equipment.

E. $60,106 was computer costs, software, and computer repairs not related to the Equipment category but properly allocable to the "other" category. $27,700 (146,700-110,000) should be allowed as a permitted reallocation of 10% of project costs. The balance should be allowed as per budget revision request, where the "nature" of the project changed completely and is "equipment" driven. See schedule of expenditures earlier in this exhibit.

5. Supplies: $24,011 are questioned.

5. A.

A. $21,506 was not approved by NIST grant officials.

   a. $378 for chase bank fees and NSF charges.

a. Bank fees were refunded but not credited properly.

   b. $2,952 for dues and subscriptions.

b. Most memberships necessary for access to online library research. See above on Subscriptions.

   c. $599 for miscellaneous costs.

c. Paypal and Barnes & Noble are direct costs of the project.

d.  $ 285 for internet costs incurred
prior to the award period.

e.  $ 15,809 for cable hook-up and
internet fees, which were listed
as indirect cost on the proposal,
therefore they are not an
allowable direct project cost.

f.  $ 1,014 was reclassified from
miscellaneous expense to
internet expense.

B.  $ 2,323 of costs was booked twice.

C.  $ 651 is capital improvements.

6.

A.  $ 37,146 should be considered indirect
costs.

a.  $2,465 is tax work and training
course taken by the auditor.

b.  $7,455 in legal fees was not
approved as part of the budget.

c.  $25,317 for bookkeeping
services, this was not approved
as part of the budget.

d.  $909 for clerical costs that are
indirect costs.

e.  $1,000 for work done by Valley
for Mage Consultants. This was
not approved by NIST officials.

d.  Conceded as error by PI.

e-f.  All internet related costs are
as indispensable to
computer technology as
electricity and modems.
The original proposal cites
internet delivery of
milestones. This
unfathomable disallowance
makes no sense because the
proposed revisions to
budget, would have
corrected this erroneous
categorization of these
being "indirect" costs. The
internet costs were in our
original proposal and
reflect the hostile and
unconsidered orientation of
Ms. Hayes.

B.  Unconfirmed

C.  See 4A above.

6.

A.

a.  Conceded.

b.  These legal fees were never
claimed as NIST expenses.

c & d.  A project without
bookkeeping is a project
without any controls. Both
bookkeeping and clerical
costs are integral direct
costs.

e.  Emergency repairs on a
security problem with
internet communication do
not need advance approval.

B. $1,000 to the Chief Technical Officers 's brother for setting up projector. The projector was not approved by NIST officials, and the installation is not allowed.

B. CASI had no blank walls to project anything. CASI needed to make a projection screen because there were no blank walls for projection. CASI gives presentations regularly pertaining to our research, and this diffusion of research findings is a direct cost. The CTO's brother was in the conference room automation and video industry, and designs and specifies million dollar installations professionally for a major video manufacturer. The work he did for CASI for only $1,000 was more a donation than an installation contract. CASI needed light baffles and blackout shades, as well as the screen and projector.

C. $12,000 for subcontracting with ATG consultants.

C. These were ongoing post-inception costs, not a pre-project cost, utilizes a $1,000 per month retainer.

D. $400 to Axiom Inc., who helped with budget negotiations with NIST.

D. Project manager Benedict, originally worked for this firm, which contracted him to CASI for $2,400, only 400 of which was paid with NIST ATP funds. Benedict was intimately familiar with CASI's NIST problems and agreed to join CASI despite these problems, as an employee for much less money then he would have earned otherwise.

E. $170 to Paypal, this was not approved by NIST officials.

E. Part of bookkeeping, solely, a direct project cost.

F. $16,656 for equipment installation that was capital improvements to the apartment.

F. See answer 4A. This should be approved under a budget revision.

7. Other: $57,035 in other costs are questioned because they were booked in Non-NIST books.

7. These were booked in a "not (yet) allocated" to NIST section. A budget revision allowing rent, electric, telephone, cleaning, computer software and other computer costs, including apartment capital renovations related to computers

and internet technology would add
approximately $153,000 to this category. The
breakdown is as follows:

| | |
|---|---|
| Rent | $ 42,000 |
| Electricity | 16,735 |
| Telephone & Modem | 8,311 |
| Cleaning | 7,600 |
| Computer Costs | 60,106 |
| (including internet) | |
| Apartment Renovations | 18,424 |
| Cost of Audit | 16,500 |
| | 169,676 |

C. A. S. I.
Computer Aided Surgery, Inc.

## Exhibit II Payroll Reconciliation

Quarterly Payroll - Dr. Karron
10/1/01 - 6/30/03

| Date | Gross | FICA | Fed | State | City | Disability | Contribution to NIST Project | Net |
|------|-------|------|-----|-------|------|------------|------------------------------|-----|
| 5/13/2002 | 8,333.33 | 637.50 | 1,909.00 | 493.56 | 270.83 | 2.60 | | 5,019.84 |
| 6/3/2002 | 8,333.33 | 637.50 | 1,909.00 | 493.56 | 288.42 | 2.60 | | 5,002.25 |
| Total Per Quarter | 16,666.66 | 1,275.00 | 3,818.00 | 987.12 | 559.25 | 5.20 | | 10,022.09 |
| | | | | | | | | |
| 7/5/2002 | 9,856.97 | 1,800.20 | 2,637.81 | 255.10 | 115.85 | 1.20 | | 5,146.81 |
| 7/5/2002 | 14,583.33 | 211.46 | 3,555.00 | 987.78 | 538.42 | 2.50 | | 9,288.07 |
| 7/5/2002 | 9,856.97 | 1,033.98 | 2,637.81 | 987.78 | 538.42 | 2.60 | | 4,756.38 |
| | | | | | | | | |
| 8/13/2002 | 61,918.07 | 2,555.84 | 17,104.00 | 4,351.00 | 2,231.00 | 1.20 | 30,000.00 | 5,675.03 |
| 9/30/2002 | 61,918.00 | 897.81 | 17,104.00 | 4,351.00 | 2,231.00 | 0.00 | 37,334.19 | (0.00) |
| Total Per Quarter | 158,333.34 | 6,499.29 | 43,038.62 | 10,932.66 | 5,654.69 | 7.60 | 67,334.19 | 24,866.29 |
| | | | | | | | | |
| 10/19/2002 | 16,826.00 | 270.98 | 5,109.00 | 1,197.90 | 652.31 | 1.20 | | 9,594.61 |
| 11/5/2002 | 16,826.00 | 243.98 | 5,109.00 | 1,197.90 | 652.31 | 1.20 | | 9,621.61 |
| 11/20/2002 | 16,826.00 | 243.97 | 5,109.00 | 1,197.90 | 652.31 | 1.20 | | 9,621.62 |
| 12/2/2003 | 16,826.00 | 243.98 | 5,109.00 | 1,197.90 | 652.31 | 1.20 | | 9,621.61 |
| 12/17/2002 | 4,206.50 | 60.99 | 678.00 | 255.60 | 147.53 | 1.20 | | 3,063.18 |
| 12/30/2002 | 4,206.50 | 61.00 | 678.00 | 255.60 | 147.53 | 1.20 | | 3,063.17 |
| Total Per Quarter | 75,717.00 | 1,124.90 | 21,792.00 | 5,302.80 | 2,904.30 | 7.20 | | 44,585.80 |
| | | | | | | | | |
| total per year | 250,717.00 | 8,899.19 | 68,648.62 | 17,222.58 | 9,118.24 | 20.00 | 67,334.19 | 79,474.18 |
| | | | | | | | | |
| 1/10/2003 | 4,206.50 | 60.99 | 678.00 | 255.60 | 147.53 | 1.20 | | 3,063.18 |
| 1/23/2003 | 4,206.50 | 321.80 | 658.00 | 255.60 | 147.53 | 1.20 | | 2,812.37 |
| 2/12/2003 | 5,047.80 | 386.16 | 921.00 | 295.90 | 167.34 | 1.20 | | 3,276.20 |
| 2/21/2003 | 5,047.80 | 386.15 | 921.00 | 295.90 | 167.34 | 1.20 | | 3,276.21 |
| 3/7/2003 | 5,047.80 | 386.16 | 921.00 | 295.90 | 167.34 | 1.20 | | 3,276.20 |
| 3/25/2003 | 5,047.80 | 386.16 | 921.00 | 295.90 | 167.34 | 1.20 | | 3,276.20 |
| Total Per Quarter | 28,604.20 | 1,927.40 | 5,030.00 | 1,694.80 | 964.42 | 7.20 | | 18,960.38 |
| | | | | | | | | |
| 4/9/2003 | 5,047.80 | 386.16 | 921.00 | 295.90 | 167.34 | 1.20 | | 3,276.20 |
| 4/18/2003 | 6,730.40 | 514.88 | 1,426.09 | 430.43 | 234.64 | 1.20 | | 4,123.25 |
| 5/2/2003 | 6,730.40 | 514.88 | 1,670.66 | 447.39 | 243.87 | 1.20 | | 3,852.50 |
| 5/16/2003 | 6,730.40 | 514.88 | 1,670.56 | 447.39 | 243.87 | 1.20 | | 3,852.50 |
| 5/30/2003 | 6,730.40 | 514.88 | 1,670.56 | 447.39 | 243.87 | 1.20 | | 3,852.50 |
| 6/13/2003 | 6,730.40 | 514.88 | 1,670.56 | 447.39 | 243.87 | 1.20 | | 3,852.50 |
| 6/27/2003 | 6,730.40 | 514.88 | 1,670.54 | 447.39 | 243.87 | 1.20 | | 3,852.52 |
| Total Per Quarter | 45,430.20 | 3,475.41 | 10,699.78 | 2,963.28 | 1,621.33 | 8.40 | | 26,662.00 |

C. A. S. I.
Computer Aided Surgery, Inc.

## Exhibit III Consolidated Project Expenditures (Profit and Loss) and related 'Balance Sheet-(9/30/02 6/30/03)

COMBINED BALANCE SHEET
CASI / NIST
9/30/02

| | CASI | NIST | TOTAL |
|---|---|---|---|
| **Assets** | | | |
| CASI (LLC) Checking - 3165 | $0 | $0 | $0 |
| CASI (LLC) Checking - 9665 | 438 | 0 | 438 |
| NIST Checking - 3565 | 0 | (60,310) | (60,310) |
| **Total Bank** | 438 | (60,310) | (59,872) |
| Advance on payroll | 75,000 | 19,000 | 94,000 |
| **Total Other Current Assets** | 75,000 | 19,000 | 94,000 |
| **Total Assets** | **75,438** | **(41,310)** | **34,129** |
| **Liabilities & Equity** | | | |
| Accounts Payable | 3,131 | 5,453 | 8,584 |
| **Total Accounts Payable** | 3,131 | 5,453 | 8,584 |
| CASI Loan | 0 | (188,927) | (188,927) |
| Chase SBFS Loan | (1,317) | 0 | (1,317) |
| DKB Loan | (5,100) | 49,736 | 44,636 |
| Due to ATP Program | 188,927 | 0 | 188,927 |
| **Total Other Current Liability** | 182,510 | (139,191) | 43,319 |
| **Total Liability** | 185,641 | (133,737) | 51,904 |
| Contributions to NIST program | 0 | 67,334 | 67,334 |
| Current Period Income (Loss) | (110,606) | 25,094 | (85,512) |
| Opening Balance Equity | 403 | 0 | 403 |
| **Total Equity** | (110,203) | 92,428 | (17,775) |
| **Total Liabilities & Equity** | **$76,438** | **($41,309)** | **$34,130** |

COMBINED PROFIT & LOSS STATEMENT
CASI / NIST
9/30/02

| | CASI | NIST | TOTAL |
|---|---|---|---|
| **Income** | | | |
| ATP Award Funds | $0 | $0 | $0 |
| ATP Award Funds - Year 1 | 0 | 800,000 | 800,000 |
| ATP Award Funds - Year 2 | 0 | 0 | 0 |
| Consulting Fee Income | 0 | 0 | 0 |
| | | | |
| **Total Income** | 0 | 800,000 | 800,000 |
| | | | |
| | | | |
| **Expenses** | | | |
| | | | |
| Advertising | 0 | 11 | 11 |
| Amex Credit Card | (0) | (34,583) | (34,583) |
| Amex Credit Card: Membership | (1) | 0 | (1) |
| Amex Credit Card: Purchases | 0 | 34,583 | 34,583 |
| Auto : Fuel | 0 | 0 | 0 |
| Auto : Mobil Credit Card | 54 | 10 | 64 |
| Auto : Sunoco Credit Card | 0 | 18 | 18 |
| Bank Service Charges | 36 | 0 | 36 |
| Credit Card: Membership Fee | 0 | 0 | 0 |
| DBK Personal | 200 | 0 | 200 |
| DBK Personal: Pharmacy | 0 | 0 | 0 |
| Dues & Subscriptions | 313 | 316 | 629 |
| Fringe Benefits (non NIST) | 0 | 0 | 0 |
| Insurance: Disability Insurance | 0 | 0 | 0 |
| Insurance: Health Plan | 0 | 0 | 0 |
| Interest Expense: Finance Charge | 0 | 0 | 0 |
| Miscellaneous | 0 | 1,074 | 1,074 |
| NIST Equipment: Ancillaries | 4,093 | 18,569 | 22,662 |
| NIST Equipment: Hardware | 2,326 | 163,557 | 165,883 |
| NIST Equipment: Software | 3,675 | 9,579 | 13,254 |
| NIST Equipment: Repair & Other | 0 | 4,704 | 4,704 |
| NIST Equipment: Computer Expense | 0 | 247 | 247 |
| NIST Fringe Benefits | 0 | 0 | 0 |
| NIST Fringe Benefits: Admin: Childcare | 0 | 1,700 | 1,700 |
| NIST Fringe Benefits: Admin: Doctors & Pharmacy | 0 | 807 | 807 |
| NIST Fringe Benefits: Disability Insurance | 0 | 163 | 163 |
| NIST Fringe Benefits: Doctors & Pharmacy | 12 | 0 | 12 |
| NIST Fringe Benefits: Education: DaSalla | 0 | 3,238 | 3,238 |
| NIST Fringe Benefits: Fitness | 0 | 1,246 | 1,246 |
| NIST Fringe Benefits: Health Insurance | 0 | 18,013 | 18,013 |
| NIST Fringe Benefits: Parking | 44 | 0 | 44 |
| NIST Fringe Benefits: Technical: Doctors & Pharmacy | 0 | 39,246 | 39,246 |
| NIST Fringe Benefits: TransitCheks | (0) | 0 | (0) |
| NIST Fringe Benefits: Travel & Parking | 0 | 2,631 | 2,631 |
| NIST Fringe Benefits: Worker's Compensation Insurance | 0 | 902 | 902 |
| NIST Materials/Supplies | 0 | 0 | 0 |
| NIST Materials/Supplies: Dues & Subscriptions | 0 | 682 | 682 |
| NIST Materials/Supplies: Postage, Shipping, Messenger | 316 | 1,187 | 1,503 |

COMBINED PROFIT & LOSS STATEMENT
CASI / NIST
9/30/02

| | | | |
|---|---|---|---|
| NIST Materials/Supplies: Supplies & Non-computer Equipment | 4,064 | 12,962 | 17,025 |
| NIST Materials/Supplies: Supplies & Non-computer Equipment | 0 | 0 | 0 |
| NIST Office Expense | 0 | 2,284 | 2,284 |
| NIST Other: Accounting | 0 | 5,090 | 5,090 |
| NIST Other: Capital Improvements | 0 | 3,500 | 3,500 |
| NIST Other: Communication: Internet, Broadband, Modem Etc. | 0 | 6,326 | 6,326 |
| NIST Other: Communication: Telephones | 0 | 110 | 110 |
| NIST Other: Communication | 0 | 0 | 0 |
| NIST Other: Communication: Internet, Broadband, Modem | 0 | 0 | 0 |
| NIST Other: Dues & Membership | 682 | 0 | 682 |
| NIST Other: Legal | 0 | 7,455 | 7,455 |
| NIST Other: Other Repairs | 0 | 424 | 424 |
| NIST Payroll Expenses | 0 | 39 | 39 |
| NIST Payroll Expenses: 940 | 0 | 214 | 214 |
| NIST Payroll Expenses: 940 & 941 | 0 | 0 | 0 |
| NIST Payroll Expenses: 941 | 0 | 25,410 | 25,410 |
| NIST Payroll Expenses: FICA | 0 | (0) | (0) |
| NIST Payroll Expenses: NC | 0 | 0 | 0 |
| NIST Payroll Expenses: NC-5 | 0 | 0 | 0 |
| NIST Payroll Expenses: NJ | 0 | (0) | (0) |
| NIST Payroll Expenses: NYS/NYC | 0 | 0 | 0 |
| NIST Payroll Expenses: NYS-45 | 0 | 0 | 0 |
| NIST Payroll Expenses: ProPay fees | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Albin | 0 | (0) | (0) |
| NIST Payroll Expenses: taxes w/held: Benedict | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Borthwick | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Cox | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: DaSalla | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Gurfein | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Karron | 0 | (0) | (0) |
| NIST Payroll Expenses: taxes w/held: Peralta | 0 | (0) | (0) |
| NIST Payroll Expenses: taxes w/held: Ross | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Rothman | 0 | (0) | (0) |
| NIST Payroll Expenses: taxes w/held: Wine | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Wynter | 0 | 0 | 0 |
| NIST Payroll Expenses: Temporary | 0 | 0 | 0 |
| NIST Project Salaries | 0 | 0 | 0 |
| NIST Project Salaries: Admin: Benedict | 0 | 0 | 0 |
| NIST Project Salaries: Admin: Gurfein | 0 | 100,001 | 100,001 |
| NIST Project Salaries: Admin: Ross | 0 | 0 | 0 |
| NIST Project Salaries: Admin: Wynter | 0 | 9,349 | 9,349 |
| NIST Project Salaries: Technical: Albin | 0 | 6,200 | 6,200 |
| NIST Project Salaries: Technical: Borthwick | 0 | 0 | 0 |
| NIST Project Salaries: Technical: Cox | 0 | 5,200 | 5,200 |
| NIST Project Salaries: Technical: DaSalla | 0 | 18,936 | 18,936 |
| NIST Project Salaries: Technical: Karron | 0 | 174,970 | 174,970 |
| NIST Project Salaries: Technical: Peralta | 0 | 1,313 | 1,313 |
| NIST Project Salaries: Technical: Rothman | 0 | 3,405 | 3,405 |
| NIST Project Salaries: Technical: Wine | 0 | 3,520 | 3,520 |
| NIST Subcontracts | 0 | 0 | 0 |

COMBINED PROFIT & LOSS STATEMENT
CASI / NIST
9/30/02

| | | | |
|---|---|---|---|
| NIST Subcontracts: Accounting | 1,000 | 0 | 1,000 |
| NIST Subcontracts: Admin: Accounting | 0 | 0 | 0 |
| NIST Subcontracts: Admin: Axiom | 0 | 0 | 0 |
| NIST Subcontracts: Admin: Bookkeeping | 0 | 4,930 | 4,930 |
| NIST Subcontracts: Admin: Clerical | 0 | 509 | 509 |
| NIST Subcontracts: Admin: Ferrand | 0 | 0 | 0 |
| NIST Subcontracts: Admin: Legal | 0 | 0 | 0 |
| NIST Subcontracts: Admin: Manning | 0 | 0 | 0 |
| NIST Subcontracts: Admin: Ross | 0 | 0 | 0 |
| NIST Subcontracts: Equipment Installation | 0 | 0 | 0 |
| NIST Subcontracts: Professional Tax Services | 0 | 0 | 0 |
| NIST Subcontracts: Technical | 0 | 300 | 300 |
| NIST Subcontracts: Technical: Abe Karron | 0 | 1,000 | 1,000 |
| NIST Subcontracts: Technical: Albin | 0 | 0 | 0 |
| NIST Subcontracts: Technical: ATG | 0 | 12,000 | 12,000 |
| NIST Subcontracts: Technical: Blumenthal | 0 | 200 | 200 |
| NIST Subcontracts: Technical: Cox | 0 | 33,930 | 33,930 |
| NIST Subcontracts: Technical: Frost | 0 | 100 | 100 |
| NIST Subcontracts: Technical: Honoraria | 0 | 0 | 0 |
| NIST Subcontracts: Technical: Mage | 0 | 0 | 0 |
| NIST Subcontracts: Technical: Radio Logic | 0 | 100 | 100 |
| NIST Subcontracts: Technical: Wolberg | 0 | 39,675 | 39,675 |
| NIST Subcontracts: Technical: Zeevi | 0 | 375 | 375 |
| NIST Travel | 0 | 0 | 0 |
| NIST Travel: Auto & Other Transportation | 3,338 | 2,105 | 5,443 |
| NIST Travel: Conferences | 3,312 | 6,943 | 10,255 |
| NIST Travel: Meals | 543 | 0 | 543 |
| NIST Travel: Other | 0 | 438 | 438 |
| NIST Travel: Other: Travel & Business Meals | 0 | 5,528 | 5,528 |
| **Total Expenses:** | 24,007 | 762,739 | 786,745 |
| **Net NIST Income:** | (24,007) | 37,261 | 13,255 |

NON-NIST (not allocated to NIST)

| | | | |
|---|---|---|---|
| Non-NIST Expenses | 0 | 0 | 0 |
| Non-NIST Expenses: Bank Service Charges | 0 | 0 | 0 |
| Non-NIST Expenses: Cleaning | 2,900 | 1,400 | 4,300 |
| Non-NIST Expenses: Con Ed | 0 | 1,040 | 1,040 |
| Non-NIST Expenses: Con Ed Solutions | 0 | 528 | 528 |
| Non-NIST Expenses: Conferences | 0 | 0 | 0 |
| Non-NIST Expenses: Fines | 0 | 55 | 55 |
| Non-NIST Expenses: NJ -927 | 0 | 0 | 0 |
| Non-NIST Expenses: Professional Fees: Accounting | 0 | 0 | 0 |
| Non-NIST Expenses: Professional Fees: Legal | 0 | 4,159 | 4,159 |
| Non-NIST Expenses: Rent | 0 | 2,000 | 2,000 |
| Non-NIST Expenses: Repairs & Hardware | 0 | 0 | 0 |
| Non-NIST Expenses: Shipping | 0 | 0 | 0 |

COMBINED PROFIT & LOSS STATEMENT
CASI / NIST
9/30/02

| | | | |
|---|---|---|---|
| Non-NIST Expenses: Supplies | 0 | 0 | 0 |
| Non-NIST Expenses: Telephone, Cell, Pager | 0 | 2,480 | 2,480 |
| Non-NIST Expenses: Travel: Auto | 0 | 506 | 506 |
| Non-NIST Expenses: Travel: Meals & Entertainment | 0 | 0 | 0 |
| Office (Non-NIST): Cleaning | 0 | 0 | 0 |
| Office (Non-NIST): Communication: Internet, Broadband | 70 | 0 | 70 |
| Office (Non-NIST): Communication: Pager | 369 | 0 | 369 |
| Office (Non-NIST): Communication: Telephone | 1,723 | 0 | 1,723 |
| Office (Non-NIST): Insurance | (26) | 0 | (26) |
| Office (Non-NIST): Meals | 1,340 | 0 | 1,340 |
| Office (Non-NIST): Postage and Delivery | 0 | 0 | 0 |
| Office (Non-NIST): Rent | 2,000 | 0 | 2,000 |
| Office (Non-NIST): Repairs & Hardware | 683 | 0 | 683 |
| Office (Non-NIST): Supplies | 818 | 0 | 818 |
| Office (Non-NIST): Telephone | 0 | 0 | 0 |
| Office (Non-NIST): Travel | 157 | 0 | 157 |
| Payroll Expenses | 0 | 0 | 0 |
| Professional Fees: Accounting | 2,000 | 0 | 2,000 |
| Professional Fees: Legal Fees | 12,335 | 0 | 12,335 |
| Rent | 56,000 | 0 | 56,000 |
| Taxes | 0 | 0 | 0 |
| Temporary | 43 | 0 | 43 |
| Travel & Ent: Conference | 545 | 0 | 545 |
| Utilities: ConEd | 1,964 | 0 | 1,964 |
| Utilities: ConEd Solutions | 3,576 | 0 | 3,576 |
| **Total NON - NIST** | 86,599 | 12,166 | 98,767 |

**Other Income**

| | | | |
|---|---|---|---|
| Interest Income | 0 | 0 | 0 |

**Other Expenses**

| | | | |
|---|---|---|---|
| Other Expenses | 0 | 0 | 0 |

| | | | |
|---|---|---|---|
| **Total Net Income (Loss)** | ($110,606) | $25,094 | ($85,512) |

COMBINED BALANCE SHEET
CASI / NIST
6/30/03

| | CASI | NIST | TOTAL |
|---|---|---|---|
| **Assets** | | | |
| CASI (LLC) Checking - 3165 | ($168) | $0 | ($168) |
| CASI (LLC) Checking - 9665 | 0 | 0 | 0 |
| NIST Checking - 3166 | 0 | 600 | 600 |
| NIST Checking - 3565 | 0 | 117 | 117 |
| **Total Bank** | (168) | 717 | 549 |
| Advance on payroll | 75,000 | 19,000 | 94,000 |
| **Total Other Current Assets** | 75,000 | 19,000 | 94,000 |
| **Total Assets** | 74,832 | 19,717 | 94,549 |
| **Liabilities & Equity** | | | |
| Accounts Payable | 30,018 | 27,962 | 57,980 |
| **Total Accounts Payable** | 30,018 | 27,962 | 57,980 |
| CASI Loan | 0 | (249,374) | (249,374) |
| Chase SBFS Loan | (1,317) | 0 | (1,317) |
| DKB Loan | 17,400 | 46,214 | 63,614 |
| Due to ATP Program | 249,375 | 0 | 249,375 |
| **Total Other Current Liability** | 265,458 | (203,161) | 62,297 |
| **Total Liability** | 295,475 | (175,198) | 120,277 |
| Contributions to NIST program | 0 | 67,334 | 67,334 |
| Current Period Income (Loss) | (110,441) | 102,488 | (7,953) |
| Opening Balance Equity | (110,203) | 25,094 | (85,109) |
| **Total Equity** | (220,644) | 194,916 | (25,728) |
| **Total Liabilities & Equity** | $74,832 | $19,718 | $94,549 |

COMBINED PROFIT & LOSS STATEMENT
CASI/NIST
10/1/02 - 6/30/03

| | CASI | NIST | TOTAL |
|---|---|---|---|
| **Income** | | | |
| ATP Award Funds | 0 | 0 | $0 |
| ATP Award Funds - Year 1 | 0 | 0 | 0 |
| ATP Award Funds - Year 2 | 0 | 545,500 | 545,500 |
| Consulting Fee Income | 0 | 0 | 0 |
| **Total Income** | 0 | 545,500 | 545,500 |
| | | | |
| **Expenses** | | | |
| Amex Credit Card | 0 | (17,837) | (17,837) |
| Amex Credit Card: Membership | 75 | 0 | 75 |
| Amex Credit Card: Purchases | 0 | 22,531 | 22,531 |
| Auto : Fuel | 0 | 0 | 0 |
| Auto : Exxon Credit Card | 0 | 326 | 326 |
| Auto : Sunoco Credit Card | 0 | 136 | 136 |
| Bank Service Charges | 286 | 0 | 286 |
| Credit Card: Membership Fee | 0 | 0 | 0 |
| DBK Personal | 0 | 0 | 0 |
| DBK Personal: Pharmacy | 0 | 0 | 0 |
| Dues & Subscriptions | 0 | 778 | 778 |
| Fringe Benefits (non NIST) | 0 | 0 | 0 |
| Insurance: Disability Insurance | 0 | 0 | 0 |
| Insurance: Health Plan | 0 | 0 | 0 |
| Interest Expense: Finance Charge | 0 | 0 | 0 |
| Miscellaneous | 0 | 0 | 0 |
| NIST Equipment: Ancillaries | 1,209 | 10,916 | 12,125 |
| NIST Equipment: Hardware | 0 | 86,260 | 86,260 |
| NIST Equipment: Software | 436 | 1,176 | 1,612 |
| NIST Equipment: Repair & Other | | 396 | 396 |
| NIST Equipment: Computer Expense | | 0 | 0 |
| NIST Fringe Benefits | 0 | 0 | 0 |
| NIST Fringe Benefits: Admin: Childcare | 0 | 900 | 900 |
| NIST Fringe Benefits: Admin: Doctors & Pharmacy | 0 | 0 | 0 |
| NIST Fringe Benefits: Disability Insurance | 0 | 0 | 0 |
| NIST Fringe Benefits: Doctors & Pharmacy | 0 | 0 | 0 |
| NIST Fringe Benefits: Education: DaSalia | 0 | 0 | 0 |
| NIST Fringe Benefits: Fitness | 0 | 408 | 408 |
| NIST Fringe Benefits: Health Insurance | 0 | 9,347 | 9,347 |
| NIST Fringe Benefits: Parking | 0 | 0 | 0 |
| NIST Fringe Benefits: Technical: Doctors & Pharmacy | 213 | 8,512 | 8,725 |
| NIST Fringe Benefits: TransitCheks | 0 | 0 | 0 |
| NIST Fringe Benefits: Travel & Parking | 0 | 1,396 | 1,396 |
| NIST Fringe Benefits: Worker's Compensation Insurance | 0 | 1,390 | 1,390 |
| NIST Materials/Supplies | 0 | 0 | 0 |
| NIST Materials/Supplies: Dues & Subscriptions | 0 | 776 | 776 |
| NIST Materials/Supplies: Postage, Shipping, Messenger | 0 | 1,040 | 1,040 |
| NIST Materials/Supplies: Supplies & Non-computer Equipment | 143 | 4,701 | 4,845 |
| NIST Materials/Supplies: Supplies & Non-computer Equipment | 0 | 0 | 0 |

COMBINED PROFIT & LOSS STATEMENT
CASI/NIST
10/1/02 - 6/30/03

| | | | |
|---|---:|---:|---:|
| NIST Other | 0 | 0 | 0 |
| NIST Other: Accounting | 0 | 12,500 | 12,500 |
| NIST Other: Capital Improvements | 0 | 0 | 0 |
| NIST Other: Communication: Internet, Broadband, Modem Etc. | 0 | 9,768 | 9,768 |
| NIST Other: Communication: Telephones | 0 | 0 | 0 |
| NIST Other: Communication | 0 | 0 | 0 |
| NIST Other: Communication: Internet, Broadband, Modem | 0 | 0 | 0 |
| NIST Other: Dues & Membership | 10 | 0 | 10 |
| NIST Other: Legal | 0 | 0 | 0 |
| NIST Other: Other Repairs | (105) | 960 | 855 |
| NIST Payroll Expenses | 0 | 0 | 0 |
| NIST Payroll Expenses: 940 | 0 | (0) | (0) |
| NIST Payroll Expenses: 940 & 941 | 25,103 | 0 | 25,103 |
| NIST Payroll Expenses: 941 | 0 | 13,994 | 13,994 |
| NIST Payroll Expenses: FICA | 0 | 0 | 0 |
| NIST Payroll Expenses: NC | 1,178 | 0 | 1,178 |
| NIST Payroll Expenses: NC-5 | 0 | 0 | 0 |
| NIST Payroll Expenses: NJ | 0 | 0 | 0 |
| NIST Payroll Expenses: NYS/NYC | 4,835 | (4,835) | 0 |
| NIST Payroll Expenses: NYS-45 | 0 | 2,164 | 2,164 |
| NIST Payroll Expenses: ProPay fees | 87 | 20 | 107 |
| NIST Payroll Expenses: taxes w/held | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Albin | 0 | (0) | (0) |
| NIST Payroll Expenses: taxes w/held: Benedict | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Borthwick | 0 | (0) | (0) |
| NIST Payroll Expenses: taxes w/held: Cox | 0 | (0) | (0) |
| NIST Payroll Expenses: taxes w/held: DaSalla | 0 | (0) | (0) |
| NIST Payroll Expenses: taxes w/held: Gurfein | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Karron | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Peralta | 0 | (0) | (0) |
| NIST Payroll Expenses: taxes w/held: Ross | 0 | (0) | (0) |
| NIST Payroll Expenses: taxes w/held: Rothman | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Wine | 0 | 0 | 0 |
| NIST Payroll Expenses: taxes w/held: Wynter | 0 | 0 | 0 |
| NIST Payroll Expenses: Temporary | 0 | (0) | (0) |
| NIST Project Salaries | 0 | 0 | 0 |
| NIST Project Salaries: Admin: Benedict | 10,989 | 6,923 | 17,911 |
| NIST Project Salaries: Admin: Gurfein | 0 | 0 | 0 |
| NIST Project Salaries: Admin: Ross | 0 | 7,718 | 7,718 |
| NIST Project Salaries: Admin: Wynter | 0 | 5,873 | 5,873 |
| NIST Project Salaries: Technical: Albin | 0 | 600 | 600 |
| NIST Project Salaries: Technical: Borthwick | 0 | 780 | 780 |
| NIST Project Salaries: Technical: Cox | 9,283 | 35,425 | 44,708 |
| NIST Project Salaries: Technical: DaSalla | 1,919 | 1,410 | 3,329 |
| NIST Project Salaries: Technical: Karron | 19,263 | 116,099 | 135,361 |
| NIST Project Salaries: Technical: Peralta | 0 | 3,735 | 3,735 |
| NIST Project Salaries: Technical: Rothman | 5,155 | 21,848 | 27,003 |
| NIST Project Salaries: Technical: Wine | 0 | 0 | 0 |
| NIST Subcontracts | 0 | 0 | 0 |
| NIST Subcontracts: Accounting | 0 | 375 | 375 |
| NIST Subcontracts: Admin: Accounting | 0 | 0 | 0 |

COMBINED PROFIT & LOSS STATEMENT
CASI/NIST
10/1/02 – 6/30/03

| | | | |
|---|--:|--:|--:|
| NIST Subcontracts: Admin: Axiom | 0 | 400 | 400 |
| NIST Subcontracts: Admin: Bookkeeping | 0 | 20,387 | 20,387 |
| NIST Subcontracts: Admin: Clerical | 0 | 200 | 200 |
| NIST Subcontracts: Admin: Ferrand | 200 | 0 | 200 |
| NIST Subcontracts: Admin: Legal | 0 | 0 | 0 |
| NIST Subcontracts: Admin: Manning | 0 | 170 | 170 |
| NIST Subcontracts: Admin: Ross | 0 | 4,100 | 4,100 |
| NIST Subcontracts: Equipment Installation | 0 | 16,657 | 16,657 |
| NIST Subcontracts: Professional Tax Services | 0 | 0 | 0 |
| NIST Subcontracts: Technical | 0 | 0 | 0 |
| NIST Subcontracts: Technical: Abe Karron | 0 | 0 | 0 |
| NIST Subcontracts: Technical: Albin | 0 | 0 | 0 |
| NIST Subcontracts: Technical: ATG | 0 | 0 | 0 |
| NIST Subcontracts: Technical: Blumenthal | 0 | 0 | 0 |
| NIST Subcontracts: Technical: Cox | 0 | 0 | 0 |
| NIST Subcontracts: Technical: Frost | 0 | 0 | 0 |
| NIST Subcontracts: Technical: Honoraria | 0 | 0 | 0 |
| NIST Subcontracts: Technical: Mage | 0 | 1,000 | 1,000 |
| NIST Subcontracts: Technical: Radio Logic | 0 | 0 | 0 |
| NIST Subcontracts: Technical: Wolberg | 0 | 1,000 | 1,000 |
| NIST Subcontracts: Technical: Zeevi | 0 | 0 | 0 |
| NIST Travel | (20) | 0 | (20) |
| NIST Travel: Auto & Other Transportation | 342 | 2,325 | 2,667 |
| NIST Travel: Conferences | (433) | 1,626 | 1,192 |
| NIST Travel: Meals | 128 | 0 | 128 |
| NIST Travel: Other | 0 | 6,405 | 6,405 |
| NIST Travel: Other: Travel & Business Meals | 0 | 3,415 | 3,415 |
| **Total Expenses:** | 80,295 | 426,193 | 506,488 |
| **Net NIST Income:** | (80,295) | 119,307 | 39,012 |

**NON-NIST (not allocated to NIST)**

| | | | |
|---|--:|--:|--:|
| Non-NIST Expenses | 0 | 0 | 0 |
| Non-NIST Expenses: Bank Service Charges | 0 | 205 | 205 |
| Non-NIST Expenses: Cleaning | 0 | 3,300 | 3,300 |
| Non-NIST Expenses: Con Ed | 0 | 1,081 | 1,081 |
| Non-NIST Expenses: Con Ed Solutions | 0 | 3,815 | 3,815 |
| Non-NIST Expenses: Conferences | 0 | 506 | 506 |
| Non-NIST Expenses: Fines | 0 | 0 | 0 |
| Non-NIST Expenses: NJ -927 | 0 | 146 | 146 |
| Non-NIST Expenses: Professional Fees: Accounting | 0 | 250 | 250 |
| Non-NIST Expenses: Professional Fees: Legal | 0 | 150 | 150 |
| Non-NIST Expenses: Rent | 0 | 0 | 0 |
| Non-NIST Expenses: Repairs & Hardware | 0 | 0 | 0 |
| Non-NIST Expenses: Shipping | 0 | 7 | 7 |
| Non-NIST Expenses: Supplies | 0 | 202 | 202 |
| Non-NIST Expenses: Telephone, Cell, Pager | 0 | 2,829 | 2,829 |

COMBINED PROFIT & LOSS STATEMENT
CASI/NIST
10/1/02 - 6/30/03

| | | | |
|---|---:|---:|---:|
| Non-NIST Expenses: Travel: Auto | 0 | 0 | 0 |
| Non-NIST Expenses: Travel: Meals & Entertainment | 0 | 222 | 222 |
| Office (Non-NIST): Cleaning | 0 | 0 | 0 |
| Office (Non-NIST): Communication: Internet, Broadband | 177 | 0 | 177 |
| Office (Non-NIST): Communication: Pager | 196 | 0 | 196 |
| Office (Non-NIST): Communication: Telephone | 537 | 0 | 537 |
| Office (Non-NIST): Insurance | 0 | 0 | 0 |
| Office (Non-NIST): Meals | 959 | 0 | 959 |
| Office (Non-NIST): Postage and Delivery | 0 | 0 | 0 |
| Office (Non-NIST): Rent | 14,000 | 0 | 14,000 |
| Office (Non-NIST): Repairs & Hardware | 0 | 0 | 0 |
| Office (Non-NIST): Supplies | 6 | 0 | 6 |
| Office (Non-NIST): Telephone | 0 | 0 | 0 |
| Office (Non-NIST): Travel | 222 | 0 | 222 |
| Payroll Expenses | 0 | 0 | 0 |
| Professional Fees: Accounting | 0 | 0 | 0 |
| Professional Fees: Legal Fees | 3,282 | 0 | 3,282 |
| Rent | 6,000 | 0 | 6,000 |
| Taxes | (75) | 0 | (75) |
| Temporary | 198 | 4,107 | 4,305 |
| Travel & Ent: Conference | 0 | 0 | 0 |
| Utilities: ConEd | 1,485 | 0 | 1,485 |
| Utilities: ConEd Solutions | 3,159 | 0 | 3,159 |
| **Total NON - NIST** | 30,146 | 16,819 | 46,965 |

**Other Income**

| | | | |
|---|---:|---:|---:|
| Interest Income | 0 | 0 | 0 |

**Other Expenses**

| | | | |
|---|---:|---:|---:|
| Other Expenses | 0 | 0 | 0 |

| | | | |
|---|---:|---:|---:|
| **Total Net Income (Loss)** | ($110,441) | $102,489 | ($7,953) |

C. A. S. I.
Computer Aided Surgery, Inc.

C. A. S. I.
Computer Aided Surgery, Inc.

# Exhibit IV NIST ATP Project Timeline

## 2001 Pre Project

April 2001 CCNY Meeting with Marc Stanley
June 2001 ATP National Meeting
July 2001 Gate one Submission
August 2001 Gate two Submissions
September 2001 Gate three Oral Presentations
August 2001 Axiom and ATG retained to assist with grant negotiations
September 2001 Gate four Negotiations

### 2001 Project Launch

October 1 Effective Start of Project
October 8 Notification of Grant Start Retroactive
October 29 First Grant Payment
October 20 ATG and Axiom retained to help manage Grant
October 20 Meetings with ITAC on NY State Co funding
October 30 Dr. Karron makes Salary Advance and Pays Rent (major error repaid over remainder of year)
November xx Kickoff Meeting in Gaithersburg 2002
December Jill Feldman Certifies Accounting System
December 2001 Jill Feldman takes in Hayes as partner/prospective practice purchaser
December 2001 Hayes introduced to CASI, starts managing account
December 2001 First Budget Revision (Correcting errors in grant budget; requested by ATP)
December 2001 NIST Rebuffed visit to attempt budget negotiations.
December 2001 Request for Fiscal Control Specialist made

## 2002

January 2002: Discussions with ATP: Discussions about quarterly budget revisions
February 2002 Hayes Purchases CASI account
June 2002 Hayes First Engagement Letter
June 2002 Start Payroll / Hayes makes errors in NJ payroll
July 2002 Start Negotiating Budget revisions / submit budget.
July 2002 First Site Visit
July 2002 Notify Gurfein of non renewal of Contract
August 2002 Hayes Second Engagement Letter
August 2002 Begin repair of CASI books and taxes by Hayes
September DBK funding of project by non-paycheck withholding payments calculated by Hayes
October 2002 1 Start second project year
October 2002 Ross takes over for Gurfein: only mission is to obtain new budget
October 2002 Site Visit re: George Wolberg, Lide and Orthwein meet Hayes, Peter Ross
October 2002 New Fiscal Plan clean sweep: Dr. Karron on regular payroll
October 2002: Request actual costs from Hayes for Budget submission by Ross;
November 2002: Hayes begins making threats to Dr. Karron of reporting non-compliance unless Hayes directives implemented.
December 2002: Hayes threatens to report name change to NIST; Memorandum of Law on name change and holdover contracts issues by CASI lawyers.
December 2002 Hayes asks for audit extension, Granted

### 2003

March 2002: Hayes misses extended audit, citing April 15 tax deadlines

C. A. S. I.
Computer Aided Surgery, Inc.

March 2002: Robert Benedict agrees to come in as Project Manager, replacing Peter Ross; Change not
acknowledged by NIST ATP
June 2003 OIG Audit visit; Project funding suspended
June 2003 CASI also hired Melvin Spitz, CPA, of Spitz and Greenstein and Professor Jerome Schwartz, CPA ESQ,
of Solomon and Schwartz LLC, and Joseph Cornwall, CPA as a backup accounting team, after the OIG completed
its fieldwork in June 2003.
July 2003 CASI revised its Financial Status Reports as requested.
October 2003 Joan Hayes releases Audit Report (1 year late)
November 2003 Presentation at MCCAII Montreal Canada
December 2003 Re-Audit by OIG with Spitz

## 2004

January 2004 MMVR Paper Presented
March 2004 Draft Audit Report Issued
April 2004 Answer to Draft Audit Report commenced