8657KAR2          Riley - direct

1  which is the nine months of the second year of the award.

2  Q. What does the purple area of the graph represent?

3  A. Deposits of grant monies received by CASI.

4  Q. And how about that line that's breaking up the circle?

5  A. This is miscellaneous other deposits into the account.

6  Q. Ms. Riley, did you prepare any additional graphs aside from

7  these ones that we just looked at?

8  A. Yes.

9  Q. What did you prepare?

10      THE COURT:  What was the amount of those other

11  deposits into the account?

12      THE WITNESS:  The deposits from NIST were $545,000,

13  and the miscellaneous deposits were like 1200, 1500, something

14  really small.

15      THE COURT:  Sorry.

16  Q. Ms. Riley, aside from these graphs, did you create any

17  additional charts and graphs?

18  A. Yes.

19  Q. What did you prepare?

20  A. I analyzed the expenditures from the accounts.

21  Q. I am showing you what have been marked for identification

22  as Government's Exhibits 114 and 115.  Do you have those in

23  front of you?

24  A. Yes.

25  Q. Do you recognize what they are?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

8657KAR2          Riley - direct

1   A. Yes, they are the pie charts that I created for the

2   analysis of the expenditures.

3   Q. And what documents did you look at to create these graphs

4   and charts?

5   A. Canceled checks and American Express statements were the

6   main source documents used to create these.

7          MR. KWOK: Government offers Government's Exhibits 114

8   and 115.

9          MR. RUBINSTEIN: No objection, your Honor.

10         THE COURT: 114 and 115 are admitted into evidence.

11         (Government's Exhibits 114 and 115 received in

12   evidence)

13         MR. KWOK: May we publish that to the jury?

14         THE COURT: You say these are expenditures?

15    .    THE WITNESS: Yes, sir. For 114 and 115 I did

16   analysis and expenditures.

17         THE COURT: First for the year ended October 10, 2002?

18         THE WITNESS: OK. And that is because of the

19   breakdown for the fringe benefits for check paid to IRS for

20   withholdings or whatever, the breakdown I had for check and

21   fringe benefits, I had an analysis for the year prepared by one

22   of the accountants that I could reconcile the numbers -- the

23   check payments through October 10. So, it doesn't --

24         THE COURT: 114 and 115 are admitted in evidence.

25   Q. Now, Ms. Riley looking first at Government Exhibit 114,

8657KAR4          Gurfein - direct

1   Q. And how was that money going to be disbursed?

2   A. In progress payments over a three-year period.

3   Q. Did you in fact have any continuing involvement with CASI

4   after the grant was awarded?

5   A. Yes.

6   Q. What was that involvement?

7   A. I was taken on as the business manager.

8   Q. How long were you the business manager?

9   A. For one year.

10  Q. Starting when and ending when?

11  A. Starting October 1, 2001, ending September 30, 2002.

12  Q. Were you paid anything for this job?

13  A. Yes.

14  Q. How much were you paid?

15  A. I was paid $100,000.

16  Q. Mr. Gurfein, did there come a time when you met with people

17  at NIST after the grant was awarded to discuss the grant?

18  A. Yes.

19  Q. About when was that?

20  A. Approximately a month or so after the award.

21  Q. When was the award?

22  A. The award was effective October 1, 2001. We were advised

23  of it on October 4, 2001.

24      THE COURT: For the $100,000, was that a full-time

25  job?

1   Q. To your knowledge, were any of those preproposal costs ever

2   approved by NIST people?

3   A. Not to my knowledge.

4   Q. What other specific expenditures did you discuss with the

5   defendant around this time when the grant was awarded?

6   A. Well, after the award, we discussed rent and utilities and

7   legal and accounting.

8   Q. Let's talk about rents and utilities for a moment.  What

9   was the nature of your discussions about rent and utilities?

10  A. Well, we had, in the proposal, and as approved in the

11  grant, we had indicated that we were going to be involved with

12  the City University at Fifth Avenue and 34th Street with the

13  graduate center there, the computer science part of it, where

14  we would have a facility there, and that facility would be a

15  company with some support staff from graduate students or

16  whatever, who were in the computer science area.

17  Q. What happened with respect to that facility?

18  A. Well, it was decided that we would not be using that

19  facility.

20  Q. Why not?

21  A. I think Dr. Karron had indicated that the overhead rates

22  for the people there was high, and that it was something that

23  would not be desirable.

24  Q. So where did CASI set up its business location?

25  A. We set up, basically, in Dr. Karron's apartment.

865ZKAR5          Gurfein - direct

1   Q. And what, if any, discussions did you have with the

2   defendant about rent and utilities with respect to the business

3   space of CASI?

4   A. Well, yeah, he felt that -- I mean, he indicated to me that

5   the rent should be paid to him by CASI, because that's where we

6   were doing all the work, and it was essentially an office

7   laboratory situation.

8   Q. This was rent from CASI to the defendant?

9   A. From CASI to the defendant, yes.

10  Q. And when the defendant told you this, what, if anything,

11  was your reaction?

12  A. Well, it was clear that the rules, or the guidelines given

13  to us by the people at NIST said no, that's -- that was not

14  allowed.

15  Q. And what, if anything, did the defendant respond?

16  A. Well, he asked me to see if we can get it approved. So I

17  wound up calling Hope Snowden at NIST and asking her if it

18  could be approved.

19  Q. What, if anything, was her response?

20  A. She said no.

21  Q. And what did you do after you heard no from Hope Snowden?

22  A. I reported to Dr. Karron. And he said, well, we talked

23  about it and he said, well, why don't you go back and try

24  again. But under the idea that this is a one grant company,

25  and so it's clear that everything we do here is for this grant

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

865ZKAR5          Gurfein - direct

1   and there were no other funds, and so that there's no other

2   activity at the moment. So that we could simply -- you know,

3   it would be, as he expressed it, appropriate for us to get paid

4   rent for that facility.

5   Q. And did you, in fact, call Hope Snowden again?

6   A. Yes, I did.

7   Q. And did you ask her that question?

8   A. Yes, I did.

9   Q. That way?

10  A. With regard, with regard to it being a one grant operation,

11  yes.

12  Q. And what was her response?

13  A. She said no, we can't -- we don't approve that.

14  Q. And what, if anything, did you do with that response?

15  A. I told it to Dr. Karron.

16  Q. And what was his response?

17  A. I don't know. I think he was a little none plused by it, I

18  don't know exactly. For that moment we dropped it at the

19  moment at that point.

20  Q. About how many times did you speak to Hope Snowden about

21  this issue of rent?

22  A. Well, certainly twice, maybe more, but certainly twice.

23  Q. And did you -- did Hope Snowden ever tell you that rent was

24  an allowable expense?

25  A. No.

865ZKAR5          Gurfein - direct

1   Q. Did you have any other discussions with Hope Snowden about

2   other expense?

3   A. Yes. We discussed other expenses. I think I probably

4   discussed the proposal costs expense and utilities. I think we

5   discussed again similar to the rent discussion.

6        THE COURT: Did you ever talk to anyone besides Hope

7   Snowden about these this rent and utilities?

8        THE WITNESS: It's possible. I might've discussed --

9   I might have called her supervisor, Marilyn Goldstein, on a few

10  occasions.

11       THE COURT: And did you get a -- what answer did you

12  get?

13       THE WITNESS: Essentially, no.

14   .  THE COURT: All right.

15  Q. And about how often did you call Hope Snowden and these

16  other people you mentioned?

17  A. Well, at the beginning of the grant period that I was

18  there, I would call her two times a week or so. As time went

19  on, I called her maybe two times a month.

20  Q. All right. Mr. Gerfein, do you know, approximately, when

21  CASI received its first installment of ATP grant money?

22  A. I've been trying to figure that out. But I know it was

23  very early. It was not very much after the notice of award.

24  The notice of award was October 4th. I keep thinking it was

25  right after that, but I'm not sure.

865ZKAR5          Gurfein - direct

1   Q. Do you recall how much was transferred into the CASI bank

2   account?

3   A. Yes.  $150,000.

4   Q. And where did that money go?

5   A. That money went into a CASI general account of some kind.

6   Q. Did you --

7   A. At Chase Bank.

8   Q. I'm sorry?

9   A. It was at Chase Bank, I recall that.

10   Q. Did you ever have any discussions with the defendant about

11   that initial transfer of $150,000?

12   A. Yes.  He, he -- we had applied for, I believe, or we had to

13   apply for it, and I think with happiness he told me one morning

14   when I arrived at his apartment that the money came in, the

15   150,000 came in.  And in the same sentence I recall he said,

16   and I've transferred $75,000 out of the account.

17   Q. Did he say why he did that?

18   A. Yes.  He said he had some personal obligations to his

19   family, money owed to his family, and he said that he had

20   credit card payments to make.

21   Q. With respect to his obligations to his family that you

22   mentioned, did you ever have any other discussions with him

23   about that topic?

24   A. Well, I mean in the course of writing the proposal, he had

25   allowed that he had not had a -- been employed in any way, nor

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

865ZKAR5          Gurfein - direct

1   had any other grant money for sometime, and so that he had to

2   resort to credit cards and to family help.

3   Q. And what in particular did you -- did he say what he was

4   spending the credit card money on?

5   A. Well, my sense was that from what the discussions were was

6   that he was spending it on just living.  He said he had to

7   live, and so he used his credit cards to live.

8   Q. When you heard from the defendant that he had transferred

9   $75,000 out of the $150,000, what, if anything, did you say?

10  A. I told him he couldn't do that.

11  Q. And what was the defendant's response?

12  A. He said, I have to do it.

13  Q. Did he expand on that?

14  A. Well, he said he had no choice; he had to get rid of those

15  debts he had and he was taking those funds at the get --

16  initially, he had to just take those funds immediately.

17  Q. Did you have any other discussions with the defendant about

18  where the grant money was being deposited?

19  A. Yes.

20  Q. What were those discussions?

21  A. Well, I told him that we had to open up a separate account

22  for the grant so that we don't have it mixed up with any other

23  activities of CASI, if there were any.

24  Q. And what was the defendant's response to that?

25  A. Well, at first he rejected the idea, I think saying that it

865ZKAR5          Gurfein - direct

1    was -- it would just cost too much to open up another account.

2    But I didn't -- I didn't understand what that meant about the

3    cost would be so great.  But I told him it was a requirement of

4    the grant that we had to have a separate account.

5    Q. And was a separate account eventually opened?

6    A. Yes.

7    Q. Mr. Gerfein, when you accepted the job at CASI as business

8    manager, what was your understanding about who would have the

9    authority to sign checks for the company?

10   A. Our initial discussions were that I was going to have sole

11   responsibility for signing checks.  I told him that, look,

12   that's okay, but this is your company and really there should

13   be dual signature requirement for most checks.  And we agreed

14   that there would be dual signature responsibility, but anything

15   under $250 could be signed by one person.

16   Q. Is this in fact that arrangement you just described, is

17   that in fact what happened after the grant was awarded?

18   A. No.

19   Q. How did it work in practice after the grant was awarded?

20   A. Within one week exactly on October 11th, Dr. Karron sent a

21   note to Hope Snowden saying that, while I had administrative

22   responsibility, I had no signature or officer responsibility at

23   CASI.

24   Q. And what did you understand that to mean?

25   A. That means that I was stripped of my ability to control the

865ZKAR5          Gurfein - direct

1    business as I was told I would have.

2    Q.  Take a look at Government's exhibit 21 in the other folder

3    in front of you.  Could we display that on the screen, page

4    three.  It's also in the jury binders.

5    A.  Uh-huh.  Yes.

6    Q.  You see that document?

7         THE COURT:  It's a little hard to see, but can you

8    read it?

9         THE WITNESS:  Yes.

10        THE COURT:  I can't, I can't read it.

11        THE WITNESS:  Here's my copy.

12        THE DEPUTY CLERK:  Judge, he has a copy.

13        THE COURT:  All right.  He was looking up there, so I

14   was --

15   Q.  Actually, he, if you could blowup exactly what you blew up.

16        Mr. Gerfein, do you see that document?

17   A.  Yes.

18   Q.  What is that document?

19   A.  That document is the letter that Dr. Karron sent to Hope

20   Snowden dated October 11th, 2001 and indicating that I only had

21   the administrator responsibility, but not the signature

22   authority.  And it says here, and is not authorized to sign for

23   the corporation.

24   Q.  Where do you see that?

25   A.  From the third -- on the right side, third line from the

                    SOUTHERN DISTRICT REPORTERS, P.C.

                          (212) 805-0300

865ZKAR5          Gurfein - direct

1   bottom.

2   Q. And you see the final sentence which says, the

3   authorization for Mr. Gerfein to commit the corporation will be

4   made by separate letter authorization if the need arises?

5   A. Correct. I see that.

6   Q. Were you ever given signatory authority for the company

7   while you were working at CASi?

8   A. No.

9   Q. And what's the date on this letter?

10  A. I'm sorry?

11  Q. What's the date on this letter?

12  A. The date on the letter above, October 11th -- right there,

13  yeah.

14  Q. And about how long after the grant was awarded was that

15  letter dated?

16  A. It's dated -- well the grant was -- notification of award

17  was October 4th, and this letter is dated October 11th. So

18  it's exactly one week after the notice of award.

19  Q. All right. Mr. Gerfein, did you have any further

20  discussions with the defendant about spending grant money after

21  that letter was submitted?

22  A. About spending grant money?

23  Q. About particular expenditures?

24  A. Sure, I mean we discussed various things that -- I mean Dr.

25  Karron kind of liked equipment. I mean he --

865ZKAR5          Gurfein - cross

1   Q. You had that discussion with Dr. Karron, did you not?

2   A. Yes. Well, we discussed the subject in general, more with

3   respect to his requirements for medical than mine. I was way

4   within the 34 percent.

5   Q. And his view was that if you had fringe benefits for the

6   company, whatever was utilized, as long as it was a fringe

7   benefit, anybody could use it?

8   A. I don't understand your question.

9   Q. Did you have a discussion with Dr. Karron as to the use of

10  fringe benefits?

11  A. Yes.

12  Q. And didn't he advise you that it was his understanding that

13  fringe benefits -- that he could utilize up to whatever fringe

14  benefit money was not used by other employees that was

15  available for him?

16  A. He said that.

17  Q. And are you aware -- did you have anything to do with the

18  quarterly financial statements?

19  A. Yes.

20  Q. Did you help prepare them?

21  A. Yes.

22  Q. Where did you get the numbers from to put into the

23  quarterly financial statements?

24  A. Those numbers were the aggregate of what was in the monthly

25  applications for, for the various progress payments. That's

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

865ZKAR5          Gurfein - cross

1    where these numbers came from.

2    Q. Did they come from actual expenses?

3    A. No, they did not.

4    Q. And who determined that that was the proper numbers, those

5    were the proper numbers to use?

6    A. Well, the first time we went in after Dr. Karron withdrew

7    the $75,000, and we had we had a discussion about that, about

8    how that $75,000, for example, could be applied to direct -- on

9    the direct charges for the grant, which we couldn't possibly do

10   because it wasn't -- I mean that money was not spent on the

11   grant. So Dr. Karron said just, okay, make it that it works;

12   make sure that, you know, you don't raise any red flags and

13   just submit the numbers that will make it work. And that's

14   what we did.

15   Q. You are aware, sir, that Dr. Karron paid back that $75,000

16   in that first year; you're aware of that?

17   A. I am. But it caused us great pain to have that $75,000

18   taken out, so at the end of every month we were down to almost

19   zero on the bank account.

20   Q. And whenever you got down to zero, Dr. Karron would put his

21   own money into the company, correct?

22   A. I don't know that.

23   Q. Well, how did you get above zero?

24   A. We got another progress payment.

25   Q. Did you get a personal loan from CASI during this period?

8657KAR6          Gurfein - cross

1  Q. Right.

2  A. No, he didn't tell me what the policy was prior to getting

3  the grant.

4  Q. Did you ever ask him if he ever charged any -- what kind of

5  fringe benefits he was accustomed to paying prior to getting

6  the grant?

7  A. In the most general way I know that his policy unwritten

8  was very loose.

9  Q. Now, were you involved in the hiring of Joan Hayes?

10  A. No.

11  Q. Did you have dealings with her involving any financial

12  documents?

13  A. Yes.

14  Q. Which financial documents were those?

15  A. I don't remember.

16  Q. You filed I believe the quarterly financial statements?

17  A. Yes.

18  Q. And did Ms. Hayes provide any of the figures that you

19  incorporated in those filings?

20  A. I don't think so.  It's possible, but I don't recall that.

21       THE COURT:  Where did you get the figures?

22       THE WITNESS:  Well, basically the figures were not

23  representative of what was actually spent but representative of

24  what was received from NIST.

25       THE COURT:  So where did you get the figures?

8657KAR6          Gurfein - cross

1      THE WITNESS: Well, the figures for the quarterly

2   reports were basically a summation of data in the applications

3   made for the prior three months to NIST for the progress

4   payments, where we had to report what was done in the prior

5   month.

6      THE COURT: Where would you get those figures?

7      THE WITNESS: Well, those figures would again be

8   gotten from essentially from what we received as opposed to

9   having the correct figures, which would have been what was

10   actually spent directly on the project.

11      THE COURT: Well, what you received was $150,000 and

12   then monthly payments of --

13      THE WITNESS: -- 60,000.

14      THE COURT: -- 60 or 65.

15      THE WITNESS: 60.

16      THE COURT: So those don't tell you the break-down.

17      THE WITNESS: No.

18      THE COURT: Does the quarterly report show a

19   break-down?

20      THE WITNESS: No, no break-down of the quarterly

21   report.

22      THE COURT: Let me see a quarterly report.

23      MR. EVERDELL: Your Honor, Government Exhibit 40 for

24   example.

25      THE COURT: He has one. He has handed me one.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

8657KAR6              Gurfein - redirect

1    this company, it is too risky.

2        In fact this is the point to be made. One of the

3    reasons for getting the ATP grant in fact is because it is

4    given to risky ventures that have difficulty raising funds in

5    the private sector, and that's one of the purposes and one of

6    the criteria for getting the award. So, I told him no, and I

7    of course did not give the 50,000, nor did I get the signature

8    authority back.

9    Q. You testified also on cross-examination about some

10   quarterly financial reports.

11   A. Yes.

12   Q. And I believe you testified that the defendant told you to

13   make it work, is that correct?

14   A. That's correct.

15   Q. Who actually signed those financial reports that were

16   submitted?

17   A. Dr. Karron.

18   Q. Did you sign those financial reports?

19   A. I did not. I had no such authority.

20       THE COURT: Are you aware of any contributions to the

21   capital of CASI that were made by anyone other than NIST?

22       THE WITNESS: No, I'm not aware of any such

23   contributions.

24   Q. You were also asked about a screen in the defendant's

25   apartment, is that correct?

866zkar4          Riley - recross

1      THE COURT: Objection sustained.

2      MR. RUBINSTEIN: I'm asking her exactly what she was

3   asked.

4      THE COURT: We all heard what she was asked her.

5      MR. RUBINSTEIN: Objection.

6      THE COURT: She doesn't have to reply to that

7   question, now go ahead and ask a question if you're going to

8   ask one or the cross-examination, recross is over.

9      MR. RUBINSTEIN: With all due respect, Judge, could I

10  have a sidebar?

11     THE COURT: No, you may not at this point. The rules

12  apply to recross-examination and they're going to be strictly

13  adhered to, in light of the lengthy lengthy cross-examination

14  we've already heard.

15     MR. RUBINSTEIN: I'm going to ask for a limiting

16  instruction to the jury, your Honor, on that comment by your

17  Court. I think it was, in all due respect --

18      THE COURT: I don't know what to instruct them. All

19  I'm doing is stating the facts. If you want to have a sidebar

20  on that, I'll take a sidebar on that.

21     MR. RUBINSTEIN: Yes, your Honor.

22      (Continued on next page)

23

24

25

86B7KAR4          Charge

1   reimbursed, in the usual course of business.

2        In order to sustain its burden of proof with respect

3   to the allegation in Count one, the government must prove

4   beyond a reasonable doubt the following five elements:

5        First, at the time alleged in the indictment, the

6   defendant was an agent of Computer Aided Surgery, Inc., or

7   CASI;

8        Second, in a one-year period, CASI received a federal

9   grant in excess of $10,000;

10       Third, during that one-year period, the defendant

11  without authority intentionally misapplied the grant money;

12       Fourth, the misapplied grant money was under the care,

13  custody, or control of, CASI;

14       Fifth, the value of the money intentionally misapplied

15  by defendant was at least $5,000.

16       Now, let us separately consider these five elements.

17       The first element the government must prove beyond a

18  reasonable doubt is that at the time alleged in the indictment,

19  the defendant was an agent of CASI.

20       The term "agent" means a person authorized to act on

21  behalf of an organization.  Employees, partners, directors,

22  officers, managers and representatives are all agents of an

23  organization.

24       Second element the government must prove beyond a

25  reasonable doubt is that in a one-year period, CASI received

86B7KAR4          Charge

1   federal benefits in excess of $10,000.

2        To prove this element, the government must establish

3   that CASI received, during a one-year period, benefits in

4   excess of $10,000 under a federal program involving a grant,

5   contract, subsidy, loan, guarantee, insurance, or some other

6   form of federal assistance.

7        The one-year period must begin no more than 12 months

8   before the defendant committed the acts charged in the

9   indictment and must end no more than 12 months after those

10  acts. You can choose any period of federal funding you want as

11  long as you unanimously find that the acts of misapplication

12  charged in the indictment occurred in that one-year period.

13       The third element the government must prove beyond a

14  reasonable doubt is that the defendant without authority

15  intentionally misapplied money. To intentionally misapply

16  money means to use money under the control of CASI knowing that

17  such use is unauthorized or unjustifiable or wrongful.

18  Intentional misapplication includes the wrongful use of the

19  money for a purpose the defendant knew was unauthorized, even

20  if such use benefited CASI in some way.

21       In this case, to intentionally misapply money means to

22  intentionally apply the grant money received by CASI in a

23  manner which the defendant knew was unauthorized under the

24  terms and conditions of the grant. Misapplication of money,

25  however, does not apply to bona fide salary, wages, fringe

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

86B7KAR4          Charge

1  benefits, or other compensation paid, or expenses paid or

2  reimbursed, in the usual course of business.

3        As I said, the government must prove beyond a

4  reasonable doubt that the defendant acted intentionally in

5  misapplying grant money. To find that the defendant acted

6  intentionally, you must be satisfied beyond a reasonable doubt

7  that the defendant acted deliberately and purposefully. That

8  is, the defendant's misapplication must have been the product

9  of the defendant's conscious objective to spend the money for

10  an unauthorized purpose, rather than the product of a mistake

11  or accident or some other innocent reason.

12        The fourth element that the government must prove

13  beyond a reasonable doubt is that the grant money that was

14  intentionally misapplied was in the care, custody, or control

15  of, CASI. Although the words "care," "custody," and "control"

16  have slightly different meanings, for the purposes of this

17  element, they express a similar idea. All that is necessary is

18  that CASI had control over and responsibility for the grant

19  money.

20        The fifth and final element the government must prove

21  beyond a reasonable doubt is that the value of the

22  intentionally misapplied money was at least $5,000.

23        The word "value" means face, par or market value, or

24  cost price, either wholesale or retail, whichever is greater.

25  "Market value" means the price a willing buyer would pay a

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

86B7KAR4

1

2    (5:25; jury not present)

3    THE COURT: Mr. Monteguedo informs me that the

4  marshals have indicated that the jury has a verdict.

5    Bring the jury in.

6    (Jury present)

7    THE COURT: Please be seated. Ladies and gentlemen,

8  Mr. Monteguedo reports that the marshals have reported that you

9  have reached a verdict, and I will ask Mr. Monteguedo to take

10  the verdict.

11    DEPUTY COURT CLERK: Ladies and gentlemen of the jury,

12  please answer to your presence as your name is called.

13    (Jury roll called; jury present)

14    DEPUTY COURT CLERK: Foreperson please stand.

15    As to Count One, with respect to Count One of

16  indictment, S2 07 Crim. 541 (RPP), how do you find the

17  defendant Daniel B. Karron. Did you answer guilty or not

18  guilty?

19    THE FOREPERSON: Guilty.

20    DEPUTY COURT CLERK: Thank you. Please be seated.

21    Ladies and gentlemen of the jury, please listen to

22  your verdict as it stands recorded. With respect to Count One

23  of indictment, S2 07 Crim. 541 (RPP), how could you find the

24  defendant Daniel B Karron? You answered guilty.

25    (Jury polled; each juror answered in the affirmative)

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300