8AKMKARS                         Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            07 Cr. 541 (RPP)

5    DANIEL B. KARRON,

6                    Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         October 20, 2008
9                                        2:30 p.m.

10

11   Before:

12                 HON. ROBERT P. PATTERSON, JR.,

13                                       District Judge

14                            APPEARANCES

15   MICHAEL J. GARCIA
          United States Attorney for the
16        Southern District of New York
     STEVE KWOK
17   CHRISTIAN EVERDELL
          Assistant United States Attorneys
18
     RUBINSTEIN & COROZZO
19        Attorneys for Defendant
     BY:  RONALD RUBINSTEIN
20

21

22
     ALSO PRESENT:   KIRK YAMATANI
23                   RACHEL ONDRIK

24

25

8AKMKARS                    Sentence

1              (Case called)

2              MR. KWOK:  Good afternoon, your Honor, Steve Kwok for

3    the government.  With me at counsel table is Chris Everdell.

4              THE COURT:  Good afternoon, Mr. Kwok and Mr. Everdell.

5              MR. RUBINSTEIN:  Good afternoon, your Honor, Ron

6    Rubinstein for the defendant.  I have to apologize.  I thought

7    it was 2:30, the sentence.  It must have been a senior moment.

8              THE COURT:  I have a presentence report.  The latest

9    one is dated October 7, 2008.  Has the defendant seen the

10   presentence reports, including the latest one, October 7, 2008?

11             MR. RUBINSTEIN:  Yes, your Honor.

12             THE COURT:  He has read them?

13             MR. RUBINSTEIN:  Yes, your Honor.

14             THE COURT:  Are there any changes to be made?

15             MR. RUBINSTEIN:  No.  Except for the objections we

16   have --

17             THE COURT:  Except for the objections that you have in

18   your letter of October 13 and also in a letter received Friday,

19   October 17, 2008, those two letters to the Court?

20             MR. RUBINSTEIN:  That's correct, your Honor.

21             THE COURT:  The government sent us a letter dated

22   October 17 also.  I have not received any response by the

23   government to your letter of October 17.

24             MR. KWOK:  The government did not submit a response to

25   the latest letter.

8AKMKARS                    Sentence

1        THE COURT:   You're willing to proceed on that basis?

2        MR. KWOK:   The government is ready to proceed.

3        THE COURT:   Then I guess the best way -- I don't know

4   how the parties think the best way to proceed, but it would

5   appear to me that the best way to proceed is by considering

6   Mr. Rubinstein's letter of October 17, which disputes the

7   computation of loss contained in the presentence report and in

8   the government's letter.

9        I might say that I've had some concerns about the loss

10  computation.   It's not clear to me that a failure to get

11  approval of expenditures from the grant officer amounts to the

12  same as an intentional misapplication of funds.  And to the

13  extent that we have here in this case, as I understand it, the

14  final budget as approved in December 2001, and subsequent to

15  the applications to amend the budget were not approved.  So the

16  requisite documents that the Court has to examine of the budget

17  contained in -- is it Exhibit 12?

18       MR. KWOK:   Your Honor, I think the last approved

19  budget is the budget attached to Government Exhibit 22.  It's

20  the third page --

21       THE COURT:   It's Exhibit 12.   Just a second.   Exhibit

22  12 is the original budget that Dr. Karron signed.   Then there

23  is Exhibit 20.   21 was just an administrative contact change.

24  Exhibit 22 contains the final budget approved -- amended budget

25  approved by the agency.

8AKMKARS                    Sentence

1          So I have difficulties.  For instance, looking at

2     Exhibit 20 and 22 and the fringe benefits being allowed at 34

3     percent of salary, as I see it in the documents.  I have

4     difficulty also with the tabulation contained in Government

5     Exhibit 114 and 115 because they are just rough calculations,

6     as I see it.  I don't know who compiled them, but I gather it

7     was Ms. Riley, but we never went into the detail about, for

8     instance, the statement in the tabulation that Dr. Karron's

9     salary budgeted at 175, various cash.  He spent 200,486,

10    according to that tabulation.  Those amounts, as I saw them,

11    err were salary.  They involved loans made which someone, I

12    don't know whom, I presume Ms. Riley, determined the equivalent

13    of salary.

14         As I alluded to earlier, the fringe benefits figure in

15    this tabulation -- I'm looking at 114 -- says that Dr. Karron

16    didn't spend $40,337 in fringe benefits, and yet in the same

17    tabulation it says that the fringe benefits were not allowed

18    and spent $4,081.  That whole scenario of fringe benefits is

19    somewhat illusive to me.

20         The testimony, as I recollect it, was CASI, the

21    corporation, did not have a formal benefit plan and they were

22    endeavoring to compile one during the time of the grant.  And

23    instead what Dr. Karron did was to pay benefits just as he was

24    accustomed to paying them, for whatever medical expenses the

25    various employees had for their wives.  I have some difficulty

8AKMKARS                    Sentence

1    in, 1, finding that there was criminal intent with respect to

2    these expenditures, which are all on Government 114, and with

3    the manner in which those overexpenditures were computed.  It

4    seems to me this is just a rough calculation and not something

5    that a Court could rely on in a criminal case.  I'll hear from

6    you.  That's my assessment of that proof.

7            MR. EVERDELL:  Your Honor, I think; in fact, I know

8    114 and 115 are based on Ms. Riley's underlying analysis.

9            THE COURT:  The spreadsheets.

10           MR. EVERDELL:  Yes, the spreadsheets.

11           THE COURT:  But it doesn't meet it because in her

12   spreadsheet she doesn't have any payment like $248,000 worth of

13   salary in year one.

14           MR. KWOK:  Your Honor, she does.  That number is the

15   net transfers.

16           THE COURT:  I've looked at salary, I think.

17           MR. KWOK:  Including the tax withholding, I believe is

18   the testimony that she testified to.  When you take into

19   account all the money that Dr. Karron took out from CASI, minus

20   the amount that he paid back --

21           THE COURT:  That isn't salary.  We are talking about

22   salary.  I don't see salary.  There is nothing like salary in

23   those documents that equals 248 -- $200,488.

24           MR. KWOK:  Salary is just a heading.  What she meant

25   by this is money that defendant took, pure money, not in terms

8AKMKARS                    Sentence

1    of expenditure; cash that he took from CASI, whether in the

2    form of quote unquote loan or whether in terms --

3              THE COURT:  Show me.  She has no tabulation putting

4    114 into context with her 110, Exhibit 110.

5              MR. KWOK:  If your Honor could look at Government

6    Exhibit 110.

7              THE COURT:  I did look at Exhibit 110.

8              MR. KWOK:  Page 38.

9              THE COURT:  I have it here.  I don't know that I have

10   it here.

11             MR. KWOK:  Page 38 of 44.

12             THE COURT:  I guess we will have to get 110, because I

13   don't think I have it here, but I'm fully familiar with it.  I

14   think it's in Mr. Rubinstein's submission, as a matter of fact.

15             MR. KWOK:  That page shows money going to the

16   defendant and money coming from the defendant.  So taking --

17             THE COURT:  What page are you referring to?  Maybe

18   it's in Mr. Rubinstein --

19             MR. KWOK:  38 of 44.

20             THE COURT:  He has payroll.  Looking at 13 of 44?

21             MR. KWOK:  Page 38 of 44.

22             THE COURT:  That's loan and loan repay.  That's not

23   salary.

24             MR. KWOK:  If you look at the memo line, it is salary.

25   Look at, for example, the third check, per check register,

8AKMKARS                    Sentence

1    salary advance.

2             THE COURT:   That one she treated as a loan.

3             MR. KWOK:   These are expressed in a spreadsheet as

4    loans, but they are all money going to the defendant.

5             THE COURT:   I understand.   It's just not salary.

6             MR. KWOK:   You can give it whatever label you like,

7    but the bottom line is, the defendant took from the company

8    this much money which added to 188.

9             THE COURT:   I don't doubt that's what your

10   calculations are.

11            MR. KWOK:   If I can just correct a misimpression,

12   Government Exhibit 114 is not a rough calculation.   It's not a

13   guess.   It's based entirely on Government Exhibit 110 which, in

14   turn, is based entirely on the bank records that she reviewed.

15            THE COURT:   They are certainly not in those records, a

16   showing of $200,488 in salary.

17            MR. KWOK:   If I can explain how she got that number.

18            THE COURT:   It's denominated salary.   It's a table

19   saying salary.   I don't care how she got the number.

20            MR. KWOK:   But that doesn't really affect the loss

21   amount.   You can label it and give it whatever label you want.

22   But at the end of the day -- let me back up one step.   The

23   grant says Dr. Karron can take from the grant for his own use,

24   whether we call it salary or compensation for efforts that he

25   put into the grant, $175,000.   That's the amount -- the portion

8AKMKARS                    Sentence

1    of the pie that he can get from the grant, $175,000.

2              THE COURT:  He can get a salary of 175,000 is what it

3    says in the budget, plus 34 percent for fringe benefits.

4              MR. KWOK:  If he took from the grant money in addition

5    to $175,000, putting aside fringe benefit for a second, any

6    amount above that is a disallowed amount, whether you call it

7    excess salary or call it a loan that never gets paid back.  It

8    doesn't really matter.  At the end of the day, the budget says

9    $175,000 and no more.  If you take more than that, the first

10   dollar above $175,000 is disallowed.  Whether you call that

11   excess salary or loan, it doesn't really matter.

12             THE COURT:  I'm not dealing with ifs.  I'm dealing

13   with what the record shows.  This doesn't show what the records

14   show as far as salary goes.

15             MR. KWOK:  It shows that, just for simplicity, she

16   doesn't want to create that many different categories.  Salary,

17   loan.

18             THE COURT:  She has got a salary category.  She shows

19   it.  Go on a couple of pages.  Payroll, next page, $35,293.58.

20             MR. EVERDELL:  Your Honor, also, to bear in mind with

21   this, these entries on the spreadsheet are based on how

22   Dr. Karron himself characterized things in the documents.  So

23   we have checks here for pay periods that are quote unquote

24   payroll checks for salary.  However, he called other things

25   loans or other things like that.

8AKMKARS                    Sentence

1              Now, Lynn Riley, in doing this analysis, put those
2     together in the same category because as Mr. Kwok was saying,
3     it was money paid from CASI to Dr. Karron.  If he is allowed a
4     payroll, a salary of $175,000, it doesn't necessarily matter
5     how the defendant himself characterizes those payments to
6     himself.  Whether he calls them payroll checks or whether he
7     calls them loans, it's still a payment to him personally from
8     CASI funds.  So her object, I think in doing it this way, was
9     to sweep together those things which were direct payments from
10    the company to Dr. Karron.
11             THE COURT:  I don't dispute that.  But the tabulation
12    is not something that I can go along with.  It is not salary.
13             MR. KWOK:  We have no problem with that.  If you want
14    to call it salary/loans or just simply money to Karron, excess
15    money to Karron, it doesn't really affect the loss amount
16    because at the end of the day the loss amount is simply
17    arithmetic, what he took from CASI minus what he is supposed to
18    get under the grant, which is $175,000.  We have no problem, if
19    it makes things clearer, instead of calling that salary, we
20    could call that, simply, excess money to Dr. Karron.
21             THE COURT:  You see what he did was -- I think it is
22    borne out by the defendant's papers to some degree -- is he
23    took a very low salary to pay back the loans.  Is that a fair
24    statement?
25             MR. EVERDELL:  Your Honor, that fact that you just

8AKMKARS                    Sentence

1   said, the fact that he didn't take his full salary, is taken

2   into account --

3          THE COURT:  I didn't say that.  I want to know whether

4   you're disputing what I just said.

5          MR. EVERDELL:  What I agree with is that, yes, the

6   defendant did not take his full salary in the sense that when

7   you look at salary in checks, they are less than the $175,000

8   of quote unquote salary.

9          THE COURT:  You saw there was less withholding, right?

10          MR. EVERDELL:  But he paid himself in other ways in

11   things he do did not characterizing as salary.

12          THE COURT:  Was there less withholding or not?  You

13   better confer.

14          MR. EVERDELL:  Your Honor, apparently what happened

15   was, he wasn't characterizing anything -- there was no

16   withholding until an accountant came in towards the end of year

17   one and said, you have to call these things payroll, you have

18   to take your salary and then you have to calculate withholding.

19   And that account went back retroactively and looked at these

20   payments and did the withholding retroactively with all these

21   payments to him which had not been characterized.

22          THE COURT:  There are documents appended to the

23   defendant's papers which indicate that the withholding was

24   taken timely.  That's not borne out by what you say, showing

25   Mr. Rubinstein's letter of Friday.  Where did I put it?  He has

8AKMKARS                    Sentence

1    got documents showing money being withheld to calculate salary.

2              MR. KWOK:  Which page are you looking at, your Honor.

3              THE COURT:  I'm trying to find the letter now.

4    Attached to it, if you look, it's about ten pages in.  It shows

5    the salary, August 2, 2002, salary.  It shows outstanding

6    salary of $61,918; federal withholding tax, minus 17,104;

7    social security deduction, 2,091; Medicare and employee 462.81.

8    New York withholding, New York City resident also.  It's all in

9    there.  He also has one for the pay period 7/01/2002.  Maybe

10   that's the same.

11             MR. KWOK:  Are you looking at this page?

12             THE COURT:  Yes, I believe so.  It has a check at the

13   top.

14             MR. EVERDELL:  Your Honor, I think this may actually

15   reflect what we are talking about.  If you look at check No.

16   10401.  Is that the page you're looking at?

17             THE COURT:  Yes.

18             MR. EVERDELL:  That looks like it was paid out on

19   August 2, 2002, which is towards the end of year one of the

20   grant.  If you look at the spreadsheet that Ms. Riley created,

21   it shows that the first actual paid check that he got was in

22   May of 2002; again, sort of towards the end of year one of the

23   grant.  This is, as we are getting towards the end of year one,

24   where Dr. Karron is being told that needs to pull out

25   withholding.  I don't think this contradicts what we were

8AKMKARS                    Sentence

1    saying before.

2            THE COURT:  It does contradict what was said.  What

3    you said is not consistent with what you're saying now.  That's

4    the trouble with these analyses.  They are fine as far as they

5    go, but they do not tell the story.

6            Anyway, there are, similarly, prescriptions, first

7    item in Mr. Rubinstein's letter.  I don't think that the item

8    is prescriptions.  I think the item is other and it included

9    other matters such as bank processing, consultants, lawyers,

10   and bookkeeping.

11           MR. EVERDELL:  Your Honor, if I can just step back for

12   one second and just talk about the general position of the

13   government on loss, which is that unless it's specifically

14   budgeted for -- that it has been preapproved in a budget or has

15   had subsequent approval authority from NIST, or whatever

16   expenditure it may be, that it's overbudget or an item in a

17   category that is not a budgeted category, that constitutes a

18   loss to the government.  The reason why is --

19           THE COURT:  It has to be -- it seems to me it has to

20   be a loss as to which there was criminal intent.

21           MR. EVERDELL:  Your Honor, I think --

22           THE COURT:  In order for there to be an intentional

23   misapplication of funds.  You have to have criminal intent

24   here.  The fact that the government lost money on the grant or

25   the money wasn't expended properly does not necessarily mean

8AKMKARS                    Sentence

1    that there was criminal intent involved in all those

2    expenditures.

3          MR. EVERDELL:  Your Honor, according to the

4    guidelines, the guidelines commentary, when you're looking at

5    government benefits, you are supposed to look at what the

6    intended use for the money was.  For loss amount you look at

7    whatever was diverted to in unintended use.  It's the

8    government's position that with this money that was given out,

9    it came with a lot of very specific spending rules and those

10   rules were clear and set forth.  So that is the intended use of

11   the money.

12         We handled this money such that you would spend it in

13   accordance with these rules and that included the budgetary

14   rules, the prior approval rules, all of the other spending

15   rules that came attached to the grant.  So that when money is

16   diverted elsewhere, when it is not part of an approved category

17   or overbudgeted category, that's not an intended use of the

18   money.  That is not an intended use of the money because,

19   otherwise, why not just give away the grant money with no rules

20   and say, okay, here is a block of money for you to use as you

21   see fit.  We won't ask you how you're spending it.  Come back

22   in a year or so and tell us the progress you've made on your

23   grant.  I'm sure there are grants that probably do operate that

24   way, but that's not this one.  This one wanted to keep a very

25   close leash on how this money was spent, they wanted to approve

8AKMKARS                    Sentence

1   everything that was spent and see all of the expenditures

2   beforehand so that they were on board.

3            THE COURT:  All the expenditures that were budgeted.

4            MR. EVERDELL:  They wanted to see a budget first, yes,

5   and anything that was not in that budget or over that budget,

6   with the exception of the 10 percent rule that we are all

7   familiar with, had to be approved.  The reason why they do that

8   is because, as defense counsel said many times in his own

9   submissions, this is a type of grant where the government is

10  actually very involved.  So they want to keep a tight leash on

11  how this money is spent.

12           Given that that is the posture of this grant, how the

13  money is supposed to be spent, that is the intended use of the

14  money, to be spent according to budgeted items or items that

15  have been preapproved by NIST.  So it's the government's

16  position that when you go outside of those categories or go

17  over budget on one of the approved categories, that still

18  constitutes a loss to the government because they have not been

19  able to exercise the control that they meant to exercise with

20  instituting these grant rules and these spending rules.

21           THE COURT:  Look.  Let's go right to an item that

22  bothers me, fringe benefits.  They were approved at 34 percent

23  of salary.  No one said what constitutes a valid, as far as I

24  could find in the papers in the court, what was a valid fringe

25  benefit and what wasn't.  How can I have any confidence that

Case 1:08-cv-10223-NRB Document 20-25 Filed 06/18/10 Page 15 of 98

15

8AKMKARS                    Sentence

1   not approved fringe benefits of $4,000 is something that is a
2   willful disregard of the rules?

3        MR. EVERDELL:  Your Honor, there are a couple of
4   things with fringe benefits which is, I believe, how this was
5   calculated.  We heard testimony that there was no plan in
6   place.

7        THE COURT:  I heard that, but there was no plan in
8   place from the beginning.  You only found that out at a certain
9   point.  No one went and checked the group out or anything in
10  advance.  It says fringe benefits.  The testimony is, he had a
11  cafeteria plan or whatever it was.

12       MR. KWOK:  Your Honor, if I may, I think the
13  testimony --

14       THE COURT:  And anything and everything could be
15  expended in the way of fringe benefits to himself and members
16  of the family and for the employees.  The government may come
17  back with, oh, it wasn't in the plan, so, therefore, it
18  shouldn't be allowed, but there is no warning to the person
19  there.  I can't see the criminal intent there.

20       MR. KWOK:  The defendant was certainly told
21  repeatedly --

22       THE COURT:  The government may have lost the money,
23  but I can't see any criminal intent.

24       MR. KWOK:  The intent is when he asked a question and
25  was told no and went ahead and did it anyway.  It was in the

(212) 805-0300

8AKMKARS                    Sentence

1    documents --

2           THE COURT:  He didn't ask any question about medical

3    benefits, as far as I know, from the record.

4           MR. KWOK:  If I could just address your Honor's

5    question about amount.  The amount reflected on this chart is

6    simply the amount over budget because he took more salary

7    because fringe benefits is a percentage of salary.  So it's

8    calculated as a fixed percentage of salary.  So because he took

9    more from CASI than the amount that he was allowed, namely,

10   $175,000, the amount we just allowed him is an amount of $4,000

11   or so.  It is simply an amount over budget because he took more

12   in dollars --

13          THE COURT:  He underspent budget through those fringe

14   benefits by $4,000 it says right above it.  Look at that.  This

15   is a mess.

16          MR. EVERDELL:  Your Honor, I think we can make this

17   much simpler.  Let me see if I can do this.  Even if you look

18   at just the categories that were nonbudgeted categories, we are

19   not talking about fringe benefits anymore, we are not talking

20   about even equipment overexpenditures, we are not talking

21   anything that was actually a budgeted category that had been at

22   least somewhere approved by NIST before.

23          If we are talking about everything else, that is,

24   rent, utilities, cleaning, meals, capital improvements, or

25   these other expenses which were actually not listed in the

8AKMKARS                    Sentence

1   category other under the budget, we are already talking about

2   for years one and two of the grant, we are already talking

3   about a loss amount, under my calculation, is over $172,000.   I

4   think --

5            THE COURT:   What figures did you use in the first year

6   of the budget to get 172,000?

7            MR. EVERDELL:   I just added up in years one and years

8   two, so this would be 114 and 15.

9            THE COURT:   Which items are you adding up?

10           MR. EVERDELL:   I'm adding up rent, which is $60,000 in

11  year one; I'm adding up utilities, which is 16,341 in year one.

12  I'm adding up capital improvements.

13           THE COURT:   Rent.   You're adding up after rent what?

14           MR. EVERDELL:   Rent was first, 60,000.

15           THE COURT:   Utilities.

16           MR. EVERDELL:   Utilities was second.

17           THE COURT:   There was some testimony on utilities.   He

18  got an approval.

19           MR. EVERDELL:   Your Honor, I don't think there was

20  ever testimony that he got a prior approval for utilities.   In

21  fact, he was told repeatedly that utilities were not allowed.

22           THE COURT:   The difference between the utilities for

23  the apartment before and after the upgrade for air conditioning

24  and for the machinery --

25           MR. EVERDELL:   I think the only testimony we had on

8AKMKARS              Sentence

1   the record is that he tried to get an approval for the

2   utilities, but he never received one.

3        THE COURT:  Mr. Rubinstein's quotes a utilities figure

4   using Mr. Benedict's testimony at 1057.  I can't find it.  Here

5   it is, 1057.

6        MR. EVERDELL:  I'm looking at the page he cited.  Here

7   it just says -- his question is, this is Mr. Rubinstein's

8   question, and he is questioning --

9        THE COURT:  And the discussions were that if he could

10  indicate the fact that there was an increase, that they could

11  be classified as direct expenses, not indirect expenses.

12       MR. EVERDELL:  It says the discussions were, right,

13  that if he could demonstrate the fact that there was an

14  increase, that they could be classified as direct expenses, not

15  indirect expenses.  But there was never any approval of this.

16  So at this point none of the testimony here is talking about

17  any approval of any additional utilities, expenses, or anything

18  like that.

19       THE COURT:  Sounds like approval, but not written

20  approval.

21       MR. EVERDELL:  He is talking to Bob Benedict.  Bob

22  Benedict, I think, is a witness here who is the finance

23  manager.  We are not talking to the people at NIST, who

24  actually made the approval, such as Hope Snowden.  If I recall

25  correctly, Hope Snowden's testimony about utilities was simply

8AKMKARS                    Sentence

1   that there were lots of conversations that she had with the

2   defendant himself and with others about whether or not grant

3   funds could be used for utilities, and she said no.

4            THE COURT:  Where is this?

5            MR. EVERDELL:  The cites to the record?

6            THE COURT:  Yes.

7            MR. EVERDELL:  Your Honor, I'm afraid I don't have

8   them --

9            THE COURT:  This does say the witness summarizes his

10  testimony at the end of the page.  The incremental amount of

11  additional expense caused by the grant could be classified as

12  direct expense and not indirect expense.  Direct expenses are

13  allowed, regardless of what they are.  Indirect expenses are

14  not allowed.

15           MR. EVERDELL:  I think that that quote just says right

16  there that they are talking about a possibility, but a

17  possibility that was never actually approved.  And a

18  possibility that was never actually budgeted.  So --

19           THE COURT:  It suggests not approved in writing.  I

20  have seen that.  I agree with that.  But it sounds as if it was

21  approved orally.

22           MR. EVERDELL:  I don't know if I read that as that.

23  Maybe it's Mr. Benedict's understanding of what he could

24  possibly get approved under the rules.

25           THE COURT:  I think that's a little bit -- the point

8AKMKARS                    Sentence

1    is that the criminal intent of the defendant is important here.

2    And if he was proceeding on that basis, that seems to me -- I

3    have reason to -- it seems to me that that amount is an amount

4    that should not be considered in the loss calculation.

5         MR. EVERDELL:  Your Honor, I think I have to

6    respectfully disagree with that.  My colleague, Mr. Kwok, has

7    pointed me to the part in the record.  This is Hope Snowden's

8    testimony on page 256 of the record where she is talking about

9    her conversations with I believe it's Dr. Karron and

10   Mr. Gurfein about expenses.  And the question was:

11        What questions did he ask you, if any, during those

12   conversations?

13        And the answer is:  Was he allowed to pay for rent and

14   utilities with the ATP federal-funded grant.

15   "Q.  And rent for what, rent utilities for what?

16   "A.  For the condo in which at this point, I guess, CASI, the

17   company, was being housed.

18   "Q.  And whose condo was that?

19   "A.  Dr. Karron's condo.

20   "Q.  What was your response to the question?  Can rent and

21   utilities be paid for with ATP funds?

22   "A.  No.  They are unallowable costs."

23        THE COURT:  I understood that testimony.  That comes

24   well preceding Benedict's testimony, it comes well preceding

25   the work for the apartment for the air conditioning, and that's

8AKMKARS                    Sentence

1   what caused the utilities to go up and that's after the time

2   that Snowden is talking about, as far as I can see.

3          MR. EVERDELL:  Let's just do this then, your Honor.

4          THE COURT:  I've got to be --

5          MR. EVERDELL:  Let's do this.  Let's set aside for the

6   moment the issue of whether that $4,595 should or should not be

7   included in the loss amount.

8          THE COURT:  According to Mr. Rubinstein, it's not

9   4,000.

10         MR. EVERDELL:  I was looking at page 2 of his letter.

11         THE COURT:  16,341, as I understand it.  The utilities

12  prior were 4595, prior to the project.

13         MR. EVERDELL:  I believe that's 16,341 is what the

14  government is claiming is the utilities amount for year one.

15         THE COURT:  Maybe you're right.  That's the

16  government's claim, not 16,000.  He claims --

17         MR. EVERDELL:  He claims that the loss is only 4,595,

18  which is the amount of the increase, he says.

19         THE COURT:  That's the prior amount of utilities, not

20  the increase.  The difference should be not a loss.

21         MR. EVERDELL:  I apologize, your Honor.  He's claiming

22  the difference between the two should be not included in the

23  loss.

24         But setting that aside for the moment, again, if you

25  add up the categories again that were nonbudgeted expenses,

8AKMKARS                        Sentence

1    even leaving that issue aside, I guess let's just say that that

2    is almost $12,000, not quite, of difference.

3          If you go to the next category, which is capital

4    improvement, in year one is 11,248.  Again, this has no --

5    there is nowhere in the budget where this stuff is talked

6    about.  There is no prior approval from NIST for this sort of

7    thing.  Mr. Benedict is using the money, same which he does for

8    cleaning and meals, to do whatever he feels like he wants to do

9    with it, and he's spending it on outside budget categories.

10          THE COURT:  Let's deal with capital improvements.

11    They claim that this should be more profited by the site

12    preparation.

13          MR. EVERDELL:  But even site preparation isn't a

14    budgeted category.

15          THE COURT:  I don't know that it is.

16          MR. EVERDELL:  It's not, according to the exhibits.

17    Basically, what the defense counsel has tried to do in this

18    submission is take every possible expenditure that he can think

19    and try to claim that if it had some tangential or arguable

20    benefit to the research, then it can't be qualified as a loss.

21    That simply can't be workable, your Honor, because almost every

22    single expenditure has some benefit to the research.  You just

23    can't work that standard.  It's unworkable.

24          So what we decided and what our loss calculation and

25    theory is about is whether or not it's in budget because that

8AKMKARS                    Sentence

1    is clearly what the intended use of the money was.  We give you

2    this money so that you can spend it according to the rules, and

3    they were very clear about that.  There was lots of testimony

4    about how the rules were supposed to be followed, how they

5    explained the rules to them, how they had to adhere to their

6    budget, and for good reason, and how they needed approvals for

7    things that were outside of the budget.

8         So while I understand that certain things that the

9    defendant is claiming may arguably have benefited the research

10   in some way, that's simply not the standard we can work with,

11   because then there would be no loss at all, it would seem like.

12   Even meals.  People have to eat in order to conduct research,

13   but you can't spend federal grant money to do it.  Yes, you

14   need to clean things in order to have your house cleaned, but

15   you can't spend federal grant money to do it.  It has to be

16   budgeted if you're going to do it that way.

17        Things like site improvement, capital improvement,

18   whatever it is, things that may sound even arguably better than

19   meals and cleaning in terms of how it might affect the

20   research, it doesn't count because it's not budgeted.  There is

21   a good reason for that.  The government needed to understand

22   and approve all the expenditures related to the research,

23   whether it was because it was in a budget or because someone

24   came to them later and asked for approval for something that

25   was outside of the budget.

8AKMKARS                    Sentence

1        THE COURT:  Let's not quite put it that way because

2    there is this 10 percent rule that they have got in there.

3        MR. EVERDELL:  Yes, your Honor.  If you look at 114

4    and 115, down at the bottom right-hand corner you see the pie

5    chart at the bottom right-hand corner which has -- I don't know

6    if you can see it.

7        THE COURT:  I can see the pie chart.

8        MR. EVERDELL:  The slice is the 10 percent.  If you're

9    inclined -- it's our argument that the 10 percent rule, the

10   money still has to go from somewhere.  Even if you are going to

11   exclude the 10 percent from the calculation, it's still going

12   to rise far above the level that I think your Honor is

13   considering.

14       Not only that, 10 percent can't be used for new

15   categories.  I'm talking simply now about categories that are

16   not in the budget.  The 10 percent rule only applies to

17   categories that are already in the budget, and you may

18   reallocate funds within those preapproved categories.

19       So with respect to the money I'm talking to you about

20   now, the ones that are not budgeted categories at all, the 10

21   percent rule does not even apply to that.  So even if you add

22   it up, all these out-of-budget, nonbudgeted categories, you

23   would still get to a loss amount, under my calculation, over

24   $172,000 in loss.

25       If your Honor subtracted the 12,000 or so from the

8AKMKARS              Sentence

1    utilities, we are still over the 120,000 threshold and

2    guidelines which makes it -- I believe, it's a level -- I want

3    to check -- it bumps it down two levels from the calculation

4    that's in the PSR.  But it's still a total offense level of 18

5    as opposed to 20, using that calculation.

6              THE COURT:  The PSR originally was more than 200,000.

7              MR. EVERDELL:  Your Honor, we still think that the

8    calculation in 114 and 115 is entirely correct.  We actually

9    think that is the loss that the government suffered.  In fact,

10   we are giving the defendant quite a bit of the benefit of the

11   doubt because we are saying that everything within the budgeted

12   category was a proper expense.  It makes that assumption.  And

13   everything -- all we are saying is everything outside of that,

14   either if it's a nonbudgeted category or something overspended

15   on a budgeted category, represents a loss to the government.

16             However, if your Honor is not inclined to accept that,

17   because of concerns you have about the calculations here, at

18   the very least, if you look simply at the nonbudgeted

19   categories, things that were not approved by NIST at all, which

20   are those things that I mentioned before -- rent, utilities,

21   capital improvement, cleaning, meals, and other -- then we have

22   a loss amount that is at a minimum just two levels less than

23   what's in the PSR.

24             THE COURT:  You would agree that it should not be

25   entitled to subscriptions as other expenses.

8AKMKARS                    Sentence

1          MR. EVERDELL:  I apologize, your Honor.  I

2    miscalculated.  It's not two levels less.  It's actually four

3    levels less.  If you start with a base offense of 6 and the

4    loss amount is more than 120,000, that adds 10 and you get 16.

5          MR. RUBINSTEIN:  Your Honor, I think that the initial

6    distinction is a question of what is allowable and what is

7    allowable.  And I think --

8          THE COURT:  What is what?

9          MR. RUBINSTEIN:  Allowable; in other words --

10         THE COURT:  I know what allowable is.

11         MR. RUBINSTEIN:  As opposed to what the budget says

12   that was allowed.  I say to your Honor that this money was not

13   given to buy equipment, just to buy equipment, to get

14   subcontractors, to have employees.  This money was given for

15   research.  That was the purpose of the money.

16         I think that the government is using the budget in a

17   way that it never was intended for the purposes of what a loss

18   should be.  Let's assume that Dr. Karron's spent the whole

19   $800,000 on machinery.  He wasn't budgeted for it, but he spent

20   $800,000 for machinery for the project.  He didn't take a

21   salary, he didn't spend money on anything else and, lo and

22   behold, the project ran the three years and he developed the

23   science that the money was given for.  Under that theory he

24   could be prosecuted for $690,000 in misspent money.

25         The bottom line is, your Honor, the fact that they

8AKMKARS                    Sentence

1   come up with a category and then they say, we have a category

2   here, capital improvements, the testimony is clear,

3   uncontroverted, that these weren't capital improvements.  They

4   were site preparation and they devalued the apartment -- we had

5   an expert -- a one bedroom apartment in Kips Bay selling for

6   just over $500,000.  Everyone who knows anything about the real

7   estate market in New York City.  That figure was devalued

8   because it devalued, but they have a category.  It's called

9   capital improvements and we don't have a category in the

10  budget.  Therefore, not only whatever you spent, no matter what

11  else you want to call it, we called it capital improvements.

12  Did anybody call it capital improvements but the government?

13  Now they say, it's capital improvement, not in the budget,

14  therefore disallowed.  I submit to your Honor, this is site

15  preparation.  Any reasonable, logical person would conclude --

16          THE COURT:  The trouble is, in his application for the

17  grant he said -- he gave the impression that they were up and

18  running.

19          MR. RUBINSTEIN:  They had equipment there.

20          THE COURT:  As I understood it, active Web site, et

21  cetera.

22          MR. RUBINSTEIN:  They had a Web site.

23          THE COURT:  And they had computer equipment.

24          MR. RUBINSTEIN:  But they didn't have this kind of

25  computer equipment, Judge.  We are going back --

8AKMKARS            Sentence

1      THE COURT:  You don't need site improvement.

2      MR. RUBINSTEIN:  They needed it here.  The contractor

3  testified what he did.  He built things, he put up rackings for

4  them to convert the living room into a computer lab.

5      THE COURT:  The material was -- everything was in

6  there.  What he did was, as I understood it, was to improve the

7  usability of the space.

8      MR. RUBINSTEIN:  Not for an apartment.

9      THE COURT:  Not something that was called for in the

10  budget.

11      MR. RUBINSTEIN:  It's not called for in the budget, I

12  agree with you.  It may come under the categories of others.

13  It may come in here.  But the question is --

14      THE COURT:  Others is for audits.  Other was the only

15  thing -- the budget under other was audits, is my recollection.

16      MR. RUBINSTEIN:  There was a budgeted category called

17  audits, your Honor.

18      THE COURT:  The only thing that was budgeted under

19  others was audits, $10,000.

20      MR. RUBINSTEIN:  If you look at 115, you'll see that

21  in 115, next year, they disallowed the $10,000.

22      The bottom line is that the items that the prosecutors

23  talked about, capital improvements, I submit, were not capital

24  improvements.  The meals, they have no breakdown of where the

25  meals were, who the meals were for.  If you recall Riley's

8AKMKARS                    Sentence

1    testimony, she went to lunch with Dr. Karron to talk about this

2    investigation with other people from CASI, and she disallowed

3    that lunch.  Any business is going to charge a lunch like that.

4    Dr. Karron spent on his Master Card -- he had three credit

5    cards.  The only card that he charged meals on that were

6    deducted were on the American Express CASI card.  His own card

7    and the Master Card is in evidence.  He never deducted.

8             To suggest that there is not a category of meals,

9    there is travel.  There is travel -- does travel include meals

10   when you travel?  That's why when we broke down, your Honor,

11   the subscription, we told you what those were.  They had

12   nothing to do -- you sort of have the category, you were

13   thinking of some magazines like Sports Illustrated.  This is

14   for research for access to research for the projects.  So you

15   subscribe to a service to get your scientific data.

16            THE COURT:  The big item that Mr. Everdell was saying,

17   just, look, take the ones that aren't within the budget, the

18   nonbudgeted items, and add them up and giving you credit for

19   the utilities amount, so you have an $11,000 credit, as I

20   understand it.  You still have 11,000 under utilities or maybe

21   12, 12,000.

22            MR. RUBINSTEIN:  It would be almost 5,000 under

23   utilities --

24            THE COURT:  You save that, so to the extent, instead

25   it would be 5,000.  What about the other entry, the rent entry?

8AKMKARS                    Sentence

1          MR. RUBINSTEIN:  Clearly, he was not entitled to the

2     rent, your Honor, so that's $60,000.

3          THE COURT:  Then you add the other two then --

4          MR. RUBINSTEIN:  What do you add two with, Judge?

5          THE COURT:  $43,000 spent.

6          MR. RUBINSTEIN:  For subscriptions?

7          THE COURT:  No.  For bookkeeping, auto expense, blank

8     processing, consultants, lawyers, dues, prescriptions.

9          MR. RUBINSTEIN:  That he's allowed.  Subcontractors.

10         MR. EVERDELL:  Your Honor, I think that the defense

11    counsel is saying it's allowed simply because it is listed

12    under the category other, but, as your Honor pointed out, in

13    the budget, the only thing that the company listed for its

14    other expenses was the audit.

15         THE COURT:  You got this 80,000 figure that you can

16    move around.  But that seems to me is already taken care of

17    when you look at the overdrawn equipment and the overdrawn

18    materials and supplies.  That takes care of the 80,000 pretty

19    well.

20         MR. RUBINSTEIN:  But those were budgeted items, your

21    Honor, that went back to the intent theory.  If they were

22.   budgeted items and he had no criminal intent -- he intended to

23    misappropriate.  We concede that.  He spent over the budget.

24    But did he criminally intend to misappropriate that amount?

25         THE COURT:  He didn't spend much over the total amount

8AKMKARS                    Sentence

1   because he took out the 836,5 plus $1300, apparently, the first

2   year.   It's these expenditures in the other category that --

3          MR. RUBINSTEIN:   If you have 60,000 for the rent, you

4   have 11,000 for the -- you have 5,000 for the utilities.

5   That's 65,000 in the first year for the utilities.   I submit

6   that the capital improvements are not -- are a legitimate

7   expense.   The cleaning is questionable.   Even though I think

8   that it's arguable on defendant's side, I won't contest the

9   cleaning.

10          THE COURT:   It's an appropriate expense.   He should

11   have gotten approval for it.

12          MR. RUBINSTEIN:   That is the point.   The point is, if

13   he didn't get approval, we know that the rent -- he was turned

14   down and he still took the rent.   We know that that is an

15   amount that he took that he wasn't entitled to.

16          But as to other items that were for the benefit of the

17   research, it doesn't seem that the guidelines, when you look at

18   the loss factors and how to consider loss and you consider

19   government benefits, I think even though they don't have the

20   specific illustration, the government can't cite one grant case

21   where there was a misappropriation.

22          The problem here is that, what was the government's

23   benefit?   They gave money for a research project.   It's

24   unquestionable that's all they did was research.   The only

25   monies he put in his pocket were the rent monies.

8AKMKARS                    Sentence

1          THE COURT:  The problem is that CASI, he did own CASI,

2    as I understood it, he and his family, I guess.  You can

3    misapply money not just for your benefit, but you can misapply

4    money for the corporation's benefit.

5          MR. RUBINSTEIN:  Right.

6          THE COURT:  The trouble with capital improvements,

7    yes, it probably was not to his personal benefit because the

8    apartment probably was worth more unimproved than it was

9    containing those improvements, but it would be beneficial to

10   CASI as a computer center, research computer center, to have

11   the improvements made.  That's the problem.  That would still

12   not be the research contemplated by the grant.

13         MR. RUBINSTEIN:  I still don't see where they get

14   their figure that they are claiming --

15         THE COURT:  I don't see the capital improvements.  I

16   didn't realize the amount was $37,000.

17         MR. RUBINSTEIN:  When the apartment was sold they had

18   to rip out all that stuff for the new owner.

19         THE COURT:  That's what I was referring to earlier.

20         What kind of a figure do you come up with,

21   Mr. Rubinstein?

22         MR. RUBINSTEIN:  In the first year, 60,000 for rent,

23   5,000 for utilities.  I'm rounding off.  2,000 for meals and

24   67,000 in the first year.  Questionable capital improvements or

25   site preparation, which would probably go under equipment.  And

8AKMKARS                      Sentence

1    the --

2              MR. KWOK:  Can we have the amount on that?

3              MR. RUBINSTEIN:  For capital improvements?

4              MR. EVERDELL:  The thing you just cited.

5              MR. RUBINSTEIN:  I said 2,000 for meals, 5,000 for

6    utilities, 60,000 for rent.  Second year, there is 2,000 for

7    rent, 5,000 for utilities.  Meals, the second year, rounded off

8    to $1500.  I'm sorry.  Meals.  $3,000.  That would make it

9    $77,000 without capital improvements.  If you gave the whole

10   capital improvements, which I don't see how you can do that for

11   the two years, you're talking about 20.  We don't concede this.

12   We are talking about 31,000 over there.

13              So in a worst-case scenario it would be 108,000, but I

14   submit to your Honor that I don't see why capital improvements

15   should be considered as a nonbudgeted item when it clearly was

16   used in order to facilitate -- you couldn't put those big

17   computers in that apartment without site preparation.  You

18   wouldn't do it without having the shades to keep the heat out,

19   without having extra wiring to get the electricity needed for

20   the place.  These are things that are totally unrelated to what

21   anybody would consider a capital improvement.

22              THE COURT:  Part of the problem here is that the site

23   was changed from NYU to apartment.  With NYU you had free space

24   and a place for the computers.  When that fell down, he

25   switched to the apartment.  But the budget doesn't change in a

8AKMKARS                         Sentence

1   material way, I believe, between the two budgets.  I think it

2   should have.

3           MR. RUBINSTEIN:  Judge, I just feel that looking at

4   Judge Rakoff's decision in Adelstein -- Adelson, rather, and in

5   other decisions that I've seen, including Judge Block's

6   decision out of the Eastern District --

7           THE COURT:  It's not in your memo.

8           MR. RUBINSTEIN:  I know.  Because I'll give you the

9   citations, your Honor.  Judge Rakoff is 441 F.Supp.2d 506.

10  Judge Block's decision citing Judge Rakoff's decision is a

11  Westlaw citation of 354151 and a -- and they talk about --

12  those cases were primarily stock cases.  They talk about that

13  the fraud guidelines -- because the numbers increase so much

14  that they give a distorted view of what a reasonable sentence

15  should be.

16          In both of those cases -- I'm not even up to that

17  point because first we have to have a guideline analysis before

18  we get to the questions of downward departure or 3553

19  considerations.  I think what the Court is trying to decide now

20  in its analysis is, first, doing what the guideline calculation

21  is required to do, before you determine whether or not you want

22  to give a guidelines sentence or a nonguidelines sentence.  I

23  think that for the purposes of a guideline analysis, I think

24  that a figure of between 70,000 and 120,000 for guideline

25  purposes, analysis purpose, that that would be an appropriate

8AKMKARS              Sentence

1    range, 70,000 to 120,000 without --

2         MR. KWOK:  Your Honor, if I may, even taking just the

3    items Mr. Rubinstein talked about, the rent, utilities, meals.

4    Utilities, by the way, just the difference, not the whole

5    thing, we are up to $100,000 already.  And then if you look at

6    Government Exhibit 115, year two, the category under other,

7    which includes all manners of things like bookkeeping, auto

8    expense, bank processing, consultants, lawyers, dues,

9    subscriptions, that alone is $31,000.  If you add that category

10   alone to all the stuff that Mr. Rubinstein just conceded, we

11   are already over $120,000, which puts us at level 16.

12        MR. RUBINSTEIN:  I didn't concede that.  There is no

13   breakdown of what they are talking about.  They give you

14   bookkeeping auto expenses, which I assume relate to travel,

15   bank processing consultants is budgeted for 250,000 -- rather,

16   he is budgeted for $110,000 in subcontractors, which I guess

17   are consultants.  He spends only 6,000 of that, and they throw

18   in consultants, dues, subscriptions into a category.  Then they

19   want to say, that's $31,000.  I submit to your Honor, that

20   nobody from that chart or from the 110 backup could say how

21   they ever arrived at this number.  Then they want to

22   arbitrarily plug it in and say, no, look at that, we have

23   arrived at the next level.

24        THE COURT:  I'm looking where those figures must have

25   come from.  I think if you look at 110, 111, we can probably

8AKMKARS                    Sentence

1    determine --

2          MR. KWOK:  For example, your Honor, you can look at

3    Government Exhibit 110, page 17 of 37.  That, for example,

4    lists all the gas payments, all her expenses.  That's where it

5    came from.  That's just one example.

6          THE COURT:  Mr. Spring is bookkeeper.  That's what Kim

7    Jackson is for Sprint.

8          MR. KWOK:  That's right.

9          THE COURT:  The sole purpose, as I understood the

10   testimony, and I may be wrong, for Mr. Spring to be employed

11   was to get the books in order for the other.  They had another

12   bookkeeper, as I understood it, but I may be wrong, who could

13   take entries for bookkeeping, but wasn't skilled enough for

14   interpreting what should be in the company's expenses and what

15   should be personal expenses, and what should be reasonable

16   expenses.  Is that correct?

17         MR. EVERDELL:  Your Honor, I think Mr. Spring, in

18   addition with helping with the audits, also stayed on to do

19   additional bookkeeping work for the company even after the

20   audit was over.

21         THE COURT:  I thought it was all computerized.

22         MR. EVERDELL:  I misspoke.

23         In addition to help preparing the books for the

24   upcoming audit, he also conducted some regular bookkeeping

25   activities for the company.  Even so, you have $10,000 budgeted

8AKMKARS                    Sentence

1    for the audit and you went over that $10,000 by the amounts in

2    other, which includes the overage, includes some of the Frank

3    Springs expenses, but it also includes some things like auto

4    expenses.

5              THE COURT:  But you are allowed the $80,000, but then

6    the $80,000 has been used up.

7              MR. EVERDELL:  By equipment or any other number of

8    categories, yes, your Honor.

9              It's the government's position that at the very least

10   that this money should be counted as a loss.  It's nonbudgeted

11   and it's completely absent from the budgets that were

12   submitted, and was money spent with ATP grant money.

13             Let's also not lose sight of the fact that it was very

14   clear from the budget rules or from the ATP rules that indirect

15   costs are not covered, and that was made very clear to the

16   defendant at all the premeetings before he started the grant.

17             Yes, certain things -- research can't happen without

18   lots of things being bought, lots of things being improved, all

19   this stuff.  But it doesn't mean that you can use ATP grant

20   funds to spend on that stuff.  You have to follow the rules.

21             So these expenses -- I think, just looking at the

22   spreadsheet that Ms. Riley prepared, you can see how they are

23   itemized out here, at least the other category.

24             THE COURT:  Is Peter Ross an employee or was he a

25   consultant?

8AKMKARS                    Sentence

1          MR. EVERDELL:  Peter Ross, your Honor?  I don't think

2    I know where you're looking, your Honor.  I see.

3          Your Honor, I think that Dr. Karron chose to pay Peter

4    Ross as a consultant.  Even so, what we are talking about here,

5    that's a $15 charge.

6          THE COURT:  What charge?

7          MR. EVERDELL:  I thought you were talking about the

8    Peter Ross parking charge.

9          THE COURT:  Yes.

10          MR. EVERDELL:  Reimbursement to Peter Ross is a $43

11    charge.

12          We are talking about very small numbers here.  Under

13    the guidelines, as it says in the commentary, the Court need

14    only make a reasonable estimate of the loss.  And I think when

15    you consider all these categories that we are talking about and

16    the fact that it is backed up on the paper here, that we are in

17    the range, at least, of 120,000, given what Mr. Rubinstein has

18    just told your Honor and the very small difference that seems

19    to exist at this point.

20          The categories that are nonbudgeted categories should

21    be counted, and that bumps us into the $120,000 range without

22    much trouble at all.  Given that your Honor doesn't have to

23    come to an exact dollar amount of loss, the minor

24    discrepancies, to the extent they even exist, shouldn't deter

25    your Honor from coming to that larger loss amount because I

8AKMKARS                    Sentence

1    think the clear, logical way to read the evidence is that there

2    are lot of nonbudgeted categories and they are backed up by the

3    spreadsheet analysis, and that these should be considered as

4    loss to the government because they were not approved, as the

5    defendant knew he needed.

6              THE COURT:   Brings me back to the question --

7              MR. RUBINSTEIN:   The problem is, Judge, when you go to

8    the backup that they throw out there, 110, and you find that

9    the bank charges are under $336 --

10             THE COURT:   What page are you on?

11             MR. RUBINSTEIN:   We have a gas expense on page 17 of

12   37 of $1,189.68.  We then have --

13             THE COURT:   I missed the page.

14             MR. RUBINSTEIN:   Page 17 of 37.  We know that

15   Dr. Karron was traveling to Washington, D.C. and to New Jersey

16   as part of his work on this research, but let's take the whole

17   figure.  Next they have -- let's assume she put in -- the

18   parking, $67, that's on 18 of 37.  Then they have bank

19   processing on 18 of 37 of $336.  If you add up lawyers they

20   have on 21 of 37 $1,173.75.  And I submit that's questionable

21   because I think those lawyers were patent lawyers related to

22   securing intellectual property that they were allowed to do.

23   Then it says dues and subscriptions under that.  They have

24   $198.

25             I'm looking for the -- they have that bookkeeping

8AKMKARS                    Sentence

1    figure out. I don't think it is appropriate, but they have a
2    bookkeeping -- I don't know who that included, but let's leave
3    the bookkeeping out of it. We are talking about under $3,000,
4    in my quick math, of expenses. And then they tell you that the
5    category calls for $31,000, but their thing is 31 thousand 8 or
6    625, depending on your eyesight. How that's broken down,
7    whether or not these are appropriate expenses, then they say,
8    let's plug in this additional $31,000. I submit to your Honor
9    that would be inappropriate.

10       MR. EVERDELL: Your Honor, let me address -- for
11   example, there is a specific issue with the lawyers. Pennie &
12   Edmonds, patent attorneys, it was my understanding that this
13   was incurred before the grant even started. And these charges
14   for lawyers are specifically prohibited by the grant rules.

15       Was Mr. Karron told this? No. Because he never
16   actually tried to budget it as an item. Had he tried to budget
17   it, he would have been told specifically that he couldn't use
18   grant money to do this.

19       Again, we are faced with this argument that if it
20   arguably somehow benefits the research, it should not be
21   covered at the loss. The government submits that that is
22   simply unworkable. What we have to work with is what was
23   budgeted and what was approved by NIST, and anything that
24   wasn't is a loss to the government.

25       Not only that, your Honor, we are talking at least --

8AKMKARS                    Sentence

1    now we seem to be talking about the difference of maybe $10,000

2    between two thresholds in the guidelines. The defendant's

3    calculation that he gave you a few moments ago doesn't even

4    include the cleaning expenses, and that's several thousand

5    dollars two years in a row. And that I just don't see the

6    argument there. Again, the only argument could be, as he said

7    in his papers, was that you need to clean in order to make the

8    computers work. That simply doesn't hold water.

9         This is an indirect expense, something that is

10   disallowed by the grant and was never budgeted and never

11   approved. That is a loss to the government. It was money that

12   was spent in contravention of clear rules that were set out

13   governing the grant fund.

14        So given the fact that we are literally arguing now

15   about a couple thousand dollars here and there, and I

16   believe -- we could sit here and tally up all of these

17   nonbudgeted expenses. I guarantee you, we would be over the

18   120,000 dollar mark without any trouble whatsoever.

19        THE COURT: What's the applicable note that we apply

20   here to losses?

21        MR. EVERDELL: Your Honor, there are a few. One is

22   the estimation of loss, which just says -- that's 3A -- 3C,

23   which says that the Court need only make a reasonable estimate

24   of the loss, but also the special rules.

25        THE COURT: You're looking in the commentary.

8AKMKARS                    Sentence

1          MR. EVERDELL:  I'm looking at the commentary, yes,
2     your Honor.
3          Commentary 3, which is loss under subsection B1 and
4     then 3C, estimation of loss, said:  The Court need only make a
5     reasonable estimate of the loss.  And the Court's loss
6     determination is entitled to appropriate deference.  And then
7     if you look at F, which are the special rules --
8          THE COURT:  I just want to see one second because I
9     have trouble, I guess, in determining whether or not it should
10    be loss to the government or misappropriation.
11         MR. RUBINSTEIN:  There is another basis --
12         THE COURT:  Intentional misappropriation by the
13    defendant.  It seems to me it should be intentional
14    misappropriation by the defendant.
15         MR. EVERDELL:  An intentional misappropriation, your
16    Honor, would include the fact that he was told that he needed
17    to submit all of these charges in his budget and get prior
18    approval for them.
19         THE COURT:  The fraud and deceit element is somewhat
20    lacking.
21         MR. EVERDELL:  Your Honor, as you, I think, pointed
22    out earlier, the case law shows that you can have a
23    misappropriations case even if the expenditures arguably
24    benefited the company.  That's the Urlacher case.
25         THE COURT:  Isn't this application to the benefit of

8AKMKARS                    Sentence

1   the defendant, or third party?

2          MR. EVERDELL:  Or to the defendant.

3          THE COURT:  That's under one of these guidelines.

4   Which is it?

5          MR. RUBINSTEIN:  No, it's not, Judge.  That is for the

6   purposes of guilt.  We are talking now for guideline purposes

7   determining the loss, which I suggest is a different analysis.

8   I think your Honor should be directed to 2B1.1, 3B, where it

9   says gain.  This is an alternate method for the Court to use.

10         THE COURT:  Let me find you, where you are.  3B.  Now

11  you're going to the commentary.

12         MR. RUBINSTEIN:  I'm in the commentary, Judge.  3B

13  says gain.  The Court shall use the gain that resulted from the

14  offense as an alternative measure of loss only if there is a

15  loss, but it reasonably cannot be determined.  And I submit to

16  your Honor that under these circumstances you cannot reasonably

17  determine what the loss is, so you should look at the gained

18  factor which in this case would result in looking at the rent,

19  the $62,000; the utilities; cleaning, if you want; meals, and

20  you would be just over $70,000.  I think that is the

21  appropriate analysis here before you consider any credits or

22  offsets.  But first we have to arrive at what is an appropriate

23  figure.  Obviously, the guideline considers the fact of what

24  someone actually puts in their pocket for personal benefits.

25         MR. EVERDELL:  Your Honor, I have not looked at the

8AKMKARS                    Sentence

1    case law on this recently and it was not cited in any

2    submission by Mr. Rubinstein, but I think the loss can be

3    reasonably determined based on the numbers set forth by the

4    government.   I don't think we need to rely on any alternative

5    method of loss because we can determine what the government

6    lost as a result of all of this.

7         I think, if I remember correctly, the cases where you

8    talked about alternative loss calculations is where the

9    victims -- there are so many victims and the calculation

10   involved things like stocks and how the value of stocks go up

11   and down and how that's very hard to estimate.   Here we are

12   talking about hard numbers.   We know what grant money went to

13   the defendant and we know what he spent it on.   The question

14   for your Honor to consider is which of these expenditures are

15   you consider as a loss to the government and which are not.

16        THE COURT:   Insofar as the misapplication involved

17   fraud, then I think you used loss.   Insofar as the

18   misapplication is intentional -- this application seems to be a

19   different definition of intended.   Then it seems to me to use

20   the gain to the defendant or a third party.   But I can't see

21   where I am in the guideline notice.   I don't see that it really

22   applies under the guideline notes.   So what I just said isn't

23   supported by the guideline notes.

24        MR. RUBINSTEIN:   What's that, your Honor?   I missed

25   that.

8AKMKARS                    Sentence

1           THE COURT:  What I just said isn't supported by the

2    guideline notes, as I see it.

3           MR. RUBINSTEIN:  What's that, your Honor?

4           THE COURT:  I gather that you only apply gain to an

5    intended misapplication, you apply loss to a fraud case if it's

6    done by a fraud.  Then you apply loss.  My problem from the

7    beginning here has been that distinction.  I am not sure you

8    apply loss here.

9           MR. EVERDELL:  Your Honor, the commentary that the

10   government was following was actually -- in combination with a

11   reasonable estimate was the 3F special rules.

12          THE COURT:  Let me look at the rules.

13          MR. EVERDELL:  3F2, government benefits, which is also

14   the section that was cited by the defendant in his letter,

15   which says:  In a case involving government benefits, e.g.

16   grants --

17          THE COURT:  It says:  Subject to the exclusion and

18   subdivision if the loss is the greater of actual loss and

19   intended loss.  In a sense, the whole thing, the whole

20   agreement was a loss to the government.

21          MR. EVERDELL:  Yes, your Honor.  In fact, the

22   defendant never even did his cost share, as we know, and was

23   essentially not entitled to any of the grant money that he

24   spent.

25          THE COURT:  There was his contribution later, wasn't

8AKMKARS                        Sentence

1    there some money?

2              MR. EVERDELL:  I think after the grant was suspended

3    there was a contribution by the defendant.

4              THE COURT:  That went to outstanding bills.

5              MR. RUBINSTEIN:  That money was probably extended.

6    That's the whole purpose.  It increases your budget.

7              MR. EVERDELL:  Your Honor, the government told the

8    defendant that in order to comply with the cost share he had to

9    make payments to the government and that's the payment that was

10   made, but I believe this was after --

11             THE COURT:  That's more than the cost share --

12             MR. EVERDELL:  I'm sorry.  He did not make that

13   payment.

14             THE COURT:  The $70,000.

15             MR. EVERDELL:  You are talking about the $70,000

16   loan --

17             THE COURT:  There is some statement in these papers

18   that he gave 70,000 after the closing period.

19             MR. EVERDELL:  That $70,000, which I believe

20   Mr. Rubinstein was saying was done between July 27 -- June 27

21   of 2003 and August of 2003 was after the suspension.

22             THE COURT:  What was that used for?

23             MR. EVERDELL:  One moment, your Honor.

24             Your Honor, I believe my understanding is there were

25   outstanding invoices at the time that the $70,000 was used to

8AKMKARS                    Sentence

1    pay the outstanding invoices.  It was not actually used to pay

2    the government any of the cost share amount.  So that didn't

3    translate --

4           MR. RUBINSTEIN:  You never pay the government the cost

5    share.  You put the money in so you take the money out and

6    spend it.  That's the concept.  The money --

7           THE COURT:  It doesn't go to the government.  It goes

8    to the budgeted items during the period of the grant.  Before

9    it was suspended --

10          MR. EVERDELL:  I think that is the point, your Honor.

11   It wasn't before the grant was suspended.  The grant was

12   suspended on June 27, 2003.

13          THE COURT:  To keep CASI going.

14          MR. EVERDELL:  But under the guideline rules, if the

15   fraud, if the misappropriation is discovered by a government

16   agency, that is the point at which you start -- you cut off

17   people from getting credit from payments they make later.  And

18   as I think I outlined in the government's letter to the Court,

19   that date predates the suspension date because we had testimony

20   from Hope Snowden who testified that when she was getting

21   revised budget submissions at the end of 2002 and the beginning

22   of 2003, she noticed there were serious discrepancies in the

23   budget numbers and that raised red flags to her that there may

24   be some problem with the appropriation of these funds and that

25   led to them calling it off.

8AKMKARS                    Sentence

1          THE COURT:  I think that's covered in my opinion.

2          MR. EVERDELL:  That is the date of discovery and the

3    defendant is, in fact, not entitled to a credit for any funds

4    he may have given back at that point because the

5    misappropriation was discovered.

6          MR. RUBINSTEIN:  That's not, your Honor -- I'll take a

7    look at your opinion.  That's not the date of the discovery

8    from the standpoint that the defendant put monies back because

9    he thought that it was discovered he did something wrong.  The

10   bottom line is, he didn't think he did anything wrong.  That's

11   the whole concept of the discovery is that we don't want

12   somebody to run back and put money in after they find out that

13   their theft has been discovered.

14          This is a misappropriation case and he did not feel --

15   he was a he then -- that he had done anything wrong.  And it's

16   his mental process, not their mental process, because the whole

17   concept is, hey, if you get caught stealing, at that point,

18   when you give it back, it's not the same as if you did this

19   voluntarily because you realized you did something wrong and

20   you wanted to make amends before it was detected.  So I think

21   that they have the wrong person that has to be aware of when

22   there is something wrong here.

23          THE COURT:  I see that this section, subsection of the

24   commentary, subsection II says, in a case involving government

25   benefits, entitlement program payments, losses shall be

8AKMKARS                    Sentence

1   considered to be something obtained from unintended recipients

2   or diverted to unintended uses.  The problem I'm having is that

3   there is more than one statute -- the statute deals in terms of

4   fraud in one case and intentional misapplication in another.

5   And it does seem to me that benefits obtained by unintended

6   recipients deals with intentional misapplication of funds

7   diverted to unintended uses.  The second part of this note to

8   the guidelines is more difficult to apply in intentional

9   misapplication of funds in terms of showing that it was an

10  intentional misapplication.  All the evidence in the case kind

11  of shows that when confronted with misapplying the funds, he

12  would say things like, my mother has got the money or something

13  else, I'm working on it, they are going to come along, and the

14  ladies down there at the program love me and everything is

15  going to be all right.  Never does he make a statement, at

16  least to these parties, the hell with rules, I'm taking the

17  money.  They owe it to me for my research.

18          I find it difficult to apply the guidelines in this

19  case.  Maybe the guidelines make it a situation that didn't

20  occur to the drafters of the guidelines.  It's not the usual

21  case, as I understand it.

22          Are there other cases of this sort that either party

23  is relying on involving the intentional misapplication -- are

24  there other cases involving the intentional misapplication of

25  funds as opposed to fraud, embezzlement?

8AKMKARS                    Sentence

1          MR. EVERDELL:  I looked for some cases that talked

2     about loss amount in sentencing.  I didn't find anything very

3     helpful in that regard.  What I was going with was literally

4     what I got from the guidelines.

5          But I still don't know why it's difficult to apply

6     diverted to unintended uses in this case, that prong of the

7     guidelines, special rules for government benefits, because that

8     seems to me to be the definition of misapplication.  You're

9     taking funds and applying them for unintended uses, unintended

10    in this case by the people who gave out the grant money, NIST.

11    And unintended in the sense that they gave out the money with

12    lots of rules attached to it, that they made clear to the grant

13    recipients and those were the intended uses of money, that is,

14    expenditures that followed the grant spending rules.  And

15    anything that did not follow the grant spending rules was an

16    unintended use of that grant money.  I think that was made very

17    clear to the defendant in this case and, from the testimony, to

18    all grant recipients, that things like the kickoff meeting and

19    other things like that.  I think that is actually the

20    appropriate part of the guidelines to be applying in this case,

21    that the money that was spent, contrary to grant spending

22    rules, was diverted for an unintended use and that that

23    constitutes a loss.

24          Now, your Honor raised some difficulties you had with

25    the calculations for certain things and whether overbudget

8AKMKARS                    Sentence

1    expenses should count or should not.  We have, at least, I

2    think, provided a more simplistic and one that benefits the

3    defendant way of thinking about this, which is just looking at

4    the unbudgeted categories.  Those are clearly cases, money that

5    was spent contrary to the grant rules because there was

6    absolutely nothing in the budget that spoke to it.  These are

7    monies that were expended without any reference to the grant

8    rules whatsoever.

9         Now, defendant can argue that these things arguably

10   benefited the research in some way.  Perhaps they did, but

11   that's not the standard that we need to operate with because

12   that would sweep in every single expenditure.  There would be

13   no loss in any of these types of cases if that's the way we

14   have to look at it.  If you look at the unbudgeted categories

15   and you apply to unintended uses, being diverted contrary to

16   the grant rules, that provides a framework for the loss amount

17   that's appropriate in this case.

18        MR. RUBINSTEIN:  Your Honor, I think that this case is

19   outside the heartland because I don't think anybody envisioned

20   a case where somebody got a grant, spent all their time and

21   energy on that grant, bought equipment in furtherance of the

22   grant.  There is no suggestion here.  As a matter of fact, Lide

23   even testified that Dr. Karron met all the benchmarks, and your

24   Honor said something that I have to take opposition to,

25   suggesting that nothing came of this research.

8AKMKARS                    Sentence

1          THE COURT:  No.  Saying that the project wasn't

2    completed, so I suppose that they didn't get their money's

3    worth in that sense.

4          MR. RUBINSTEIN:  No.  Because the government gets

5    their money's worth since they didn't have a financial benefit,

6    no matter what, and that the whole concept was that if

7    something was developed, Dr. Karron and CASI would keep all the

8    profits for themselves.  Society would benefit.  They were

9    doing research on a cutting edge.  We have to go back seven

10   years ago.  Now it's commonplace.  But they were dealing with

11   the concept of -- I hope I pronounce this right -- topological

12   imaging that they use today in many medical factions.

13          I submit to the Court and the government a paper that

14   was submitted for publication, citing work that was submitted

15   to a medical journal, citing this work because, in fact, that

16   was the whole purpose of this research.  That's why the grant

17   was given, to develop this concept, at a time where they use

18   computers half the size of this room.  Today they probably

19   could use a laptop and get the same information.  I know I have

20   it here.  Just a second, your Honor.

21          THE COURT:  I'm not taking issue with that,

22   Mr. Rubinstein.  I am not taking issue with that.  It never

23   came to fruition with the commercialization of the process, as

24   far as I know.

25          MR. RUBINSTEIN:  They are talking about the amount

8AKMKARS                    Sentence

1   that Dr. Karron received and the figure that we started out

2   with from -- as to salary, it seemed to me that that figure, as

3   I cited in my submission of October 17, on page 3 -- first of

4   all, they have 129,850 in loans.  This is at 110, Government

5   Exhibit 110, 38 through 40 of 44, the second portion of 110.

6   They show 129,850 loans to Dr. Karron.  We dispute one, and I

7   have backup for it, a $750 check that was really for Scott Alba

8   that was advanced from defendant out of his own money.  Then

9   December 30, '02, 15,000 check that's for reimbursement.

10  Doesn't say anywhere on that check where it says loan, we

11  reduced those numbers.

12          THE COURT:  Why do you say that shouldn't be --

13          MR. RUBINSTEIN:  Because that was a partial

14  reimbursement.  There is nothing on that check --

15          THE COURT:  If he writes a check and it says partial

16  reimbursement on it, isn't that reimbursement for loans taken?

17          MR. RUBINSTEIN:  It's partial reimbursement because

18  the medical expenses that were on the credit cards --

19          THE COURT:  What's partial reimbursement of expenses

20  taken?  I don't know what you're talking about.

21          MR. RUBINSTEIN:  Out-of-pocket expenses that he paid

22  on the MasterCard that's in evidence.  They never give him

23  credit for the monies that we have the documentation that we

24  submitted to the Court, and I have additional documentation

25  showing -- not only showing that these bookkeeping entries gave

8AKMKARS                    Sentence

1    back 67 -- $75,000 that was given back by salary paychecks that

2    he never gets credit for.  It seems to me when they came up

3    with the figure that they used for his salary, they included

4    the 60,000 of rent.  I mean, they have never said --

5            THE COURT:  I don't think it did.

6            MR. RUBINSTEIN:  If you look at pages 38 through 40 of

7    Exhibit 110, the one that ends in 44 --

8            THE COURT:  1 and --

9            MR. RUBINSTEIN:  The second half of 110 has 38 of 44.

10   The beginning part says --

11           THE COURT:  38 of 44, yes.

12           MR. RUBINSTEIN:  We have 38 of 44, 39 of 44, 40 of 44.

13   It starts out on the top of 38 saying, Dr. Karron's loans.  I

14   have the check that I submitted as part of it on the $15,000

15   loan.  It doesn't say anything about loan.  Here she puts DPK

16   loan, but there is nothing on the check to indicate loan.

17   There are other checks that do say loan.  So why --

18           THE COURT:  Which one is that?

19           MR. RUBINSTEIN:  Just above the line for loan repay.

20           THE COURT:  I see it.  I see that.

21           MR. RUBINSTEIN:  This is 9/12/02, check 10451, it's

22   written to Dr. Karron.

23           THE COURT:  Can I see the check?

24           MR. RUBINSTEIN:  Yes, your Honor.

25           THE COURT:  It's a check payable to Dr. Karron.  It

8AKMKARS                    Sentence

1    says something.  It's deposited.  It isn't salary.  Why isn't

2    it a loan?

3           MR. RUBINSTEIN:  Why is it a loan?  It's a

4    reimbursement.  It doesn't say anywhere what it is, but they

5    classified it as a loan.

6           THE COURT:  I would, too, if I see it paid to him.

7           MR. RUBINSTEIN:  They have other checks, your Honor,

8    where it says loan on it.

9           THE COURT:  Where does it show as reimbursement?

10           MR. RUBINSTEIN:  It doesn't show on that check.  We

11    understand it's on the check stub.

12           THE COURT:  Reimbursement for what?  It's a round sum.

13    It sounds rather strange to be a reimbursement.

14           MR. RUBINSTEIN:  This comes out of the Quick Books,

15    you will recall, your Honor, the computer-generated software

16    that they had, so it's in that software.

17           THE COURT:  For 15,000 round dollars?

18           MR. RUBINSTEIN:  You have to have an invoice --

19           THE COURT:  You never have a reimbursement like that.

20           MR. RUBINSTEIN:  He had a number of items.  He took

21    15,000 --

22           THE COURT:  It just happens to add up to 15,000.  It's

23    very strange.  Let's see the backup.

24           MR. RUBINSTEIN:  Your Honor, if you can give us a

25    short recess.  Dr. Karron came with the computer.  He forgot to

8AKMKARS                     Sentence

1   bring the power supply.  We could generate it right here.  We

2   have it in the computer.  If he can recess --

3          THE COURT:  Doesn't show rent, does it?

4          MR. RUBINSTEIN:  Yes.  He has everything in the

5   computer in the Quick Books that are in the computer.  We don't

6   need --

7          THE COURT:  This doesn't show that the amounts taken

8   for rent were part of the salary computation.

9          MR. RUBINSTEIN:  What I'm saying, Judge, I was trying

10  to add up the numbers to get to her number.  And the only way I

11  could do that was by throwing in the 60,000 for salary so that

12  if, in fact, his salary is accurate, which he has --

13         THE COURT:  I've got to get this sentence completed.

14  We can take a five-minute recess, if that's what you want.

15  Take a five-minute recess then, but I don't think it's going to

16  make much difference.

17         MR. RUBINSTEIN:  All right, Judge.

18         (Recess)

19         THE COURT:  Mr. Rubinstein.

20         MR. RUBINSTEIN:  Your Honor, Dr. Karron purchased the

21  necessary part -- actually, I gave him my credit card -- and

22  the machine is booting up.  We should have it momentarily.

23         MR. KWOK:  Your Honor, while we are waiting, if the

24  Court pleases, we could go to talk about the 3553(a) factors,

25  which is another major factor.

8AKMKARS                     Sentence

1          THE COURT:  I want to deal with the computation.  Then

2     we can deal with the 3553(a) factors.

3          When will you be ready, Mr. Rubinstein?

4          MR. RUBINSTEIN:  Your Honor, do you have a computer

5     screen that we can plug into to show you that would be more

6     efficient to show you?

7          THE COURT:  No, I don't have one here.

8          MR. KWOK:  Your Honor, just to save time on this, I

9     think that what they are trying to print out is the Quick Books

10    ledger, which is not in evidence, which is not authenticated,

11    which is a document that witness after witness have

12    testified --

13         THE COURT:  I don't know what he's trying to print

14    out.

15         MR. RUBINSTEIN:  It doesn't have to be in evidence for

16    the purposes of sentencing, your Honor.

17         THE COURT:  What are you trying to print out?

18         MR. RUBINSTEIN:  We are trying to print out the backup

19    to that $15,000 check to show your Honor that, in fact, that is

20    not a loan; was, in fact, a reimbursement.

21         THE COURT:  I am not going to make the findings on

22    that issue.  I am going to make the findings on the basis that

23    Mr. Everdell suggested.  And taking the amounts in the other

24    categories that are not included in the budget and making the

25    adjustments he talked about, giving the defendant credit for

8AKMKARS            Sentence

1   the utilities and all.  It seems to me that the amount of the

2   loss, pursuant to guideline 2B1.1, is more than $120,000.

3           Isn't that your correct conclusion, Mr. Everdell?

4           MR. EVERDELL:  Yes, your Honor, that's correct, more

5   than 120,000 adding ten points to a base offense of 6.

6           THE COURT:  I think that's borne out by the figures

7   with adjustments that you pointed out, Mr. Rubinstein, as the

8   total loss to the -- which should be computed, intended loss

9   which should be included for guideline calculation purposes,

10  which makes a total loss of 16 levels.

11          MR. RUBINSTEIN:  Your Honor, I think your Honor has to

12  consider the credits against whatever loss your Honor has --

13          THE COURT:  I don't think there are any credits --

14          MR. RUBINSTEIN:  Your Honor, I submit that under

15  the -- that the amount of salary that they have calculated is

16  not supported by any documentation they submitted.

17          THE COURT:  In that tabulation I agree with you, that

18  the entry includes salary and loans as they calculated it, but

19  it doesn't make much difference because the 80,000 odd dollars

20  that the defendant was entitled to redistribute are

21  incorporated in the equipment --

22          MR. RUBINSTEIN:  I submit, your Honor, under their

23  figures --

24          THE COURT:  Other entries.

25          MR. RUBINSTEIN:  I submit under their figures, Judge,

8AKMKARS                    Sentence

1   that they have added back the $60,000 rent.  If you take a
2   look --

3          THE COURT:  There is no showing of that.

4          MR. RUBINSTEIN:  There is, Judge.  They have not shown
5   you at all where they get the figure that they have in 114.
6   And I submit the only backup is on page 38, 39, and 40 of
7   Exhibit 110 of 44 pages.  And the only thing they have there is
8   a loan which they claim is $129,000, repayment is 37,000.
9   Taking their best figures --

10         THE COURT:  You haven't gotten any salary --

11         MR. RUBINSTEIN:  Salary of 37,000 -- of, rather,
12  35,000, and you have to add the $60,000.

13         THE COURT:  I've got to take into account on the
14  salary the figures that apply to withholding taxes, et cetera.

15         MR. RUBINSTEIN:  Yes.  I don't disagree with that,
16  Judge, but I submit that they have a $129,000 in a loan and
17  they don't show the repayment of the 67,000.

18         THE COURT:  Repayment is right below it.

19         MR. RUBINSTEIN:  No.  They don't include it there.
20  The two checks that I submitted to the Court that I have copies
21  of with the backup showing --

22         THE COURT:  Those checks are after the close of the
23  period and were for, as I understand it, expenses incurred
24  thereafter.

25         MR. RUBINSTEIN:  No, your Honor.  We are talking about

8AKMKARS                    Sentence

1    two separate things.  We are talking about, one is the salary

2    that is submitted in our letter of the 17th where we provide to

3    the Court check of August 2, '02, a year before the grant was

4    suspended, actually ten months before the grant was suspended

5    where you have -- that's in evidence --

6              THE COURT:  Where are you reading?

7              MR. RUBINSTEIN:  I'm looking at our letter of October

8    17, your Honor.  And I am showing you what was previously

9    marked as Defendant's P6 in evidence, which shows --

10             THE COURT:  You'll have to show me and you'll have to

11   show Mr. Kwok.

12             MR. RUBINSTEIN:  Mr. Kwok has the page.  He has turned

13   to it.

14             THE COURT:  $5,000 check?

15             MR. RUBINSTEIN:  Yes, your Honor.

16             THE COURT:  That shows the defendant had taken $61,918

17   in salary just below it.

18             MR. RUBINSTEIN:  Right.  And that --

19             THE COURT:  61,000 plus 129,000.  If that's the

20   government's figure, adds to more than $200,000, right?

21             MR. RUBINSTEIN:  No, your Honor.

22             THE COURT:  $187,000.

23             MR. RUBINSTEIN:  The Court is commingling two

24   different concepts.  One is they claim there is a loan

25   outstanding that they never gave him credit for anywhere of

8AKMKARS                    Sentence

1    $75,000 that was taken in October of 2001.  I think the date

2    was October 25 or 26 of 2001.

3              THE COURT:  That's what the loan advances.

4              MR. RUBINSTEIN:  It doesn't show the offset of that

5    loan.  What I'm showing your Honor is --

6              THE COURT:  I know you had offsets for the loan.  I

7    have given you credit for that and I have gone over your

8    figures in your letter and I've made calculations on the basis

9    of it.  It shows me that there is still a net payment due the

10   government on loans.

11             MR. RUBINSTEIN:  But when you add that together with

12   the salary, it shows that Dr. Karron did not get his full

13   salary.

14             THE COURT:  I agree he didn't.

15             MR. RUBINSTEIN:  So he should have an offset under

16   guideline 2B1.1(3)(e) for credit against loss for services

17   rendered.  He rendered the services, he was entitled to full

18   salary.

19             THE COURT:  He got it in the form of loans.

20             MR. RUBINSTEIN:  I submit, Judge, that it doesn't

21   compute -- that the loan calculation does not compute to what

22   they are saying and I submitted in my letter --

23             THE COURT:  He got it in the form of loans.  It's very

24   simple.

25             MR. RUBINSTEIN:  Your Honor, in my letter I showed the

8AKMKARS                    Sentence

1  Court --

2         THE COURT:  If you take the money from the corporation

3  in loans --

4         MR. RUBINSTEIN:  He took loans, but he paid it back

5  out of these salary --

6         THE COURT:  In part --

7         MR. RUBINSTEIN:  In part.  So that left, your Honor, a

8  balance in a worst case -- in a best-case scenario for the

9  government of $24,765.81, and you have to add to that the

10  60,000 from the rent.

11        THE COURT:  No, you don't.  Add to it?

12        MR. RUBINSTEIN:  They did, though.  They have never

13  submitted how they arrived at their figure of the 200,488 in

14  the chart, 114.

15        THE COURT:  All I have to do is use my best judgment

16  on the figures that are here.  I exercised them and I have read

17  your papers and I've taken them under account and I have

18  somewhat struggled with them, I must admit that.  I've

19  calculated his credits for salary not taken and offset that

20  against the loans.  I still get the balance of loans due the

21  corporation from Dr. Karron of several thousand dollars.

22  Without taking into account in any way the rent he received of

23  $60,000.

24        MR. RUBINSTEIN:  In all due respect, Judge, I don't

25  see how that is possible.  Nobody has shown me to this point.

8AKMKARS                     Sentence

1   The government hasn't proffered how they come to their figure.

2   I frankly don't comprehend it, but I think that even --

3            THE COURT:  I think you've got to read salaries,

4   Dr. Karron's salaries, as salaries plus loans.

5            MR. RUBINSTEIN:  I do, your Honor.

6            THE COURT:  The loan entries.

7            MR. RUBINSTEIN:  I do.  I see an entry for $75,000 as

8   a loan and I don't see any salary -- I don't see the balance of

9   the two entries that I submitted to your Honor --

10           THE COURT:  If he had taken the salary, you'd have a

11  worse situation because you then have the payments due the

12  government for withholding that weren't made, social security

13  weren't made, the other payments of taxes not made as a result

14  of taking less salary.  The situation would be less if he had

15  taken all his salary.  He would have a worse situation

16  confronting him.

17           MR. RUBINSTEIN:  Do I understand that the Court is not

18  giving him credit for the $70,000 that he contributed in July

19  and August after the grant -- this is money that he took out of

20  a home equity loan, and I submitted the documentation to show

21  that.

22           THE COURT:  I went into that earlier in front of you

23  with counsel and it was stated on the record, without any

24  exception taken, that those monies were for additional

25  expenditures that have been made between June 30 or June 23 and

8AKMKARS                    Sentence

1    the date of payment of those amounts.

2         MR. RUBINSTEIN:  But he should get credit for that.

3    These are expenses --

4         THE COURT:  Depends on when the expenditures were made

5    and, as stated in open court and not objected to by you, these

6    were expenditures that occurred after the period of the audit.

7         MR. RUBINSTEIN:  The audit, your Honor -- the audit

8    didn't occur --

9         THE COURT:  The audit didn't occur until later,

10   obviously, but books and records were reviewed as of the date

11   June 23, as I understand it, the date of suspension.

12        MR. RUBINSTEIN:  He was unaware of that.  As a matter

13   of fact, Judge, you may recall the testimony that he didn't

14   receive a copy of the audit until September, so he was totally

15   unaware of any discrepancies.  He understood that the grant was

16   suspended because --

17        THE COURT:  It doesn't matter whether he was aware of

18   it or not.  It's irrelevant.

19        MR. RUBINSTEIN:  I think, Judge, that the concept is,

20   when he's aware, because it's when he becomes aware whether or

21   not his intention in making compensation was motivated by a

22   guilty mind.

23        THE COURT:  All I know -- I am going to take that into

24   account in connection with the 3553(a), but not taking the

25   guideline computation.  I'm making the guideline computation as

8AKMKARS                    Sentence

1    I've stated, and on that basis.  And I'll hear from you further

2    on 3553(a).

3              MR. RUBINSTEIN:  Yes, your Honor.  I think that this

4    is a case that is very unusual in that Judge Rakoff used this

5    language in the case that I previously cited, and I have a copy

6    for the government and your Honor, Adelson.  Unfortunately --

7              THE COURT:  You'll want your notes, won't you?

8              MR. RUBINSTEIN:  Judge, Judge Rakoff said that there

9    are --

10             THE COURT:  It's a securities fraud case.  What part

11   of the case do you want me to refer?  I think I see a little

12   error in the opinion, but it's not -- the six or seven points

13   under the base level doesn't depend on the date of the offense.

14   It depends on the maximum penalty for the offense.  Here the

15   maximum penalty was ten years, so only six points are allowed.

16   If it were 20 years, it would be seven points.  It has nothing

17   to do with the date of the offense.  It has something to do

18   with the maximum penalty on the offense.

19             Give me something else.

20             MR. RUBINSTEIN:  I have the language.

21             THE COURT:  Tell me what you're relying on, because

22   he's probably right.

23             MR. RUBINSTEIN:  I'll try and find it as I'm reading

24   it here, but I have the quote.  There may be cases in which the

25   offense level determined under the guidelines substantially

8AKMKARS              Sentence

1    overstates the seriousness of the offense.

2          THE COURT:  You can get that in securities cases

3    because of the number the people who lose as a result of the

4    fraud committed by the officials of the company.  The stock is

5    publicly traded and, therefore, you have a number of

6    transactions involved, so you get tremendous losses, as you do

7    in this case, Adelson case.  This is a different case.

8          MR. RUBINSTEIN:  He was referring to that, Judge, and

9    you're absolutely right --

10          THE COURT:  I'm fully aware -- I understand that.

11          MR. RUBINSTEIN:  In this case, your Honor, it is a

12    unique case and the government cannot point to one case like it

13    because there is no case like it.  And I think that the

14    guidelines overstate the seriousness of what happened here.

15          There is no question that the United States Government

16    afforded Dr. Karron an opportunity to do research.  They had no

17    vested interest financially in the product of his research.

18    Even though he has a business background that dates back over

19    20 years, he was ill-equipped to handle these funds.  And if

20    you could see the way he withdrew money, just the dates when he

21    did it, whether you call it a loan or a salary, you see he

22    functioned as if whenever he needed money he would take it.

23          So he didn't take a salary until April or May of 2002,

24    eight months into the grant.  He takes his first salary check.

25    Before that he's taking loans.  At the end of the year he winds

8AKMKARS                    Sentence

1    up that he owes all this money that he had taken as a loan back

2    in October 2001, so they take it as salary at that time.

3           All his efforts and all his energies were devoted to

4    this project, to do the research that the government wanted to

5    be performed for everybody in society's benefit.  That's why he

6    got this grant.  And when they say credit against loss in

7    2B1.1(e), they are talking about monies returned, fair market

8    value for the property returned and the services rendered.

9    There is no way to quantify what the value of what Dr. Karron

10   created at that time in this topographical imaging that's used

11   today in all kinds of surgeries and what benefit it was to the

12   nation and to the world.

13          I think that that takes this case out of the heartland

14   because he, as you know from everything said, he didn't get

15   involved here to benefit himself financially.  He took the rent

16   money.  He shouldn't have taken it.  He owed debts, so he paid

17   the debt with the rent money.  That was wrong.  That was wrong.

18          I think that this case goes outside the heartland,

19   that your Honor should consider 3553 Title 18, U.S.C., and

20   consider giving him a nonguideline sentence.  And I think that

21   because you sat through a trial with Dr. Karron and you know

22   all the evidence and the background and the way he was advised

23   by people not to do this, not to do that, and he, like a bowl

24   in a China shop, insisted on doing it his way, that is why

25   there is really a legitimate likelihood that if he had followed

8AKMKARS                      Sentence

1     protocol and followed procedure that he would not have been

2     sitting here as a defendant in a criminal case.

3          It seemed that although the budget, which he

4     submitted.  Remember, he submitted a budget.  He put down

5     110,000 for equipment.  That was what's accepted.  He put down

6     for subcontractors, he put down 250,000.  He found that he

7     could get students for free.  Is he entitled to an offset or

8     consideration for that because he didn't spend the government's

9     money on subcontractors and got free employees to do a job?

10         There is no suggestion here that the equipment he

11    purchased he used for other items other than this project.  The

12    government, by law, owned this equipment.  Yes, at the end of

13    the day it was possible for a grant recipient to get possession

14    and benefit from that equipment, but, in reality, he was using

15    government money to buy government equipment which the

16    government took back.  They not only took back their equipment,

17    they took back everything, piece of equipment that he had,

18    whether they had any right to it or not, and they kept it.

19         So that's where he found himself in this case.  So I

20    think when you look at the way he managed his money, he saved

21    the government considerable money on subcontractors.  He saved

22    them, according to the government's own figures, in the first

23    year $174,000 just on subcontractors.  He got the work done,

24    but he didn't have to spend the money because he did something

25    he wasn't supposed to do.  He wasn't supposed to have employees

8AKMKARS                    Sentence

1    without approval and we had testimony of that.

2            And in the second year they revised the budget and

3    110,000 for subcontractors and he used 6100.  You know from the

4    testimony here that there were numbers of people working in

5    that apartment on these computers, on this project.  And the

6    government wasn't billed for it.  Why?  Because he was using

7    students.  Does the government get a benefit of that?  They do.

8            That is why, your Honor, the mathematical

9    considerations of a strict guideline calculation doesn't apply

10   in this case because Dr. Karron, with good intentions, and good

11   intentions meaning that he wanted the research to work, because

12   that's all he cared about.  Those were the good intentions.  He

13   might have used improper means, but the intentions were there.

14           And he created a product which people built upon and I

15   have a manuscript that was submitted to the Elsevier Editorial

16   Systems for computer medical imaging and graphics.  This is a

17   draft manuscript that was submitted, hasn't been published yet,

18   but it may well be published in the near future.  It cites ATP,

19   it cites Dr. Karron, and it shows that the work that he did may

20   have a significant value.  So it's hard to say what the value

21   was, but I don't think anybody in this room could say that he

22   didn't do the research that he was contracted to do.

23           I think your Honor has to consider the 3553 and ask

24   yourself whether or not his background, this offense, his

25   character, is such that should cause your Honor to impose a

8AKMKARS                    Sentence

1   nonguideline sentence.

2          I think the fact that you're dealing with a man who

3   frankly has a lot of issues. He's not a man anymore. He's, in

4   fact, legally a woman. I spoke to the BOP. Rather, my office

5   did. And he is and as the probation report says, he will be

6   treated as a woman and, if confined, he will go to a women's

7   prison. We submitted letters from people who know him. He has

8   a generous good side to him. He has no criminality in his

9   past, and I think that he will have no criminality in his

10  future.

11         His mother is incapacitated. She is in a home. They

12  are hopeful. He is now living in that house in Long Beach.

13  Amongst the things he lost here, he lost his home. He is

14  hopeful -- and I spoke to his brother about this. I have a

15  letter from his brother that wasn't included in the original

16  submissions. I am not going to burden the Court with it. He

17  says when his mother needed assistance in the slightest way,

18  the defendant was the one who was there because he was the

19  closest to where his mother was situated in Staten Island, and

20  he's hoping to be able to take his mother home, and he's

21  learning to work a ventilator because she needs that in order

22  to breathe, and that is the hope, that he can stay in the home

23  there.

24         So I would ask your Honor to consider under, all these

25  circumstances, to fashion a sentence that doesn't have

8AKMKARS                    Sentence

1    confinement in a federal institution, that has house arrest,

2    that he could function from the home that he's presently

3    residing in Long Beach; and when his mother gets out, he can

4    assist her there, and provide for restitution out of his future

5    earnings, if he's able to earn anything.

6          He has been severely compromised in his profession.

7    He has been turned down for positions because this case

8    received a lot of notoriety.  They talk about general

9    deterrence.  This case has sent a shock wave through the

10   scientific community as to how they ought to comport themselves

11   when dealing with federal grant and federal monies.

12         There is no question that he will never be eligible --

13   I don't say never, but, in all probability, will not be

14   eligible to any federal funding so that he could go ahead with

15   his research, which is his life's work, is to do scientific

16   research.  And the question is what sentence would be

17   appropriate under all these circumstances, and I don't see that

18   based upon his background and characteristics that confinement

19   is necessary here based on his history and character, and I

20   think that that sort of sentence will be as much as necessary

21   and not more than is necessary as the cases seem to say what

22   punishment should be.

23         Dr. Karron would like to address you, your Honor, and

24   I know you'll afford him that opportunity.

25         THE COURT:  Does the government want to say something

8AKMKARS                          Sentence

1    first?

2            MR. KWOK:   Yes, we do.

3            Your Honor, we spent a good part of the afternoon

4    arguing about loss amount, and rightly so, because the numbers

5    can be a little bit confusing.   But the defendant's conduct,

6    when distilled to its essence, it is very clear what he did.

7    This is not the case about someone forgetting to cross the Ts

8    or dot the I's.   This is not the a case about a technical

9    violation.   If it were, the government wouldn't have been able

10   to show intent, and the jury wouldn't have been able to return

11   a guilty verdict.   And the jury in this case convicted the

12   defendant because the defendant's intent was clearly shown at

13   trial.

14           The defendant was repeatedly told to stop.   The

15   government wasn't in this to trip someone up.   The trial

16   testimony established that the people who administered the

17   grant wanted to succeed.   That's why they kept telling him and

18   kept working with him to explain the rules to him time and time

19   again ad nauseam.   Every one of those times he could have

20   gotten himself out of the hole that he was digging, every one

21   of those times he could have stopped.   And none of what he did,

22   none of that money that he would spent would have even been

23   reported to the Department of Commerce, the inspector general's

24   office, much less prosecuted by our office, and, ultimately,

25   the case brought before your Honor.

8AKMKARS                      Sentence

1        Of course, the defendant never stopped.  He kept

2   misusing the grant money.  And not only that, he tried to muck

3   around, as Frank Spring testified, with the company's books to

4   hide his tracks.  And Mr. Rubinstein just now talked about him

5   spending less money than he's allotted in the category of

6   subcontracting.  And the reason that's so is because he could

7   use students so there was more money left so he could pay

8   himself.

9        So everything ultimately comes back to how he could

10  use the grant to benefit himself or his company that he owns,

11  CASI, time and time again.

12       In his e-mails to his friends he didn't mince words

13  about what he was doing.  He was, in fact, brazen and open

14  about what he was doing.

15       THE COURT:  I don't think there is any evidence that

16  he used the students so he could pay more money to himself.

17       MR. KWOK:  There is evidence in the record that

18  equipment under $5,000 he would be able to keep at the end of

19  the day.

20       THE COURT:  It may be that it benefited him, but I am

21  not sure from the evidence that he actually intentionally said,

22  I am going to use students rather than subcontract so I could

23  get money for myself.  I don't think the record establishes

24  that.

25       MR. KWOK:  Let me go to the larger point.  The larger

8AKMKARS                    Sentence

1   point is, when no one was looking, when he thought no one was

2   listening, in his e-mail to his friends, he was open about what

3   he was doing.  In the e-mail to his friend, he said he wanted

4   to make a lease with his friend living in Connecticut, so he

5   could "make like I only keep a folding bed on 33rd Street.  And

6   if ATP buys into this idea, then I can charge my rent on the

7   apartment to the grant and pay my mortgage."  He said in

8   another e-mail that if the ATP people didn't agree with him he

9   would turn the grant into enough of a train wreck so the

10  government would be forced to negotiate with him and, quote,

11  find a liveable solution for all.

12          Now, certainly in that e-mail, after his crime was

13  detected, at no time did he show any remorse.  He didn't take

14  any responsibility for his actions.  Instead, he tried to

15  engage in, essentially, financial black mail of the government

16  to strongarm the government to accept his fait accompli because

17  he has misspent so much of the government's money.  And this

18  kind --

19          THE COURT:  I saw that that was what he might think

20  about doing.  I don't think there is any evidence in the record

21  that he strongarmed or attempted to strongarm the government is

22  such.

23          MR. KWOK:  I would submit to the Court that's what it

24  means when he says, I would make the grant enough of a train

25  wreck so that they can find a livable solution for all.

8AKMKARS                    Sentence

1         THE COURT:   That was one of two alternatives in that

2    e-mail that he mentioned, rather to pay more, I think -- more

3    money to cover the expenses or to make it a train wreck.

4         MR. KWOK:   It's the government's view that those

5    e-mails, when you take them together, it shows the type of

6    brazenness, the type of arrogance that necessarily warrants

7    consideration under the 3553 factors because they go directly

8    to the seriousness of the offense.

9         Let me turn now to the defendant.  Of course, none of

10   this conduct can be considered in a vacuum.  It has to be

11   considered in the context of this defendant.  And here, too,

12   the 3553 factors argue for a meaningful custodial guidelines

13   sentence.

14         This is not the case about someone who broke the law

15   because he was in dire straits where some sympathy might

16   appropriately be shown.  This is not a food stamps case, this

17   is not a housing fraud Section 8 case where we also calculate

18   the loss under 2B1.1 where sometimes those mitigating

19   circumstances are present.

20         This is a defendant, who under the grant in year one

21   alone, is given an annual salary of $175,000, $175,000 in

22   taxpayer's money.  That's a lot of money for a lot of people,

23   but not for this defendant because he kept misspending the

24   government's grant money to buy equipment that he knows he's

25   not supposed to buy.

8AKMKARS                    Sentence

1          Of course, the defendant is a Ph.D. scientist from one

2     of the finest universities in the world.  He did not have to

3     steal to put food on the table.  He didn't have to steal to

4     find a place to live.  But he did it anyway.

5          I think the defendant's characteristics under 3553

6     also argue for a custodial sentence within the guidelines.

7          Finally, your Honor, a guidelines sentence is

8     necessary in this case to serve the goal of the terms.  Anyone

9     paying any attention to any public policy debate in the past

10    10, 20 years knows that one of the prime arguments opponents of

11    these government programs like to use is rampant, it is full of

12    fraud.

13         We know that's not true in this case because we have

14    ATP witnesses who testified that they keep a close eye on the

15    grant.  In fact, they have these rules so that they can closely

16    monitor what the recipients are doing with government money.

17    But there is fraud and this is one such case.  And it's the

18    government's view that when a clear-cut fraud case presents

19    itself, there has got to be a strong deterrence, as reflected

20    in a meaningful custodial sentence so that people who get this

21    money will know that you can't just walk away and apologize and

22    say, I shouldn't have done it.

23         Rather, as his business manager told him himself at

24    the time, you could go to jail for this, and that message

25    should be sent because it is the taxpayer's money, and for

8AKMKARS                    Sentence

1   these programs to survive there must be a general deterrence

2   message that if you misspend the government money and you get

3   caught, you don't just get slapped on the wrist and let go.

4         For all of those reasons, because the defendant's

5   conduct is intentional and repeatedly so, because of the

6   characteristics of this defendant, and because of the need to

7   serve the goals of general deterrence, the government

8   respectfully urges the Court to impose a custodial sentence

9   within the guidelines range.

10        THE COURT:  Dr. Karron, would you like to say

11  something at this time?

12        THE DEFENDANT:  Yes, I would.

13        MR. RUBINSTEIN:  Where should he make the statement

14  from, your Honor?

15        THE COURT:  You can make it sitting there or standing,

16  whichever you wish or she wishes.

17        THE DEFENDANT:  How much time do I have?

18        Your Honor, I'm deeply sorry for what I have done,

19  more sorry than I can convey with words.  I have been doing --

20  I wish to apologize to the Court and to ATP, to Mark Stanley,

21  who convinced me that I had a chance to win this grant, and to

22  people of the United States, who I feel like I'm working for

23  with this money.

24        I'm beginning to see that I violated their trust and

25  it disturbs me tremendously for anyone to even think that I

8AKMKARS                    Sentence

1    could do that.  And if, in fact, I did, then I will take

2    whatever punishment is appropriate.  I can only state that I

3    can perhaps explain myself a little bit better and maybe

4    prevent other people from making the same mistakes I've made

5    because I understand, from having lived through it, how the

6    PIs, who receive large grants, think differently than the

7    accountants and the grant managers that are responsible for the

8    money.

9          And I feel terrible that B.J. and Jane, I got them in

10   trouble.  I got myself in a lot more trouble.  My past five

11   years have been hell.  I thought I knew what I was doing and I

12   recognize now that I really didn't know what I was doing.

13         I've spoken to other PIs, principal investigators, and

14   I've seen them making the same mistakes, and I've tried to help

15   them.  And I know when somebody gives you $2 million, it's

16   like, holy cow, the government of the United States believes in

17   me, they trust me, and they believe in my research.  That's an

18   intense thing.

19         I believed, and I'll admit that I was wrong, that I

20   could use my salary to pay for everything that the grant --

21   that's indirect on the grant.  I didn't know how to keep track

22   of it.  I didn't know that I should have taken a paycheck,

23   deposited it into my personal account, and then write a check

24   back to CASI, and CASI should have written a check back to the

25   grant.  Then there would be no confusion that I seem to have in

1    my wake.

2          Seven years ago I didn't know about accounting.  I've

3    always done contracts.  I've never done grants.  DARPA would

4    give me money.  They didn't care what I did with it, as long as

5    I could produce the research that I said I could do.  I never

6    understood that a grant, you do whatever you can, but it's how

7    you spend the money that's most important.  I didn't know how

8    to spend this money.  I didn't think that I was throwing it

9    away.  I didn't think I was unduly enriching myself until a

10   couple of years later I realized, I took too much money.

11         I didn't want to take money unless I absolutely needed

12   it.  It was like running a little business.  The owner doesn't

13   take the money unless you need it.  I didn't want to take

14   salary.  I just wanted to take $2,000 at a pop for rent.  I

15   thought I could charge it against salary.  And at the end of

16   the day, I overdid it.

17         In the second year I thought I had made amends, but

18   the budget was wedged.  I never thought that I would be impaled

19   on my own budget.  When I wrote the budget I just needed to

20   fill something in to get the grant out the door by the

21   deadline.  I asked a couple of ATP people, what is a reasonable

22   salary?  They said, don't worry.  In fact, it says, don't

23   worry, so I didn't worry.  I was just going to do the research

24   and that was it.  I took a big advance so I could eliminate all

25   my personal and financial problems.  I didn't want to have to

8AKMKARS                    Sentence

1   worry about the money.  I wanted to focus on the research.  And

2   trying to run this project has destroyed my life.  We kept the

3   research going after the project was suspended because the

4   research is mine.  The grant doesn't tell me how to live.  The

5   grant tells me how to spend the government's money.

6            But, anyway -- I'm getting lost.

7            I'm bullheaded.  I'm boneheaded.  My exwife said I

8   couldn't tell my friends from my enemies.  That's really been

9   true in this adventure.  I'm a strange person.  I let people

10  come and go.  I don't know.  Just do whatever you want.

11           I had some brilliant students working on this project

12  who should have been on the payroll.  I didn't put them on the

13  payroll.  One, because either I was advising them on their

14  Ph.D., or they were already on some other payroll.  This whole

15  issue of like, you know, do I take people and pay them more for

16  the same hours?  ATP also said, don't do certain things, what I

17  understood I could do.  I didn't understand.

18           I'm boneheaded.  I'm also too bright for my own good.

19  When people told me that I could -- when I started thinking

20  that I could use Morse Theory in digital data, in discrete

21  picture data, pixelated data, everybody said you can't do that,

22  it doesn't work.  Morse Theory only works for continuum

23  mechanics, not where you have imagery.

24           But Jim Cox and I talked about it.  I think I see a

25  way to do it.  Despite everybody telling me, no, no, no, that's

8AKMKARS                    Sentence

1   not how you do it; this is how you do it.  We persisted, and

2   for ten years we came up with digital Morse Theory and now it's

3   becoming part of the accepted panoply of topological image

4   processing.

5        If I listened to everybody telling me, no, no, no, you

6   can't do it, you can't do it, fine, I'll do something else.

7   When somebody says, you can't do it, I start blowing steam out

8   my nose.  There has got to be a way to do it.

9        We did get the power approved.  I did have long

10  discussions with B.J. and Jane about how we can fix this, how

11  we can change this, what needs to be done.  I made regular

12  visits to Washington.  I tried to keep in touch with my program

13  managers.  They came and visited regularly.  We were making

14  good scientific progress.  But my attitude was, the hell with

15  the financing, as long as I kept records.  I have all of the

16  source records.  And give it to the accountant and she will

17  figure it out.

18       And, you know, I never thought -- we didn't have a

19  year's worth of running actuals to calculate a good budget.

20  And towards the end the accountant was telling me, this is an

21  unliveable budget.  You can't do this project with this budget.

22  You need to put a lot more money in.  And without coinvestors

23  and cofunding, you're going to get in trouble.

24       I thought that I could keep overhead minimal, take as

25  little salary as I could, take rent instead of salary, which is

8AKMKARS                    Sentence

1    a colossal mistake.  It is more of a mistake than even this

2    Court will understand.  I have to pay tax twice on the money.

3    This is the stupidest thing imaginable.  It's like the absolute

4    worst thing I can do.  It inflated my income.  The W2s and the

5    1099s from the grant show that I made $250,000.  That's too

6    much.  Because I took the same money, gave it back to the

7    company, and paid it again.  It was spectacularly dumb.

8         The worst thing is, worst thing is that my business

9    managers, I really wish that -- we needed to get a new budget.

10   We needed to get a new budget approved.  I think we were almost

11   at that point and then I screwed up.

12        I'm responsible for everything I've done.  I took

13   responsibility.  I kept records at the time I was doing it.  I

14   didn't think I was committing -- I was defrauding the

15   government.  I thought as long as I was doing good work, the

16   research is moving ahead, we are presenting at conferences, I'm

17   flying all over the country presenting.  We are attracting

18   students, we are attracting attention.  That's what was

19   important.  In the past five years all -- I have bean counters

20   going over and over and over.  I'm still stuck in 2001 and

21   2003.

22        My career is over.  My colleagues don't return my

23   phone calls.  I've alienated my wife and daughter.  I've had a

24   sex change operation.  I am now going to live as a woman.

25        I didn't think -- I wanted my staff to be happy and

8AKMKARS                    Sentence

1   healthy.  I wanted Nicky Winter, the bookkeeper, I wanted her
2   to fix her teeth.  I wanted to fix my teeth.  I didn't want to
3   have -- I wanted everybody around me to be happy.  And I wanted
4   them to know that the fringes were available.  I didn't
5   overspend the fringes.

6          After the grant was suspended I got a job with a
7   colleague and I was much happier working for him than trying to
8   manage my own grant.  If I get out from underneath this I would
9   like to advise Mark Stanley in the ATP program, now TIP
10  program, what to look out for in PIs when you give them a lot
11  of money.  What are the common misunderstandings that a
12  scientist will have when you give him a lot of money.  My
13  colleagues at City College said, we win grants, but we have
14  almost no sale.  I wanted to make my little company unique.  I
15  wanted to do things different.  I wanted to do things nicer,
16  better.  I didn't know what to do and I didn't know what I was
17  doing, and I ended up with a train wreck.

18         Lee Gurfein, my business manager, wanted to lock me up
19  in a room and just give me a computer and let me out for air
20  and exercise.  He didn't make any coinvestment.  My brother
21  didn't have any signing authority until we had a contract with
22  him and he gave me some money.  I did everything he wanted.  I
23  did everything my accountant wanted me to do.

24         I did everything that Bob Benedict wanted me to do.
25  If he told me not to do something, I wouldn't do it.  When he

8AKMKARS                     Sentence

1  told me to stop paying the rent, it was getting to be a real

2  problem, I stopped.  I had to understand why.  I didn't get it

3  right.  I made a mistake.  I never thought it would be this big

4  of a mistake.  If I have to go to prison for it, then I'll go

5  to prison for it.  I made a mistake.  I didn't think -- I

6  hope -- I feel terrible that people feel I violated their

7  trust, and I'll never be able to recover that.

8           I want to finish the Joe Morse Theory.  It has nothing

9  to do with money anymore.  It's something that needs to be

10 done.  It's why ATP gave me the money.  The research was more

11 important than the money, but I didn't know how to handle the

12 money.  I think if I got a job as a grants manager, because I

13 needed a job, having made every mistake twice, I would know how

14 to prevent it.  I have been advising other colleagues, that

15 kind of attitude is going to get you in real big trouble.  I

16 have told them that, and they usually get really mad at me.

17          Other ATP grants, when I talk with them, I said, be

18 really careful, don't have a certain mind-set.  You are not

19 your grant.  The grant funds certain activities, but don't put

20 your ego, and get more than one grant and have more than one

21 sponsor.

22          I thought I could do everything myself.  I do

23 everything so hard and so intensely and so monomaniacally, so

24 bipolar that I usually get myself in trouble.  This is the

25 worst trouble I've ever got myself in.  I don't know.  Maybe

8AKMKARS                        Sentence

1   I've learned something from it.  I tell people I made every

2   mistake twice.  It's like if anybody knows the lessons of

3   managing federal and public money, so that everybody can look

4   at it and say, yeah, there is no problem with that, I think I

5   know how to do it.

6           I could probably pass the CPA exam now.  Do I feel

7   comfortable defending what I did, knowing what I did in 2001

8   with what I know now in 2008?  Absolutely not.  I made a mess.

9   It was a big mess.  But it was fixable.  And I wasn't able to

10  fix it.  It was too much of a mess, and I just wanted to focus

11  on the research, and I decided to do good work and maybe

12  something good would come out of it.

13          If I need to go to jail, I'll go to jail.  I would

14  like to finish what I started.  I would like to help the ATP

15  program in the sense that I can probably smell fraud brewing in

16  the mind-sets of the PIs.  Because I have a sense now of what

17  this entails, particularly in small startups, very small

18  startups.  That's what ATP wanted to fund, and they should

19  continue to do it, but they need special supervision.  When I

20  was doing SBIR grants, they have special supervision for SBIR

21  grants because the PIs don't always know what they are doing.

22          I don't have a home to go to.  My mom is going to die

23  soon.  I want to bring her home to die.

24          Am I wandering off too far?

25          THE COURT:  I couldn't hear you.

8AKMKARS                        Sentence

1           THE DEFENDANT:  Am I wandering off too far or am I

2    becoming incomprehensible?

3           My mom is going to die soon.  She is on a ventilator.

4    She is on a feeding tube.  I'm only trying to bring her home,

5    with my family's consent, so that she is at least home, because

6    that's where she always wanted to be.  After she passes on, we

7    are going to have to sell the house anyway because of the bills

8    from the nursing home.  If I have to go to prison, I would like

9    to at least see her through.

10           I'm taking classes now on ventilator care, so at

11    least -- we have three shifts of nurses at the house running a

12    ventilator.  I need to be able to cover them.  My Ph.D. is

13    sufficiently medical, and I have enough insight on how to run a

14    ventilator that I need a lot of training so I don't screw up,

15    because I think I know what I'm doing, and Mondays are usually

16    my days to go get training.

17           I pre-separated from paying myself rent because I

18    thought I wanted to take rent as I needed it and not use

19    salary, and just use my salary line to pay utilities and

20    telephone and the legal cost, the bills to Pennie & Edmonds.  I

21    tried to keep a green check and a burgundy check.  Green checks

22    were nonprogram, burgundy was program.

23           But we didn't set up the account before we got the

24    first payment from ATP.  I took too much money at the

25    beginning, and I tried to put it back.  The way I tried to put

8AKMKARS                    Sentence

1    it back.  Now I just did it all wrong.  I thought it didn't

2    matter where I spent the money out of.  I just give ATP a stack

3    of receipts.

4         I tried to keep good records.  I got consumed with

5    recordkeeping.  It's like I was telling -- it's like I got

6    buried in receipts that I lost and I never added them up.  I

7    just took pictures of them and filed them under each day and

8    let the accountant deal with it.  She got lost.

9         I think the best thing I can do for my country is

10   prevent me from happening again.  I don't know that I will ever

11   personally handle big federal projects, but I think I can be of

12   value to the program, particularly since they are going to be

13   gun shy to giving money to small grant recipients.  And I feel

14   terrible because Mark really believed in me, the program

15   director.

16        If there is something that can be done with me to help

17   the program, I would do it any way I can.  I'm happy to lecture

18   and explain how to get yourself in trouble with more money than

19   you can deal with.  I don't know whether that would help.  I

20   didn't believe that I really misspent money until I finally had

21   to really, really study exactly what I did, like a third person

22   did it, and I admit I took too much money.

23        But I didn't not do research.  I didn't advance the

24   state of the art.  The big problem is that I spent so much time

25   being an amateur accountant that I couldn't be a professional

8AKMKARS                    Sentence

1    scientist.

2            If you can find it in your heart to -- I'm sorry.  I'd

3    like this to be over and I would like to move on.  If I can

4    help, I will.  If making me an example by spending a few years

5    will prison to help, that's what I need to do.  If making me an

6    example and I can prevent other people from getting the

7    boneheaded mind-set that I have, maybe my experience is more

8    valuable in some other setting.

9            I would like to finish the research.  And the program

10   would actually -- they are horrified of what's happened, but I

11   think there is a reason why they never completely shut down the

12   grant.  They just want me to clean up my act.  If we could

13   finish the program with somebody else running it, that's fine,

14   too.  My boss at ATP could administer it for me.

15           Having worked in a big federal defense contractor, I

16   see how they do it.  If I had spent a couple of years working

17   in a large corporation, perhaps I would see how these are done.

18   I have never done that.  I now know more about grants

19   management than I care to.

20           I don't know what else to say.  I'm really sorry.  I

21   didn't try to hide it from anybody.  And people call up and

22   say, what's going on?  I say, I have been convicted of stealing

23   from the grant.  If that's what I did, then I did it, but I

24   never kept it a secret.  I took pictures of everything I did.

25   I kept records to hang myself, because I never thought I would

8AKMKARS                    Sentence

1   be hanging.  I have never thought I would be impaled.

2           I'm redundant and I'm repetitive and I forget what I

3   say, and I'm a disaster.  I really am.  I will be late for my

4   own funeral.  If I do something too fast, I always forget

5   something, screw something up.

6           I apologize to the Court for keeping you this late and

7   for everything else that I've done in the past.

8           Thank you, your Honor.

9           THE COURT:  Thank you.

10          As I said, under the guidelines, the Court's findings

11  are that the base offense level for this violation for Title 18

12  Section 666 is found under 2B1.1.  The base offense level under

13  subsection (a)(2) of that guidelines is 6.  Because more than

14  $120,000 was lost through inappropriate expenses, 10 points are

15  added.  Making that decision the Court looked to guideline note

16  which applies to 2F.  The guideline note that applies to grants

17  is federal grant under guideline commentary (f)(2)(ii).  At

18  that guideline of 16, the guidelines calls for a sentence of 21

19  to 27 months in prison.

20          Turning to 18 3553(a) of Title 18, the Court, as the

21  Court must, consider any guidelines sentence as a result of the

22  Booker decision, the Court must take into account the history

23  and circumstances of the offense, history and characteristics

24  of the defendant.  The defendant here has no prior record.

25          And addressing the Court he said that he's never

8AKMKARS                    Sentence

1   before had the responsibility before of handling a federal

2   grant and dealt with contracts in the past.  Those are

3   contracts, I gather, to perform specific services for a fee,

4   which is a little different than a federal grant.  Both of

5   those circumstances relate to the circumstances of the offense

6   and the history and characteristics of the defendant.

7           But the Court must also impose a sentence which is

8   sufficient but not greater than necessary to comply with the

9   purposes set forth in subparagraph 2 of 3553(a), and that is

10  the need for the sentence imposed to reflect the seriousness of

11  the offense, to promote respect for the law, and to provide a

12  just punishment for the offense; B, to afford adequate

13  deterrence to criminal conduct of other persons, and to protect

14  the public from further crimes of the defendant -- C, to

15  protect the public from further crimes of the defendant; and,

16  D, to provide the defendant with needed educational and

17  vocational training, medical care, or other correctional

18  treatment in the most effective manner.

19          I don't believe that it would be necessary to protect

20  the public from further crimes of the defendant that would

21  serve to ameliorate the penalty imposed under the guidelines.

22          I have some difficulty with this case because

23  delineating the intent of the defendant is difficult for me.

24  It is true that the loss is at least $120,000, but the

25  defendant's intent in causing that loss is something that the

8AKMKARS                    Sentence

1    Court has been concerned about.

2         And, on the other hand, the Court has to consider a

3    sentence that affords adequate deterrence to criminal conduct

4    and the government gives these grants, they are placing a lot

5    of trust in the grantee.  It's important that the grantee not

6    intentionally misapply the funds.

7         It's clear to me that there was an intentional

8    misapplication of the rent money.  The defendant was told time

9    and time again not to use the rent funds for rent or for

10   utilities.  That's what the record here substantiates.  That's

11   a lesser sum than the sum found in the guidelines.

12        Under the circumstances, it seems to me as the first

13   offense that the Court should not impose a sentence that is

14   heavy as the guideline and, yet, impose a sentence that

15   provides deterrence to other people.  I am going to vary the

16   sentence pursuant to Section 3553(a).

17        I am going to impose a sentence of 15 months under

18   zone C of the guidelines, one half of the term to be served in

19   prison and one half of home confinement, eight months'

20   imprisonment, and the remainder in home confinement.

21        The term of supervised release is three years,

22   restitution in the amount of $120,000.  That's required, I

23   guess.  And a special assessment of $100.  I think I'm right on

24   the split sentence, that if it falls in the 12 category, I can

25   give the split sentence.

8AKMKARS                    Sentence

1          MR. KWOK:  Section 5C1.1, section D.

2          MR. EVERDELL:  Yes, your Honor, I believe it is

3     correct.  It has to be a one-for-one ratio.

4          THE COURT:  One has to be imprisonment, the other has

5     to be home confinement.

6          MR. EVERDELL:  That's correct.

7          THE COURT:  That's to enable defendant to take care of

8     his mother as soon as possible.

9          Three years of supervised release.  There will also be

10    a $100 assessment as provided by the law.  The conditions of

11    supervised release are:  The defendant shall not commit another

12    federal, state, or local crime; shall not illegally possess a

13    controlled substance; shall not possess a firearm or

14    destructive device.  Mandatory drug testing is suspended due to

15    the Court's determination that defendant poses little risk of

16    future substance abuse.  The defendant shall cooperate in the

17    collection of DNA as directed by the probation officer.

18         Standard conditions of supervision 1 through 13 will

19    also apply with the following special conditions:  Defendant

20    shall provide the probation officer with access to any

21    requested financial information; defendant shall not incur new

22    credit charges or open additional lines of credit without

23    approval of the probation officer unless the defendant is in

24    compliance with the installment schedule, installment payment

25    schedule.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8AKMKARS                    Sentence

1           Defendant is to report to the nearest probation office

2     within 72 hours of release from custody and be supervised in

3     the district of his residence.   $100 will be due immediately.

4     That's the special assessment.   The restitution shall be in the

5     amount of $120,000, payable to the clerk of the United States

6     District Court for disbursement to Julie Weiblinger, U.S.

7     Department of Commerce, National Institute of Standards and

8     Technology, Advanced Technology Program Receivables Group, 100

9     Bureau Drive, Mail Stop 1624, Gaithersburg, Maryland

10    20899-1624.

11          The restitution shall be paid in monthly installments

12    of 10 percent of gross monthly income over the period of

13    supervision to commence 30 days after the date of release from

14    custody, and the defendant shall notify the U.S. Attorney's

15    Office for this district within 30 days of any change of name

16    or residence address that occurs while any portion of the

17    restitution remains unpaid.

18          If the defendant is engaged in BOP non-UNICOR program,

19    the defendant shall pay $25 per quarter towards the

20    restitution.   However, if the defendant participates in the

21    BOP's UNICOR program as a grade 1 through 4, the defendant

22    shall pay 50 percent of her UNICOR earnings to any financial

23    penalties, consistent with Bureau of Prisons regulations of 28

24    CFI Section 45.11.   The factors in 18 United States Code

25    Section 3664(f)(2) were considered in formulating the payment

8AKMKARS                    Sentence

1    schedule.

2          There will be no fine in this case in view of the

3    restitution requirements.

4          I gather you want to have a voluntary surrender,

5    Mr. Rubinstein?

6          MR. RUBINSTEIN:  Yes, your Honor.  I was wondering, if

7    it's possible, I don't know how it works.  Is it possible to do

8    the home confinement first and then the incarceration

9    afterwards?  So this way if they can get his mother home,

10   because her life expectancy isn't that long.

11         THE COURT:  It seems to me that it could.  I don't see

12   anything under the section that says it couldn't.  It certainly

13   surprises me.

14         MR. EVERDELL:  I'm sorry to interrupt, your Honor.  I

15   do have a different case with Judge Kaplan where he did allow

16   that very thing to happen.  If that precedent counts for

17   anything, I believe there is a precedent in the Southern

18   District for doing this.

19         THE COURT:  I am going to do it that way.  So the home

20   confinement period will start.  You better see that the

21   defendant sees the probation officer in the next 24 hours, Mr.

22   Rubinstein.

23         MR. RUBINSTEIN:  Absolutely.  I will go there

24   tomorrow.

25         THE COURT:  We will make arrangements for home

8AKMKARS                    Sentence

1   confinement to start.  If you have home confinement, there will

2   have to be a telephone without call forwarding in the residence

3   in which the defendant would be located because they have to

4   know that he's not leaving the premises during the period of

5   home confinement.  Home confinement is not to interfere with

6   religious services or employment, but it will require the

7   defendant to be home in the evening and nonworking hours part

8   of the day.

9               MR. RUBINSTEIN:  And medical, your Honor?

10              THE COURT:  What?

11              MR. RUBINSTEIN:  And medical.

12              THE COURT:  Of course, he can attend medical

13   appointments for himself and his mother.

14              There will be no call forwarding or call waiting or

15   modem attached to the telephones.  It's clear that he is

16   serving his term of home confinement without any further

17   investigation by the probation office.

18              MR. RUBINSTEIN:  Your Honor, would your Honor

19   consider -- first, on the restitution, did your Honor say how

20   that's to be paid?

21              THE COURT:  Yes, I did.  10 percent of gross pay.

22              MR. RUBINSTEIN:  Is that without interest?

23              THE COURT:  I leave that to the greater, higher

24   authorities.  I believe that interest does run.

25              MR. RUBINSTEIN:  Would your Honor --

8AKMKARS                    Sentence

1       THE COURT:  I believe interest runs.  But it can start
2   after the period of incarceration.
3       MR. RUBINSTEIN:  Your Honor, I believe that the
4   defendant wishes to appeal this matter.  That's what I've been
5   informed.  In view of that, I wonder if your Honor will
6   consider releasing him pending the appeal.  He is going to be
7   on house arrest for seven and a half -- I'll reserve the right
8   to make that application.
9       THE COURT:  He can appeal, but I don't see where you
10  can appeal, but is that beneficial to your situation for me to
11  suspend the imposition of sentence pending the appeal?
12      MR. RUBINSTEIN:  I would like to serve the house
13  arrest portion while his mother is alive.
14      THE COURT:  I can't break it up, I don't believe,
15  under the statute.
16      MR. RUBINSTEIN:  I'll have to consider it, Judge.  We
17  will go to probation tomorrow.  As far as the house arrest, we
18  don't have a problem with starting that immediately.
19      THE COURT:  Make an expedited appeal.
20      MR. RUBINSTEIN:  File an expedited appeal?
21      THE COURT:  All right.
22      MR. RUBINSTEIN:  Thank you very much, your Honor.
23  Good night.
24      MR. KWOK:  A few things, your Honor.
25      If the government could request the Court to give an

8AKMKARS                    Sentence

1   oral pronouncement of his forfeiture order.  There is a

2   forfeiture allegation in the indictment.

3           THE COURT:  Is forfeiture required here?  I didn't see

4   that in the presentence report.

5           MR. KWOK:  It is not reflected in the presentence

6   report, but, as your Honor might recall, there was an order by

7   stipulation between the parties where we seized the proceeds

8   from the sale of defendant's apartment.  And so if we could

9   forfeit that in partial satisfaction of the restitution

10  obligation.

11          THE COURT:  You can submit a forfeiture order, yes.

12          MR. RUBINSTEIN:  The marshals are holding those funds,

13  if that's what the government is talking about.

14          THE COURT:  I have to make an order with respect to

15  it.  The marshals already have it.

16          MR. KWOK:  But the order the Court signed says that

17  the money will be held with the U.S. Marshals pending further

18  order of the Court.  We will certainly submit an order to

19  release those funds.

20          THE COURT:  So ordered.

21          MR. KWOK:  Thank you.

22          Also, just one last matter.  Because this is a second

23  superseding indictment, the government moves that the

24  underlying indictments be dismissed.

25          THE COURT:  That's granted.  I am sure there is no

8AKMKARS                    Sentence

1    opposition to that.

2            MR. RUBINSTEIN:  No opposition, your Honor.

3            THE COURT:  You have ten days to file a notice of

4    appeal, Dr. Karron.  All you have to do is write a letter to

5    the Court, United States District Court, 500 Pearl Street, New

6    York, New York, and say, I wish to appeal and that will

7    preserve your appeal, but you have to do it within the ten-day

8    period because, otherwise, the Second Circuit will say you

9    waived your right to appeal by not filing that letter within

10   the ten-day period.

11           You understand me?  You're nodding yes.

12           If you want to appeal, you just write the letter

13   within ten days and that preserves your right.  If you don't

14   write it in the ten-day period, you lose your right to appeal.

15   If you don't have funds for an appeal, the Court of Appeals

16   will decide on it for you to handle your appeal free of charge.

17           MR. RUBINSTEIN:  What they do, Judge, in reality, is,

18   they assign trial counsel free of charge.  I had that

19   experience with Judge Kaplan, who was mentioned once today

20   already.

21                              o0o

22

23

24

25