UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
  UNITED STATES OF AMERICA,              :

                                                 :
                Plaintiff,                        :
                                               :      08 Civ. 10223 (NRB) (DFE)
   - v. -                                   :
                                               :      **LOCAL CIVIL RULE 56.1**
  DANIEL B. KARRON,                    :      **STATEMENT OF MATERIAL**
                                               :      **FACTS**
             Defendant.                   :
------------------------------------------------------------------- x

        Pursuant to Local Civil Rule 56.1(a), plaintiff the United States of America ("the Government"), by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits the following statement, in numbered paragraphs, of the material facts as to which there is no genuine issue to be tried:

    **A.**    **Background**

    1.    In June 2008, defendant Daniel B. Karron ("Karron") was convicted after a jury trial on charges of misapplying funds in the care, custody and control of Computer Aided Surgery, Inc. ("CASI"), in violation of Title 18 U.S.C. § 666.  *See* Trial Tr.[1] at 1379:15-25; *see also* Amended Judgment, *United States v. Karron*, No. 07-CR-541 (RPP) (S.D.N.Y. Oct. 31, 2008) at 1-2 (the "Amended Judgment").

---

[1] Citations herein to "Trial Tr." reference the transcript of defendant's June 2008 criminal trial in *United States v. Karron*, No. 07-CR-541 (RPP), which is attached as an exhibit to the Declaration of Michael J. Byars (the "Byars Declaration" or "Byars Decl.").  The Byars Declaration also attaches certain exhibits from the criminal trial, which are referenced herein in the form "GX ___."  The remaining exhibit to the Byars Declaration is the transcript of defendant's sentencing proceeding before Judge Patterson, referenced herein as "Sentencing Tr."

2. Karron was sentenced, *inter alia*, to a fifteen-month custodial sentence and $120,000 in restitution. *See* Amended Judgment, *United States v. Karron*, No. 07-CR-541 (RPP) (S.D.N.Y. Oct. 31, 2008) at 1-2.

3. Karron was CASI's President and Chief Technical Officer. *See* Trial Tr. 107:9-10.

4. From October 1, 2001 through September 30, 2002, Elisha Gurfein served as CASI's Business Manager. *See* Trial Tr. 628:6-11.

**B.  The ATP Proposal**

5. On or about July 6, 2001 and August 6, 2001, Karron submitted a two-part Advanced Technology Program ("ATP") proposal to the United States Department of Commerce's National Institute of Standards and Technology ("NIST") on behalf of CASI entitled "Anatomic Computer Modeling for Precise and Accurate Therapies" (together, the "Proposal"). *See* GX 10; GX 10A.

6. Karron signed the Proposal as CASI's "Authorized Company Representative." *See* GX 10; GX 10A.

7. According to the Proposal, CASI would

> develop a new computer application server that will take calibrated, encrypted raw images from a client['s] medical imaging instrumentation (MRI, CT, Ultrasound, etc.), over the Internet. Our system will rapidly generate encrypted, precise, accurate, and variable resolution three dimensional tiled models applicable for diverse applications as radiation therapy, surgical planning, intraoperative guidance, rapid manufacturing of prosthesis, verification of surgical results, robotic surgery trajectory planning, patient communication, education and other customer specific applications[.] The novel idea[] that enables this technological leap forward is Digital Morse Theory (DMT).

GX 10A at 1 (Box 13).

8. The Proposal included an estimated three-year budget prepared by Karron (the "Budget"). *See* GX 14.

9. The Budget, as later revised, projected CASI's costs for three years as $2,110,500. *See id.*

10. The Budget, as revised, provided that $2,000,000 of the costs would come from the ATP, specifically, $800,000 in year one and $600,000 in each of years two and three. *See id.*

11. The Budget specified that CASI would enter into a three-year, $420,000 Sole Source Contract (the "Subcontract") with the City University of New York's Institute for Software Design and Development ("CUNY"). *See* GX 10 at 3-4.

12. Karron included the Subcontract in the Budget because CUNY's faculty, visiting scientists, and PhD graduate students" were "expected [to make a] unique contribution" to the project. *Id.* at 4.

13. The Proposal listed fourteen "team members." *Id.* at 23.

14. The Proposal named Professors Wolberg and Cox as "Core Members" along with Karron. *Id.*

15. The Proposal noted the potential for the project to yield widespread economic and social benefits, including through the creation of new markets, improvement of medical treatments, and reduction of medical costs, employee sick leave, medical malpractice litigation and insurance costs. *See id.* at 5-6, 23-26.

**C.     The Cooperative Agreement**

16. In October 2001, the ATP notified Karron that his Proposal had been approved. *See* GX 11.

17. On or about Oct. 5, 2001, Karron signed the Financial Assistance Award, designated as a "cooperative agreement," indicating CASI would comply with various regulations, including 15 C.F.R. Part 14 and 48 C.F.R. Part 31, as well as other standard provisions and special conditions. *See* GX 12.

18. The standard provisions upon which the Cooperative Agreement was contingent included a requirement that CASI would provide quarterly Financial Status Reports. *See* GX 2 at § 7(c)(3)(a); Declaration of Melinda S. Chukran dated June 18, 2010 (the "Chukran Declaration" or "Chukran Decl."), at ¶ 11 & Ex. D.

19. CASI (and thus Karron) stood to gain exclusive rights to any intellectual property developed under the Cooperative Agreement, subject to, *inter alia*, the grant of certain licensing rights to the United States. *See* GX 2 at § 25(a), (b).

20. Under the Cooperative Agreement, CASI and Karron would to keep all profits derived from the results of the research conducted with the assistance provided under the Cooperative Agreement. *See* Sentencing Tr. 52:4-8.

21. The Cooperative Agreement required Karron to agree to a cost-share of $30,000 in year one. *See* GX 13 at § 7.

**D.     Financial Reporting**

22. During the period October 2001 through July 2003, Karron signed and submitted to ATP certain financial reporting forms to satisfy the requirements of the Cooperative Agreement necessary to release ATP funds to CASI. *See* Chukran Decl. Exs. B, C, D. Each of these forms required the signatory, designated as the recipient's "Authorized Certifying Official," to certify compliance with the terms of the Cooperative Agreement. *See id.* ¶¶ 2, 4, 8, 12, 13 & Exs. B, C, D.

23. Karron informed the National Institute of Standards and Technology ("NIST") that only Karron had authority to sign documents on CASI's behalf. *See* Trial Tr. 639:7-640:1; *see also* GX 21.

24. During the period October 2001 through July 2003, Karron signed as CASI's "Authorized Certifying Official" on at least twenty financial reporting forms and caused them to be submitted to the ATP to obtain release of government funds. *See* Chukran Exs. B, C, D.

25. Karron directed Gurfein to create financial reports that were false because they did not reflect actual expenditures, and Karron signed these reports for submission to the ATP. *See* Trial Tr. 663:17-664:14; 683:21-684:10; 696:9-19.

**E.  Karron's Noncompliance and Misapplication of Funds**

26. On June 27, 2003, the ATP suspended the Cooperative Agreement after a limited scope audit confirmed that Karron had failed to comply with the cost share and had drawn down more than $200,000 above the amount authorized. *See* GX 26; GX 62 at 10 (page i, "Executive Summary").

27. From October 5, 2001 through June 27, 2003, Karron had drawn down the entire $800,000 available from the ATP during the first year, and $545,000 of the $600,000 amount available during the second year, for total disbursements of $1,345,500. *See* GX 62 at 12 ("Introduction").

28. Karron diverted $75,000 of the initial $150,000 drawn down from the ATP for payment of personal debts. *See* Trial Tr. 636:20-638:16.

29. From October 2001 to June 2003, Karron made $547,426 in expenditures that would later be challenged by Commerce auditors as "either unallowable, unallocable or [in

excess of] budget limitations established in the ATP award."  GX 62 at 10 (page i, "Executive Summary").

30. In the first year of the Cooperative Agreement, Karron incurred over $120,000 in unauthorized expenses for non-budgeted categories, including $60,000 in back rent paid by Karron (to himself), $9,832 in fringe benefits, $11,248 in capital improvements to Karron's apartment, $5,019 in cleaning expenses, and $43,592 in other unauthorized categories.  *See* GX 114.

31. Karron decided, without authorization from the ATP, not to enter into the Subcontract with CUNY and instead to set up CASI's business location in his own apartment and direct CASI to pay him rent.  *See* Trial Tr. 633:8-635:25.

By submitting this statement, the Government does not waive the right to contend that any of the above-referenced facts are not material to the present action.

Dated: New York, New York
       June 18, 2010

                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney

      By:  *s/ Michael J. Byars*
             MICHAEL J. BYARS
             Assistant United States Attorney
             Telephone:  (212) 637-2793
             Facsimile:  (212) 637-2717
             Email:  michael.byars@usdoj.gov