UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 8-23-2010

-------------------------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff,

**08 Civ. 10223 (NRB) (DFE)**

**LOCAL CIVIL RULE 56.1**

- v. —

**OPPOSING 56.1 STATEMENT
OF MATERIAL FACTS**

DANIEL B. KARRON,

Defendant.

-------------------------------------------------------------

## 1. INTRODUCTION

Pursuant to Local Civil Rule 56.1(b), defendant D. B. Karron, responding *pro se* at this time, respectfully submits the following statement in opposition to the Plaintiffs' Statement of Material Facts. Defendant herein recites and responds to all the 31 numbered paragraphs in the Plaintiffs' Statement of Material Facts, leaving no material facts uncontested. Additionally, the defendant makes an additional statement containing separate, short and concise statement of additional material facts as to which she contended there exists a genuine issue to be tried.

By refuting these statements and raising additional issues of fact, the defendant raises material issues of fact to be decided at a trial.

The Plaintiffs' request for a Motion of Summary Judgment should therefore be denied in whole.

a) forensic reconstruction

The main issue of material fact is the "ground truth"[1] forensic reconstruction. .See *Decl. Dunlevy* The purpose of this is to answer the most basic fiscal questions for this project. Questions such as

- ✓ How much were spent in total?. *Karron Decl. Ex 10 at 38*

- ✓ Of that what was spent on direct project costs ? *Karron Decl. Ex 10*

- ✓ How much was spent on overhead ? *Karron Decl. Ex 10*

- ✓ How much did Karron earn? *Karron Decl. Ex Group 22 Ex 109 et seq*, Compare *Karron Decl. Ex 36, GX 50, Trial Transcript Page 803 Line 19*

- ✓ How much did Karron co-fund? *Dunlevy Decl. Ex BAC 301*

- ✓ What happened to the withholding taxes from the grant payroll? *Karron Decl. Ex 124,125,126,127*


These questions were never unambiguously and authoritatively answered previously. *Karron Decl. Ex  60*. The criminal trial court had great difficulty even determining how much was lost, and even that is severely flawed[2] *Sentencing Transcript Page 3 Line 9 et seq. .*

---

[1] Ground truth is a term used in cartography, the military, meteorology, and analysis of aerial photographs, satellite imagery, and a range of other remote sensing techniques in which data are gathered at a distance.  Ground truth refers to information that is collected "on location". More specifically, ground truth may refer to a process in which a pixel on a satellite image is compared to what is there in reality in order to verify the contents of the pixel on the image.  This imaging terminology is finding wider use in the military and even in accounting for data that is accepted as true and used to calibrate other, derived, inferred, or composite measures of reality.

[2] THE COURT: It seems to me this [GX114] is just a rough calculation and not something that a Court could rely on in a criminal case.  I'll hear from you. That's my assessment of that proof. *Sentencing Transcript Page 5 Lines 4-6.*

These questions are material and important because it shows how the Defendant funded the non-federal portion of this project, and shows that federal funds were not used to pay for nominally disallowed, unallowable, or unallocable costs despite allegations by the Plaintiff of fraudulent funding of indirect and overhead costs.

Because these key facts were not established in the previous trial, they cannot be precluded by *res judicata* in this follow on civil attack.

# Contents

1.   INTRODUCTION ............................................................................................... 1

  a)   forensic reconstruction ......................................................................... 2

2.   SPECIFIC REFUTATIONS by PARAGRAPH NUMBERS ............................... 7

  A. Background ................................................................................................ 7

1)   In June 2008, defendant Daniel B. Karron ("Karron") was convicted after a jury trial on charges of misapplying funds in the care, custody and control of Computer Aided Surgery, Inc. ("CASI"), in violation of Title 18 U.S.C. § 666. See Trial Tr.1 at 1379:15-25; see also Amended Judgment, United States v. Karron, No. 07-CR-541 (RPP) (S.D.N.Y. Oct. 31, 2008) at 1-2 (the "Amended Judgment"). .............................................. 7

2)   Karron was sentenced, *inter alia*, to a fifteen-month custodial sentence and $120,000 in restitution. See Amended Judgment, United States v. Karron, No. 07-CR-541 (RPP) (S.D.N.Y. Oct. 31, 2008) at 1-2. .................................................................................... 8

3)   Karron was CASI's President and Chief Technical Officer. See Trial Tr. 107:9-10. ....... 8

4)   From October 1, 2001 through September 30, 2002, Elisha Gurfein served as CASI's Business Manager. See Trial Tr. 628:6-11. ............................................................. 9

  B. The ATP Proposal .................................................................................... 9

5)   On or about July 6, 2001 and August 6, 2001, Karron submitted a two-part Advanced Technology Program ("ATP") proposal to the United States Department of Commerce's National Institute of Standards and Technology ("NIST") on behalf of CASI entitled "Anatomic Computer Modeling for Precise and Accurate Therapies" (together, the "Proposal"). See GX 10; GX 10A. .................................................................................. 9

6)   Karron signed the Proposal as CASI's "Authorized Company Representative." See GX 10; GX 10A. ............................................................................................................. 11

7)   According to the Proposal, CASI would ....................................................... 11

8)   The Proposal included an estimated three-year budget prepared by Karron (the "Budget"). See GX 14. .................................................................................................... 12

9)   The Budget, as later revised, projected CASI's costs for three years as $2,110,500. See id. ....................................................................................................... 12

10)   The Budget, as revised, provided that $2,000,000 of the costs would come from the ATP, specifically, $800,000 in year one and $600,000 in each of years two and three. See id. 13

11)   The Budget specified that CASI would enter into a three-year, $420,000 Sole Source Contract (the "Subcontract") with the City University of New York's Institute for Software Design and Development ("CUNY"). See GX 10 at 3-4. ...................................... 13

12)   Karron included the Subcontract in the Budget because CUNY's faculty, visiting scientists, and PhD graduate students" were "expected [to make a] unique contribution" to the project. Id. at 4. .................................................................................. 14

13)   The Proposal listed fourteen "team members." Id. at 23................................. 14

14)   The Proposal named Professors Wolberg and Cox as "Core Members" along with Karron. Id................................................................................................................. 15

15)   The Proposal noted the potential for the project to yield widespread economic and social benefits, including through the creation of new markets, improvement of medical treatments, and reduction of medical costs, employee sick leave, medical malpractice litigation and insurance costs. See id. at 5-6, 23-26............................................. 15

C. The Cooperative Agreement ...................................................................... 15

16)   In October 2001, the ATP notified Karron that his Proposal had been approved. See GX 11. ............................................................................................... 15

17)   On or about Oct. 5, 2001, Karron signed the Financial Assistance Award, designated as a "cooperative agreement," indicating CASI would comply with various regulations, including 15 C.F.R. Part 14 and 48 C.F.R. Part 31, as well as other standard provisions and special conditions. See GX 12.......................................................... 16

18)   The standard provisions upon which the Cooperative Agreement was contingent included a requirement that CASI would provide quarterly Financial Status Reports. See GX 2 at § 7(c)(3)(a); Decl.aration of Melinda S. Chukran dated June 18, 2010 (the "Chukran Decl.aration" or "Chukran Decl."), at ¶ 11 & Ex. D............................... 17

19)   CASI (and thus Karron) stood to gain exclusive rights to any intellectual property developed under the Cooperative Agreement, subject to, inter alia, the grant of certain licensing rights to the United States. See GX 2 at § 25(a), (b). ........................ 17

20)   Under the Cooperative Agreement, CASI and Karron would to keep all profits derived from the results of the research conducted with the assistance provided under the Cooperative Agreement. See Sentencing Tr. 52:4-8. ............................................... 17

21)   The Cooperative Agreement required Karron to agree to a cost-share of $30,000 in year one. See GX 13 at § 7. ........................................................................ 18

D. Financial Reporting ................................................................................. 19

22)   During the period October 2001 through July 2003, Karron signed and submitted to ATP certain financial reporting forms to satisfy the requirements of the Cooperative Agreement necessary to release ATP funds to CASI. See Chukran Decl. Exs. B, C, D. Each of these forms required the signatory, designated as the recipient's "Authorized Certifying Official," to certify compliance with the terms of the Cooperative Agreement. See id. ¶¶ 2, 4, 8, 12, 13 & Exs. B, C, D........................................... 19

23)   Karron informed the National Institute of Standards and Technology ("NIST") that only Karron had authority to sign documents on CASI's behalf. See Trial Tr. 639:7-640:1; see also GX 21 ....................................................................................... 21

24)   During the period October 2001 through July 2003, Karron signed as CASI's "Authorized Certifying Official" on at least twenty financial reporting forms and caused them to be submitted to the ATP to obtain release of government funds. See Chukran Exs. B, C, D.      21

25)   Karron directed Gurfein to create financial reports that were false because they did not reflect actual expenditures, and Karron signed these reports for submission to the ATP. See Trial Tr. 663:17-664:14; 683:21-684:10; 696:9-19............................................. 24

E. Karron's Noncompliance and Misapplication of Funds........................................... 25

26)   On June 27, 2003, the ATP suspended the Cooperative Agreement after a limited scope audit confirmed that Karron had failed to comply with the cost share and had drawn down more than $200,000 above the amount authorized. See GX 26; GX 62 at 10 (page i, "Executive Summary"). .......................................................................................... 25

27)   From October 5, 2001 through June 27, 2003, Karron had drawn down the entire $800,000 available from the ATP during the first year and $545,000 of the $600,000 amount available during the second year, for total disbursements of $1,345,500. See GX 62 at 12 ("Introduction")................................................................................................... 26

28)   Karron diverted $75,000 of the initial $150,000 drawn down from the ATP for payment of personal debts. See Trial Tr. 636:20-638:16...................................................... 27

29)   From October 2001 to June 2003, Karron made $547,426 in expenditures that would later be challenged by Commerce auditors as "either unallowable, unallocable or [in excess of] budget limitations established in the ATP award." GX 62 at 10 (page i, "Executive Summary"). ...................................................................................................... 29

30)   In the first year of the Cooperative Agreement, Karron incurred over $120,000 in unauthorized expenses for non-budgeted categories, including $60,000 in back rent paid by Karron (to himself), $9,832 in fringe benefits, $11,248 in capital improvements to Karron's apartment, $5,019 in cleaning expenses, and $43,592 in other unauthorized categories. See GX 114................................................................................................... 31

**31)   Karron decided, without authorization from the ATP, not to enter into the Subcontract with CUNY and instead to set up CASI's business location in his own apartment and direct CASI to pay him rent.** *See* **Trial Tr. 633:8-635:25.** .................. 32

4.        ADDITIONAL REFUTATIONS....................................................................... 34

GROUND TRUTH QUARTERLY SPENDING BY REVISED SF269A ................. 34

**Cases**

ALLISON ENGINE CO. v. UNITED STATES ex rel.SANDERS (No. 07-214)  471 F. 3d 610 ... 22

Amended Judgment, United States v. Karron, No. 07-CR-541 (RPP) (S.D.N.Y. Oct. 31, 2008).. 8

Chateau Chambrey Homeowners Association v. Associated International Ins. Co. (2001) 90 Cal.App.4th 335, 108 Cal.Rptr.2d 776, ................................................................... 30

Opsal v. United Services Auto Association (1991) 2 Cal.App.4th 1197, 10 Cal.Rptr.2d 352 ..... 30

United States v Karron, Judgment in a Criminal Case 07CR541-01, 2009 .................................. 9

United States v. Karron  2010 U.S. LEXIS 1056,*;130 S. Ct. 1555;176 L. Ed. 2d 153;78 U.S.L.W. 3482, Daniel B. Karron, Petitioner v. United States. No. 09-8476.SUPREME COURT OF THE UNITED STATES 130 S. Ct. 1555; 176 L. Ed. 2d 153; 2010 U.S. LEXIS 1056; 78 U.S.L.W. 3482 ................................................................................................ 8

United States v. Karron, 348 Fed. Appx. 632, 2009 U.S. App. LEXIS 22026 (2d Cir. N.Y., Oct. 7, 2009) ............................................................................................................................... 8

United States v. Karron, No. 07-CR-541 (RPP) (S.D.N.Y. Oct. 31, 2008) .................................. 8

US v MILLS No.  97-5085 (US Court of Appeals,Sixth Circuit March 31, 1998) ...................... 28

**Statutes**

15 C.F.R § 14.25 ...................................................................................................................... 34

15 CFR Subtitle A (1–1–02 Edition) § 14.25(f) ........................................................................ 32

18 U.S.C. § 666 .......................................................................................................................... 8

## 2. SPECIFIC REFUTATIONS by PARAGRAPH NUMBERS

### A. Background

1) In June 2008, defendant Daniel B. Karron ("Karron") was convicted after a jury trial on charges of misapplying funds in the care, custody and control of Computer Aided Surgery, Inc. ("CASI"), in violation of Title 18 U.S.C. § 666. See Trial Tr.1 at 1379:15-25; see also Amended Judgment, United States v. Karron, No. 07-CR-541 (RPP) (S.D.N.Y. Oct. 31, 2008) at 1-2 (the "Amended Judgment").

This statement is incorrect by imprecision. The conviction was 18 U.S.C. § 666(a)(1)(A), not 18 U.S.C. § 666[3]. The paragraph #1 above does not mean that Karron was found guilty of Bribery, and/or Embezzlement, stealing money, or conversion of money to personal gain. Karron was not found to have obtained federal funds by fraudulent means. United States v. Karron, 348 Fed. Appx. 632, 2009 U.S. App. LEXIS 22026 (2d Cir. N.Y., Oct. 7, 2009), United States v. Karron  2010 U.S. LEXIS 1056,*;130 S. Ct. 1555;176 L. Ed. 2d 153;78 U.S.L.W. 3482, Daniel B. Karron, Petitioner v. United States. No. 09-8476.SUPREME COURT OF THE UNITED STATES 130 S. Ct. 1555; 176 L. Ed. 2d 153; 2010 U.S. LEXIS 1056; 78 U.S.L.W. 3482[4]

2) Karron was sentenced, *inter alia*, to a fifteen-month custodial sentence and $120,000 in restitution. See Amended Judgment, United States v. Karron, No. 07-CR-541 (RPP) (S.D.N.Y. Oct. 31, 2008) at 1-2.

Karron has completed her sentence of 7.5 months incarceration in a minimum security facility without incident and has successfully completed her sentence of 7.5 months home

---

[3] The page of transcript cited does not contain a recitation of the statute of conviction; it contains a reference to" Count One of Indictment S2 07 Crim 541 (RPP)".
[4] On June 11, 2008 the trial jury was charged with finding only 'knowing' misapplication of grant funds without regard to any other elements that constitute a crime (United States v Karron Jury Charge, 2009). The appeals court upheld the judges' decision eliminating Fraudulent Intent. United States v Karron, BRIEF FOR THE UNITED STATES OF AMERICA, (2009) and affirmed the conviction for only knowingly misapplied (United States Attorneys Manual, Online 1997).

confinement without any problems. Karron was paying her restitution of 120,000 at 10% of her

gross salary, and a fine of $100.00. *Inter alia*, all other matters are dismissed United States v

Karron, Judgment in a Criminal Case 07CR541-01, 2009, as amended (07CR541-01, 2008).

Karron is due to be finished with probation in August 2012. This paragraph is moot[5].

3)  <u>Karron was CASI's President and Chief Technical Officer. See Trial Tr. 107:9-10.</u>

Karron started as CASI founder and CTO, and signed documents as President with

brother Abe Karron as secretary. During the period of the grant on August 30, 2002, CASI was

noviated from a corporation to a LLC at the behest of the CASI Board Member Mr. Joel

Bernstein, ESQ with Hayes as CASI CPA in attendance and concurring. Karron signed as Senior

Managing Partner, also with her brother as Co-Signor

4)  <u>From October 1, 2001 through September 30, 2002, Elisha Gurfein served as
CASI's Business Manager. See Trial Tr. 628:6-11.</u>

Gurfein, a former angel investor of CASI who had provided CASI funding in the past,

joined as ATP project manager, responsible for day to day administration, grant budget tracking,

compliance assurance and to secure budget modifications. He worked 60% on the grant and

donated 30% of his time to general CASI activities, which included fund raising and new project

generation.  Gurfein was originally expected to help co-fund the project. Once the funding was

secured and project was launched, Gurfein Decl.ined to provide any equity funding. Without any

equity stake in CASI, Dr. Karron and, Abe Karron and the CASI board decided NOT to give

Gurfein officer status and did not extend signing authority to Gurfein in his employment

contract. This paragraph is moot.

---

[5] a matter is moot if legal proceedings with regard to it can have no effect, or events have placed
it beyond the reach of the law. Thereby the matter has been deprived of practical significance or rendered
purely academic.

## B. The ATP Proposal

5) <u>On or about July 6, 2001 and August 6, 2001, Karron submitted a two-part Advanced Technology Program ("ATP") proposal to the United States Department of Commerce's National Institute of Standards and Technology ("NIST") on behalf of CASI entitled "Anatomic Computer Modeling for Precise and Accurate Therapies" (together, the "Proposal"). See GX 10; GX 10A.</u>

The ATP proposal process consists of a four part process, consisting of four "gates" that must be "passed" or "hurdled" to win a cooperative agreement. *Karron Decl. Exhibit 141, 143.* This is done to reduce amount of information required at any one time by the proposer or the Source Evaluation Board SEB[6]. Required information may be submitted at different stages as competitive determinations are made by the ATP SEB that a proposal has high merit based on well-defined established selection criteria. Proposals must pass sequentially through each gate in order to receive funding appropriation at the conclusion of Gate 4. Proposals are submitted only in response to formal competition announcements and requests for proposals.  As of the 2001 time frame ATP did not set the specific intent and nature of the projects proposed; this is determined by the industry proposer, and was unique for industry grants.

The four "Gates" are as follows:

Gate 1: "Technical Merit" The proposer submits detailed information to address the scientific and technological merit selection criterion. Additionally, the proposer submits preliminary information to address the selection criterion on the potential for broad-based economic benefits. A Budget cover sheet is included in the Proposal Cover Sheet, but a full budget consists of a filled in Exhibit 14 Detailed Budget Worksheet for each year not submitted until Gate II. If the information submitted is determined to have high merit, ATP notifies the

---

[6] The SEB is the technical and business evaluative entity that selects meritorious proposals for ATP and now TIP award. Typically A source evaluation board is a group of appointed or elected officers who, on behalf of a company, non-profit organization or government agency, come together to identify, research and procure vendors to provide the organization with goods and/or services (Etzkowitz & Spivack, 2001).

proposer and requests that the required additional information be submitted for consideration in Gate 2. The Defendant Submitted Gate 1 on July 13, 2001, and passed July 25, 2001 (ATP Gate I Passage, 2001)

Gate 2: "Economic Merit" The proposer submits more detailed information to address the potential for broad-based economic benefits selection criterion and detailed budget data. A copy of Exhibit 14 Detailed Budget is included at this gate. If the information submitted is determined to have high merit, ATP notifies the proposer of its selection as a semi-finalist and the proposal proceeds to Gate 3. The Defendant submitted a Gate 2 proposal and was notified of passage on Aug 15, 2001 with an invitation to the Gate III Oral Review.

Gate 3: "Oral Review" The proposer is requested to submit required forms and additional documentation, as necessary, and may be invited to NIST for an intensive oral review. If ATP determines, based on all the information received, that the proposal has high merit to be funded, the proposal is considered a finalist and proceeds to Gate 4.

Gate 4: "Cooperative Agreement Negotiation" consists of final award processing, proposer vetting, budget negotiation and cooperative agreement issuance, if so selected.

6) Karron signed the Proposal as CASI's "Authorized Company Representative." See GX 10; GX 10A.

The CASI Certificate of Incorporate expressly authorizes Karron as signatory to sign contracts and legally bind corporation (CASI Signing Authority, 1995) as well as limit liability of officers. This paragraph is moot.

7) According to the Proposal, CASI would

> "develop a new computer application server that will take calibrated, encrypted raw images from a client['s] medical imaging instrumentation (MRI, CT, Ultrasound, etc.),

> over the Internet. Our system will rapidly generate
> encrypted, precise, accurate, and variable resolution three
> dimensional tiled models applicable for diverse
> applications as radiation therapy, surgical planning,
> intraoperative guidance, rapid manufacturing of
> prosthesis, verification of surgical results, robotic surgery
> trajectory planning, patient communication, education and
> other customer specific applications[.] The novel idea[]
> that enables this technological leap forward is Digital
> Morse Theory (DMT).

CASI has made significant progress up until the projects abrupt suspension. *Karron Decl.*

*Exhibit Group 3, Scientific and Technical Publications, Exhibit 15-20,Exhibit Group 21,*

*Scientific Merit Post Post Project, Exhibits 100-107* . Progress continued after suspension, with

Karron paying limited payroll out of pocket (*Karron Decl. Exhibit 120, 121*) and colleagues

working *pro bono*. There was never any documented issue with CASI technical competence and

it was making satisfactory technical progress[7]. This paragraph is moot.


8) <u>The Proposal included an estimated three-year budget prepared by Karron (the
"Budget"). See GX 14.</u>

The particular proposal or associated budget is not specified in GX14. Karron and the

CASI staff prepared many 3 year estimated budgets in the proposal kit the for each of the four

Gate proposals submitted. From the above statement is impossible to determine which proposed

budget is being referenced; any one of the proposed budget submitted for Gate I, II, III, or IV.

There is a hand annotation "Revision Budget dated 9/20/01" on GX14. The annotation is not in

Karron's hand and one can only assume this budget corresponds to a budget submitted Gate 3 or

---

[7] Q. And is it a fact that while the CASI perform was
suspended, it seemed to be making technical progress? A.
**Technically it seemed to be making progress, yes.** (Trial
Transcript Lide Cross, 2008). Page 180, Line 18-20

4. In any event; it is obsoleted by subsequent versions (ATP COOPERATIVE AGREEMENT

AMENDMENT #3) attached to subsequent amendments. This paragraph is therefore moot.

9) <u>The Budget, as later revised, projected CASI's costs for three years as $2,110,500.</u>
<u>See id.</u>

The statement is incorrect by its imprecision. The project total cost was estimated by

Karron to be $2,110,400 in the Gate 4 paperwork (GX10). The Total Project Cost was estimated

at one point in the proposal process (GX10 above) as costing a total $2,110,500 with $2,000,000

coming from ATP, and the balance coming from CASI, and indirectly Karron. *Dunlevy Decl.*

*Exhibit BAC-301.* The projected CASI cost was some $110,400, not $2,100,500. *Karron Decl.*

*Exhibit 1..* . The actual real total cost for the partial completed  project were $1,517,239 total,

with NIST ATP supplying $1,345,500(88.68%) and CASI/Karron supplying $171,739 (11.32%)

*Karron Decl. Exhibit 14.*

There were various revisions of the budget approved and in the pipeline for approval. As

the statement does not specify which of the various budgets are referred to by the statement

"later revised" or the last explicitly (as opposed to implicitly) approved revision. *Karron Decl.*

*Exhibit  3-4.*

10) <u>The Budget, as revised, provided that $2,000,000 of the costs would come from the</u>
<u>ATP, specifically, $800,000 in year one and $600,000 in each of years two and</u>
<u>three. See id.</u>

Again, this paragraph is incorrect by lack of precision: which "The Budget, as revised",

being referenced is not explicitly specified in GX14. *Karron Decl. Exhibit 1.*  Which revision?

Also, the costs do not come from ATP, they are not the vendor, the source of cost. ATP is the

funder, the source of funds, who, in partnership with Karron, are the payer of costs.

11) The Budget specified that CASI would enter into a three-year, $420,000 Sole Source Contract (the "Subcontract") with the City University of New York's Institute for Software Design and Development ("CUNY"). See GX 10 at 3-4.

The above statement is incorrect. It is also wrong by imprecision and lack of specification. If "The Budget" referred to is the "Estimated MULTIYEAR budget" summary cover sheet, the line items do not specify any particular subcontractor(s). There is no reference to the duration "three year" required subcontract with CUNY on the proposal cover sheet. "The Budget" consists of an "Estimated MULTI YEAR Budget" summary cover sheet, and three detailed Exhibit 14 Budget Worksheets, which are used to prepare the Estimated MULTIYEAR Budget, annual budgets, one for each year of the three year budget, as called out in the proposal kit.

The subcontract cover page alluded to in paragraph 11 is not part of the budget *per se*, but is part of the proposal proposed subcontracts for the project. It is also not part of the last approved budget, and "The Budget" specified above does not cite as to which budget revision contained the specification, or if it was the last approved negotiated budget. There was no contractual obligation to subcontract, only option clearance or permission to do so[8]. It was not mandated. Therefor this paragraph is moot.

---

[8] Everything which is not forbidden is allowed is a constitutional principle of English law — an essential freedom of the ordinary citizen. The converse principle — everything which is not allowed is forbidden — applies to public authorities, whose actions are limited to the powers explicitly granted to them by law. (Baron Gordon Slynn Slynn of Hadley, 2000)

The jocular saying is that, in England, "everything which is not forbidden is allowed", while, in Germany, the opposite applies so "everything which is not allowed is forbidden". This may be extended to France — "everything is allowed even if it is forbidden" — and Russia where "everything is forbidden, even that which is expressly allowed".

12) <u>Karron included the Subcontract in the Budget because CUNY's faculty, visiting scientists, and PhD graduate students" were "expected [to make a] unique contribution" to the project. Id. at 4.</u>

And so they did. See Decl.aration of Karron Exhibit, and the list of papers that referred to the PhD students who worked on and eventually published under Cox and Karron. *Karron Decl. Background Statements.* However, above paragraph 12 statement is also incorrect by imprecision. The Subcontract proposal cover page is not part of the proposal cover page 'Estimated Three Year Budget'. This reference to 'the Budget' is vague and misleading. The above paragraph is also moot.

13) <u>The Proposal listed fourteen "team members." Id. at 23.</u>

The number is immaterial, and therefor moot: despite the instability caused by the CASI accountant and auditor, the core science team, named below in response to paragraph #14, remained relatively stable, even after the project was suspended.

14) <u>The Proposal named Professors Wolberg and Cox as "Core Members" along with Karron. Id.</u>

They were "Core Members", and they were engaged directly as consultants instead of as chattel of CUNY, with CUNY permission. "The Proposal names", the budget sheet, does not name anyone . See above Items 12, 13, 14, and this paragraph is similarly moot.

15) <u>The Proposal noted the potential for the project to yield widespread economic and social benefits, including through the creation of new markets, improvement of medical treatments, and reduction of medical costs, employee sick leave, medical malpractice litigation and insurance costs. See id. at 5-6, 23-26.</u>

The accepted project proposal cites a possible economic benefit of in the gate II proposal dollars in 5 years.. Since the project was suspended (and not terminated) and continued after suspension, these benefits are still being accrued because of Karron's dogged pursuit of the

project over the years, despite OIG meddling.  This paragraph is still true, and the need for sound

segmentation theory remains a national unmet need, but ATP funded progress reduced the gap,

including this project funding despite the funding.  ATP issued a report on this (Stanley M. ,

2006).

## C. The Cooperative Agreement

16) <u>In October 2001, the ATP notified Karron that his Proposal had been approved.</u>
<u>See GX 11.</u>

More precisely, Karron was notified the project was retroactively approved on October 5,

2001 by e-mail from Marilyn Goldstein, the NIST ATP Grants Officer. Karron has been prior

notified during the vetting process[9] despite Snowden's testimony on ATP policy not to, that it

looked like the project was in the final stages of approval pending completion of the key

personnel vetting process. Based partly on this expectation, Karron made pre-award purchases on

(then) his personal credit card, not paid for with cash until after the first cash advance 'hit the

bank' [10]for payment after the project got underway, as was authorized by law, at his own risk, as

was his right[11] In any event the paragraph is moot.

---

[9] Thursday, October 04, 2001 9:22 AM Dear Dr. Karron, This is in reply to your e-mail
to Hope Snowden last Friday.  I signed the cooperative agreement to your company on Saturday
and the award is being sent today via FEDEX. Congratulations.  We look forward to working
with you.  Marilyn Goldstein NIST Grants Officer. *Karron Decl. Exhibit 4.*

[10] Consider the equivalent situation where a vendor extends CASI credit terms and ships
merchandise for the grant prior to the grant start day, but invoices after the grant date, and the
invoice is paid after the grant date.  It is unreasonable, from a management perspective to sit on
ones hands one day then scramble to launch a project of this scale on the next day all at once.  If
pre-award program activities prior to the award funded period can be shifted if the time period is
small enough that the payment for these pre-award costs are not due until the funded period.  The
payment of these costs is at the risk of the awardee. *OMB Circular and Guidance § 215.25*
*Revision of budget and program plans.*

[11] (e) ...  Federal awarding agencies are authorized, at their option, to waive cost-related
and administrative prior written approvals required by this Circular and OMB Circulars A-21

17) <u>On or about Oct. 5, 2001, Karron signed the Financial Assistance Award,
designated as a "cooperative agreement," indicating CASI would comply with
various regulations, including 15 C.F.R. Part 14 and 48 C.F.R. Part 31, as well as
other standard provisions and special conditions. See GX 12.</u>

Karron observed, in good faith, to the best of the Defendant's abilities, all of the

applicable rules and regulations. Where there were contractual issues, they were reported in the

quarterly Technical and Business reports, and on the table and being actively negotiated. .

18) <u>The standard provisions upon which the Cooperative Agreement was contingent
included a requirement that CASI would provide quarterly Financial Status
Reports. See GX 2 at § 7(c)(3)(a); Decl.aration of Melinda S. Chukran dated June
18, 2010 (the "Chukran Decl.aration" or "Chukran Decl."), at ¶ 11 & Ex. D.</u>

The Cooperative Agreement standard provisions included by citation on the contract

were not a contingency condition on the award.  There were other contingency conditions listed

in the special conditions to the ward.   GX 2 at § 7(c)(3)(a)[12] does not specify a signed SF 269 is

a requirement for payment, cash advance, funding, or other claim, or a *sine qua non* for

continuing with the project. Therefore the above reference to a **contingency** is factually

incorrect.  There was no statement that if the above condition was not met that would abrogate

the cooperative agreement.

---

and A-122. Such waivers may include authorizing recipients to do any one or more of the
following. *OMB Circular and A-21 and A-122.*
    (1) Incur pre-award costs 90 calendar days prior to award or more than 90 calendar days
with the prior approval of the Federal awarding agency. All pre-award costs are incurred at the
recipient's risk (i.e., the Federal awarding agency is under no obligation to reimburse such costs
if for any reason the recipient does not receive an award or if the award is less than anticipated
and inadequate to cover such costs) *§ 215.25.*
    [12] 7. TECHNICAL/BUSINESS/FINANCIAL REPORTS AND PLANS (c).
Financial Reporting: (3) Submission of Financial Reports For ATP Recipients, Article
A.01 of the DoC Financial Assistance Standard Terms and Conditions dated October
1998 is revised as follows: (a) The Recipient shall submit a "Financial Status Report"
(SF-269) on a calendar quarter basis for the periods ending March 31, June 30,
September 30, and December 31, or any portion thereof, unless otherwise specified in a
special award condition. Reports are due no later than 30 days following the end of each
reporting period…

19) <u>CASI (and thus Karron) stood to gain exclusive rights to any intellectual property developed under the Cooperative Agreement, subject to, inter alia, the grant of certain licensing rights to the United States. See GX 2 at § 25(a), (b).</u>

See next item for unified response.

20) <u>Under the Cooperative Agreement, CASI and Karron would to keep all profits derived from the results of the research conducted with the assistance provided under the Cooperative Agreement. See Sentencing Tr. 52:4-8.</u>

Karron was undertaking the unfunded mandate to obtain patents for the work being developed. As shown in the Decl.aration of Dunlevy, Non Program Vendor Balances, CASI paid for (using overhead funding, not ATP funding) the services of Patent Attorneys Pennie & Edmonds, showing CASI was actively engaging in patent protection, as specified by the ATP statute.

21) <u>The Cooperative Agreement required Karron to agree to a cost-share of $30,000 in year one. See GX 13 at § 7.</u>

No one can do arithmetic here. The amount of $30,000 cited above is not precisely correct. The Cooperative Agreement cover sheet, GX12 cited a cost share figure of $36,500.00. The Cooperative Agreement in GX13 further confuses matters:

```
7. COST SHARE
For the first year period, the cost sharing ratio
applicable to this award is the Recipient's contribution of 3.61
% ($30,000.00 and NIST's contribution of 96.39% $800,000.00).
```

Checking the arithmetic, and to guard against OCR reading errors [13] we are forced to assume, with no guidance from the entirety of GX12 and GX13, the base for the percentage contribution must be the sum of the total cash direct cost specified,

$30,000 + $800,000 = $830,000.00.

---

[13] is the numeral in the cost share a '6' or an '8', is it 3.61% or 3.81% ?

This gives a cost share percentage rounded to two significant decimal places of

$30,000 / $830,000=%3.61,

as shown above. This is in contradiction to the recipient cost share shown in GX12 of

$36,500. That also changes the base on which the percentages are calculated, changes the

percentages of contribution implicitly.

This amount, whatever it actually was thought to be, was volunteered by Karron as a

demonstration of Karron's belief in the project: a voluntary partnering with the ATP program.

*Karron Decl. Exhibit 140 ff* The source funding was Karron's' after tax salary CASI earnings

and savings, and credit. *Dunlevy Decl. Exhibit  BAC-301*. It is not a *sine qua non* for funding.

The cost share was proposed by Karron, accepted by ATP, albeit imprecisely.

Ultimately, further Dunlevy (*ibid*) forensic analysis reveals that this cost share requirement was

met despite the best efforts of the Plaintiff to ignore it. The actual real total cost for the partial

completed  project were $1,517,239 total, with NIST ATP supplying $1,345,500(88.68%) and

CASI/Karron supplying $171,739 (11.32%). *Karron Decl. Exhibit 14, Dunlevy Decl.*

### D. Financial Reporting

22) <u>During the period October 2001 through July 2003, Karron signed and submitted
to ATP certain financial reporting forms to satisfy the requirements of the
Cooperative Agreement necessary to release ATP funds to CASI. See Chukran
Decl. Exs. B, C, D. Each of these forms required the signatory, designated as the
recipient's "Authorized Certifying Official," to certify compliance with the terms
of the Cooperative Agreement. See id. ¶¶ 2, 4, 8, 12, 13 & Exs. B, C, D.</u>

The DECL.ARATION OF MELINDA S. CHUKRAN cites three types of Standard

Forms and alleges to provide copies of executed forms as signed by the Defendant. These forms

are

A.  The "Request for Advance or Reimbursement" Form (Form SF -270)

B.  The "Federal Cash Transactions Report" Form (Form SF -272)

C.  The "Financial Status Report" Form (Form SF-269)

Cooperative Agreement #4, Dated July 23, 2002 obviates the requirement for B. SF-272:

*viz:*

> REASON(S) FOR AMENDMENT
> This cooperative agreement is being amended to (1) incorporate a special
> award condition on the "Automated Standard Application for Payments,"
> System; and (2) indicate on the attached, those terms and conditions
> affected by any administrative or statutory requirements.

Page 2, section "f" of Amendment #4 calls out:

```
f. Term # 7.c(3)(b) TO THE ATP General Terms and
Conditions, dated August 2001, is deleted in its
entirety to remove the requirement for a "Federal Cash
Transactions Report" (SF·272).
```

Therefore, the form SF272 and anything the Defendant placed on the SF272 document is

moot, immaterial, deleted in its entirety, and retroactively removed as a requirement.  They don't

count.  Therefore, Exhibit C is effectively moot, removed as a requirement and without any

standing as a possible False Claim, discarded as an interleaved carbon paper between two copies

of a withdrawal slip.

The form SF 269 "Financial Status Report" Form are not the forms attached in Exhibit D.

MELINDA S. CHUKRAN avers:

13. Attached as Exhibit D are true and correct copies of four Financial Status Reports
dated between the inception of the award in October 2001 and the date the award was
suspended in June 2003 and signed by defendant Daniel B. Karron as the Authorized
Certifying Official for Computer Aided Surgery, Inc. ("CASI") for purposes of receiving
the funds under the Cooperative Agreement at issue in this case. *Karron Decl. Exhibit 71.*

Exhibit D does not contain all, or a subset of four, or any of the SF-269 forms submitted by the Defendant for the entire six quarter year time period of the award, "dated between the inception of the award in October 2001 and the date the award was suspended in June 2003". It contains none of them.

What the Defendant infers, as the only reasonable interpretation of what CHUNKRAN meant to Decl.are (but not said) was that Exhibit D contains SF269A forms, also known as "Financial Status Reports (Short Form)" for the first year of the cooperative agreement in the four quarterly reports. But this is not what she said, and not was included in Exhibit D.

MELINDA S. CHUKRAN avers that her DECL.ARATION is true and correct under penalty of perjury pursuant to 28 U.S.C. § 1746, when in fact it is not true and correct in Section C. Section B is moot and void by Amendment 4. This leaves only Section A of MELINDA S. CHUKRAN Declaration to eviscerate below.

> 23) Karron informed the National Institute of Standards and Technology ("NIST") that only Karron had authority to sign documents on CASI's behalf. See Trial Tr. 639:7-640:1; see also GX 21

Karron reserved and is ultimately paid for being a sole point of authority. Fraudulent intent would have been indicated by Karron conniving and convincing others sign for Karron's crimes.

> 24) During the period October 2001 through July 2003, Karron signed as CASI's "Authorized Certifying Official" on at least twenty financial reporting forms and caused them to be submitted to the ATP to obtain release of government funds. See Chukran Exs. B, C, D.

The Plaintiff can't count to 'at least twenty'. The Chukran Exhibits are mislabeled as to their true contents. The proposal cover sheet, which is repeated for each one of the four gates, and the cooperative agreement, was also not a material 'claim' in the ALLISON ENGINE CO. v.

UNITED STATES ex rel.SANDERS (No. 07-214)  471 F. 3d 610, (vacated and remanded).

sense of the word.  But the Defendant can't count as well.  The Plaintiff did not know what she

was doing when she filled in these forms.  This is evident by all of the hologram (handwritten)

redaction on the forms.  These are not Karron's hand (the handwriting is too legible) It took until

Amendment 2 for ATP to correct cofounding arithmetic errors in the budget in response to CASI

concerns about the inconsistency in totals and cost shares[14]. Some of the documents are copies

under two different names (long form and short form); others are multiple revisions of the same

form.

In any event, the funds being reported were not used fraudulently and were used to pay

payroll and direct invoices to have more than justified the release of funds for the uses in the

project.  A financial 'ground truth' section, with revised known true and good Financial

Quarterly Forms are appended, along with a comparison with the forms as submitted. The

differences are 'close enough for government work[15]' and less than the statutory bounds required

to trigger a possibly valid fraudulent False Claim.

Here is the inventory of unique original signed documents the Plaintiff alleges contain the

Defendant's signature.


NIST 1262 Proposal Cover Sheets
I.    GX 10 Dated July 6 2001 (on Page 2). Cites recipient (CASI) co-funding of $30,000
II.   GX 10A Dated Aug 6 (on Page 2). ). Cites recipient (CASI) co-funding of $30,000

---

[14] REASON(S) FOR AMENDMENT [#2]: This cooperative agreement is being amended to (1) revise administrative contact's name; (2) **correct** total estimated cost for budgeted year; (3) approve and incorporated revised budget dated 12/27/01; (4) remove Special Award Condition #9; and (5) and indicate on the attached those terms and conditions that affected by these actions. Karron Affidavit Exhibit DBK 02not in evidence previously.

[15] From the (wiktionary, 2010).The phrase originated in World War II. When something was "good enough for Government work" it meant it could pass the most rigorous of standards. Over the years it took on an ironic meaning that is now the primary sense, referring to poorly executed work. (idiomatic, humorous, disparaging, slang) It is not worth investing additional time on perfecting this thing.

CD 451 Cooperative Agreement.

III.    GX 12, Signed October 5, 2001. Cites recipient (CASI) co-funding of $36,500

SF269A Financial Status Form, Short Form

(copy 1)GX 41A, (copy 2) Chukran Dec 1, Signed Jan 31, 2002 for Q4 2001

(copy 1)GX 42A,(copy 2) Chukran Dec 2, Signed April 21, 2002 for Q1 2002

(copy 1)GX 43 A,(copy 2) Chukran Dec 3, Signed July 12, 2002 for Q2 2002

(copy 1)GX 44A, (copy 2) Chukran Dec 4, Signed October 28, 2002 Q3 2002

The SF269 and SF269A both incorporate a signature block that[16] contains this text:

I certify to the best of my knowledge and belief that this report is correct and complete and that all outlays and unliquidated obligations are for the purposes set forth in the award documents.

SF269 Financial Status Form, Long Form

1. GX 40, GX40A Signed  Jan 10, 2002 and Aug 13, 2003 (post suspension revision, initialed on behalf of Dr. Karron by unspecified CASI staff)
2. GX 41, GX41A Signed  Jan 10, 2002 and Aug 13, 2003 (post suspension revision, initialed on behalf of Dr. Karron by unspecified CASI staff)
3. GX 42, GX42A Signed  Jan 10, 2002 and Aug 13, 2003 (post suspension revision, initialed on behalf of Dr. Karron by unspecified CASI staff)
4. GX 43, GX43A Signed  Jan 10, 2002 and Aug 13, 2003 (post suspension revision, initialed on behalf of Dr. Karron by unspecified CASI staff)

SF270 Request for Reimbursement or Advance, by Signature date, Month Funded, Advance Amount (Chukran Section A, from above)

5. October 19, 2001, November, $175,000
6. November 20, 2001
7. December 19, 2001
8. January 11, 2002
9. February 11, 2002
10. March 11, 2002
11. April 4, 2002
12. May 13, 2002
13. June 14, 2002

The SF 270 form has a signature block that[17] contains this text:

---

[16] exactly, not "or a substantially similar"
[17] exactly, not "or a substantially similar"

```
I certify that to the 'best of my knowledge and belief the
data on the reverse are correct and that all outlays were
made in accordance with the grant conditions or other
agreements and that payment is due and has not been
previously requested
```

The assertions as signed are not false. The use of the money was as promised.

Finally, an examination of the very first SF270 request for a cash advance signed October 19, 2001, for the month of November (and by assumption, also covers the first project month of October) for $150,000, does not make a retrospective statement of any spending, correct, incorrect, truthful or fraudulent. It is a pure prospective estimate of first month's spending, with no recapitulation of any prior spending. It is not a claim for payment, it is a request for cash advance, and as we show, was used for salary used for startup costs, computer hardware, bootstrap costs in and out of the budget (by paying the PI).

**None of these financial reports were knowingly false or fraudulent, or even that wrong. See Table 1, Quarterly Spending Analysis.**

25) <u>Karron directed Gurfein to create financial reports that were false because they did not reflect actual expenditures, and Karron signed these reports for submission to the ATP. See Trial Tr. 663:17-664:14; 683:21-684:10; 696:9-19.</u>

Nowhere does the government give what it believe are the true values for the financial reports. This statement is contradictory; how could Gurfein or Karron know they are false if until correct figures are known. Further, if Karron had fraudulent intent, Karron would he have connived and manipulated Gurfein into signing them, instead of taking culpable responsibility for allegedly false documentation ?

Karron signed statement prepared by Gurfein but he generated these statements out of Quick Books. Karron never had any reason to believe that they were to be made false, or could be too far from the ground truth. Gurfein used the data on hand at the time, or estimated as a

percentage from the government's share of the total funding. The error underestimated Karron's cofounding to Karron's detriment and the Governments advantage relative to what we know now from *Dunlevy Decl. Exhibits*.

## E. Karron's Noncompliance and Misapplication of Funds

26) <u>On June 27, 2003, the ATP suspended the Cooperative Agreement after a limited scope audit confirmed that Karron had failed to comply with the cost share and had drawn down more than $200,000 above the amount authorized. See GX 26; GX 62 at 10 (page i, "Executive Summary").</u>

This statement is incorrect.  The July 3 Flash report only indicated problem with the payment of the cost share of some $56,000 [18]. But this was not the only problem, as the OIG Special Agents were already on the scene, unbeknownst to the Defendant and made any resolution impossible[19].  A later draft report dated July 25, 2003 issued cited a figure of $205,126 in report ATL-16095-3-001, appendix II of GX62 page 3 of 6. See *Dunlevy Declaration on cost share and cash tracing.*

---

[18] MR. RUBINSTEIN : Q Were these reports, the revised financial statement reports, submitted after you received the first report from Riley, I think they called it a flash audit report? Had you received that?
A.[BENEDICT] I don't recall the exact date of that report, no, sir, but I know that these reports were prepared in the middle of July. I don't recall the date of the flash review.
Q. Well, did you receive it -- do you know if you received a flash review as soon as it was submitted?
A. I don't know.
Q. Would July 3, 2003 refresh your recollection of the date of the flash report?
A. No, sir, it doesn't.
Trial Transcript Page 1045-1046 Line 22 *et seq.*
[19] MR. RUBINSTEIN: Q. You told us that they're the ones[NIST ATP] that should have the final say-so of what's allowable and what's not allowable in a grant, right?
RILEY : A. Correct.
Q. And what happened here is that the special agents jumped in on this back in 2003, right?
MR. KWOK: Objection.
THE COURT: Objection sustained.
Q. And they made this from a civil matter into a criminal matter, correct?
MR. KWOK: Objection. Objection.
THE COURT: Objection sustained.
Q. Well, is the audit resolution a civil procedure?
A. It's just a procedure.
Q. Yeah, where you sit down with the grant officers and discuss whether or not certain expenses are allowed or allowable or not?
A. Correct.

27) From October 5, 2001 through June 27, 2003, Karron had drawn down the entire $800,000 available from the ATP during the first year and $545,000 of the $600,000 amount available during the second year, for total disbursements of $1,345,500. See GX 62 at 12 ("Introduction").

This statement is incorrect. The plaintiff's addition is incorrect.

$800,000 + $545,000 \neq $1,345,**500**.

The correct sum is

$800,000 + $545,000 = $1,345,**000** .

---

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Institute of Standards and Technology**
Gaithersburg , Maryland 20899-
November 05, 2007
Mr. Peter Ross
Computer Aided Surgery, Inc.
300 East 33rd Street, Suite 4N
New York, New York 10016
RE: NIST Cooperative Agreement No.: 70NANB1H3050
Dear Mr. Ross:
The above referenced cooperative agreement ended on September 30, 2004 with a balance in the grant account totaling $54,500. We want to be sure our records agree with yours before we proceed to deobligate these funds.
If there were additional claims made against the account please so indicate and we will proceed to deobligate the remaining balance and finalize the closeout of this project.
...
Sincerely Yours, James Browning, Grants Specialist

**Figure 1 NIST ATP Browning Letter**

---

Q. That never happened here, right?
A. Sorry. What?
Q. It never happened here?
THE COURT: He says that never happened.
THE WITNESS: **Correct.**
THE COURT: You never sat down with him? [The Defendant]
THE WITNESS: Oh --
MR. RUBINSTEIN: Is my ten minutes up, Judge?
THE COURT: What?
MR. RUBINSTEIN: I retire. I'm finished.
Trial Transcript Page 810 - 811 Line 16 *et seq.*

The correct total NIST ATP disbursement as reviewed by Mr. James Browning Figure 1 NIST ATP Browning Letter, who observed the unliquidated balance in the CASI ATP 70NANBIH3050 project balance of $54,500

Working backward from $54,500 against a year 2 appropriation of $600,000 we can solve for a second year ATP NIST grant disbursement of

$600,000 - $54,500 = $545,500, or a two year disbursement of $1,345,500

But this error was not made here by the Plaintiff; the error is propagated from the U.S. Department of Commerce Office of Inspector General August 2004 Report ATL-16095-4-0002, GX 62 at both on page 10 and 12. [20]

The drawdowns were to pay ATP direct cost invoices. Table 1 summarizes quarterly spending,  Leaving a balance of $54,500. still payable for reimbursement by ATP after all these years.

28) Karron diverted $75,000 of the initial $150,000 drawn down from the ATP for payment of personal debts. See Trial Tr. 636:20-638:16.

The sum was not diverted; it was *bona fide*[21] Salary, advanced with tacit permission from ATP in the pipeline for approval.  As such, the above referenced $75,000 sum is not a candidate transaction for the successor FCA 'same transaction' if it passed the BEA *bona fide* test.

---

[20] The OIG auditors can't add, but love to subtract.

[21] A second restriction on the reach of 18 U.S.C. §666 is also built into the statute.  Pursuant to the provisions of 18 U.S.C. §666(c), [Bribery, Embezzlement Act, BEA] "[t]his section does not apply to *bona fide* salary, wages, fees, or other compensation paid, or *expenses paid or reimbursed*, in the usual course of business. It is the application of the subsection (c) exception …[on which this appeal is predicated]

Because the *bona fide* salary exception of subsection (c) must be read to apply to all of §666, however, the value of the yearly salary of a deputy sheriff's job, if *bona fide*, should not be considered in establishing the $5,000 transactional valuation.   In such a case, the values of the allegedly illegal transactions are not the salaries to be paid to deputy sheriffs for actual performance of necessary governmental duties US v MILLS No.  97-5085 (US Court of Appeals,Sixth Circuit March 31, 1998).

Further, if it passes the BEA *bona fide* test it cannot be cited as a 'knowingly false transaction'.

As we will show below (Item Paragraph #30), there is hard surviving evidence of this

permission.  While Lide[22] and Snowden[23] objected to this early personal advance in their trial

testimony they would not state affirmatively that no budget changes or approvals were required

at that point; as it is all chargeable to the Salary line A on the budget form[24].  As Lide testifies [25]

the ATP management team was extremely available, and Dr. Karron made use of their expertise.

As accepted at the criminal trial by the District Court, that payment was a tax paid salary

advance to bootstrap the project, out of a total gross *bona fide*  salary of in excess of $200,488.

---

[22] MR. RUBINSTEIN: Q. Well, but in the first month if he took down $800,000, at the end of the month he would account that he took $800,000, correct?

LIDE:  A. He would have to account how he spent that $800 in that month.

6 THE COURT: 800,000.

7 THE WITNESS: I'm sorry. Yes, 800,000. My checkbook is a little different.
Trial Transcript Page 164 Lines 1-8

[23] MR. RUBINSTEIN: Q. I mean he could do anything he wants with his $175,000 that he gets paid in the initial year, correct?

A. If he gets a paycheck, just like me and you when we get our paycheck, you can do whatever you want with it ... Trial Transcript Page 381 Lines 15-18

[24]  MR. RUBINSTEIN :Q. It's fair to say that as soon as the money became available, within a month or two months, Dr. Karron could have withdrawn $800,000.

MS. LIDE : A. As long as it was -- well, one must account for the budget month by month.

Q. Well, but in the first month if he took down $800,000, a the end of the month he would account that he took $800,000, correct?

A. He would have to account how he spent that $800 in that month.

THE COURT: 800,000.

THE WITNESS: I'm sorry. Yes, 800,000. ...
Trial Transcript Page 163 *ff* Line 21 *et seq.*

[25] MR. RUBINSTEIN: Q. Now, Ms. Lide, after the kickoff meeting, did you have any  further interactions with the defendant?

MS. LIDE: A. Yes. We had phone calls, visits, e-mails.

THE COURT: You, yourself?

THE WITNESS: Yes, sir.

MR. RUBINSTEIN: Q. Could you describe your interaction with the defendant?

MS. LIDE  A. Certainly. As a member of the project management team, we are always available for consultation, and that can be face-to-face, that can be via e-mail, and that can be phone calls. And in the case of this grant, all three occurred.
Trial Transcript Page 120 *ff* Line 19 *et seq.*

Paid by Salary Advance Loan was that was repaid in full by a combination of payroll deductions, engineered by Hayes.  This partially obscured the loans repayment As the District Court said below "It's denominated salary. It's a table saying salary. I don't care how she got the number"[26] .

> 29) From October 2001 to June 2003, Karron made $547,426 in expenditures that would later be challenged by Commerce auditors as "either unallowable, unallocable or [in excess of] budget limitations established in the ATP award." GX 62 at 10 (page i, "Executive Summary").

The Defendant is entitled to a civil response to the audit challenge by DAO order Karron Decl. Exhibit 162. "Un-" allowable/allocable  are unsupported audit assertions not findings of fact made a the criminal trial.  Even so, the specific language "un-" does not necessary mean false if there is a genuine difference of opinion. Opsal v. United Services Auto Association (1991) 2 Cal.App.4th 1197, 10 Cal.Rptr.2d 352, Chateau Chambrey Homeowners Association v. Associated International Ins. Co. (2001) 90 Cal.App.4th 335, 108 Cal.Rptr.2d 776,  Auditees with adverse audit findings are entitled to administrative[27] and legislated due process[28] subject to

---

[26] Sentencing Transcript Page 7 Line 18 – 19.

[27] MR. RUBNSTEIN: Q. Is it fair to say that you are not the last word on what's allowable and what's not allowable in the OIG's office?

MS. RILEY: OIG AUDITOR: A. During resolution of the audit?

Q. In the whole process that a company can dispute your interpretations, correct?

A. Correct, it goes through a resolution process.

Q. And are you part of that resolution process?

A. Yes.

Q. Do you make the final decision at that resolution process?

A. The grants office makes the final decision.

Q. The grants office?

A. Um-hum.

Q. The grants office of what?

A. NIST ATP.

Q. So they have a right in the final resolution to approve any of these expenses, correct?

various audit resolution directives as amended[29].  CASI discovered it was the target of a criminal

investigation before it was afforded the opportunity for audit resolution process[30]. The purported

spending analysis in GX62 is at odds with the erroneous analysis of spending attempted in

GX114, upon which ultimately the District Court relied upon, for whatever it was worth. Table 1

---

A. Yes, they do.
Trial Transcript Page 732 Lines 1-17
[28] RESPONSIBILITIES IN GRANTS ADMINISTRATION (Department of
Commerce Grants Management Division, 2010)

[29] AUDIT RESOLUTION AND FOLLOW-UP AUDIT RESOLUTION AND
FOLLOW-UP  Order DAO 213-5, *Karron Decl. Exhibit 162*.  the Audit Resolution
process is now taken over by the INSPECTOR GENERAL INSPECTIONS AND
EVALUATIONS and published in the OIG Semiannual Report to Congress.

[30]MR RUBINSTEIN: Q. I am showing you what's been marked as Defendant's
Exhibit I believe 2, 3501-FF?
        DEPUTY COURT CLERK: That's B.
        THE COURT: B as in boy. Ms. Lide, Mr. Rubinstein asked you a moment ago
to read a 24 portion of that e-mail. Can you read the e-mail in its 25 entirety?
        THE COURT: Actually what he read -- he read a portion
        A. Certainly. The date is October 1, 2004. "The Department of Justice has
formally initiated a grand jury investigation regarding the NIST ATP award made to
Computer Aided Surgery In order to ensure that DOJ and the Inspector General's office
are able to complete a thorough and timely investigation, we are requesting that all
NIST" -- "all" is all in caps -- "NIST personnel cease contact with Computer Aided
Surgery (CASI), Dr. Karron and all CASI representatives. Inquiries from those parties
should be directed to myself or SA Kirk Yamatani. Additionally" -- Shall I continue? Q.
Yes.
        A. "Additionally please do not proceed with the audit resolution for CASI. It is
extremely important that a bill not be generated for the funds that  CASI
misappropriated from the award. Please contact me if there are any further concerns or
questions. I look forward to working with all of you over the next few months. Thank
you."
        Q. And who wrote that e-mail?
        A. Rachel A Garrison, special agent.
        THE COURT: For the Department of Commerce?
        THE WITNESS: Sorry. Yes, United States Department of Commerce.
        Q. And do you see Rachel Garrison in this courtroom?
        A. I do.
        Q. Can you point her out?
        A. She is at the front table with a dark suit and a blue blouse under it.
Trial Transcript Page 242-243 Lines 5 *et seq.*

Karron 56.1 Counterstatement Page 31 of 36 Pages total

shows the ground truth analysis of expenditures.  Further, because the spending shift is within

%10 on a base of the combined Federal and Non Federal Share[31], no prior written budget

approval is required.

> 30) <u>In the first year of the Cooperative Agreement, Karron incurred over $120,000 in</u>
>     <u>unauthorized expenses for non-budgeted categories, including $60,000 in back rent</u>
>     <u>paid by Karron (to himself), $9,832 in fringe benefits, $11,248 in capital</u>
>     <u>improvements to Karron's apartment, $5,019 in cleaning expenses, and $43,592 in</u>
>     <u>other unauthorized categories. See GX 114.</u>

GX114 is a perhaps a most remarkable exhibit in this entire matter. It appears to the

ultimate basis of Karron's conviction. There was no other attempted analysis of total year 1 grant

spending brought into evidence by the prosecution at the criminal trial.  The District Court Judge

describes it better than the Defendant could ever say:

> THE COURT: He underspent budget through those fringe benefits by $4,000 it says right
> above it. … Look at that**. This [GX114] is a mess**.  [emphasis added]
> Sentencing Transcript Page 15, Lines 13-16

No analysis of this material was ever presented by either side during the Defendant's

criminal trial except for GX114 for the first project year. It was called back for review by the

Jury in their deliberations[32]. The main problem with GX114 is that does not add up from any

conceivable support or backup. **Because it does not add up, is it 'made up'?**  In two *prima*

---

[31] 15 CFR Subtitle A (1–1–02 Edition) § 14.25(f)
[32] THE COURT: I sent in [GX]114 and [GX]115.
MR. KWOK: I understand, but as I understand it these are the ones that are
actually marked.
THE COURT: Well, I gave what you gave me which had things marked 114 and
115. I don't know whether Mr. Rubinstein consents to this.
MR. RUBINSTEIN: If they have 114 and 115, I don't think they need the blow-
up version.
THE COURT: If we started off that way, I think they would be entitled to it, but
I don't think we ought to send duplicate exhibits in.
*Trial Transcript Page 1377 Lines 6 et seq.*

*facie* instances, it adds the same item class items at least twice, implicitly and explicitly.  The

District Court said of GX114:

> ". It seems to me this is just a rough calculation and not something that a Court could rely on in a criminal case".

Yet it was:  By the Jury.  By the Judge in sentencing.  And it should not have been.  But

the Defense Counsel did not offer anything in its place[33].  It is not even approximately supported

by schedules prepared by OIG Auditor Riley in GX110[34] or her prior audit work papers[35].  "It's

denominated salary. It's a table saying salary. I don't care how she got the number"., in the

District Court Judge's words, "Its ...Salary".  GX114_ includes the rent reclassified as Salary.

> **31)  Karron decided, without authorization from the ATP, not to enter into the Subcontract with CUNY and instead to set up CASI's business location in his own apartment and direct CASI to pay him rent.  *See* Trial Tr. 633:8-635:25.**

No written authorization was required.  While ATP wanted, and got notification, it was

not their province or under their authority.   Karron decided, as was her right as PI, and in

concert with the CUNY faculty and management and with full knowledge of NIST ATP project

management to not contract with CUNY CISDD and instead contract directly with CUNY

faculty Cox and Wolberg. Copies of relevant permission and memos are in *Karron Decl.*

*Exhibits Group 4, Exhibits 21, 25-32*.  Because it was not a change involving moving funds from

one line item category to another, no approval, authorization, or grant amendment was required.

---

[33] Now we do that here by the Dunlevy Declaration Exhibits Section.
[34] MR. RUBINSTEIN: I submit to your Honor, that nobody from that chart[GX114] or from the [GX]110 backup could say how they ever arrived at this number.
*Sentencing Transcript Page 35 Line 20*
[35] THE COURT:  … She has no tabulation putting [Exhibit] 114 into context with her […] Exhibit 110. *Sentencing Transcript Page 6 Line 3*

There was no need to amend the cover sheet of the contract and close out future subcontracting options with CUNY.

*Karron Decl. Exhibit 5* shows that on October 22, 2001, prior to the NIST Kickoff Meeting of November 8th , Jayne Orthwein, the ATP program manager listed these issues that were under discussion in her agenda memo to Gurfein and Karron:

There is no possibility of fraud here; with all relevant issues were on the table as shown above. The substitution of Cox and Wolberg as consultants instead of CUNY CISDD was on the table. Permission was obtained and approved. There is no time specification for the proposed subcontract. It is not even a part of the budget form on the next page. Further, as the award contract Exhibit GX 13, section 8,(below) spells out, CASI had 60 days to "nail down" personnel and consultants/contractors.

8. PERSONNEL AND CONSULTANT REQUIREMENT
The Recipient must provide to the ATP Project Manager in writing within 60 days of project start date, identification of the personnel on the project and the percentage of time including consultants.

Moving personnel from CUNY CISDD contractor to CASI contractor would not necessarily change the line item on the estimated 3 year budget. The change was within the same line item. Snowden, in cross examination, *Trial Transcript Page 350 Line 13*, states:

[SNOWDEN]A. He can move it among budget categories without the approval, within 10 percent, but he must notify; we ask for notification to the federal government.

Prior notification is clearly present; it was an agenda topic from the kickoff meeting (Orthwein, 2001). Snowden is correct about the lack of approval for intra-line budget changes, but misstates the 'within 10 percent' according to the relevant statute, 15 C.F.R § 14.25 (*Karron*

*Decl. Exhibit 160*) below.  Snowden in the Trial Transcript page 351 line 5 – 9 further

confounds the court:

> [SNOWDEN] THE WITNESS: It's not usually done, but the 10 percent rule said he can
> move it.
> THE COURT: Does he need prior approval for that?
> THE WITNESS: No. We ask that we be notified, but he does not need prior approval.

> Moreover, notified they clearly were.  *Karron Decl. Exhibit 25,26,27,28,30,31,21.*

However, the notification does not require a formal written application and response.


## 4.  ADDITIONAL REFUTATIONS

### GROUND TRUTH QUARTERLY SPENDING BY REVISED SF269A

## Table 1 Ground Truth Grant Spending for First Year by Quarter cast in SF269A terminology.

| SF269A Review | | | | | |
|---|---|---|---|---|---|
| Corrected Figures | | Q1 | Q2 | Q3 | Q4 | x sum |
| a | Total Outlays | $ 258,320.00 | $ 190,036.00 | $ 214,071.00 | $ 223,545.00 | $ 885,972.00 |
| b | Recipient Share of Outlays | $ 41,682.00 | $ 1,365.00 | $ 17,053.00 | $ 18,104.00 | $ 78,204.00 |
| c | Federal Share of Outlays | $ 210,000.00 | $ 240,000.00 | $ 140,000.00 | $ 210,000.00 | $ 800,000.00 |
| d | Total Unliquidated Obligations | $ 6,638.00 | $ (51,329.00) | $ 57,018.00 | $ (4,559.00) | $ 7,768.00 |
| | b+c+d | $ 258,320.00 | $ 190,036.00 | $ 214,071.00 | $ 223,545.00 | $ 885,972.00 |
| | Zero Check(b+c+d-a) | $ - | $ - | $ - | $ - | |
| | Original Date Signed | 1/31/2002 | 4/21/2002 | 7/12/2002 | 10/28/2002 | $ 149,660.00 |
| a | Total Outlays | $ 219,573.00 | $ 188,203.00 | $ 208,727.00 | $ 212,977.00 | $ 829,480.00 |
| b | Recipient Share of Outlays | $ 9,573.00 | $ 8,214.00 | $ 8,727.00 | $ 2,979.00 | $ 29,493.00 |
| c | Federal Share of Outlays | $ 210,000.00 | $ 180,000.00 | $ 200,000.00 | $ 210,000.00 | $ 800,000.00 |
| | Over Cofunding | $ 48,320.00 | $ (49,964.00) | $ 74,071.00 | $ 13,545.00 | $ 85,972.00 |

This chart is the culmination of extensive forensic analysis of CASI-ATP spending by

quarter for the first year. *Karron Decl. Exhibit 14,15,16,17,19* contains these figures in restated

SF269A Short Forms.  The co-funding exceeded the spending except for Q2. The overall co-

funding exceeded the ATP funding by the end of Year 1 by 85,972, well in excess of the required

year 1 co funding requirement called out in the budget of %4.57, or $30,500.  The original

SF269A were not accurate, but the error was not to the harm of ATP, but understated CASI

cofounding by $48,711.00.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------
UNITED STATES OF AMERICA,

Plaintiff,

- v. –                                               08 Civ. 10223 (NRB) (DFE)

                                                     AFFIRMATION OF SERVICE

DANIEL B. KARRON,

 Defendant.
-------------------------------------------------------------
I, Deborah Anne Dunlevy, declare under penalty of perjury that I have served a
copy of the attached

   1. MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
     MOTION FOR SUMMARY JUDGEMENT
   2. OPPOSING 56.1 STATEMENT OF MATERIAL FACTS
   3. Declaration of Deborah Anne Dunlevy
   4. Declaration of D B Karron

upon

Michael J. Byars,  Assistant United States Attorney,

whose address is

86 Chambers Street, 3rd Floor

New York, New York 10007

By  Hand on this day

       8/23/10

Dated: New York, NY

Signed
Deborah Anne Dunlevy    8/23/10
31-18 Broadway, 2R
Long Island City, NY 11106

1