UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff,

08 Civ. 10223 (NRB) (DFE)

- v. –

DECLARATION OF ERIC A. EISEN,
ESQ. IN RE OPPOSITION TO
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

DANIEL B. KARRON,

Defendant.

-----------------------------------------------------------------

     I, ERIC A. EISEN, ESQ, pursuant to 28 U.S.C. § 1746, declare under the penalty of perjury as follows:

1.     My name is Eric A. Eisen. I am a principal of the law firm of Eisen & Shapiro, which is located at 10028 Woodhill Road, Bethesda, Maryland 20817.

2.     I am admitted to practice law in the District of Columbia and Maryland. I am also admitted to practice in several United States District Courts, Courts of Appeal, and the United States Supreme Court.

3.     Dr. Daniel Karron is an acquaintance of a friend of mine from childhood. I first met him shortly before his criminal trial and was asked to provide him help.

4.     Dr. Karron had no funds to my knowledge and the last time I had been involved in any criminal matter was over thirty years ago. Based on this I was unable to provide him assistance.

5.     Recently Dr. Karron asked me to review for accuracy a transcript he had prepared from a video of what he told me was a presentation made by a government agency and to certify the accuracy of excerpts he had transcribed from that video.

6.     As a pro bono action and a service to the court and the administration of justice, I agreed to review the transcript, correct it, and certify the accuracy of the corrected transcript.

7,     I was presented with a video and transcript excerpts. For each excerpt, I located the corresponding time in the video, listened to the speakers, and corrected the transcript so that it was as accurate as possible. I did not select the excerpts to be transcribed and I did not listen to

what was said before and after the excerpts, focusing only on the accuracy of what was transcribed.

8.      Because I did not know the names of the speakers, I omitted names, which Dr. Karron had sometimes placed in his draft. Where more than one person on the podium responded to a question, I reflected the multiple responses by putting more than one answer to a question in the order in which the answers were given.

9.      The attached transcript is the result of that effort. It contains a total of 11 excerpts, each identified by the time reported on the video of when the excerpt begins. The identifiers, preceded by Dr. Karron's exhibit numbers, are:

| | |
|---|---|
| 115. | 1:54:00 |
| 116. | 2:02:45 |
| 117. | 2:37:33 |
| 118. | 2:42:26 |
| 119. | 2:45:35 |
| 120. | 21:51:30 |
| 121. | 2:58:30 |
| 122. | 2:59:30 |
| 123. | 3:03:15 |
| 124. | 2:28:27 |
| 125. | 2:31:14 |

I certify that the attached transcription is accurate and complete as to the material it contains, with no elisions (except immaterial stuttering and the like such as are typically removed from transcripts) in the text produced.

SO SWORN:_____                    August 30, 2009
             Eric A. Eisen
             Eisen & Shapiro
             10028 Woodhill Rd.
             Bethesda MD 20817
             301-469-8590

**BEGINNING OF EXCERPTS**

**1:54:00**

A:      Well, now you're all experts in ATP, hopefully.

We are going to conclude with a few remarks. I'll ask my colleagues to approach the table

for the Q and A section.  Just to repeat a few comments the competition is currently open,

we've announced on April 4, we are accepting proposals, again, in all technology areas,

but we're also interested in receiving proposals in the 4 cross cutting areas of national

interest, described earlier.  Again, Let me repeat, that deadline at 3pm on May 21, is

exact; no exceptions.

[…]

**2:02:45**

Q:      I have two quick questions.

First question is that if you're a single company, and I understand that the limit of the budget is 2 million dollars for three years, does that include the cost sharing that can be up to 30 percent. So...

A:      The Federal share is limited to 2 million dollars.

Q:      So that if you submit 2 million you can..., that doesn't count the cost sharing; you can add to that.  Right? So the total budget is more than 2 million.

A:      That's correct.

Q:      Thank you.

Second Question. Is that you didn't mention about the fringe benefit could be looked at as direct for those companies  in which that  is normally counted as direct and not included for those companies that doesn't included include that. Is that in the regulations in the kit?

A:      Well we stipulate in the budget that you can charge fringe benefits as a direct cost. However if your company normally charges them as an indirect,  you have to leave them as an indirect and if you're a single company you will have to absorb those costs.  And when your project is audited, the auditors will be looking to insure that you've charged the cost in the appropriate category.

Q:      I see because that's a huge difference in the application. But anyway... it's in the kit that's stated. Thank you.

[…]

-2-

**2:28:27**

Q:      My question has to do with how broad your definition is of 'technology'. Our company
        works in medical informatics developing classification schemes, thesauri, mapping
        strategies, and then we subcontract out a lot of the computer work.  Would our work
        qualify for an ATP proposal?

A:      It can.  We've actually funded a fair amount of in medical informatics.  If you go to our
        web site and look under the funded projects you might see some examples.  Basically you
        need to make it very clear to as to what..., where is the high technical risk and who is
        working on those high technical risk tasks so that it doesn't look like it is an entire pass
        through to the subcontractor for all the high technical risk issues.  But you need to make
        the business case and the technical case as to why this is the best way to put a project
        together.
        Ok so it is possible, but I think you have to make the case as to what is the technical risk .
        And what innovation approach do you have to overcoming those barriers.

Q:      And who is assuming the technical risk, primary application and not the subcontractor?

A:      Well, I think we like to see that it's not all in one place and not in the other. I think that
        we do get a little bit concerned if all the high-risk tasks are in the subcontractor and not in
        the primary awardee.  But to be honest, you have to explain why that may be the only way
        to do this project. You know it really depends on your rationale based on how companies
        are structured in your business sector and how they construct their businesses, that might
        be the only way anybody could do it. You need to explain that to us as to why this
        approach is the best technical way to address the risks and innovation.
        And I would encourage you to call one of our information technology folks; is there
        anyone in the room that could raise their hand that would love to chat with this guy later?
        Well, call Barbara Cuthill... and Ammet. Ammet is in the back there. So there will be

-3-

some folks who can talk to you about that.

Case 1:08-cv-10223-NRB   Filed 05/02/11   Page 6 of 18

**2:37:33**

Q:      I have a two part question.

Part 1. If a small company is subcontracting with a university does the company have to cost share other than indirect costs?

A:      The University or any subcontractors are allowed to charge indirect costs. It's the prime recipient that is submitting the proposal as a single company that is not allowed to charge indirect costs.

Q:      Does the small company have to do cost sharing other than the indirect costs?

A:      No. No they do not.

[…]

**2:42:26**

Q:      With a startup company, we are generally pretty lucky if we can accurately forecast what's going to happen in 96 hours in the future… if a…a  sort of a two part question.., How detailed does the planning have to be, if we reach a decision point,  and we go A-B, or is it A-B-C and then second point is, How flexible is the funding if we end up pursuing some route that we didn't even envision to begin with.


A:       OK, basically I would have to say on average, most decisions points in the technical plans, we rarely see people with more than two or three alternative directions. We are looking for where do you think are the highest priority things to go after that are also still consistent with our criteria of high risk and innovation

OK, so. basically what you can't do, or hope to do is, is 'OK we'll get to this decision point, and  if it looks like we can't do A, which is the highest risk thing, we'll go right to B, which is product development,' because we'll say, 'Ah no you won't,' because we can't fund  product development.

OK, so basically your alternatives that you might be considering in a decision point have to also be meritorious against the scientific and technological criteria.

Sometimes, though, things happen along the way, in a high-risk research project where you say 'You know ...' or something may have happened out in the community, that a new discovery that makes you want to rethink a particular direction or part of your proposal. If you ever want to make a recommendation for a major technical scope change, depending on how major it is, sometimes companies have requested to suspend the project in order to stop the clock because we don't want your three years to run out while it gets evaluated and then they would send us in a 'This is how we would like to change the technical scope.  Depending on how big of a change it is -it could be something that the technical and business project managers can evaluate and decide 'yes' or 'no'- they may decide they want additional peer review from federal technical folks to see if it still makes sense. And in a few cases, though it has happened rarely in ATP's history, sometimes

-6-

we've had a oral review for that particular company on their major technical scope change to see if the SEB would have -if the Source Evaluation Board- would have selected it had it been submitted that way.

Because we want to see that whatever change that you propose is of equivalent or higher merit to the original proposal.  So it depends on the scope change -how big it is, how much of a change- but we can accommodate those things, but sometimes it can take a suspension of the award in order to stop the time period and give us time to evaluate it. It's not a negative against you to suspend an award for that because it just stops the clock so you don't lose any of your time.

**2:45:35**

A:     [STANLEY] I would take one more crack at that.  One of the things I pride myself on in
this program and with my colleagues is that:

We try not to be too bureaucratic.

We are very supportive of the companies that win awards from us, and you actually have
a management team that we assign, as Linda Beth has described.

So to the degree it maintains the true fidelity of the original proposal, in terms of the
innovation and the risk, we recognize that, we're not going to give up on you if you can
present appropriate evidence.  It may have to go through various quick reviews, to make
sure that you're not creating a whole new opportunity that we didn't hear of, because that
would be unfair for people who have already gone through the process.

But it's not unusual for us to go through that process. It's not unique, and to the extent
possible we all are in agreement that this would add strength to it, it's in line with general
fidelity with the original proposal we certainly will do all we can with you giving us
appropriate information to continue that project along.  Because we have obviously
determined that it has great value to our country.

And as for your future look in terms of the business plans things of that sort, we also
understand, we don't expect you to be a gipsy ball reader either.  So you have to indicate
to us against the criteria, why and where, and what the commercial pathway is, but we
have our own ways of reviewing that and we have ways of clarifying that with you before
we make that award.  But, we understand some of the things, nobody knows yet.  But you
should be able to nail some of those things because you know one of the real problems,
and I've talked to a lot of VC is…  well, is, inventors are wonderful people, particularly
in the United States.  Entrepreneurs are just wonderful to talk to. But there is a disconnect
sometimes between clearly what the technology is going to be and how you are going to
penetrate the market .  The nuance in this program is we don't support basic science.
There's lots of federal programs that do that .  What we are interested in is capturing that
innovation, defining the risk and the feasibility and the commercialization plan and

-8-

having it getting to the market here, before anyplace else in the world, so we maintain increased US competitiveness and jobs etc.  So, that's the gap we play in, and that's what you have to address in that proposal . You can ask very serious hundred thousand foot questions before you submit the proposal. If you don't completely understand what we have talked about today we welcome those opportunities to talk to you .  The difference here is we can't write the proposal for you.  But you can always ask for points of clarification.  And you'll find many people, including  the people I've got out in the employees lounge for those who are not staying here, that can highlight on some if the things we've talked about right now.

**2:51:33**

Q:      Yes please.  Our product consists of three components.

One of them is the high risk - technically high risk- component, the other two are there is some risk, but not the same degree. So the first component is necessary [garbled] but not sufficient.  I was wondering if, as part of the project, obviously that would be part of the project, would the development of the other two components, and more importantly, the integration of the all three components be fair game for the tasks of the project?

A:      Absolutely.

Q:      On both questions?

A:      Yes.

It's very common for us to see...,  that's one reason that a lot of companies do come to ATP, we are looking for the whole risk profile. But we're also looking for projects that where we define risk as not just the point risk but it's also if there's risk associated with that integration where it can fail,  that's an element of risk that, you know, for example, maybe your components aren't that compatible with each other right now.  Why is that? Why do you hope you can make them compatible  So I think that we look at risk as not just by-component; We are looking at the whole profile of risk , of the whole project.  So, there are often lower risk aspects of a project and higher risk aspects of a project.  We want you to identify for us in each task where you think all the risks are, y'know high, medium, and low, something to that regard, because then we can evaluate the profile of the whole project.

**2:58:30**

Q:     [Unidentified Questioner 3] Yes sir, this is a cost-share question

Would you clarify the use of fringe benefits being part of or not part of your overhead rate.

I don't have my DCAA disclosure in front of me, here but  I know that we typically will refer to fringes as part of our overhead but I also know that they are broken out as a separate line item in our disclosure. So how does that work?

A:     It depends on how your..., you said you have a DCA ?

Q:     Yes.

A:     It depends on how they established it. If it is part of your indirect cost pool, you must charge it as an  indirect cost and cannot charge it as a direct. We do allow it as a direct, because we do have a lot of small businesses, a lot of startups, who don't have big accounting  systems and they are able to charge it as a direct expense.

Q:     Thank you.

A:     You're welcome. Strange new face.

**2:59:30**

Q:     I'll try to ask yet again another new question this time.

A:     Go ahead.

Q:     About past performance:  The kit does not specify past performance as part of the evaluation criteria, either past performance with the NIST ATP or with other similar externally funded programs . So I'm wondering, is there in some subtle way, past performance factored into evaluations?

A:     Well, in terms of evaluating your qualifications and experience I'd say in that context it does,  but to be honest, from a real negative point of view, only if you have been debarred is that going to be a really negative thing overall.  We are really just going to look at your experience based on how it relates to this award and do we think that you have the qualifications to perform the work that you're doing . Past federal awards might not have been in this area, so it really wouldn't be an indicator of whether or not you can perform research in this particular area.  So we're looking for relevant experience and qualifications that relate to this proposal.

Q:     So just as a quick follow up if we do have prior NIST ATP experience but it isn't necessarily relevant to this proposal, there's no need to include that  in the write up. Is that what I'm hearing more or less?

A:     I would say it's only relevant in terms of you know how to manage projects, you're good at managing, talking to your collaborators, and from that perspective if it's not specifically relevant to the R and D area that you're working on on this particular proposal , but you know  we're looking at your business qualifications  as well as your technical, so I think it can relate but having had a past ATP award doesn't necessarily mean you're more

-12-

qualified for this award. OK? But you need to really make the case; what are the qualifications. 'cause sometimes we have had companies that have had more than one ATP award and for example a particular company would come to an oral review and they always would bring a particular scientist who is very eloquent in explaining the science and at one point we had to say 'OK, you've really explained it well but are you gonna really be the PI on this project, or as soon as it starts are you gonna be gone?' Alright? The old Bait and Switch on qualified personnel doesn't go over really well, so sometimes just putting a familiar face on a proposal if your intention is to not really have that person on it for the entire time won't go over very well.  So we are looking for how are..., what are the best resources that you're allocating qualifications to this project.

Q:     Let me do a favor here, in the effort to those who want to stay and talk to Dr. Utag or want to go on and talk to my business people and some who are just, hungry.  I'm going to say the remaining three are the remaining three. But all of us here, up on the table, there's a lot of program managers I see standing up at the back end of the auditorium, we're all going to be sticking around. But I think in order to make sure we cover all the parts we promised I'm going to limit these last three.

       […]

**3:03:15**

Q:      This question [is] about the personnel that can be involved with the project.  Some startups spring out of university research.  [Garbled] To what extent can they wear their hats as company personnel and at the same time retain their university affiliation and not be frowned upon on by NIST?

A:      It depends on the rules of the university. If the university has no restrictions on employees having their own companies or doing work in other companies, and as long as they are employed by that company as well as the university, there is no problem.  But it does depend on the university restrictions.

Q:      Okay. So NIST doesn't have to specify how this going to be arranged?

A:      Correct.

A:      There can't be a conflict of interest between the two relationships so you have to really make sure there is no financial conflict of interest.

Q:       So if its ok with the university, its ok with you?

A:      It's actually addressed in the kit in more detail so we might want to find the page and it gives you the regulation to look at just to make sure there's no conflict of interest.  So, for example if you're the small company and you're the professor and you're gonna come out here and have a company and then you wanna be able to subcontract back to your group that might..., we might ask a few questions cause we want to make sure there's really no conflict of interest, and that might not work out.  Ok so it really depends on what your role is and do you want the university to be part of the project as well as your company .  That's where it could get a little confusing and the kit actually does have some

-14-

information on that to make sure that you avoid those conflicts of interest.  Ok?

A:       There are also codes of conduct standards in the federal regulations that I had up on the

         slides... 14 CFR..., 15 CFR Part 14; you may want to look at those.

**2:31:14**

Q:     I have two questions concerning budgets.

How much budget justification details are required?  Do we have to explain also where

we gonna get the money for indirect for small business.


A:     You don't have to identify the source of your indirect costs unless you're getting  on... on

the 1262 page 3, in the middle portion of the page 3, it identifies the cost-sharing, so most

of the companies do have it within their own company. But if you're getting it from state

funding then you would identify the state.

[…]


**END OF EXCERPTS**

-16-